> **EXHIBIT**
>
> **9**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NHC LLC, a Florida limited liability
company,

        Plaintiff,

v.                                                   No. 19-cv-06332

CENTAUR CONSTRUCTION COMPANY          Honorable Matthew F. Kennelly
INC., an Illinois corporation, SPIRO
TSAPARAS, and PETER ALEXOPOULOS,

        Defendants.

## PLAINTIFF/JUDGMENT CREDITOR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY CITATION RESPONDENTS M DEVELOPMENT, LLC AND M SOURCING, LLC

Daniel P. Jackson, Bar No. 6289813
Bryan K. Clark, Bar No. 6296090
Zachary J. Watters, Bar No. 6310675
Allison E. Czerniak, Bar No. 6319273
Keeley A. Sawyer, Bar No. 6336704
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500
djackson@vedderprice.com
bclark@vedderprice.com
zwatters@vedderprice.com
aczerniak@vedderprice.com
ksawyer@vedderprice.com

Gini S. Marziani, Bar No. 3127421
Davis McGrath LLC
125 S. Wacker Drive
Chicago, Illinois 60606
T: +1 312 332 3033
gsmarziani@davismcgrath.com

Plaintiff/judgment creditor, NHC LLC ("NHC"), by its undersigned counsel, hereby moves to compel production of documents in the possession, custody, or control of third-party citation respondents M Development, LLC ("M Development") and M Sourcing, LLC ("M Sourcing" and collectively with M Development, the "M Entities").  In support hereof, NHC states as follows:

## INTRODUCTION

1.      The issues raised in this Motion follow a familiar and unfortunate pattern.  In an effort to hold Judgment Debtors[1] accountable and collect the judgment it is owed, NHC issued third-party citations to the M Entities.  The M Entities responded consistent with numerous other third-party citation respondents with a close connection to Judgment Debtors – they delayed, obfuscated, and ultimately made partial productions of cherry-picked documents which do not approach a fulsome production.  NHC is mindful of the number of filings in this matter and, as a result, made numerous efforts to resolve this dispute before filing this Motion.  Those efforts were unsuccessful.  Now, in order to obtain documents and information which are exclusively within the possession of the M Entities, NHC is forced to file this Motion.

### RELEVANT FACTS AND PROCEDURAL BACKGROUND

**I.      M Development's Role in the Nobu Hotel Project and Relationship with Centaur**

2.      M Development has been operating since approximately 1997 and is a developer of both residential and commercial properties.[2]  (Ex. 1 at 7:1-17.)  In 2016, M Development become the owner of the Nobu Hotel project in Chicago.  (*Id*. at 7:21-24.)  M Development retained Centaur as the general contractor of the Nobu Hotel project in order to construct the hotel.[3]  (Ex.

---

[1] Collectively, Centaur Construction Company Inc. ("Centaur"), Spiro Tsaparas ("Tsaparas"), and Peter Alexopoulos ("Alexopoulos") are referred to as the "Judgment Debtors."
[2] A true and correct copy of portions of the deposition transcript of Mark Hunt ("Hunt") is attached hereto as **Exhibit 1**.
[3] A true and correct copy of portions of the trial transcript, Volume 3-A, is attached hereto as **Exhibit 2**.

2 at 8:1-14.)  During that time, Centaur was responsible for demolishing the existing building and performing certain subgrade work for the Nobu Hotel.[4]  (Ex. 3 at 19:8-16.)

3.    However, no "above-grade work" took place while M Development owned the project.  (*Id*. at 19:14-16.)  The reason for the stoppage in work was M Development's inability to obtain financing in order to continue construction on the Nobu Hotel project.[5]  (Ex. 4 at 36:14-23.) In December 2017, M Development sold the Nobu Hotel project to NHC and recommended that Centaur remain as the general contractor of the project.  (*Id*. at 35:10-24; Ex. 3 at 18:17-21.)

4.    The Nobu Hotel project was not the first time M Development and Centaur worked together.  Indeed, the relationship between M Development and Centaur was "longstanding" and the two entities had collaborated on more than a dozen projects, in addition to the Nobu Hotel project. (Ex. 1 at 18:21-24; Ex. 2 at 9:5-7.)  The relationship between M Development and Centaur extends beyond the entities to their respective principals, Hunt and Tsaparas.  Hunt and Tsaparas describe themselves as "dear friends" and call each other "brothers."[6]  (Ex. 5 at 70:20-24.)  Hunt previously testified that he has "gotten into kind of the bad habit of making a bunch of loans to [Tsaparas] over the years[.]"[7]  (Ex. 6 at 13:10-25; 14:1-25; 15:1-16.)  Hunt testified that the cumulative values of those loans was approximately $4.1 million.  (*Id*. at 13:18-25; 14:1-10.)

5.    While unknown to NHC at the time, the significance of this seven figure debt cannot be overstated.  It was in the context of allegedly being unable to obtain financing and being

---

[4] A true and correct copy of portions of the deposition transcript of Alexopoulos is attached hereto as **Exhibit 3**.

[5] A true and correct copy of portions of the deposition transcript of Rodrigo Chapur Duarte is attached hereto as **Exhibit 4**.

[6] A true and correct copy of portions of the January 8, 2025, hearing transcript is attached hereto as **Exhibit 5**.

[7] A true and correct copy of portions of the citation examination transcript of Hunt is attached hereto as **Exhibit 6**.

2

owed millions of dollars by Centaur and/or Tsaparas that M Development ultimately sold the Nobu Hotel project to NHC. The events that occurred after M Development sold the Nobu Hotel project are well known to this Court. Centaur, and its principals Tsaparas and Alexopoulos, breached their contractual obligations and committed fraud. After a jury trial, judgment was entered against Centaur, Tsaparas, and Alexopoulos jointly and severally in the total amount of $22,272,124.34 for fraud and breach of contract, plus punitive damages against the defendants individually and in particular Tsaparas in the amount of $1,500,000.00 (the "Judgment"). (Dkt. No. 228.)

**II.    M Development's Continued Relationship with the Judgment Debtors**

6.      Contrary to information provided by M Development, NHC now knows that M Development's relationship with the Judgment Debtors, specifically Centaur, continued after the sale of the Nobu Hotel project. At trial, Hunt, the owner of M Development, testified that although he and his company were currently working with Tsaparas on "upwards of 20 projects," he and his company were *not* currently working on any projects with Centaur.[8] (Ex. 7 at 25:6-24.) NHC and this Court now know this testimony was false. As outlined in greater detail in other submissions to this Court (*see, e.g.*, Dkt. No. 590), the relationship between Centaur and M Development continued long after the Nobu Hotel project.

7.      For example, in early October 2022 (approximately two months after Hunt's trial testimony), Tsaparas, in his role as CEO of Centaur, communicated with the City of Aspen and multiple M Development employees regarding a joint project referred to as the "201 E Main Street" project.[9] (Ex. 8.) Based on information currently available, NHC believes that Centaur was involved in multiple similar projects in the greater Aspen area with M Development,

---

[8] A true and correct copy of portions of the trial transcript, Volume 4-A, is attached hereto as **Exhibit 7**.
[9] A true and correct copy of an email exchange between Tsaparas, the City of Aspen, and M Development employees regarding the 201 E Main Street project is attached hereto as **Exhibit 8**.

including, but not limited to, projects referred to as "312 Hyman," "434 Cooper," and "834 Hallam."[10]  (Ex. 9 (referring to the "Centaur team" working on various projects).)  Eventually, Centaur's name was removed from these projects, including the "201 E Main Street" project, and replaced with another entity.[11]  (Ex. 10 (Ms. Van Senus: "The proposal for 201 is directed to centaur.  Should I cross that out and put 201 Main LLC?"  Tsaparas: "Yes").)  With the exception of the name change, however, there is no indication of any other change.  Put simply, the personnel, tasks, and all other aspects of the projects remained the same; a new corporate name was inserted as part of an overnight transition from Centaur to other entities.[12]  (Ex. 11 (Tsaparas:  "Please tell Martha OK field Greg Woods not to use my Centaur Construction email anymore and only use the M source and you'll see.  Thanks."  Tsaparas:  "Please make sure mail forwarding g [sic] is still active and change the address on as many accounts as possible.").)

8.     In January 2023, Tsaparas (still using his Centaur email address that listed him as the CEO) continued to brag to his landlord, Ms. Bateman-Hershey, about new projects, stating that "We purchased the Aman Hotel in Jackson Hole WY that we are preparing for a major rehabilitation" and "We purchased the last palace on Villanueva and meeting with architects.  It will be a magnificent project."[13]  (Ex. 12.)

9.     From the email alone it is unclear exactly who Tsaparas means by "we" in these emails, but news articles provide additional context and reflect that the Aman Hotel was actually purchased by M Development.  *See* "M Development marches to its own beat," *Hotels Magazine*,

---

[10] A true and correct copy of a July 29, 2021 email from Linda Manning of M Development regarding the projects referred to as "312 Hyman," "434 Cooper," and "834 Hallam" is attached hereto as **Exhibit 9**.
[11] A true and correct copy of excerpts of text message communications between Tsaparas and Deanna Van Senus ("Ms. Van Senus"), Tsaparas' assistant, is attached hereto as **Exhibit 10**.
[12] A true and correct copy of excerpts of text message communications between Tsaparas and Ms. Van Senus is attached hereto as **Exhibit 11**.
[13] A true and correct copy of an email exchange between Tsaparas and Ms. Bateman-Hershey is attached hereto as **Exhibit 12**.

available at https://hotelsmag.com/news/m-development-marches-to-its-own-beat/ (last visited July 13, 2025). It is clear that a professional relationship between M Development and Centaur continued long after both entities were no longer involved in the Nobu Hotel project.

## III.    Judgment Debtors' Use of Triton Marine Holdings LLC to Further Partner with M Development

10.    NHC's ongoing investigation has revealed that Judgment Debtors utilized Triton Marine Holdings LLC ("Triton") in, *inter alia*, an attempt to obfuscate their continued relationship with M Development. Tsaparas and Alexopoulos have each confirmed that they were or are the sole owners of Triton.[14] (Ex. 13 at 43:7-45:2; Ex. 14 50:19-53:2.) NHC, however, has never gotten a straight answer as to Triton's purpose.

11.    During his citation examination, Hunt testified that Triton was an entity owned by Tsaparas and through which Tsaparas allegedly provided consulting services to M Development or M Sourcing, prior to Tsaparas executing his employment agreement with M Sourcing in December 2022. (Ex. 6 at 12:17-13:9.) Specifically, Hunt testified that Triton was hired for consulting services "with a handful of – of construction projects." (*Id*. at 13:9.) Hunt testified that in connection with those consulting services Triton issued 11 invoices[15] (Group Ex. 15) to M Development and M Sourcing for a cumulative total of $211,538.47. (Ex. 6 at 19:17-20:1.) Curiously, all of these invoices were issued *after* the jury's verdict. However, NHC's analysis of bank records indicates that between December 2020 and November 2022, M Development paid Triton a total of $1,747,356.47.[16] (Ex. 16.)

---

[14] A true and correct copy of portions of Tsaparas' citation examination transcript is attached hereto as **Exhibit 13**. A true and correct copy of portions of Alexopoulos' citation examination transcript is attached hereto as **Exhibit 14**.

[15] True and correct copies of invoices issued by Triton to M Development or M Sourcing are attached hereto as **Group Exhibit 15**.

[16] A summary of bank records indicating payments from M Development to Triton is attached hereto as **Exhibit 16**.

12.     However, following Hunt's citation examination, Tsaparas gave drastically different testimony regarding the alleged purpose of Triton during his citation examination. According to Tsaparas, the "only purpose" of Triton was to own "a vessel that [Tsaparas and Alexopoulos] purchased in Greece."  (Ex. 13 at 47:23-48:4.)  Tsaparas clarified that Triton "was not in the construction business."  (*Id*. at 48:16-18.)   Likewise, at Alexopoulos' citation examination, he testified that Triton "did not have anything to do with construction."  (Ex. 14 at 51:6-8.)  Alexopoulos also testified that Triton was "an entity that was set up with the expectation of trying to explore opportunities in the hospitality sector in Greece."  (*Id*. at 51:21-24.)

13.     According to Tsaparas, Hunt and M Sourcing's attorneys came up with the idea to pay Tsaparas for work he was performing for M Development through Triton because of the fraud case against him.  (Ex. 5 at 64:23-65:11.)  However, Hunt's testimony suggests it was Tsaparas' idea to use Triton for Tsaparas' consulting work for M Development.  (Ex. 6 at 12:20-13:2.)

14.     In addition to the divergent stories regarding the role of Triton, M Development and Judgment Debtors have never explained why Triton, whether involved in the construction industry or not, was purportedly provided a more than $4.1 million dollar loan from M Sourcing.[17] (Ex. 17.)  NHC continues to explore the role of Triton in the professional and monetary relationship between M Development and/or M Sourcing, on the one hand, and the Judgment Debtors on the other hand.

**IV.     The Formation of M Sourcing**

15.     M Sourcing was formed in November 2022, shortly *after* the Judgment was originally entered in this case.[18]  (Ex. 18.)  NHC now knows that Amundsen Davis, former counsel

---

[17] A true and correct copy of an Amended and Restated Promissory Note between Triton and M Sourcing is attached hereto as **Exhibit 17**.

[18] A true and correct copy of publicly available records of the Colorado Secretary of State is attached hereto as **Exhibit 18**.

for Judgment Debtors, Hunt, M Development, and M Sourcing, coordinated both the creation of

M Sourcing and the documentation of the purported loan between Triton and M Sourcing.[19] (Ex.

19.)

## V.    Prior Efforts to Obtain Information and Documents from the M Entities

16.    On August 4 and 24, 2023, NHC served a third-party citation to discover assets on

M Development and M Sourcing, respectively.  (Dkt. Nos. 257, 262.)

17.    In total, M Development and M Sourcing produced less than 300 pages of

documents in response to those third-party citations, including Tsaparas' employment agreement

with M Sourcing, partial payroll records, and various invoices pertaining to purported

"construction services."

18.    On September 22, 2023, NHC conducted the citation examination of Hunt based

on the incomplete document production from M Development and M Sourcing.

19.    Based on newly discovered information, on December 16, 2024, NHC filed an *ex

parte* motion seeking the Court's permission to issue certain citations.  (Dkt. No. 548.)   On

December 17, 2024, the Court granted NHC's *ex parte* motion.  (Dkt. No. 550.)

20.    Thereafter and pursuant to an agreement with counsel for M Development and M

Sourcing, NHC served citations on M Development and M Sourcing.[20] (Exs. 20-21.)

21.    Since the service of those citations in January 2025, on April 8, 2025 the M Entities

produced a cumulative total of 319 pages of documents.  This limited production is the result of

numerous meet-and-confer discussions with counsel for the M Entities.  In short, counsel for NHC

has made repeated efforts to reach a compromise with the M Entities and eliminate the need for

---

[19] A true and correct copy of an email between M Development personnel and Amundsen Davis is attached
hereto as **Exhibit 19**.

[20] True and correct copies of the third-party citation to discover assets served on M Development and M
Sourcing are attached hereto as **Exhibits 20** and **21**, respectively.

Court intervention.  Those efforts have included permitting the M Entities to make initial partial document productions responsive to select requests and attempting to gather documents and information from Judgment Debtors or other third parties.[21]  Unfortunately, those efforts have been unsuccessful given the collusion and entanglement the M Entities have had with Judgment Debtors and the wholesale failure of Judgment Debtors to produce responsive information.

22.    Once it became clear that a fulsome document production with respect to the M Entities would be necessary, on July 16, 2025, the undersigned sent an email to counsel for the M Entities requesting that counsel confirm the positions the M Entities had previously staked out with respect to the pending requests.[22]  (Ex. 23.)  In that email, the undersigned requested confirmation of the M Entities' position within five days.  (*Id.*)  On July 21, 2025, at the request of counsel for the M Entities, the parties engaged in yet another telephonic meet-and-confer.  (*Id.*) That same day, counsel for the M Entities stated she would provide a response to NHC "by the end of this week or, at the latest, early next week."  (*Id.*)

23.    On July 30, 2025, counsel for the M Entities sent a lengthy written response to NHC.  (*Id.*)  While the response is long, it is not complex.  The M Entities confirm that unless NHC agrees to narrow its existing requests, the M Entities "are not prepared to produce documents beyond those [previously] described[.]"  (*Id.*)  The response is relevant in two respects.  *First*, it demonstrates NHC and the M Entities are at an impasse.  *Second*, the timing of the response, provided the day of NHC's filing, is not a coincidence.  The M Entities appear to be operating from the same playbook as several other third parties with close ties to Judgment Debtors – the

---

[21] A true and correct copy of correspondence from counsel for the M Entities setting forth the M Entities' general objections and positions with respect to the pending requests is attached hereto as **Exhibit 22**.

[22] A true and correct copy of an email chain between counsel for NHC and counsel for the M Entities is attached hereto as **Exhibit 23**.  There are numerous other email communications regarding earlier meet-and-confer efforts, which are not included herein.

strategy is to delay and obfuscate through protracted meet-and-confer discussions and never-ending requests for clarification, with the end goal of running out the clock. This improper strategy should not be rewarded. The M Entities cannot avoid their obligation to provide a fulsome document production under the guise of engaging in endless consideration of more narrow and limited productions, if NHC will identify specific documents. NHC is entitled to a fulsome production of documents responsive to the requests and is not limited to documents it is aware of.

## **ARGUMENT**

### I.    **Legal Standard**

24.    Fed. R. Civ. P. 69 ("Rule 69") incorporates into federal law state post-judgment enforcement procedures. The incorporated state procedures in this district are Section 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402) and Illinois Supreme Court Rule 277, the state statutes and rules governing supplementary procedures. Thus, included within Rule 69 is the Court's authority to compel the production of documents in these citation proceedings to discover assets to apply to the judgment. *See GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 628 (7th Cir. 2013). The scope of permissible discovery by the judgment creditor is extremely broad: "more than one appellate court has held that extensive searching for assets — even described as 'a "fishing expedition"' — is permissible." *Id.*

### II.    **The M Entities Must Make a Fulsome Production of Documents Responsive to the Citations**

25.    Applying the broad scope of relevancy under Rule 69, the M Entities should be compelled to produce documents responsive to the citations. (Exs. 20-21.) The citations call for the production of documents related to: (i) the income or assets of Judgment Debtors (*see, e.g.*, Ex. 20 at Request Nos. 1-4, 8-16, 18, 25-26, 30-34, 36, 40-41, 43-47); (ii) the relationship between the M Entities and Judgment Debtors (*id.* at Request Nos. 7, 23-24, 35, 37-38); (iii) the relationship

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 11 of
262
Case: 1:19-cv-06332 Document #: 761 Filed: 07/30/25 Page 11 of 18 PageID #:33040

between the M Entities and Triton (*id.* at Request Nos. 5-6); and (iv) corporate records of the M
Entities and their relationship to one another (*id.* at Request Nos. 19-22, 27-29, 39, 42). To date,
the M Entities have either not made a fulsome production of documents responsive to certain
categories, or have refused to make a production at all.

*The Income or Assets of Judgment Debtors*

26.    Identifying and locating the assets of Judgment Debtors is of paramount importance
to NHC. As a result, NHC propounded numerous requests aimed at discovering Judgment
Debtors' assets. It is NHC's understanding that the M Entities have taken the position that they
have produced all documents responsive to these requests. Not so. Discovery provided by other
third parties has identified at least *three* categories of documents which are responsive to these
requests and have not been produced.

27.    *First*, as the Court is well aware, the M Entities are responsible for the payment of
a significant portion of Judgment Debtors' legal fees. As disclosed by Tsaparas in his "Disclosure
of Legal Fees Pursuant to May 24, 2024 Court Directive" (Dkt. No. 563-1 at 5-6) and in his
"Revised Disclosure of Legal Fee Payments" (Dkt. No. 561), M Development has paid
approximately $803,653.73 to Amundsen Davis on behalf of Judgment Debtors. The M Entities
have produced a *de minimis* amount of communications pertaining to these payments.
Specifically, while the M Entities have produced ministerial communications related to some of
these payments (*e.g.,* wire transfer confirmations, communications with Amundsen Davis to
confirm receipt), the M Entities have not produced a single communication (*e.g.,* email or text
message) between Tsaparas and any representative of the M Entities in which Tsaparas requests
that these payments be made or the terms under which the payments are made. The implied

representation that no such communications exist regarding payment of more than $800,000 spread across nearly three years strains credulity.[23]

28.    Moreover, the M Entities have not produced any communications or documents related to more recent payments made to Amundsen Davis on behalf of Judgment Debtors. Through third party discovery, NHC has learned that on or about September 13, 2024, M Sourcing sent a payment to Amundsen Davis in the amount of $63,400.60.[24]  (Ex. 24.)  The existence of this payment was not revealed by Tsaparas, the M Entities, or Amundsen Davis and no documents or communications related to this payment have been produced by the M Entities.  Moreover, recent communications produced by Tsaparas reveal that on May 19, 2025, Nancy Turken, of M Development, sent Tsaparas a "draft of a new promissory note regarding legal fees."  (Dkt. No. 729 at 10.)  No draft promissory note or related correspondence has been produced.

29.    *Second*, third-party discovery strongly indicates that Tsaparas possesses an ownership interest in at least one corporate entity which also involves the M Entities.  Specifically, in a September 1, 2021, email Tsaparas told Ms. Van Senus that her "position is to act as the integrator of the *entire new company*."[25]  (Ex. 25 (emphasis added).)  While Tsaparas does not explain what "new company" he is referring to, later correspondence indicates that he likely is referring to a new entity in which he possesses an ownership interest.

---

[23] The absence of any text message correspondence on this subject is particularly vexing.  To say that Tsaparas is a prolific communicator via text message is an understatement.  By way of example, Ms. Van Senus produced over *three hundred pages* of text message communications between her and Tsaparas.  The failure of the M Entities to produce a single text message between Tsaparas and Hunt (or any other representative of the M Entities) is a strong indication that the M Entities' document production is not complete.

[24] A true and correct copy of a text message communication with Corri McFadden is attached hereto as **Exhibit 24**.

[25] A true and correct copy of an email chain between Tsaparas and Ms. Van Senus is attached hereto as **Exhibit 25**.

30.     Several months later, in a December 29, 2021 email from Tsaparas to Ms. Bateman-Hershey, he writes, "[o]n a personal note, I finalized my deal and executed the documents.  Excited to begin a new chapter while I continue to do what I love."[26]  (Ex. 26.)  In response, Ms. Bateman-Hershey writes, "Congratulations on the deal.  Is this for RH,[27] Crystal Palace, or both or something new? Nonetheless, I am sure you worked hard to do the deal and it will keep you very busy! Always good to be busy."  (*Id*.)  While somewhat unclear, this email correspondence does *not* appear to be related to Tsaparas' move to M Sourcing; his employment agreement with M. Sourcing is dated a full year later, in December 2022.

31.     In multiple later emails, Ms. Bateman-Hershey congratulates Tsaparas "on the merger/acquisition by RH" and in a later email states that Tsaparas is closing down Centaur "but working for another newly-formed company that is RH and another investor" and "will eventually do a REIT."[28]  (Group Ex. 27.)  Ms. Bateman-Hershey testified that based, in part, on these emails and other communications she had with Tsaparas, it was her understanding that Tsaparas was involved in a joint venture with RH and had an ownership interest in multiple pieces of real estate as a result.[29]  (Ex. 28 at 96:5-25, 97:1-14, 101:4-25, 102:1-25, 103:1-11.)

32.     Additional third-party discovery indicates that Tsaparas' relationship with RH also included the M Entities.  By way of example, Tsaparas' text messages with Ms. Van Senus contain multiple references to RH and the M Entities.[30]  (Ex. 29 at 1 (Tsaparas: "Can you send me a pdf

---

[26] A true and correct copy of an email chain between Tsaparas and Ms. Bateman-Hershey is attached hereto as **Exhibit 26**.
[27] RH (formerly Restoration Hardware) appears to feature prominently in the Centaur to Triton to M Sourcing/M Development succession.
[28] A true and correct copy of emails between Tsaparas and Ms. Bateman-Hershey is attached hereto as **Group Exhibit 27**.
[29] A true and correct copy of portions of Ms. Bateman-Hershey's citation examination transcript is attached hereto as **Exhibit 28**.
[30] A true and correct copy of excerpts of text message communications between Tsaparas and Ms. Van Senus is attached hereto as **Exhibit 29**.

of the accountability chart for M/Rh global expansion?"); at 2 (Ms. Van Senus: "Nancy's response: [. . .] As an FYI, you are asking mark to put in $ for this and for payroll.  Again, RH not paying not only makes us look bad but puts a huge burden on M.  It's a vicious cycle[.]").)

33.    *Finally*, the M Entities have not produced any communications with Tsaparas regarding the amount of his tax withholding.  As outlined in greater detail in NHC's pending motion to compel production of tax documents (Dkt. No. 671), the production of documents and communications pertaining to Tsaparas' purported outstanding tax liabilities owed to the U.S. Internal Revenue Service and the additional withholding from his paycheck related to those purported liabilities is relevant to adjudicating lien priority of Tsaparas' assets.  To date, the M Entities have produced partial payroll records related to Tsaparas, but no records pertaining to changes in his withholding or his outstanding tax obligations.

34.    To be clear, NHC identifies the three above-referenced categories of documents relating to Judgment Debtors' assets, as *examples* of documents which have not been produced. These examples are not intended to be an exhaustive list of outstanding documents.  Instead, they are provided to illustrate the failure of the M Entities to make a fulsome document production.

*The Relationship Between the M Entities and Judgment Debtors*

35.    NHC is entitled to explore the relationship between the M Entities and Judgment Debtors and how those relationships have changed and evolved over time.  M Development and Centaur allegedly began their relationship as separate entities often working together on various projects.  (Ex. 1 at 18:21-24; Ex. 2 at 9:5-7.)  However, NHC believes that during the pendency of the underlying litigation the relationship between M Development and Judgment Debtors changed dramatically and culminated in the transfer of personnel and assets from Centaur to the M Entities. NHC is seeking information related to possible alter ego and/or successor liability theory(ies) of

13

recovery. This Court has already ruled NHC is entitled to pursue this information. (Dkt. No. 674

(permitting "NHC to seek documents relating to its successor liability theory."); *see also Sullivan*

*v. Alpine Irrigation Co.*, 2011 U.S. Dist. LEXIS 44571, at *14 (N.D. Ill. Apr. 25, 2011) ("not only

has the Seventh Circuit allowed judgment creditors to pursue successor liability claims in

supplemental proceedings, but other Illinois courts have as well.") (citations omitted).)

36.     Moreover, NHC is entitled to explore other aspects of the relationship between the

M Entities and Judgment Debtors, including any additional contracts or agreements between them

and any references in the corporate records of the M Entities with respect to Judgment Debtors.

*The Relationship Between the M Entities and Triton*

37.     Between August 26, 2022, and January 10, 2023, Triton issued a total of 11 invoices

to the M Entities for a total amount due of $211,538.47. (Group Ex. 15.) The invoices are

substantively identical and all seek payment for undefined "Construction Services." (*Id.*)

Moreover, a total of $1,747,356.47 in payments were made to Triton by M Development. (Ex.

16.) However, as outlined in greater detail above (*see* ¶¶ 10-14 *supra*), NHC has received wildly

different versions of events regarding the purpose of Triton and whether or not it performed any

construction related work. To date, the M Entities have not produced *any* documents and

communications pertaining to their relationship with Triton or with respect to any work Triton

purportedly performed on their behalf (whether related to the Triton invoices or otherwise).

38.     NHC is entitled to documents and communications related to Triton, an entity

which is/was owed by Tsaparas and Alexopoulos. (Ex. 13 at 43:7-45:2; Ex. 14 50:19-53:2.)

Specifically, NHC is entitled to documents and communications related to the work performed by

Triton on behalf of the M Entities, payment for that work, loan agreements with Triton (Ex. 17),

and the associated indemnification agreement with Triton.

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 16 of
262
Case: 1:19-cv-06332 Document #: 761 Filed: 07/30/25 Page 16 of 18 PageID #:33045

*Corporate Records of the M Entities and Their Relationship to One Another*

39.    While M Development has operated since approximately 1997, M Sourcing was created in November 2022, shortly after the Judgment was originally entered in this case.  Despite a shifting story, Tsaparas' employment agreement indicates that he is an employee of M Sourcing, and not M Development.[31]  (Ex. 30.)  NHC is entitled to explore the relationship between the M Entities and the ownership of each entity.[32]  Moreover, NHC is entitled to explore the rationale behind creating a "new" entity, M Sourcing, to "employ" Tsaparas after M Development had existed and been operating for approximately 25 years.  As with the other categories of requests, this information may assist NHC in identifying and locating assets of the Judgment Debtors, including any purported ownership interest possessed by Judgment Debtors in relation to the M Entities, the transfer of Centaur's operations under the guise of the M Entities and the terms of any compensation, loans, or other monies or interests provided to Judgment Debtors by the M Entities.

WHEREFORE, for the above and foregoing reasons, NHC LLC respectfully requests that this Court enter an Order:

(i) compelling M Development, LLC and M Sourcing, LLC to make a fulsome production of documents in response to the third party citations to discover assets served on each entity within 14 days; and

(ii) granting NHC such other, further, or additional relief in its favor and against M Development, LLC and M Sourcing, LLC as this Court deems fair, just, and equitable.

---

[31] A true and correct copy of Tsaparas' employment agreement is attached hereto as **Exhibit 30**.

[32] As the Court may recall, Tsaparas and third party Sachse Construction have publicly held out Tsaparas as a "principal" of M Development.  (Dkt. No. 526 at ¶¶ 30-31.)  While those statements were initially believed to be based solely on representations from Tsaparas in preparation for a "Retail Summit," documents subsequently obtained by NHC from Sachse Construction and various FOIA requests have confirmed that the M Entities, Tsaparas, and Sachse Construction worked collaboratively on numerous construction projects.  As a result, these representations appear to be based, in part, on Sachse Construction's longstanding professional relationship with Tsaparas.

Dated: July 30, 2025

Respectfully submitted,

NHC LLC

By: /s/ *Zachary J. Watters*

One of Its Attorneys

Daniel P. Jackson, Bar No. 6289813
Bryan K. Clark, Bar No. 6296090
Zachary J. Watters, Bar No. 6310675
Allison E. Czerniak, Bar No. 6319273
Keeley A. Sawyer, Bar No. 6336704
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500
djackson@vedderprice.com
bclark@vedderprice.com
zwatters@vedderprice.com
aczerniak@vedderprice.com
ksawyer@vedderprice.com

Gini S. Marziani, Bar No. 3127421
Davis McGrath LLC
125 S. Wacker Drive
Chicago, Illinois 60606
T: +1 312 332 3033
gsmarziani@davismcgrath.com

## CERTIFICATE OF SERVICE

I hereby certify that, on July 30, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system and thereby served electronically by the CM/ECF system on all counsel of record.

Additionally, I hereby certify that, on July 30, 2025, a true and correct copy the foregoing was served on the following individuals and entities in the manner indicated below:

Spiro Tsaparas
Via email to spiro@msourcingllc.com

Peter Alexopoulos
Via email to peter@srtrainingllc.com

Centaur Construction Company
Via U.S. First Class Mail
Illinois Secretary of State
501 S. Second St., Suite 328
Springfield, IL 62756

M Development, LLC and M Sourcing, LLC
Jessica Arett
Venable LLP
Jarett@venable.com
*Counsel for M Development, LLC and M Sourcing, LLC*

/s/  Zachary J. Watters
An Attorney for NHC LLC

# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NHC LLC, a Florida limited        )
liability company,                )
                                  )
        Plaintiff,                )
                                  )
    vs.                           )
                                  ) No. 19-CV-6332
CENTAUR CONSTRUCTION COMPANY INC.,)
an Illinois corporation, SPIRO    )
TSAPARAS, and PETER ALEXOPOULOS,  )
                                  )
        Defendants.               )

        The deposition of MARK HUNT called by the
Defendants for examination taken at 516 East Hyman in
Aspen, Colorado, commencing at 2:00 p.m. on the
26th day of January, A.D., 2021.  It is taken pursuant
to notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Sharon A. Jerndt, Certified Shorthand Reporter and
Registered Professional Reporter, appearing remotely via
videoconferencing.

---

Page 2

1    APPEARANCES: (remotely via videoconference)
2        VEDDER PRICE
         JOSHUA OREWILER
3        222 North LaSalle Street
         Suite 2600
4        Chicago, Illinois 60601
         Phone:  (312) 609-7500
5        E-mail:  clibman@vedderprice.com
6            On behalf of the Plaintiff;
7        SMITH AMUNDSEN, LLC
         MS. KIMBERLY HERRING
8        150 North Michigan Avenue
         Suite 3300
9        Chicago, Illinois 60601
         Phone:  (312) 894-3358
10       E-mail:  kherring@salawus.com
11           On behalf of the Defendants;
12       LYNCH THOMPSON, LLP
         MR. DANIEL LYNCH
13       150 South Wacker Drive
         Suite 2600
14       Chicago, Illinois 60606
         Phone:  (312) 346-1600
15       E-mail:  dlynch@1stllp.com
16           On Behalf of the Deponent.
17
18
19
20
21
22
23
24

---

Page 3

1             I N D E X
2    WITNESS                         PAGE
3    MARK HUNT
4      Direct Examination By Ms. Herring      4
5      Cross-Examination By Mr. Orewiler     19
6
7           E X H I B I T S
8    DEFENDANT'S                      PAGE
9      No. 54 (E-mail)                 9
10     No. 60 (E-mail Chain & Budget)       10
11     No. 61 (E-mail Chain & Budget)       11
12     No. 52 (E-mail Chain & Appraisal)       13
13     No. 4 (Appraisal Report)            15
14
15
16
17
18   (Exhibits were uploaded to a drop box for all counsel.)
19
20
21
22
23
24

---

Page 4

1        MS. REPORTER:  The deposition of Mark Hunt is being
2    conducted remotely via LegalView.  Today's date is
3    January 26th, 2021, and the time is 2:00 p.m.
4        The witness is located at 516 East Hyman in
5    Aspen, Colorado.  My name is Sharon Jerndt.
6        At the conclusion of today's deposition, I
7    will ask that counsel place their orders on the record.
8        Thank you.
9        Can you raise your right hand, please.
10           (Witness sworn.)
11       MS. HERRING:  All right.  Let the record reflect
12   that this is the deposition of Mark Hunt taken pursuant
13   to subpoena and in accordance with all applicable
14   federal rules.  By agreement this deposition is being
15   teen via Zoom.
16   WHEREUPON:
17           MARK HUNT,
18   called as a witness herein, having been first duly
19   sworn, was examined and testified as follows:
20           DIRECT EXAMINATION
21   BY MS. HERRING:
22       Q.   Can I call you Mark?
23       A.   Please.
24       Q.   All right, Mark.  And feel free to call me

---

1 (Pages 1 to 4)

Page 5

1    Kim.  We met a little bit ago off the record, but I am
2    one of the attorneys representing Centaur Construction,
3    Spiro Tsaparas, and Peter Alexopoulos in a lawsuit
4    brought by NHC, LLC surrounding the design and build of
5    of the Nobu Hotel Chicago.
6         Mark, do you understand generally that you are
7    to testify about the Nobu Hotel Chicago?
8         A.   I do.
9         Q.   Okay.  And today I might call it Nobu or the
10   project or the hotel, but if I do, will you understand
11   that I mean the Nobu Hotel Chicago?
12        A.   Yes.
13        Q.   Have you ever given a deposition before?
14        A.   I have.
15        Q.   How many times?
16        A.   Maybe once.
17        Q.   Okay.  I am going to go over a couple of quick
18   deposition rules.  You may have heard them last time,
19   but to refamiliarize yourself, the first rule surrounds
20   our court reporter, Sharon, and she is taking down every
21   word that I say and every word that you say, and any
22   words that Josh or Dan may say as well.  So the first
23   kind of deposition rule is that we all need to make sure
24   we are not talking over each other.  So I am going to do

Page 6

1    my best to let you finish your answer before I ask my
2    next question, and then I ask that you do your best to
3    let me finish my question before you give your answer
4    even though you might already know before I get the
5    whole question out.  Does that make sense?
6         A.   Yes.
7         Q.   Okay.  And the other rule, which you are doing
8    a great job of so far, is because Sharon is here taking
9    down everything that you way, we need all of your
10   answers to be yes or no or real words that can be found
11   in the dictionary as opposed to a shrug or an uh-uh or
12   an uh-huh because those are difficult things for Sharon
13   to take down.  Does that makes sense?
14        A.   Yes.
15        Q.   I don't expect our deposition to go too long
16   today, but if you need a break at any time, let me know
17   and we will take one.
18        If I ask a question that you don't understand,
19   please let me know and I will clarify or rephrase it.
20   Otherwise, if you do answer it, I am going to assume
21   that you understood my question; is that fair?
22        A.   Okay.  Yes.
23        Q.   All right.  Those were kind of the background
24   rules.

Page 7

1         Mark, where do you work?
2         A.   I work for myself, a company called
3    M Development.
4         Q.   And what is your title at that company?
5         A.   Owner.
6         Q.   How long have you been the owner of
7    M Development?
8         A.   Since probably '97, 1997, '98.
9         Q.   How long total have you been in the
10   construction industry?
11        A.   Since 1991.
12        Q.   What generally does M Development do?
13        A.   We generally develop properties across a broad
14   spectrum of residential, commercial, but primarily small
15   to medium size commercial, street retail, and from time
16   to time we will do condo buildings, apartment buildings,
17   or hospitality projects.
18        Q.   Since 1991, approximately how many projects
19   have you worked on?
20        A.   I would say probably a couple hundred, 200.
21        Q.   When did you first get involved in the
22   Nobu Chicago project?
23        A.   I don't remember the exact date, but it was
24   2016, somewhere around 2016.

Page 8

1         Q.   And there came a time when you sold the
2    project, right?
3         A.   Correct.
4         Q.   Who did you sell the project to?
5         A.   The Chapur family.
6         Q.   And do you remember approximately when that
7    was?
8         A.   I don't, '17 or '18 maybe.
9         MR. LYNCH:  If there is no dispute on the date it
10   might be helpful if you just supply him with the date of
11   the closing.
12   BY MS. HERRING:
13        Q.   Does 2017, early 2018 sound about right?
14        A.   That sounds about right.
15        Q.   Before you sold the project to NHC, had
16   construction stopped for a while?
17        A.   Yes.
18        Q.   Do you remember approximately how long
19   construction had been stopped?
20        A.   I mean, it would be a guess, but I would say a
21   couple of months.
22        MS. HERRING:  I want to turn to Defendant's Exhibit
23   54.  I am going to share my screen so you don't have to
24   pull it up, but you do have it in that folder.

2 (Pages 5 to 8)

Page 17

1   family, what was the status of construction?
2       A.   It was halted.  There was no construction
3   going on at the time.
4       Q.   And what had been built?
5       A.   We did some demolition, excavation.  We had to
6   do some work to the adjacent property wall for support,
7   structural support.  They had poured concrete.
8   Basically just, I think, foundation work for the most
9   part.
10      Q.   Were final design decisions made at the time
11  that you sold the project?
12      A.   Like all of the final design?
13      Q.   Yes.
14      A.   No, no.  You know, that's typically kind of a
15  work in progress.
16      Q.   How about SS&E and OS&E, had all that stuff
17  been ordered?
18      A.   No.
19      Q.   So the flooring hadn't been picked out or the
20  paint colors and that kind of stuff hadn't been set?
21      A.   No.  I'm sure we had a list of finishes and
22  stuff that we were, you know, as part of the design
23  group, what they put together, but as far as actually
24  picking anything out specifically, I do not think, at

Page 18

1   that time, not.
2       Q.   Okay.  And how about subcontractors, had all
3   of the subcontractors been retained to perform all the
4   trades?
5       A.   I would say highly doubtful.
6       Q.   How about, you know, things like the model
7   room?  Had the model room been designed?
8       A.   Not sure if it had been designed, but it was
9   not built.  It may have been designed.  I mean, I
10  believe the rooms were designed, but I don't believe
11  that it was built.
12      MR. LYNCH:  Not sure everybody else got that
13  answer, but it was distorted a little bit.  So I think
14  the answer was he thinks it may have been designed, but
15  it wasn't built.  That's what I heard.
16      THE WITNESS:  Perfect.
17  BY MS. HERRING:
18      Q.   How about all of the architectural plans,
19  Mark, were those all final?
20      A.   I don't recall.
21      Q.   Other than the Nobu -- well, how many times
22  have you worked with Centaur Construction?
23      A.   Probably at least probably worked together on
24  at least a dozen properties.  Maybe more.  Maybe 15.

Page 19

1       Q.   And when you work with Centaur, who at Centaur
2   are you primarily dealing with?
3       A.   Spiro.
4       Q.   Do you also know Peter?
5       A.   I do.
6       Q.   The 15 projects that you have worked on with
7   Centaur, approximately how many years do those projects
8   span?
9       A.   Probably 12, 12 years.
10      Q.   Would you work with Spiro again?
11      A.   I would.  For the record, I am working with
12  him now.
13      MS. HERRING:  Those are all the questions I have,
14  Mark.  Josh may have some for you.
15      THE WITNESS:  Thank you, Kimberly.
16      MS. HERRING:  Thank you.
17      MR. OREWILER:  Yeah, I have just a few.
18            CROSS-EXAMINATION
19  BY MR. OREWILER:
20      Q.   Mark, are you familiar with an entity called
21  854 West Randolph, LLC?
22      A.   Yes, I think that was our entity; is that
23  correct?
24      Q.   And by our entity, was that the entity that

Page 20

1   owned the Nobu Hotel Chicago project before it was sold?
2       A.   Say the last part, Josh.  Before what?
3       Q.   Before you sold it.  Before it was sold?
4       A.   That sounds right.
5       Q.   And are you familiar with an entity called
6   NHC, LLC?
7       A.   Yes.
8       Q.   And did 854 West Randolph, LLC sell the Nobu
9   Hotel Chicago project to NHC, LLC?
10      MR. LYNCH:  Are you asking who the exact
11  counter party is?
12      MR. OREWILER:  Yes.
13  MR. OREWILER:
14      Q.   Is that yes?
15      A.   You froze for a moment there.  Can you repeat
16  your last question, Josh?
17      Q.   Sure.  Earlier you testified that you had sold
18  the Nobu Hotel Chicago project to the Chapur family,
19  right?
20      A.   Right.
21      Q.   Is it possible that the actual purchase and
22  sale agreement listed NHC, LLC instead of the
23  individuals of the Chapur family?
24      A.   Yes.

5 (Pages 17 to 20)

Page 25

```
 1          Witness my official signature on this 1st day
 2    of March, A.D., 2021.
 3
 4
 5
 6
 7
 8          Sharon A. Jerndt
            SHARON A. JERNDT, CSR, RPR
 9          180 North LaSalle Street
            Suite 2800
10          Chicago, Illinois 60601
            Phone:  (312) 236-6936
11
12
13
      CSR No. 084-004044
14
15
16
17
18
19
20
21
22
23
24
```



Draft Copy

7  (Page 25)

Electronically signed by Sharon Jerndt (601-281-855-7397)                    00b3f42e-09cc-4a5f-9a17-9802aa47696f

# EXHIBIT 2

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 25 of
Case: 1:19-cv-06332 Document #: 761-2 Filed: 07/30/25 Page 2 of 6 PageID #:33054
***REALTIME UNEDITED TRANSCRIPT ONLY***

1

| | | |
|---|---|---|
| 08:56:52 | 1 | Judge Kennelly, August 16, 2022, 9:00 a.m., volume 3-A.  NHC |
| 08:57:04 | 2 | v. Centaur, jury trial. |
| 08:57:07 | 3 | THE CLERK:  Case 19 C633-2, NHC LLC v. Centaur |
| 08:59:34 | 4 | Construction Company Inc. et al. |
| 08:59:34 | 5 | THE COURT:  Can we get counsel's appearances on the |
| 08:59:36 | 6 | record, please. |
| 08:59:37 | 7 | MS. WING:  Good morning, Nicole Wing and Joshua |
| 08:59:42 | 8 | Orewiler on behalf of the plaintiff. |
| 08:59:43 | 9 | MS. HERRING:  Kimberly Herring and Matthew Horn for |
| 08:59:46 | 10 | the defendants. |
| 08:59:46 | 11 | THE COURT:  We are still short one juror.  There was |
| 08:59:48 | 12 | one thing on the instructions that I wanted to ask about and |
| 08:59:51 | 13 | it had to do with the damages instructions. |
| 08:59:53 | 14 | So the draft instruction that I had gotten from the |
| 08:59:59 | 15 | plaintiff I think with the pretrial order on damages on the |
| 09:00:04 | 16 | contract claim says, and this is proposed instruction number |
| 09:00:11 | 17 | 24, says that basically what -- not basically.  It says what |
| 09:00:15 | 18 | NHC is asking for on the contract claim are payments made to |
| 09:00:20 | 19 | subcontractors that Centaur didn't pay, number one. |
| 09:00:23 | 20 | Number two, payments made to Shawmut to complete |
| 09:00:26 | 21 | construction. |
| 09:00:27 | 22 | Is that still true? |
| 09:00:29 | 23 | MS. WING:  Yes, Judge. |
| 09:00:31 | 24 | THE COURT:  Okay.  So here's what I think the |
| 09:00:33 | 25 | solution is on the question about overlap and double recovery |

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 26 of
Case: 1:19-cv-06332 Document #: 761-2 Filed: 07/30/25 Page 3 of 6 PageID #:33055
***REALTIME UNEDITED TRANSCRIPT ONLY***

7

| | | |
|---|---|---|
| 09:15:02 | 1 | NICK MARTORANO, DIRECT EXAMINATION |
| 09:15:03 | 2 | BY MS. HERRING: |
| 09:15:03 | 3 | BY MS. WING: |
| 09:15:03 | 4 | Q.  Good morning.  Would you please introduce yourself to the |
| 09:15:06 | 5 | jury? |
| 09:15:06 | 6 | A.  Yes, I'm Nicholas Martorano. |
| 09:15:08 | 7 | THE COURT:  Spell Martorano if you wouldn't mind. |
| 09:15:11 | 8 | THE WITNESS:  Martorano. |
| 09:15:13 | 9 | THE COURT:  Thank you. |
| 09:15:14 | 10 | BY MS. WING: |
| 09:15:14 | 11 | Q.  You previously worked for Centaur Construction Company, |
| 09:15:16 | 12 | correct? |
| 09:15:16 | 13 | A.  Yes. |
| 09:15:17 | 14 | Q.  How long did you work for Centaur? |
| 09:15:19 | 15 | A.  13 years. |
| 09:15:20 | 16 | Q.  You left in October 2019; is that right? |
| 09:15:23 | 17 | A.  Correct. |
| 09:15:23 | 18 | Q.  Why did you leave? |
| 09:15:25 | 19 | A.  Well, a number of reasons.  We were Nobu employed a lot of |
| 09:15:33 | 20 | our employees, I was one of the main people.  It looked very |
| 09:15:38 | 21 | apparent that there was no future there,that we weren't going |
| 09:15:44 | 22 | to be able to finish the job and I didn't see any prospects, |
| 09:15:47 | 23 | meaning that I thought it was a matter of time before I was |
| 09:15:50 | 24 | going to get let go and they were having difficulty paying the |
| 09:15:55 | 25 | paychecks. |

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 27 of
262
Case: 1:19-cv-06332 Document #: 761-2 Filed: 07/30/25 Page 4 of 6 PageID #:33056
***REALTIME UNEDITED TRANSCRIPT ONLY***

8

| | | |
|---|---|---|
| 09:15:57 | 1 | Q.  When you worked on the Nobu project, what was your job |
| 09:16:04 | 2 | title? |
| 09:16:04 | 3 | A.  Senior project manager. |
| 09:16:06 | 4 | Q.  What did you do as a senior project manager on the Nobu |
| 09:16:11 | 5 | project? |
| 09:16:11 | 6 | A.  A multitude of things, but mainly was part of bidding, |
| 09:16:17 | 7 | awarding the work, subcontract management, management of the |
| 09:16:25 | 8 | site team which was part of our quality control, schedule, |
| 09:16:30 | 9 | change orders. |
| 09:16:32 | 10 | Q.  When you first started working on the Nobu project, who |
| 09:16:35 | 11 | was the owner of the hotel? |
| 09:16:37 | 12 | A.  M Development. |
| 09:16:41 | 13 | Q.  M Development is a company run by mark hunt? |
| 09:16:46 | 14 | A.  Correct. |
| 09:16:47 | 15 | Q.  And you did continue working on the Nobu project after NHC |
| 09:16:49 | 16 | became the owner, right? |
| 09:16:51 | 17 | A.  Correct. |
| 09:16:51 | 18 | Q.  So I want to talk a little bit about what was different |
| 09:16:56 | 19 | between the time M Development owned the project to when NHC |
| 09:17:00 | 20 | owned the project.  Centaur's responsibilities increased under |
| 09:17:03 | 21 | the NHC contract; is that right? |
| 09:17:05 | 22 | A.  Yes. |
| 09:17:05 | 23 | Q.  Centaur was the design builder under the NHC contract? |
| 09:17:10 | 24 | A.  Correct. |
| 09:17:10 | 25 | Q.  That's different than a general contractor, right? |

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 28 of
Case: 1:19-cv-06332 Document #: 761-2 Filed: 07/30/25 Page 5 of 6 PageID #:33057
***REALTIME UNEDITED TRANSCRIPT ONLY***

9

| | | |
|---|---|---|
| 09:17:13 | 1 | A.  Correct. |
| 09:17:14 | 2 | Q.  Okay.  Under the contract with M Development, Centaur was |
| 09:17:19 | 3 | a general contractor; is that correct? |
| 09:17:20 | 4 | A.  Yeah, in a sense.  The relationship there was a little bit |
| 09:17:25 | 5 | more complex, I guess.  We were -- a lot of the work that we |
| 09:17:31 | 6 | did was for M Development.  There was a longstanding |
| 09:17:34 | 7 | relationship.  We got involved in other aspects that a general |
| 09:17:36 | 8 | contractor wouldn't typically get involved with, with |
| 09:17:40 | 9 | management design team and owners' responsibilities and so on |
| 09:17:43 | 10 | and so forth. |
| 09:17:44 | 11 | Q.  Was the contract with M Development a design bid build |
| 09:17:48 | 12 | contract? |
| 09:17:49 | 13 | A.  No. |
| 09:17:49 | 14 | Q.  What was it? |
| 09:17:51 | 15 | A.  We were purely a general contractor.  They had their own |
| 09:17:56 | 16 | architectural and engineering team.  They at points had |
| 09:18:01 | 17 | owners' represents that were involved in managing those |
| 09:18:04 | 18 | aspects. |
| 09:18:06 | 19 | Q.  When you say they had an owners' rep and their own design |
| 09:18:12 | 20 | team, you mean Mark Hunt and M Development? |
| 09:18:14 | 21 | A.  Correct. |
| 09:18:15 | 22 | Q.  Now, once NHC was the owner of the project, all of that |
| 09:18:19 | 23 | design team and owners' representative, that all fell with |
| 09:18:23 | 24 | Centaur, right? |
| 09:18:23 | 25 | A.  Correct. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

10

| 09:18:23 | 1 | Q.  A design builder has more responsibility on a project than |
| 09:18:27 | 2 | a general contractor, do you agree? |
| 09:18:29 | 3 | A.  Yes. |
| 09:18:29 | 4 | Q.  The design builder becomes responsible for all aspects of |
| 09:18:34 | 5 | the project, correct? |
| 09:18:34 | 6 | A.  Correct. |
| 09:18:35 | 7 | Q.  Prior to NHC, there was a separate owner's representative |
| 09:18:40 | 8 | on the project? |
| 09:18:41 | 9 | A.  Yes, there was two different ones.  The first one didn't |
| 09:18:45 | 10 | work out. |
| 09:18:45 | 11 | Q.  There was an architectural team that the developer was |
| 09:18:49 | 12 | responsible for? |
| 09:18:50 | 13 | A.  Yes. |
| 09:18:50 | 14 | Q.  The developer was responsible for FF&E? |
| 09:18:55 | 15 | A.  Yes. |
| 09:18:55 | 16 | Q.  And OS&E? |
| 09:18:56 | 17 | A.  Yes. |
| 09:18:57 | 18 | Q.  Those are the furnishings and the operational supplies for |
| 09:19:01 | 19 | the project, correct? |
| 09:19:02 | 20 | A.  Correct. |
| 09:19:02 | 21 | Q.  As the design builder for NHC, Centaur became responsible |
| 09:19:06 | 22 | for all of those components, correct? |
| 09:19:08 | 23 | A.  Correct. |
| 09:19:08 | 24 | Q.  It employed its own architectural staff? |
| 09:19:11 | 25 | A.  Yeah, to some extent, they were -- we still had the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

# EXHIBIT 3



**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NHC, LLC, a Florida limited      )
liability company,               )
                                 )
          Plaintiff,      )
                                 )
     vs.              )   No. 19-cv-06332
                                 )
CENTAUR CONSTRUCTION COMPANY    )
INC., an Illinois corporation;  )
SPIRO TSAPARAS; and PETER       )
ALEXOPOULOS,                     )
                                 )
          Defendants.     )

The videotaped deposition of PETER
ALEXOPOULOS, called by the Plaintiff for examination,
pursuant to notice and pursuant to the Federal Rules of
Civil Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Nicole Marie DeBartolo, Certified Shorthand Reporter and
Registered Professional Reporter, at 222 North LaSalle
Street, Suite 2600, Chicago, Illinois, commencing at
10:16 a.m. on October 8, 2020.

**Page 2**

 1  APPEARANCES:
 2     VEDDER PRICE, P.C.
       MS. NICOLE J. WING
 3     222 North LaSalle Street
       Chicago, Illinois 60601
 4     Phone:  312.609.7500
       E-Mail:  nwing@vedderprice.com
 5
          On behalf of the Plaintiff;
 6
       SMITHAMUNDSEN LLC
 7     MS. KIMBERLY A. HERRING
       150 North Michigan Avenue
 8     Suite 3300
       Chicago, Illinois 60601
 9     Phone:  312.894.3200
       E-Mail:  kherring@salawus.com
10
          On behalf of the Defendants.
11
       ALSO PRESENT:  MR. SCOT ZIARKO, Videographer
12
13              *  *  *  *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

 1                       INDEX
 2  WITNESS NAME                          PAGE
 3  PETER ALEXOPOULOS
 4     Cross- Examination by Ms. Wing............  7
       Direct Examination by Ms. Herring..........  203
 5     Recross-Examination by Ms. Wing...........  231
 6
                         EXHIBITS
 7                                       PAGE
 8  PLAINTIFF'S
 9  Exhibit 1   Centaur-NHC contract        19
       Exhibit 2   Shawmut Financial Assessment,   76
10        NHC0000047602-652
       Exhibit 3   Shawmut contractor list with    87
11        amounts past due and costs to
          complete, NHC0000047563-601
12  Exhibit 9   E-mails between Service     108
          Sanitation and Centaur
13  Exhibit 10  6/13/19 e-mail with attachment  122
          regarding Vitralum Industries
14  Exhibit 11  E-mail chain between Centaur  145
          and USA Hoist
15  Exhibit 12  "Financial Info for Nobu"    147
          e-mail chain between Martorano
16        and Harris
       Exhibit 13  7/18/19 Velez e-mail regarding  152
17        Nobu Financial Package,
          NHC0000046741
18  Exhibit 14  Nobu Financial and Table of  153
          Contents, NHC0000033928-30
19  Exhibit 15  3/27/19 "Nobu Back-Up" e-mail  155
          chain involving Velez and Nunez
20  Exhibit 16  8/20/19 Centaur summary report  46
       Exhibit 19  6/30/18 Byline Bank statement,  54
21        CEN_009298-307
       Exhibit 20  7/16/19 Montemayor e-mail chain  176
22        regarding "Nobu Subcontractor
          Payment Summary,"
23        NHC0000046638-39
24

**Page 4**

 1          EXHIBITS CONTINUED
 2  PLAINTIFF'S                          PAGE
 3  Exhibit 21  Subcontractor Payment Summary,  176
       7/16/19
 4  Exhibit 28  4/18/19 e-mail from Alexopoulos  95
       to Leffler, Tsaparas, Chapur
 5        with attachment,
          NHC0000005828-31
 6  Exhibit 29  "Notice of Lien to be Filed"  100
          e-mail chain, NHC0000041039-44
 7  Exhibit 30  8/28/19 "Nobu Extra Work"     105
          e-mail between Tsaparas to
 8        Leahy
       Exhibit 31  E-mails between LaForce and  109
 9        Centaur
       Exhibit 32  2/28/19 Byline Bank statement,  112
10        CEN_009233-38
       Exhibit 33  E-mail between Continental  115
11        Electric and Centaur
       Exhibit 34  E-mail regarding State     119
12        Mechanical between Tsaparas and
          Chapur, NHC 0000031678-79
13  Exhibit 35  "Nobu - AOR issues" e-mail   129
          chain between Martorano,
14        Harris, and Alexopoulos
       Exhibit 36  Centaur invoice to NHC LLC,  140
15        6/14/19
       Exhibit 37  "Payment March/06" e-mail chain  182
16  Exhibit 38  10/31/18 "October Payment    187
          Application" e-mail,
17        CEN_005987-88
       Exhibit 39  7/25-26/19 e-mail regarding   191
18        insurance questions,
          NHC0000042989-90
19  Exhibit 27  7/18/19 e-mail with link to    196
          Nobu Financial Package,
20        NHC0000046741
       Exhibit 40  8/9-10/19 e-mail chain between  197
21        Chapur and Tsaparas regarding
          information needed for Shawmut,
22        NHC0000041842
23
24

Page 17

1  things went south with Rodrigo?
2      A  I do.
3      Q  When would you say that was?
4      A  I believe the timing was around summer
5  of 2019.
6      Q  What caused the relationship to deteriorate?
7      A  A difference of the progress versus the
8  payments that had been made and a discrepancy in
9  recollection between what was agreed to at the onset as
10  it relates to kind of trueing up the project later and
11  the ability to actually do so.
12      Q  I'm not asking about specific numbers because
13  I wouldn't expect you to have that kind of thing up at
14  the top of your head, but when you say a difference
15  between progress made and payment, what do you mean by
16  that? What was the difference?
17      A  So our focus was on building the building.
18  The project progress moved much faster than the
19  accounting and the bookkeeping side of the equation, and
20  we ended up realizing that our bookkeeping was not up to
21  speed and that there were discrepancies that we had
22  found out as it relates to dollars received versus
23  dollars spent.
24      Q  Which was more?

Page 18

1      A  Dollars received was more.
2      Q  Dollars received was more than dollars spent?
3      A  Correct.
4      Q  So essentially you had been overpaid on the
5  project?
6      A  Based on the original contract amount, yes.
7      Q  In what ways had Centaur's bookkeeping fallen
8  behind on the project?
9      A  Because the project started before plans and
10  specifications were fully developed, the -- the scope of
11  work on the project continued to evolve. The process of
12  entering an initial budget wasn't able to occur because
13  we didn't have a final budget and -- to establish
14  initial scopes. So we were focused on building the
15  building and didn't focus on fine-tuning the financials
16  until much later.
17      Q  When you first started on the project, you
18  were working with a developer other than NHC, correct?
19      A  Correct.
20      Q  What was the name of that company?
21      A  M Development.
22      Q  How long did you work with M Development on
23  the project?
24      A  Many years. There was a significant period of

Page 19

1  time from when the project was anticipated to commence.
2  Then commencement while originally to start kind of
3  dragged on for a while, so the project was delayed on
4  several instances. So from the time we first started
5  working on what was to be the 854 West Randolph Street
6  development until we parted ways with the prior
7  developer, it was -- excuse me -- it was several years.
8      Q  Approximately how much actual construction got
9  done during the M Development years?
10      A  So during the M Development years, there was
11  the demolition of the initial building and then most of
12  the subgrade work as far as concrete and earth
13  retention, things like that.
14      Q  No above work -- above-grade work took place
15  while M Development was the owner?
16      A  No.
17                  (Plaintiff's Exhibit 1 introduced.)
18  BY MS. WING:
19      Q  If we look at Plaintiff's Exhibit 1, which you
20  have in hard copy in front of you, do you recognize that
21  to be the contract between Centaur and NHC in connection
22  with the Nobu project?
23      A  Yes, it appears to be the construction
24  services agreement.

Page 20

1      Q  The numbers in the bottom right-hand corner,
2  in this case, they start with the letters N-H-C, those
3  are called Bates numbers, and they're unique identifying
4  numbers that we use in litigation to identify every
5  single page of documents that get produced so that we
6  can with precision identify a specific page if we want
7  to draw your attention to it.
8          So looking at the Bates number that ends with
9  9324, it's about two-thirds of the way through the
10  document, does your signature appear on that page?
11      A  It does.
12      Q  Did you have authority to enter into this
13  contract with NHC on behalf of Centaur?
14      A  I did.
15      Q  Do you have any contention that this is not a
16  valid or enforceable contract?
17      A  No.
18      Q  For now, I just wanted to use this contract
19  sort of as a time stamp. On the first page, it's dated
20  April 16th of 2018. Is that about the time that work
21  started on the Nobu Hotel project under the ownership of
22  NHC?
23      A  Approximately.
24      Q  From your perspective, can you describe for me

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4278208
NHC, LLC, etc. v. Centaur Construction Compan Inc., et al.
DATE OF DEPOSITION: 10/8/2020
WITNESS' NAME: Peter Alexopoulos
     In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
     I have made no changes to the testimony
as transcribed by the court reporter.

_____
Date                Peter Alexopoulos
     Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

     They have read the transcript;
     They signed the foregoing Sworn
     Statement; and
     Their execution of this Statement is of
     their free act and deed.

     I have affixed my name and official seal

this _____ day of _____, 20____.

_____
     Notary Public

_____
     Commission Expiration Date

---

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 4278208
PAGE/LINE(S) /      CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____        _____
Date                     Peter Alexopoulos
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .

_____
     Notary Public

_____
     Commission Expiration Date

---

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4278208
NHC, LLC, etc. v. Centaur Construction Compan Inc., et al.
DATE OF DEPOSITION: 10/8/2020
WITNESS' NAME: Peter Alexopoulos
     In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
     I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
     I request that these changes be entered
as part of the record of my testimony.

     I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____
Date                Peter Alexopoulos

     Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
     They have read the transcript;
     They have listed all of their corrections
     in the appended Errata Sheet;
     They signed the foregoing Sworn
     Statement; and
     Their execution of this Statement is of
     their free act and deed.
     I have affixed my name and official seal
this _____ day of _____, 20____.

_____
     Notary Public

_____
     Commission Expiration Date

# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION


 3
     NHC, LLC, a Florida limited    )
 4   liability company,             )
                                    )
 5                                  )
                       Plaintiff,   )
 6                                  )
               vs.                  ) No. 1:19-cv-06332
 7                                  )
     CENTAUR CONSTRUCTION           )
 8   COMPANY, INC., and Illinois    )
     corporation, SPIRO             )
 9   TSAPARAS, and PETER            )
     ALEXOPOULOS,                   )
10                                  )
                                    )
11                     Defendants.  )


12


13              The deposition of RODRIGO CHAPUR DUARTE,

14   called by the Defendants for examination, taken pursuant

15   to notice and pursuant to the Federal Rules of Civil

16   Procedure for the United States District Courts

17   pertaining to the taking of depositions, taken before

18   Emily Frain, Certified Shorthand Reporter and Registered

19   Professional Reporter at 150 North Michigan Avenue,

20   Suite 3300, Chicago, Illinois, commencing at 10:06 a.m.

21   on the 3rd day of December, 2020.


22


23


24
```



Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 36 of
262
Case: 1:19-cv-06332 Document #: 761-4 Filed: 07/30/25 Page 3 of 7 PageID #:33065

NHC LLC vs Centaur Construction Company
Rodrigo Chapur Duarte - 12/03/2020                                              Page 34

```
 1    put him there.  So...
 2         Q.   Okay.  I don't think I asked you this, but
 3    what was Antonio's -- or was Antonio involved from the
 4    very beginning of the project?
 5         A.    Involved in the sense of -- Yes.  I mean, he
 6    always knew about Nobu Chicago, that we purchased it,
 7    how much it was.  I mean, all those details that the CFO
 8    would know.
 9         Q.   Okay.  And he -- Okay.
10              What was Israel's involvement in this project?
11         A.   He's treasury, so pay.  I mean, he did the
12    execution of the wires after, you know, I told him to
13    pay it.
14         Q.   Fair to say he wasn't involved in any
15    construction aspects?
16         A.   No, no.
17         Q.   Okay.  And you said you would tell him to pay
18    the wires.  Did he ever pay any wires without
19    authorization from you?
20         A.   No, no.  Never.  Hopefully not that I know of.
21         Q.   Other than the people we've already -- we've
22    already talked about, is there anyone else that you
23    would say had a major role in this project that we
24    haven't talked about?
```



Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 37 of 262
Case: 1:19-cv-06332 Document #: 761-4 Filed: 07/30/25 Page 4 of 7 PageID #:33066

NHC LLC vs Centaur Construction Company
Rodrigo Chapur Duarte - 12/03/2020                                      Page 35

1       A.    No.

2       Q.    Okay.   And I mean on behalf --

3       A.    Oh.

4       Q.    -- of RCD.

5       A.    Of course, of course.   No.

6       Q.    Okay.   I want to kind of talk about when you

7   first became aware of the Nobu Chicago project.   So I

8   want to kind of take you back a few years to -- back to

9   where it all began.

10          How did you first become involved in Nobu

11  Chicago?

12      A.    So Trevor and Struan that work for a -- the

13  CEO and the COO of Nobu Hospitality, told us that they

14  had a project that was stopped in Chicago, that they

15  were looking to -- you know, the owner was looking to

16  sell part of it.   So we, you know, were interested in

17  that.   And then we told them that we already have six

18  brothers -- six partners already and it's too

19  complicated to get more partners, you know, which is my

20  brothers and sisters.   And we said if he's willing to

21  sell the whole project, we're willing to look at it.

22          So after a couple of -- you know, maybe that

23  was 2017.   Because we purchased it December 2017.   We

24  did the construction 2018.   So, yeah, sometime in 2017



1   my father and myself flew here with Trevor and Struan

2   and we met the developer, Mark Hunt, at Spiro's

3   office -- Centaur's office, and we saw the project.  I

4   mean, there was nothing to see, it was just land, and we

5   negotiated a couple of months to purchase that project

6   from him.

7        Q.   Okay.  So how did you know Trevor and Struan?

8        A.   So Trevor and Struan were working for Hard

9   Rock when we did the Hard Rock Punta Cana deal in 2009.

10  So I was the one working with them doing the contract.

11  Before we signed the contract with Hard Rock, they went

12  to work for Nobu Hospitality.  So they created Nobu

13  Hospitality.

14       Q.   Okay.  You said something about not wanting

15  more partners.  Did Trevor and Stru want to be your

16  partners in this deal?

17       A.   No, no, no.  So Mark wanted -- Mark Hunt

18  wanted to maybe -- you know, he needed money to start

19  because he wasn't getting a loan, I think, or whatever

20  the story was.  So he wanted to be like 50/50 partners,

21  and we told him, No, we already have six brothers and

22  sisters as partners.  We either purchase it or we don't

23  get involved.

24       Q.   Okay.  So it was Mark Hunt --



Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 39 of 262
Case: 1:19-cv-06332 Document #: 761-4 Filed: 07/30/25 Page 6 of 7 PageID #:33068

NHC LLC vs Centaur Construction Company
Rodrigo Chapur Duarte - 12/03/2020                                          Page 37

```
1        A.    Yes.

2        Q.    -- that you didn't want to partner with --

3        A.    Correct.

4        Q.    -- or that maybe wanted to partner with you?

5        A.    Correct.

6        Q.    Okay.  So Trevor and Stru called and said,

7   We've got this project in Chicago and it stopped and we

8   need your help, essentially.

9              Who did they call, you or your dad?

10       A.    Myself.

11       Q.    Okay.

12       A.    My dad with his English, they call me.

13       Q.    Okay.  So you and your dad then came to

14  Chicago to see the project?

15       A.    Correct.

16       Q.    And you might have told me when that was, but

17  when was that?

18       A.    I don't remember the date.  I mean, I know

19  sometime in 2017.  I think -- I mean, if I told you a

20  month, it would be -- I could look at it, but I don't --

21  I don't remember.

22       Q.    Was it cold out?

23       A.    I don't remember.

24       Q.    Okay.  So 2017, you came to Chicago to look at
```



1             In witness whereof, I have hereunto set my

2    hand and affixed my seal of office at Chicago, Illinois,

3    this 8th day of January, 2021.

4

5

6

7

8                        Emily Frain, CSR, RPR
                         180 North LaSalle Street
9                        Suite 2800
                         Chicago, Illinois 60601
10                       Phone:   (312) 236-6936

11

12   CSR No. 084-004892

13

14

15

16

17

18

19

20

21

22

23

24



# EXHIBIT 5

<div style="text-align:center">

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

</div>

| | | |
|---|---|---|
| NHC LLC, | ) | Case No. 19 C 6332 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CENTAUR CONSTRUCTION COMPANY INC., | ) | Chicago, Illinois |
| et al., | ) | January 8, 2025 |
| | ) | 2:00 p.m. |
| Defendants. | ) | |

<div style="text-align:center">

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

</div>

APPEARANCES:

For the Plaintiff:      VEDDER PRICE P.C.
                        BY:  MR. ZACHARY J. WATTERS
                        222 North LaSalle Street, Suite 2600
                        Chicago, IL 60601
                        (312) 609-7500

                        DAVIS MCGRATH LLC
                        BY:  MS. GINI S. MARZIANI
                        125 South Wacker Drive, Suite 300
                        Chicago, IL 60606
                        (312) 332-3033

Court Reporter:         MS. CAROLYN R. COX, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2102
                        Chicago, Illinois  60604
                        (312) 435-5639

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 43 of
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 3 of 10 PageID #:33072
Tsaparas - cross by Herring
63

1   Q.  Okay.  I want to look back at the initial declaration that

2   Mr. Watters talked you through.  If I have the option to share

3   my screen, which looks like I am not able --

4           MS. HERRING:  Mr.  Gavrilos, can you share your

5   screen and show the August 2nd disclosure of legal fees?

6           MR. GAVRILOS:  I sure can.  One moment.

7     (Brief pause.)

8   BY MS. HERRING:

9   Q.  What case does this --

10           THE COURT:  You might want to make it a little

11   bigger.

12           MS. HERRING:  Sure.

13           THE COURT:  Thanks.  I appreciate it.

14   BY MS. HERRING:

15   Q.  What case does this declaration itemize attorneys' fees

16   from?

17   A.  NHC against Centaur, Spiro, and Peter.

18   Q.  Amundsen Davis represents Centaur in the case involving

19   Four Province Masonry, correct?

20   A.  Correct.

21   Q.  Do you know if NHC is a party to that case?

22   A.  I don't believe so.

23   Q.  Did you ever ask M Development to pay you or Triton

24   instead of paying Amundsen Davis?

25   A.  No.

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 44 of
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 4 of 10 PageID #:33073
Tsaparas - cross by Herring
64

1  Q.  Do you know for certain if Mark Hunt would have paid you

2  or Triton instead of paying Amundsen Davis for legal fees?

3        MR. WATTERS:  Objection, your Honor.  Speculation.

4        THE COURT:  Overruled.  You can answer.

5        THE WITNESS:  I have to answer speculatively.

6        My answer is he wouldn't.

7  BY MS. HERRING:

8  Q.  Mr. Watters showed you a number of documents that had the

9  word "Triton Marine" on them, and you testified you had never

10 seen those before.

11       Do you remember that?

12 A.  Which documents are you referring to?  There were several

13 documents.

14       Are you talking about the invoices?

15 Q.  Yes.

16 A.  Yes.

17 Q.  Did you prepare those documents?

18 A.  I don't believe I stated that I've never seen them before.

19       I stated that I have no idea what these are, and I

20 can't remember what these are.

21       But during our break, I found out what they are.

22 Q.  What are they?

23 A.  M Sourcing, after they hired me, they were paying me my

24 paycheck through Triton and not through the paycheck for a

25 period of time before M Sourcing attorneys were comfortable

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 45 of 262
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 5 of 10 PageID #:33074
Tsaparas - cross by Herring
65

1   with the idea of me being an employee and having a fraud case
2   against me.
3          So Mark, the entrepreneur and the man who has seen me
4   perform dozens of projects in 16 years and the owner of the
5   company, wanted me there.
6          But their attorneys were warranted, and they were
7   taking their time until they make me an employee of the
8   company.
9          During that period, they were paying me.  So what you
10  see as Triton is just my paycheck until I became an employee,
11  and I started getting paid by ADP.
12  Q.  Mr. Watters pulled up a spreadsheet of payments that was
13  not produced to us.
14          MS. HERRING:  Mr. Watters, can you please put that
15  back up on the screen for me.
16          MR. WATTERS:  Yes, I can.
17  BY MS. HERRING:
18  Q.  And this is a document, which looks to be Bates numbered M
19  Development 13.
20          Mr. Tsaparas, have you seen this document before
21  today?
22  A.  No, I have not seen this document in its entirety after
23  Mr. Watters was scrolling down.  This beginning part rings a
24  bell.
25          And I believe it's an attachment to my employment

Case No. 1:25-cv-02537     Document 1-9     filed 08/13/25     USDC Colorado     pg 46 of 262
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 6 of 10 PageID #:33075
Tsaparas - cross by Herring
66

1   agreement but just a portion of this entire document.

2   Q.  Okay.

3   A.  The rest of the document to the bottom, it is not and I

4   have not seen.

5   Q.  If we scroll through this document, when is the last

6   date -- last transaction on this document?

7   A.  December 30th, 2022.

8   Q.  Thank you.

9        MS. HERRING:  Thank you, Mr. Watters.  You can put

10  that down.

11  BY MS. HERRING:

12  Q.  All right.  Mr. Tsaparas, I want to take a little bit of a

13  step back.

14        What company do you work for?

15  A.  M Sourcing LLC.

16  Q.  What is the difference between M Sourcing and M

17  Development?

18  A.  Two completely legal entities with different employees

19  owned by the same person.

20  Q.  Have you ever worked for M Development?

21  A.  I have never worked for M Development.

22  Q.  How long have you worked at M Sourcing?

23  A.  For the last two -- a little over two years, two and a

24  half years.

25  Q.  What is your title at M Sourcing?

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 47 of
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 7 of 10 PageID #:33076
Tsaparas - cross by Herring
69

 1  Q.  Have you at any time been a signer on any account for M

 2  Development or M Sourcing, which would allow you to write

 3  checks on behalf of either of those companies?

 4  A.  I have never been a signer.

 5  Q.  Do you know how many bank accounts M Sourcing has?

 6  A.  I do not.

 7  Q.  Do you know how many bank accounts M Development has?

 8  A.  I do not.

 9  Q.  Do you know how much money is in M Sourcing's bank

10  accounts?

11  A.  I do not.

12  Q.  Do you know how much money is in M Development's bank

13  accounts?

14  A.  I do not.

15  Q.  You told us that your job duties include sourcing.

16      When there are materials to be purchased, how does M

17  Development or M Sourcing go about purchasing those materials?

18  A.  That entire process happens under my supervision.  And I

19  prequalify, receive bids, proposals, qualify, accept.

20      I'm not a signer of contracts.  I'm not allowed to.

21  So Mark has to sign contracts, POs, RFQs, RFPs, and so on.

22      Then once a contract with a supplier or vendor has

23  been concluded and has been contracted and I receive an

24  invoice, I confirm that the invoice is accurate.  I stamp it.

25  I say what project it is, when is it due to be paid, whether

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 48 of
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 8 of 10 PageID #:33077
Tsaparas - cross by Herring

70

1    it's accurate or not.

2            And then I send it to the controller of the company

3    with -- via email saying that this shall be processed, it is

4    accurate, and that vendor is due to be paid at that time.

5    Q.  Who then handles the payment to the vendor?

6    A.  It is the controller of the company and, depending on

7    projects and so on, one of the accountants.

8            But I don't deal directly with the accountants.  I

9    deal just with the controller, and her name is Nancy Turket

10   (phonetic).

11   Q.  Do you travel for M Sourcing as part of your employment?

12   A.  I do if I need to.

13   Q.  Do you have an M Sourcing credit card for use while you

14   travel?

15   A.  I do not.

16   Q.  How long have you known Mark Hunt?

17   A.  Since the beginning of 2006.

18   Q.  Okay.  So 18, 19 years?

19   A.  18, 19 years.

20   Q.  What is the nature of your relationship with Mr. Hunt?

21   A.  Well, we call each other "brothers."  We're dear friends.

22   Our families are friends.  His kids call me "uncle."  I know

23   them since they were two years old, and they just graduated

24   college.

25           And at the same time, I am very proper in maintaining

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 49 of 262
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 9 of 10 PageID #:33078
Tsaparas - cross by Herring
71

1    the professional orders when I'm working for him.  Because at

2    the same time, the relationship is quite interesting because

3    he is my employer, and he is a friend.

4         MS. HERRING:  Mr. Gavrilos, can you put the August

5    2nd disclosure up on the screen for us again, please?

6    BY MS. HERRING:

7    Q.  If you look at paragraph 3, Mr. Tsaparas, it says, "All

8    payments were made at my direction."

9         What did you mean by "direction" in this disclosure?

10   A.  That I gave -- I asked for those payments to be made.

11        I'm assuming you're talking about specifically to M

12   Development?

13   Q.  Yes.

14   A.  Yeah.  I asked Mark to please help me pay the legal fees

15   because I'm drowning.

16   Q.  If you wanted $100,000 of M Development's money today,

17   could you direct M Sourcing or M Development to pay $100,000?

18   A.  No.  I don't have the authority -- the ability to do or

19   have never done that.

20        Not a hundred thousand, $5, I can't do that.

21   Q.  Was there ever a time when you had the authority to direct

22   M Development, M Sourcing, or Mark Hunt to send $100,000?

23   A.  No, there has never been a time.

24   Q.  There are three payments to M Development -- or from M

25   Development to Amundsen Davis, which are at issue here today.

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 50 of
Case: 1:19-cv-06332 Document #: 761-5 Filed: 07/30/25 Page 10 of 10 PageID #:33079

104

1          THE COURT:  Everybody take care.  Thanks.

2          MR. WATTERS:  Thank you, your Honor.

3          MR. GAVRILOS:  Thank you, your Honor.

4          THE WITNESS:  Thank you.

5      (Which were all the proceedings had in the above-entitled

6    cause on the day and date aforesaid.)

7      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
8
     /s/ *Carolyn R. Cox, RPR, F/CRR*_____  February 24, 2025
9    Official Court Reporter
     United States District Court
10   Northern District of Illinois
     Eastern Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 6

*NHC LLC*

*v.*

*Centaur Construction Company Inc*

---

Mark Hunt

September 22, 2023

---

**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 53 of
Case: 1:19-cv-06332 Document #: 761-6 Filed: 07/30/25 Page 3 of 8 PageID #:33082
AB Litigation Services

**Page 1**

UNITED STATES DISTRICT COURT, FOR THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION

Case No. 19 C 6332

_____

REMOTE DEPOSITION OF MARK HUNT    September 22, 2023

_____

PLAINTIFF:

NHC LLC,

vs.

DEFENDANTS:

Centaur Construction Company, Inc.,

Spiros Tsaparas and Peter Alexopoulos

APPEARANCES:

    BUECHLER & GARBER LLC

        By Michael Lamb, Esq.

            999 18th Street, Suite 1230 South

            Denver, Colorado  80202

                    Appearing on behalf of Plaintiff.

                (Via Zoom videoconference.)

    SHERMAN & HOWARD L.L.C.

        By Emily F. Keimig, Esq.

            675 15th Street, Suite 2300

            Denver, Colorado  80202

                Appearing on behalf of Defendants.

                (Via Zoom videoconference.)

**Page 2**

1    Pursuant to Subpoena and the Federal
2  Rules of Civil Procedure, the deposition of
3  MARK HUNT, called by Plaintiff, was taken
4  on  Friday, September 22, 2023, commencing at
5  10:00 a.m., via Zoom videoconference, before
6  Sharon R. Dobson, Registered Professional
7  Reporter within and for the State of Colorado.
8
9
10                  I N D E X
11  DEPOSITION OF MARK HUNT
12  EXAMINATION BY:                        PAGE
13    Mr. Lamb                              3
14    Ms. Keimig                            --
15
    EXHIBITS                        INITIAL REFERENCE
16
    Exhibit 1  Employment Agreement            7
17
    Exhibit 2  Payroll Details                11
18
    Exhibit 3  Amended and restated           12
19             promissory note
20  Exhibit 4  Invoices                       19
21
22
23
24
25

**Page 3**

1              P R O C E E D I N G S
2                  MARK HUNT,
3  being first duly sworn in the above cause, was
4  examined and testified as follows:
5                  EXAMINATION
6  BY MR. LAMB:
7    Q    Good morning, Mr. Hunt.  My name is Mike
8  Lamb.  I represent NHC, LLC.  Do you have any issues
9  if I call you Mark or would you prefer Mr. Hunt?
10    A    Mark is fine.  Thank you.
11    Q    Okay.  Mark, have you ever been deposed or
12  been under oath in a setting like this prior to
13  this?  Today, that is.
14    A    I have.  I don't exactly remember when,
15  but it was a long, long time ago.
16    Q    Sure.  Okay.  Well, let me -- let me give
17  you a couple brief ground rules.  As you heard, we
18  have a court reporter here that's taking down the
19  transcript of everything that's being said today.
20  As a result, we need to do our best not to talk over
21  one another.  If you'll do me the courtesy of
22  allowing me to finish my question, I'll do my best
23  to allow you to finish your answer, and then we can
24  proceed in that fashion.
25          What we can't have that happens in typical

**Page 4**

1  conversation a lot is sort of nonverbal answers,
2  um-hum, huh-uh, that kind of thing.  That doesn't
3  translate very well to the transcript.  And so we
4  need yes, no, that kind of thing, as best as you're
5  able.
6          If I ask a question -- or when I ask a
7  question that you don't understand, please ask me to
8  clarify.  I'm not trying to trick you or anything
9  along those lines.  But if you answer the question,
10  I will assume you understood it.  Is that fair?
11    A    Fair.
12    Q    Good.  And with that said, is there -- do
13  you have -- are you on any medication or sick or
14  anything along those lines in such a way that would
15  prevent you from testifying accurately today?
16    A    I am not.
17    Q    Okay.  Let's just jump -- I'm going to
18  refer to him as Spiro.  That's a lot easier than his
19  last name, which I still don't know how to
20  pronounce.
21          But let me just ask you this; How long
22  have you known Spiro?
23    A    I've known Spiro probably somewhere
24  between 15 and 20 years.
25    Q    How did you first meet?

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 54 of
Case: 1:19-cv-06332 Document #: 761-6 Page: 4 of 8 PageID #:33083
AB Litigation Services
filed 07/30/25

Page 5

1    A    I met him -- I was a developer in Chicago.
2  He had a smaller general contracting firm.  Met a
3  couple times through mutual friends and -- and then
4  ultimately ended up doing -- hiring him to -- to
5  build a building.
6    Q    How would you characterize your
7  relationship with Spiro?  Are you at this point
8  friends, professional acquaintances, somewhere in
9  between?
10    A    I would say both.
11    Q    Okay.  Do you speak to him regularly
12  still?
13    A    I do.
14    Q    Are you coming to us from Aspen this
15  morning?
16    A    Am I in Aspen?
17    Q    Yes.
18    A    I am, yes.
19    Q    And does Spiro also live in Aspen?
20    A    He does, yes.
21    Q    Do you -- do you meet face to face on a
22  regular basis as well?
23    A    Yes.
24    Q    And I want to -- I want to lay out one
25  other ground rule that I didn't get to.  I know as

Page 6

1  we get into this a little bit further there's going
2  to be a lot of entities involved.  I know you have
3  several entities that are at least tangentially
4  related to some of this.  I'm going to do my best to
5  have clear pronouns.
6         And so when I say "you," I might mean,
7  you know, you in your individual capacity.  In
8  other cases I might mean you as an entity such as
9  M Development or M Sourcing or something along those
10  lines.
11         I'm sure your counsel will help me clarify
12  my pronoun usage if needed, because I don't want to
13  attribute a statement to you as an individual if
14  it's more attributable to one of your entities, if
15  that makes sense.
16         And if -- if there's ever a circumstance
17  where you are questioning whether it's, you know,
18  a reference to an entity or to you individually,
19  please ask me to clarify and I'll do that.  Is
20  that -- I know that was a bit complicated, but I
21  hope you take my meaning with all that.
22    A    Understood.
23    Q    Okay.  So I'm going to try and share my
24  screen here.  It's been a minute since I've done
25  this, so hopefully I do it correctly.

Page 7

1         Is that Employment Agreement coming up on
2  the screen now?
3    A    It is, yes.
4    MR. BUECHLER:  And, Shar, I'll send this
5  over to you as an exhibit.  We can designate this as
6  Exhibit 1.
7         (Exhibit 1 marked.)
8    Q    (By Mr. Lamb) Do you recognize this
9  document?  Let me know, I can scroll down for you.
10    A    Yes, I do.
11    Q    Okay.  And it's an Employment Agreement
12  between one of your entities, M Sourcing, and Spiro;
13  is that correct?
14    A    That is correct.
15    Q    And it says, as I scroll down here, term
16  of employment.  It ends -- the initial term goes
17  through December 31st, 2029.  And I believe it
18  started December 31st, 2022.  Is that, give or take,
19  pretty accurate?
20    A    Yes.
21    Q    Is this agreement still in effect?
22    A    It is.
23    Q    And so he is still employed by M Sourcing?
24    A    Correct.
25    Q    Now I want to scroll down, if you can see

Page 8

1  here where it says, Title and positions.  And I'll
2  read it for you.  It says, During the employment
3  term, executive shall hold the position of blank.
4  And it looks like maybe there was some title that
5  should have been inserted at that point.  What is
6  Spiro's title with regard to M Sourcing?
7    A    He doesn't have one.
8    Q    And what does Spiro do for M Sourcing?
9    A    He -- basically when we build buildings,
10  he has been fairly resourceful on just basically
11  kind of scouring around as the -- as the
12  construction materials have gotten very expensive,
13  you know, over the last handful of years, certainly.
14  He is really just kind of sourcing, you know,
15  best -- whether it's steel, windows, brick, stone,
16  millwork, case goods, and just has a lot of
17  relationships from over the years and finding kind
18  of the best -- best place to procure the -- the
19  materials for the buildings that we're building.
20    Q    So generally speaking, procurement, is
21  that a fair overall description, procurement --
22    A    Yes.
23    Q    -- of construction materials?
24    A    Yes.
25    Q    And is he doing that strictly on behalf of

Page 9

1  M Sourcing or is he doing that for some of your
2  other entities as well?
3      A    What do you mean by "other entities"?
4          (Ms. Keimig's audio failed and her Zoom
5  connection was restarted.)
6          (Page 7, Line 23 through Page 9, Line 4,
7           read.)
8      Q    (By Mr. Lamb) So going back to that
9  question, my understanding is, you know, you're at
10 least affiliated -- well, let me back up one.
11         What is your title with respect to
12 M Sourcing?
13     A    I'm the owner.
14     Q    Owner.  And is it fair to say you are the
15 owner of several other entities that are engaged in
16 various construction projects?
17     A    Yes.
18     Q    So does Spiro do any procurement directly
19 for those other entities with respect to those other
20 construction projects?
21     A    Yes.
22     Q    Is he paid exclusively by M Sourcing?
23     A    Yes.
24     Q    Does he have any title with any of your
25 other entities?

Page 10

1      A    He does not.
2      Q    There was another sort of preliminary
3  question I should have asked you.  Did you do
4  anything to prepare for today's -- I guess it's a
5  deposition, but I sort of characterize it almost as
6  more of a conversation.  But did you prepare in any
7  way for today's deposition?
8      A    No, other than just looking at the -- the
9  documents that we provided.  Not really studying the
10 documents, but seeing which documents we provided.
11     Q    Did you speak with Spiro with respect to
12 your appearance today?
13     A    I did not other than the fact that I told
14 him that I had a deposition.  But I had zero
15 conversation with him as it relates to it.
16     Q    Has he spoken with you regarding this
17 dispute in any capacity, in any way?
18     A    Just surface.  You know, obviously, you
19 know, I've known Spiro for a long time and when he
20 was going through it.  You know, nothing in detail,
21 but I certainly knew what was going on.
22     Q    I am going to switch to another document
23 here.  Is that coming up on your screen?
24     A    It is.
25         MR. LAMB:  And we'll designate this

Page 11

1  Exhibit 2.
2          (Exhibit 2 marked.)
3          MS. KEIMIG:  Mike, it might be helpful for
4  the record if you reference the Bates numbers.
5          MR. LAMB:  Oh, yes.  I see that now.
6  Okay.  And in the lower right-hand corner there's a
7  Bates number here MDEV-24.
8      Q    (By Mr. Buechler) I'll represent to you
9  that these are payroll details relating to Spiro.
10 And it looks to me that he gets paid twice a month.
11 Is that your understanding, Mark?
12     A    Yes.
13     Q    And that is continuing through September,
14 through today's deposition; is that correct?
15     A    That is correct.
16     Q    Do you know who handles your payroll?
17 Sorry.
18         Do you know who handles M Sourcing's
19 payroll?
20     A    I do not.  I would guess it's ADP, but I'm
21 not certain.
22     Q    Moving on to a new document here.  Does
23 this promissory note appear on your screen?
24     A    Yes.
25     Q    And it's --

Page 12

1          MR. LAMB:  And we'll call -- this Amended
2  and Restated Promissory Note, we'll call this
3  Exhibit 3.
4      A    Okay.
5          (Exhibit 3 marked.)
6      Q    (By Mr. Lamb) And this is a promissory
7  note -- do you recognize this document?  Let me ask
8  you that first.
9      A    Yes.
10     Q    And it's a promissory note between your
11 company, M Sourcing, and Triton Marine Holdings; is
12 that accurate?
13     A    Yes.
14     Q    It looks like the total amount of this
15 note was $4,164,759.90.  Do you see that?
16     A    Yes.
17     Q    To your understanding, is Triton Marine
18 Holdings one of Spiro's entities?
19     A    That is my understanding.
20     Q    Do you have any understanding of what type
21 of business Triton Marine Holdings is engaged in?
22     A    I do not.  I don't know that it actually
23 is.  I know he used it for a while there.  I was
24 using him as a consultant before we went and put
25 together an employment agreement.  And I believe he

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 56 of
Case: 1:19-cv-06332 Document #: 761-6 Filed: 07/30/25 Page 6 of 8 PageID #:33085
*AB Litigation Services*

Page 13

1  used Triton as the consultant agreement, as the
2  company that was -- he used for consulting.
3      Q    So just to clarify, your recollection is
4  you hired -- or one of your entities hired Triton
5  Marine Holdings as a consulting firm for one of your
6  construction projects?  Something along those lines?
7      A    Yeah.  Just kind of general consulting.
8  You know, overseeing, you know, a handful -- help
9  with a handful of -- of construction projects.
10     Q    Do you recall the purpose of this loan?
11     A    Not specifically.  This loan is made up
12 of, you know, death by a thousand cuts.  I mean, and
13 it spans, you know, a long period of time.  I've
14 gotten into kind of a bad habit of making a bunch of
15 loans to Spiro over the years.  And -- and it just
16 kind of rolled up to a sizable number, as we can
17 see.
18     Q    Is it fair to say that this promissory
19 note sort of captured several previous loans that
20 you -- that were made, you know, from you or one of
21 your entities to Spiro?
22     A    Yes.
23     Q    So it's not as if when you executed this
24 particular note on behalf of M Sourcing that you
25 then funded $4.1 million, give or take, to Spiro in

Page 14

1  connection with the note?
2      A    No.  This -- this spans years.
3      Q    And so it was sort of a let's clean up our
4  relationship a little bit here.  I've been giving
5  you money or my company has been lending you money
6  over these years and we need to -- to paper this up
7  so we have a clear understanding of how much that
8  amount is and what your responsibilities are going
9  forward?
10     A    Correct.
11     Q    When it says in here that the note will be
12 forgiven provided Spiro continues in his employment
13 with M Sourcing, is that accurate?
14     A    That is accurate.  It burns off over eight
15 or nine years, if I recall.
16     Q    Is -- is Spiro required to make ongoing
17 payments, and then whatever the balance is will be
18 forgiven at the end of the term of employment, or is
19 everything being held in abeyance, so to speak?
20     A    He is not required to make any payments.
21     Q    And then you mentioned that these --
22 this -- this dollar figure spans numerous years.  Do
23 you recall generally why these loans were going from
24 M Sourcing to Spiro or one of his entities?
25     A    I -- I mean, it went -- it really kind of

Page 15

1  ran the gamut.  I mean, there's -- there's certain
2  dollar amounts in there that may be as low as $500
3  or a thousand dollars.  You know, and that could
4  have been for a nanny, he had to pay his nanny.  I
5  mean, it was -- it was that.
6          And then, you know, over the years there
7  were times where he needed money for his business,
8  you know, Centaur at the time, you know, some things
9  personally.  You know, so it -- it really runs the
10 gamut of anything from really small dollar amounts
11 to, you know, some, you know, a lot more sizable.
12     Q    And some were for his personal use and
13 some were business oriented, so it just -- so it ran
14 the gamut in terms of amounts and purpose; is that
15 fair to say?
16     A    That's -- yeah, that's my understanding.
17     Q    Did any of your entities do business with
18 Centaur Construction?
19     A    Yes.
20     Q    And I assume -- and I guess I don't know
21 this because we're sort of follow-up counsel, but to
22 your understanding Centaur is no longer in business?
23     A    Correct.
24     Q    Is there a particular geographic area
25 that -- that Spiro is doing most of his work in on

Page 16

1  behalf of M Sourcing?  Like, is it mostly for the
2  projects in the Aspen area?  I know you said he did
3  some business in the Chicago area.  I don't know if
4  you're still doing business there, but -- or your
5  entities, but is he mostly focused in Aspen or is he
6  all over the place?
7      A    Mainly Aspen.
8      Q    Do you know -- do you know his address in
9  Aspen?
10     A    I do not.
11     Q    Do you know if he owns his -- do you know
12 if he owns the residence that he lives at in Aspen?
13     A    He does not.
14     Q    Do you have any understanding of who owns
15 that?
16     A    I just know a single woman owns it and
17 rents it to Spiro and his family.
18     Q    I believe the employment agreement
19 requires Spiro to work exclusively on behalf of
20 M Sourcing.  Is that your understanding?
21     A    Yes.
22     Q    Has that term of the agreement been
23 modified in any way, to your under -- to your -- to
24 your knowledge?
25     A    No.

*AB Litigation Services*

Page 17

1    Q    Do you know -- and I'm going to butcher
2  this last name.  Do you know Peter Alexopoulos?
3    A    I do.
4    Q    How long have you known Peter?
5    A    I've known Peter -- I wasn't really close
6  with Peter, but I've known him for almost as long as
7  I've known Spiro.
8    Q    So approximately 10 to 15 years?
9    A    Yeah.  At least 10 to 15 years.
10    Q    Your -- but you're not as close to Peter
11  as you are to Spiro?
12    A    Correct.
13    Q    Do you know where Peter lives?
14    A    I believe Peter lives in Chicago.  I
15  haven't heard anything any different.  I mean, I
16  assumed he lived in Chicago when I knew him and I
17  assume he lives there now, but I do not know.
18    Q    Okay.  Does Peter have any business
19  relationships with any of your entities?
20    A    He does not.
21    Q    Has he ever -- has he or any of his
22  entities ever had a business relationship with your
23  entities?
24    A    Only when he was part of Centaur
25  Construction and we would do -- we would do deals

Page 18

1  with Centaur.  He -- he obviously would have been
2  involved at some level.
3    Q    So your communications with Peter, fair to
4  say, are pretty few and far between?
5    A    Exactly.
6    Q    Would you be able to put a date on the
7  last time you spoke with him?
8    A    I -- I could not.  Years.
9    Q    Do you know when he was associated with
10  Centaur, is it fair to say that your point of
11  contact was primarily Spiro?
12    A    Correct.
13    Q    Do you know -- do you know if Triton
14  Marine Holdings is still doing any sort of separate
15  consulting or in business at all?
16    A    I do not, but that would be very
17  disappointing if they were.
18    Q    I mean, I -- I -- I take it, then, the
19  entire point of the employment agreement is sort of
20  Spiro works for M Sourcing, no side gigs, no side
21  hustles, nothing like that?
22    A    Correct.
23    Q    And you don't have any reason to doubt
24  that that's what's been going on?
25    A    I do not.

Page 19

1    Q    I'm going to share one other document
2  here.  Has this invoice come up on -- on your
3  screen?
4    A    It does.
5    Q    This has been marked as -- well, there are
6  several here, but it starts at MDEV, M-D-E-V, 44.
7  And on the top here we've got M Development.  The
8  invoice is to M Development, and it says, Ship to
9  Triton.
10    A    That's -- that's his home address, by the
11  way.
12    Q    The 96 Mountain Laurel Court?
13    A    Yes.
14         THE COURT REPORTER:  And this is 4?
15         MR. LAMB:  Yes, Exhibit 4.
16         (Exhibit 4 marked.)
17    Q    (By Mr. Lamb) And it says -- down below it
18  says 8 -- 8-26, 2022, for construction services.
19  I -- I assume this occurred -- and the date, again,
20  on the upper right, 8-26, 2022.  I assume you
21  referenced earlier when you were talking about
22  consulting services -- is this invoice in relation
23  to the consulting services Triton provided to
24  M Development prior to entering the employment
25  agreement?

Page 20

1    A    Correct.
2    Q    Let me ask you this.  Why did it -- what
3  prompted the -- the shift, so to speak, from this
4  offering sort of outside consulting to bringing him
5  on as an employee on behalf of M Sourcing?  What --
6  what prompted that to happen?
7    A    Just getting the agreements put together
8  and -- and finalize and making sure, you know, the
9  right -- there were the right protections and
10  everything put in place.
11    Q    So this -- this is just sort of a stopgap
12  measure with the idea that he would become an
13  employee of -- of M Sourcing once the agreements
14  were properly drafted up?
15    A    Yes.
16    Q    Do you know during that period of time
17  when Triton was acting as a consultant, was there
18  anything in writing or at least a verbal
19  understanding that even at that point he was going
20  to be working exclusively for M Sourcing or M
21  Development?
22    A    Not necessarily at this time.  I mean, he
23  had a bunch of cleanup things that he was, you know,
24  doing as it related to Centaur, so I knew he was
25  spending plenty of time on that as well.

Case No. 1:25-cv-02537     Document 1-9     filed 08/13/25     USDC Colorado     pg 58 of
Case: 1:19-cv-06332 Document #: 761-6 Filed: 07/30/25 Page 8 of 8 PageID #:33087
*AB Litigation Services*

Page 21

1     Q    Okay.  I actually don't believe I have any
2   more questions.  Let me just -- give me one second
3   to look over my notes real fast.  No, I think that's
4   it.  You know, this was never going to be a real
5   long one.  I appreciate you showing up today and
6   participating, but I don't have any more questions
7   for you.
8     A    Okay.
9         MS. KEIMIG:  Nothing from me.
10         (The deposition concluded at 10:33 a.m.,
11   on September 22, 2023.)
12         (The deponent waived signature.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 22

1   STATE OF COLORADO  )
2                      )  SS.   REPORTER'S CERTIFICATE
3   COUNTY OF DENVER   )
4         I, Sharon R. Dobson, do hereby certify
5   that I am a Registered Professional Reporter; that
6   previous to the commencement of the examination, the
7   deponent was duly sworn to testify to the truth.
8         I further certify that this deposition was
9   taken in shorthand by me at the time and place
10   herein set forth, that it was thereafter reduced to
11   typewritten form, and that the foregoing constitutes
12   a true and correct transcript.
13         I further certify that I am not related
14   to, employed by, nor of counsel for any of the
15   parties or attorneys herein, nor otherwise
16   interested in the result of the within action.
17         In witness whereof, I have affixed my
18   signature on September 27, 2023.
19
20              *Sharon R Dobson*
              Sharon R. Dobson, RPR
21              216 - 16th Street, Suite 600
              Denver, Colorado  80202
22
23
24
25

Page 23

1   AB LITIGATION SERVICES
    216 - 16th Street, Suite 600
2   Denver, Colorado  80202
3
4
5              MARK HUNT
            September 22, 2023
6      NHC LLC v. Centaur Construction Company Inc
            Case No. 19 C 6332
7
8
    The original deposition was filed with
9
    Michael Lamb, Esq. on approximately
10
    the 27th day of September, 2023.
11
    _XXX_ Signature waived
12
    _____ Signature not requested
13
    _____ Unsigned; signed signature page and
14       amendment sheets, if any, to be filed at
         trial
15
    _____ Unsigned; original amendment sheets and/or
16       signature pages should be forwarded to
         AB Litigation Services to be filed in the
17       envelope attached to the sealed original
18
19   Thank you.
20   AB LITIGATION SERVICES
21   cc:  All Counsel
22
23
24
25

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 59 of
Case: 1:19-cv-06332 Document #: 761-7 Filed: 07/30/25 Page 1 of 5 PageID #:33088
262

# EXHIBIT 7

***REALTIME UNEDITED TRANSCRIPT ONLY***

1

| | | |
|---|---|---|
| 09:02:38 | 1 | Judge Kennelly, August 17, 2022, 9:00 a.m., volume 4-A, NHC v. |
| 09:02:44 | 2 | Centaur, case on trial. |
| 09:02:47 | 3 | THE CLERK:  Case 19 C6332, NHC v. Centaur |
| 09:03:11 | 4 | Construction. |
| 09:03:11 | 5 | THE COURT:  All right.  Let's get counsel's |
| 09:03:13 | 6 | appearances on the record, please. |
| 09:03:15 | 7 | MS. WING:  Good morning, I can Nicole Wing and Joshua |
| 09:03:19 | 8 | OR on behalf of the plaintiff. |
| 09:03:20 | 9 | MS. HERRING:  Kimberly Herring, Matthew Horn, and |
| 09:03:24 | 10 | Michael Cocciemiglio on behalf of the defendant. |
| 09:03:26 | 11 | THE COURT:  Anything before we resume? |
| 09:03:27 | 12 | MS. HERRING:  Judge, I have our list of admitted |
| 09:03:30 | 13 | exhibits have yesterday. |
| 09:03:31 | 14 | THE COURT:  Give them to Kym there if you wouldn't |
| 09:03:33 | 15 | mind. |
| 09:03:36 | 16 | Okay.  So the following exhibits have been admitted. |
| 09:03:38 | 17 | Plaintiff's 14, 31 and 32, 45, 52, 54, 56, 60, and 78 through |
| 09:03:50 | 18 | 83, and then defendant's 1, 33, 39, 103, 105 and 119 through |
| 09:03:59 | 19 | 122. |
| 09:04:00 | 20 | Okay.  If we can get Mr. Tsaparas back up on the |
| 09:04:03 | 21 | witness stand, we'll get the jury. |
| 09:04:08 | 22 | MR. HORN:  Your Honor, last night counsel for NHC |
| 09:04:11 | 23 | indicated that they did not intend to call Veronica Velez.  As |
| 09:04:16 | 24 | such, I believe that they rest their case. |
| 09:04:19 | 25 | THE COURT:  Got it. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 61 of
262
Case: 1:19-cv-06332 Document #: 761-7 Filed: 07/30/25 Page 3 of 5 PageID #:33090
***REALTIME UNEDITED TRANSCRIPT ONLY***

24

| | | |
|---|---|---|
| 09:42:12 | 1 | A.  It's a hotel report from HVS. |
| 09:42:15 | 2 | Q.  What is HVS? |
| 09:42:17 | 3 | A.  They're a group, you know, that a lot of people, lenders |
| 09:42:21 | 4 | hire in order to value, you know, our property. |
| 09:42:25 | 5 | Q.  Okay. |
| 09:42:27 | 6 | A.  Appraisal. |
| 09:42:28 | 7 | Q.  Did M Development hire HVS to value the Nobu Hotel |
| 09:42:31 | 8 | Chicago? |
| 09:42:31 | 9 | A.  I believe we did, yes. |
| 09:42:33 | 10 | Q.  Did HVS send M Development a valuation of the Nobu Hotel |
| 09:42:44 | 11 | Chicago? |
| 09:42:44 | 12 | A.  I believe they did, yes. |
| 09:42:45 | 13 | Q.  If we scroll through this, do you recall what the |
| 09:42:48 | 14 | valuation was that HVS sent to M Development for the Nobu |
| 09:42:58 | 15 | Hotel Chicago as of 2021? |
| 09:42:59 | 16 | A.  Yeah, they have a range of roughly 90,000 -- roughly 90 |
| 09:43:11 | 17 | million to 101 million. |
| 09:43:14 | 18 | MS. HERRING:  We can put this exhibit to the side. |
| 09:43:19 | 19 | BY MS. HERRING: |
| 09:43:24 | 20 | Q.  Who was your general contractor when you were constructing |
| 09:43:26 | 21 | the Nobu Hotel Chicago project? |
| 09:43:27 | 22 | A.  Centaur. |
| 09:43:27 | 23 | Q.  Had you worked with Centaur Construction before? |
| 09:43:30 | 24 | A.  I have. |
| 09:43:31 | 25 | Q.  When was the first time you worked with Centaur |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 62 of
Case: 1:19-cv-06332 Document #: 761-7 Filed: 07/30/25 Page 4 of 5 PageID #:33091
***REALTIME UNEDITED TRANSCRIPT ONLY***

25

09:43:34   1   Construction?

09:43:34   2   A.  I believe our relationship started in 2015.

09:43:43   3   Q.  Approximately how many projects have you worked on with

09:43:47   4   Centaur Construction?

09:43:48   5   A.  No, actually, our first project, I'm sorry, was 2007.

09:43:53   6   Q.  From 2007 to the present, approximately how many projects

09:43:57   7   have you worked on with Centaur Construction?

09:43:59   8   A.  It has to be over 20.

09:44:09   9   Q.  How about Mr. Spiro Tsaparas, how many projects have you

09:44:16  10   worked on with him?

09:44:17  11   A.  All of them.

09:44:17  12   Q.  What do you mean all of them?

09:44:20  13   A.  I mean, he had the company Centaur, so from 2007 to

09:44:25  14   current day, I've -- you know, my main contact with Centaur

09:44:30  15   was Spiro Tsaparas.

09:44:32  16   Q.  You mentioned current day.  Are you currently working on

09:44:35  17   any projects with Centaur?

09:44:36  18   A.  I am not.

09:44:38  19   Q.  Are you currently working on any projects with Spiro

09:44:42  20   Tsaparas?

09:44:42  21   A.  I am.

09:44:42  22   Q.  What are they?

09:44:43  23   A.  We are probably working on upwards of 20 projects

09:44:56  24   currently.

09:44:56  25   Q.  Can you give us just a general sense of what kind of

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 63 of 262
Case: 1:19-cv-06332 Document #: 761-7 Filed: 07/30/25 Page 5 of 5 PageID #:33092
***REALTIME UNEDITED TRANSCRIPT ONLY***

26

| | | |
|---|---|---|
| 09:44:59 | 1 | projects? |
| 09:45:01 | 2 | A.  Yeah, they are anywhere from renovations, single family |
| 09:45:07 | 3 | homes, mainly commercial, hotels, large retail boxes, |
| 09:45:17 | 4 | apartment buildings, condominiums all over the country. |
| 09:45:21 | 5 | MS. HERRING:  I have no further questions. |
| 09:45:22 | 6 | THE COURT:  Cross. |
| 09:45:25 | 7 | MR. OREWILER:  Yes, your Honor. |
| 09:45:26 | 8 | - - - |
| 09:45:26 | 9 | MARK HUNT, CROSS-EXAMINATION |
| 09:45:26 | 10 | BY MR. OREWILER: |
| 09:45:40 | 11 | Q.  Good morning, Mr. Hunt.  My name is Josh Orewiler and I am |
| 09:45:44 | 12 | an attorney for the plaintiff NHC. |
| 09:45:48 | 13 | MR. OREWILER:  Could we pull up Defendant's Exhibit |
| 09:45:49 | 14 | 25, Michael, please.  Could we turn to page 2. |
| 09:46:01 | 15 | BY MR. OREWILER: |
| 09:46:02 | 16 | Q.  Mr. Hunt, you testified on direct examination this was a |
| 09:46:05 | 17 | budget that was prepared under M Development, correct? |
| 09:46:09 | 18 | A.  Yes. |
| 09:46:12 | 19 | Q.  Was it your understanding that this budget was accurate at |
| 09:46:19 | 20 | the time it was prepared? |
| 09:46:20 | 21 | A.  I believe so. |
| 09:46:26 | 22 | MR. OREWILER:  Could we scroll down towards the |
| 09:46:28 | 23 | middle of the page, Michael. |
| 09:46:30 | 24 | BY MR. OREWILER: |
| 09:46:31 | 25 | Q.  So towards the bottom of the screen, Mr. Hunt, do you see |

# EXHIBIT 8

| | |
|---|---|
| **From:** | Amy Simon[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=16EFA8C492674DF2AD9260C9241D00DD-AMY.GUTHRIE] |
| **Sent:** | Wed 10/5/2022 11:52:43 PM (UTC-05:00) |
| **To:** | Bonnie Muhigirwa[bonnie.muhigirwa@aspen.gov]; Spiro Tsaparas[spiro@centaurco.com]; Jimmy Marcus[jmarcus@mdevco.com]; brad@mdevco.com[brad@mdevco.com]; Phillip Supino[phillip.supino@aspen.gov] |
| **Subject:** | FW: 201 Main - exploratory/Investigative work of the historic asset masonry |
| **Attachment:** | ANA_Proposal - 201 East Main Street Aspen_Revised 9_30_2022.pdf |
| **Attachment:** | ICR Proposal - 201 E Main Street Aspen_REV 9-30.pdf |

Hi all- Spiro, I am definitely in support of your pursuing this expert advice on stabilization that needs to be undertaken at 201 E. Main before winter. I'm fine with the scope as described in these attachments, which is primarily non-destructive testing, but there is mention of temporarily removing the existing shoring, etc. I have copied Bonnie Muhigirwa, our Acting CBO, to weigh in on any permitting that may be required. At the least this should be added to the Salesforce record as Supplemental Information I would think.

Please make sure that these consultants are coordinating with your primary structural engineer, REG, so that everyone is working on the same assumptions/with the same goals to preserve the building, and the master permit correctly represents their unified direction. Thank you!



**Amy Simon** *(she/her/hers)*
**Planning Director | Community Development**
**(O):** 970.429.2758 | **(C):** 970.309.9353
www.cityofaspen.com

   

My typical in-office hours are Tuesday, Thursday, and Friday, 9:15-5:15. I work remotely Monday and Wednesday, 9:15-5:15.

**Our Values: Stewardship | Partnership | Service | Innovation**

**Notice and Disclaimer:**
This message is intended only for the individual or entity to which it is addressed and may contain information that is confidential and exempt from disclosure pursuant to applicable law. If you are not the intended recipient, please reply to the sender that you have received the message in error and then delete it. Further, the information or opinions contained in this email are advisory in

nature only and are not binding on the City of Aspen. If applicable, the information and opinions contain in the email are based on current zoning, which is subject to change in the future, and upon factual representations that may or may not be accurate. The opinions and information contained herein do not create a legal or vested right or any claim of detrimental reliance.

**From:** Spiro Tsaparas <spiro@centaurco.com>
**Sent:** Monday, October 3, 2022 1:10 PM
**To:** Amy Simon <amy.simon@aspen.gov>
**Cc:** Jimmy Marcus <jmarcus@mdevco.com>; brad@mdevco.com; Phillip Supino <phillip.supino@aspen.gov>; Spiro Tsaparas <spiro@centaurco.com>
**Subject:** 201 Main - exploratory/Investigative work of the historic asset masonry

Hello Amy,

We have hired ICR and ANA for 201 Main. Both parties visited the site, reviewed the scope and have been engaged by us to perform the work.
May we proceed with the investigative portion of the scope prior to permit issuance? My concern is weather. Glenn and Michael said that we cannot afford another freeze-thaw cycle.

We will not perform any other work whatsoever other than the exploratory work required for ANA and ICR to determine the next steps.

I have attached their proposals so you can see the way we are approaching the project.

Feel free to call with any questions.

All the best.

Spiro Tsaparas | Chief Executive Officer

**CENTAUR**
121 South Galena St, Aspen, Colorado, 81611

**P** 312 644 4470 **C** 312 735 4960

Centaurco.com



Notice: The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centaur. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to info@centaurco.com and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 9

| From: | Linda Manning[lmanning@mdevco.com] |
|---|---|
| Sent: | Thur 7/29/2021 1:54:37 PM (UTC-05:00) |
| To: | Tim Rohe[tim.rohe@cityofaspen.com] |
| Cc: | Trish Aragon[trish.aragon@cityofaspen.com]; Mike Horvath[mike.horvath@cityofaspen.com]; Mark Hunt[mhunt@mdevco.com]; Nancy Turken[nturken@mdevco.com] |
| Subject: | encroachment fees |

Hi Tim,

Would you please confirm these are the outstanding encroachment fees for our projects.  This is what I show in Salesforce.

For 312 Hyman:
3-1-21 to 5-31-21     $38,339.58
6-1-21 to 6-30-21     $37,115.78
7-1-21 to 7-31-21     $38,339.58
Total                          $113,794.94

The Centaur team is in the process of adding August


For 434 Cooper:
4-1-21 to 9-6-21          $69,720.62

For 834 Hallam
I know Trish is out of the office and I'm not sure if you all have discussed these fees. I'm looking for some direction from you on these
9-7-20 to 3-24-21     $61,292.00

Please let me know if you agree with the above amounts and I will bring checks over. I will be reaching out to parking to discuss those fees as well.

Thank you, Linda



Linda Manning
M Development
724.422.1303

# EXHIBIT 10

CTRL000022141 - Messages - Spiro Tsaparas-1.xlsx

| Chat Session | Message Date | Type | Sender Name | Text | Attachment |
|---|---|---|---|---|---|
| Spiro Tsaparas | 2022-08-05 13:14:17 | Incoming | Spiro Tsaparas | What is MY? | |
| Spiro Tsaparas | 2022-08-05 13:15:06 | Outgoing | | MT | |
| Spiro Tsaparas | 2022-08-05 13:29:29 | Incoming | Spiro Tsaparas | :-) | |
| Spiro Tsaparas | | | | Did we sign and send ICC proposal? | |
| | | | | Did you send James email to Baison | |
| | | | | No need to respond now | |
| Spiro Tsaparas | 2022-08-05 23:31:11 | Incoming | Spiro Tsaparas | Just so I don't forget | |
| | | | | No, to my knowledge no one from M signed and returned it yet. | |
| Spiro Tsaparas | 2022-08-06 05:28:25 | Outgoing | | Yes, I sent to Beison | |
| Spiro Tsaparas | 2022-08-06 08:03:11 | Incoming | Spiro Tsaparas | Please sign it with my signature and return | |
| Spiro Tsaparas | 2022-08-06 08:05:22 | Outgoing | | Ok, I can do that when I get home from the wedding this morning | |
| Spiro Tsaparas | 2022-08-06 08:06:05 | Outgoing | | | tmp.gif |
| Spiro Tsaparas | 2022-08-06 08:24:05 | Incoming | Spiro Tsaparas | No worries | |
| | | | | Also, | |
| | | | | Please coordinate with Linda to book a hotel room for him | |
| | | | | He will book his own flights and we will book a hotel | |
| | | | | That's the deal. | |
| Spiro Tsaparas | 2022-08-06 08:27:00 | Incoming | Spiro Tsaparas | Prospector or the W or lime light. ? | |
| Spiro Tsaparas | 2022-08-06 08:28:26 | Outgoing | | Ok | |
| Spiro Tsaparas | 2022-08-06 12:13:32 | Outgoing | | The proposal for 201 is directed to centaur. Should I cross that out and put 201 Main LLC? | |
| Spiro Tsaparas | 2022-08-06 17:36:06 | Incoming | Spiro Tsaparas | Yes | |
| Spiro Tsaparas | 2022-08-07 09:20:46 | Incoming | Spiro Tsaparas | Can you talk? | |
| Spiro Tsaparas | 2022-08-07 09:21:10 | Outgoing | | Bill is on the phone in the car so not right now. | |
| Spiro Tsaparas | 2022-08-07 09:21:16 | Outgoing | | We are driving back to the city now | |
| Spiro Tsaparas | 2022-08-07 09:21:27 | Incoming | Spiro Tsaparas | Ok | |
| Spiro Tsaparas | 2022-08-07 09:21:33 | Outgoing | | Once he hangs up, I can talk | |
| | | | | No worries | |
| Spiro Tsaparas | 2022-08-07 09:21:57 | Incoming | Spiro Tsaparas | How long before you are home | |
| Spiro Tsaparas | 2022-08-07 09:22:50 | Outgoing | | 1.5 hrs. Maybe a little less | |
| Spiro Tsaparas | 2022-08-07 09:23:00 | Incoming | Spiro Tsaparas | Cool | |
| Spiro Tsaparas | 2022-08-07 15:05:22 | Incoming | Spiro Tsaparas | Did you sign and send the proposal to Glenn? | |
| Spiro Tsaparas | 2022-08-07 15:05:36 | Outgoing | | Yes | |
| Spiro Tsaparas | 2022-08-07 15:05:56 | Outgoing | | Actually, I sent it to Bill since he was the one who sent it to you. | |
| Spiro Tsaparas | 2022-08-07 22:17:40 | Incoming | Spiro Tsaparas | The proposal has to go to Glenn | Audio Message.caf |
| Spiro Tsaparas | 2022-08-07 22:17:58 | Incoming | Spiro Tsaparas | | |

# EXHIBIT 11

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 72 of
Case: 1:19-cv-06332 Document #: 761-12 Filed: 07/30/25 Page 2 of 2 PageID #:33101
262

CTRL000022141 - Messages - Spiro Tsaparas-1.xlsx

| Chat Session | Message Date | Type | Sender Name | Text | Attachment |
|---|---|---|---|---|---|
| Spiro Tsaparas | 2022-12-03 19:30:12 | Outgoing | Spiro Tsaparas | You never have to worry about work/personal balance so send away | |
| Spiro Tsaparas | 2022-12-04 09:39:58 | Incoming | Spiro Tsaparas | | IMG_1587.heic |
| Spiro Tsaparas | 2022-12-04 09:40:17 | Incoming | Spiro Tsaparas | I have to call this tomorrow morning and pay! | |
| Spiro Tsaparas | 2022-12-04 09:40:55 | Outgoing | Spiro Tsaparas | Ok | |
| Spiro Tsaparas | 2022-12-05 13:29:15 | Incoming | Spiro Tsaparas | Disconnecting for one hour | |
| Spiro Tsaparas | 2022-12-05 13:29:20 | Incoming | Spiro Tsaparas | Need it | |
| Spiro Tsaparas | 2022-12-05 13:29:31 | Outgoing | Spiro Tsaparas | Ok | |
| Spiro Tsaparas | 2022-12-05 18:15:15 | Incoming | Spiro Tsaparas | Please tell Martha OK field Greg Woods not to use my Centaur Construction email anymore and only use the M source and you'll see. Thanks. | |
| Spiro Tsaparas | 2022-12-05 18:56:14 | Incoming | Spiro Tsaparas | | Audio Message.caf |
| Spiro Tsaparas | 2022-12-06 03:04:28 | Incoming | Spiro Tsaparas | | Audio Message.caf |
| Spiro Tsaparas | 2022-12-06 11:14:09 | Incoming | Spiro Tsaparas | Spoke to Steven Blanc. He is good now | |
| Spiro Tsaparas | 2022-12-06 11:59:49 | Outgoing | Spiro Tsaparas | Please call me back when you can. Need to discuss Seth and lululemon | |
| Spiro Tsaparas | 2022-12-07 06:53:18 | Incoming | Spiro Tsaparas | | Audio Message.caf |
| Spiro Tsaparas | 2022-12-07 06:55:35 | Outgoing | Spiro Tsaparas | Need to pay Greece cell phone | |
| Spiro Tsaparas | 2022-12-07 07:20:09 | Incoming | Spiro Tsaparas | Yes! | |
| Spiro Tsaparas | 2022-12-07 07:30:48 | Incoming | Spiro Tsaparas | I'll call her now | Audio Message.caf |
| Spiro Tsaparas | 2022-12-07 09:03:13 | Outgoing | Spiro Tsaparas | I have to submit a claim for the windshield and wait for geico to respond and tell me how to proceed. Can you live with your window for a day or two? Not sure how long it takes. | |
| Spiro Tsaparas | 2022-12-07 13:21:39 | Outgoing | Spiro Tsaparas | Still in webinar | |
| Spiro Tsaparas | 2022-12-07 13:21:50 | Incoming | Spiro Tsaparas | I forgot. Sorry | |
| Spiro Tsaparas | 2022-12-07 13:22:09 | Outgoing | Spiro Tsaparas | 👍 | |
| Spiro Tsaparas | 2022-12-07 13:55:57 | Incoming | Spiro Tsaparas | Also | |
| Spiro Tsaparas | 2022-12-07 13:58:06 | Incoming | Spiro Tsaparas | Arrange a time with them in a week or so to take them out to dinner | |
| Spiro Tsaparas | 2022-12-07 17:37:58 | Outgoing | Spiro Tsaparas | Sheldon just sent the wire | |
| Spiro Tsaparas | 2022-12-07 17:38:19 | Incoming | Spiro Tsaparas | Texting to let you know it's about time for you to leave | |
| Spiro Tsaparas | 2022-12-08 05:50:19 | Incoming | Spiro Tsaparas | Liked "Texting to let you know it's about time for you to…" | |
| Spiro Tsaparas | | | Spiro Tsaparas | Please make sure mail forwarding g is still active and change the adddress on as many accounts as possible | |
| Spiro Tsaparas | 2022-12-08 09:18:50 | Incoming | Spiro Tsaparas | Please confirm you have Steve blanks wiring Instructiins. | |
| Spiro Tsaparas | 2022-12-08 09:19:12 | Outgoing | Spiro Tsaparas | I will send him something today. | |
| Spiro Tsaparas | 2022-12-08 10:17:42 | Incoming | Spiro Tsaparas | I have them. He sent them to me last week. | |
| Spiro Tsaparas | 2022-12-08 10:50:49 | Incoming | Spiro Tsaparas | On the presentation of dash board, map that can click projects | |
| Spiro Tsaparas | | | Spiro Tsaparas | Get the photo from my sister ready to go up | |

# EXHIBIT 12

Case No. 1:25-cv-02537   Re: Condenser cleaning - master bathroom sink   USDC Colorado     pg 74 of
Case: 1:19-cv-06332 Document #: 761-12 Filed: 07/30/25 Page 2 of 4 PageID #:33103
262

**Subject:** Re: Condenser cleaning - master bathroom sink
**From:** Bronwyn Bateman <span style="background:black">        </span>
**Date:** 1/31/2023, 9:03 PM
**To:** Spiro Tsaparas <spiro@centaurco.com>

I am sure you will do a terrific job - what an opportunity!

Bronwyn

On Tue, Jan 31, 2023 at 7:23 PM Spiro Tsaparas <spiro@centaurco.com> wrote:

I am staying at the Bless. Strictly logistics.

We purchased the last palace on Villanueva and meeting with architects.

It will be a magnificent project.

Get Outlook for iOS

Spiro Tsaparas | Chief Executive Officer

**CENTAUR**
121 South Galena St, Aspen, Colorado, 81611
**P** 312 644 4470 **C** 312 735 4960
Centaurco.com

  

Notice: The information contained in this communication is confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centaur.
Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be
unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to
info@centaurco.com and destroy this communication and all copies thereof, including all attachments.

---

**From:** Bronwyn Bateman <span style="background:black">        </span>
**Sent:** Tuesday, January 31, 2023 7:33:46 PM
**To:** Spiro Tsaparas <spiro@centaurco.com>
**Subject:** Re: Condenser cleaning - master bathroom sink

Wonderful for RH and your career.

I must have had ESP as I phoned Miguel while he was there.

I will put a reminder in May.

When you return, please let me know about the condensers and the pipes under the master bath sinks.

If you need a hotel connection in Madrid, the son-in-law of a high school

<div style="text-align:center; font-size:2em;">JBB005023</div>

friend owns a hotel in Madrid. I visit her every January in Oviedo.

Bronwyn

On Tue, Jan 31, 2023 at 6:01 PM Spiro Tsaparas <spiro@centaurco.com> wrote:

Bronwyn,
Actually Miguel was at the house today as the snowmelt was not working g the last couple weeks. Boilers and controls were operating but hydronic tubes were not circulating the glycol mix.
The color it was a dead circulation pump. Not surprising as these are the ones that have been going out the last couple years.  Typical as their expected life span is about 10-13 years.

Miguel came and changed the pump and operations of snow melt are back to normal.

As it relates to the service of the boilers, I suggest that it happens in May. Servicing the boilers in the middle of winter is not a good idea.  The boilers have to shut down for 4-6 hrs and in case a part needs replacement that needs to be ordered, the boilers will not be able to provide heat for the house for that period.

End of May is the perfect time as the required load for heat is much lower

I spoke to Miguel from the airport and he agreed with that schedule.

I hope you and Doug are well! I have been traveling a lot all over the US and EU
Headed to London and then Madrid to perform the duties of my job at those two RH locations.

We also purchased the Aman Hotel in Jackson Hole WY that we are preparing for a major rehabilitation.  Work has been extremely busy.

All the best

Get Outlook for iOS

Spiro Tsaparas | Chief Executive Officer

**CENTAUR**
121 South Galena St, Aspen, Colorado, 81611
**P** 312 644 4470 **C** 312 735 4960
Centaurco.com



Case No. 1:25-cv-02537  Re: Condenser cleaning - master bathroom sink  USDC Colorado   pg 76 of
Case: 1:19-cv-06332 Document #: 761-12 Filed: 07/30/25 Page 4 of 4 PageID #:33105
262

Notice: The information contained in this communication is confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centaur.
Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be
unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to
info@centaurco.com and destroy this communication and all copies thereof, including all attachments.

**From:** Bronwyn Bateman ███████████████████████
**Sent:** Tuesday, January 31, 2023 1:34:55 PM
**To:** Spiro Tsaparas <spiro@centaurco.com>
**Subject:** Condenser cleaning - master bathroom sink

Good afternoon again,

As you can tell, I am filing and catching up.

I called Miguel and he was working on the boilers - ESP.

In the past, I have cleaned the condensers. Does this need to be done?

Can you give me an update on the 'Y' pipes in the master bath?

Thanks

Bronwyn
This email has been generated from outside your organization.
This email has been generated from outside your organization.

JBB005025

12/29/2024, 11:01 AM

# EXHIBIT 13

# NHC LLC

## v.

# Centaur Construction Company Inc

---

Spyridon Tsaparas

December 12, 2023

---

**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

Case No. 1:25-cv-02537 Document 1-9 filed 08/13/25 USDC Colorado pg 79 of
Case: 1:19-cv-06332 Document #: 761-1 262 07/30/25 Page 3 of 7 PageID #:33108
*AB Litigation Services*

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

Case No. 1:19-cv-06332

_____

REMOTE CITATION EXAMINATION OF SPYRIDON TSAPARAS

December 12, 2023

_____

PLAINTIFF:

NHC LLC, a Florida limited liability company

vs.

DEFENDANTS:

CENTAUR CONSTRUCTION COMPANY INC., an Illinois

corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS

_____

APPEARANCES:

    DAVIS McGRATH, LLC

        By Gini Marziani, Esq.

          125 S. Wacker Drive, Suite 300

          Chicago, Illinois 60606

              Appearing on behalf of Plaintiff.

              (Via Zoom videoconference.)

    AMUNDSEN DAVIS

        By Constantine Gavrilos, Esq.

          150 North Michigan Avenue, Suite 3300

          Chicago, Illinois 60601

              Appearing on behalf of Defendant.

              (Via Zoom videoconference.)

**Page 2**

1        Pursuant to Court Order and the
2  Federal Rules of Civil Procedure, the Citation
3  Examination of SPYRIDON TSAPARAS, called by
4  Plaintiff, was  taken on Tuesday, December 12, 2023,
5  commencing at 8:00 a.m., via Zoom videoconference,
6  before Sharon R. Dobson, Registered Professional
7  Reporter within and for the State of Colorado.
8
9
10            I N D E X
11  CITATION EXAMINATION OF SPYRIDON TSAPARAS
12  EXAMINATION BY:              PAGE
13    Ms. Marziani                 5
14    Mr. Gavrilos                --
15
    EXHIBITS                  INITIAL REFERENCE
16
    Exhibit A      Citation Served        13
17
    REQUESTS:
18
    Page    8, Line 20
19
    Page  17, Line 13
20
    Page  26, Line  2
21
    Page  26, Line 12
22
    Page  27, Line 24
23
    Page  28  Line  2
24
    Page  56  Line  6
25

**Page 3**

1  REQUESTS:
2  Page  67, Line  7
3  Page  72, Line  5
4  Page  73, Line 11
5  Page  74, Line  4
6  Page  76, Line  5
7  Page  78, Line 13
8  Page  78, Line 15
9  Page  78, Line 17
10  Page  83, Line  4
11  Page  83, Line  7
12  Page  83, Line  9
13  Page  86, Line 14
14  Page  86, Line 18
15  Page  95, Line 24
16  Page  96, Line  3
17  Page  99, Line  6
18  Page 101, Line 13
19  Page 102, Line 11
20  Page 103, Line  4
21  Page 107, Line  4
22  Page 108, Line 15
23  Page 118, Line 16
24  Page 119, Line  3
25  Page 123, Line 19

**Page 4**

1  REQUESTS:
2  Page 124, Line  5
3  Page 124, Line 16
4  Page 129, Line 14
5  Page 129, Line 20
6  Page 133, Line  2
7  Page 137, Line 15
8  Page 138, Line 13
9  Page 166, Line 11
10  Page 183, Line  7
11  Page 205, Line  1
12  Page 232, Line 17
13
14
15
16
17
18
19
20
21
22
23
24
25

AB Litigation Services

**Page 41**

1    any interest in certificates of deposit, any other
2    savings, we call them, you know, college plans,
3    anything like that for yourself or for your family?
4        A    Gini, that was easy to answer because I
5    have absolutely nothing.
6        Q    Okay.  All right.  Do you have any
7    retirement accounts?
8        A    I do not.
9        Q    Do you have any interest in any entity
10   other than Centaur, which we now know is -- has been
11   dissolved?  But do you have any other interest in
12   any other entity?
13       A    I do not.
14       Q    There's an entity called Broadsmore
15   Capital, LLC.  Are you familiar with that?
16       A    Sure.
17       Q    Did you ever have an interest in
18   Broadsmore Capital?
19       A    I did not.
20           MR. GAVRILOS:  Gini, just real quick, for
21   the benefit of Miss Dobson, can you spell that?
22           MS. MARZIANI:  I have a spelling
23   B-r-o-a-d-s-m-o-r-e Capital, LLC.
24       Q    (By Ms. Marziani) Are you familiar with
25   that entity?

**Page 42**

1        A    I am.
2        Q    Okay.  And who is -- who has an interest
3    in that entity -- (inaudible.)
4        A    I don't know -- I don't know who has
5    interest in that entity, but I know that Peter's
6    brother, Nicholas Alexos, is the -- the owner for
7    that entity.  But it's --
8            THE DEPONENT:  I can spell it for you.
9    It's Alexos.  It's Alpha, Lima, echo, X-ray, Oscar,
10   Sierra.
11           THE COURT REPORTER:  I'm sorry if I cut
12   you off.  What I was going to say is your last two
13   or three words didn't come through.  I heard, "And
14   who is -- who has an interest in that entity --"
15           MS. MARZIANI:  It's gone.
16           MR. GAVRILOS:  I think it was just "other
17   than yourself," right, talking about Broadsmore,
18   LLC.  Right, Gini?
19           MS. MARZIANI:  Correct.
20       Q    (By Ms. Marziani) And, Mr. Tsaparas,
21   Alexos's last name is Alexopoulos?
22       A    No.
23       Q    What is Alexos's last name?
24       A    Alexos, that is his last name,
25   A-l-e-x-o-s.

**Page 43**

1        Q    And this is Peter's brother?
2        A    Brother.
3        Q    What is Peter's brother's first name,
4    then?
5        A    Nicholas.
6        Q    Nicholas.
7            There's an entity, Triton Marine.
8        A    Yes.
9        Q    Do you have interest in that entity?
10       A    I did, but that entity is also done and
11   doesn't do anything, doesn't own anything or...
12       Q    Is that the entity that has a bank account
13   at US Bank ending in 3011?
14       A    That was.
15       Q    And when -- when did it stop doing
16   anything?
17       A    Some time ago.  And, again, I don't know
18   because I never participated in how an account, an
19   LLC is created or shut down and so on.  I don't know
20   what has happened in that.
21           But that entity didn't really do anything
22   for a long time, and hasn't really operated as an
23   entity, as an LLC.  So I'm not sure if it's closed
24   properly or just kind of fainted (sic) out.  I'm not
25   sure.  I don't know if we ever did that or not.  But

**Page 44**

1    that entity -- the sole purpose of that entity
2    stopped existing, which I'm sure we'll get to that
3    later in this meeting, and then nothing was there.
4        Q    You produced bank statements as recent as
5    May of 2023 --
6        A    Okay.
7        Q    -- for that account, for that entity.  Is
8    that correct?
9        A    Sure.  Yeah.  Everything that existed in
10   that US Bank, I produced it.
11       Q    Okay.
12       A    Every single thing that I had and I was
13   requested to, I produced it.
14       Q    But you're saying that it stopped
15   operating prior to that?
16       A    Oh, yeah.  Yeah.  As a business, yeah.
17       Q    Okay.  And you had an interest in that
18   business, though, correct?
19       A    I did.
20       Q    Okay.  What was your interest?
21       A    50.  50 percent.
22       Q    Okay.  Okay.  All right.  Let's see.  Who
23   had the other 50 percent?
24       A    Peter.
25       Q    Did anyone else have an interest in that

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 81 of
Case: 1:19-cv-06332 Document #: 761-1 262 filed: 07/30/25 Page 5 of 7 PageID #:33110
AB Litigation Services

**Page 45**

1  entity?
2      A    No.  I don't think so.
3      Q    Okay.  There's another --
4      A    Centaur that owned it, and then we had
5  50-50 on Centaur.  I don't remember exactly how the
6  structure was.  I don't know.  But it was pretty
7  much -- whether it was directly to us or indirectly
8  through Centaur, it was 50-50, me and Peter.
9      Q    Okay.  There's another entity called
10 Triton Marine Holdings, LLC.  Is that a different
11 entity?
12     A    No.  It's the same entity.
13     Q    It's the same entity?
14     A    Yeah.  LLC, you said?  They're both LLCs?
15     Q    Well, one has a name Triton Marine, LLC,
16 and another one has a name Triton Marine Holdings,
17 LLC.
18     A    No.  I think it's the same company.
19     Q    Okay.
20     A    Something.
21     Q    Who helped set those entities up for you?
22     A    I'm not sure who we used as attorneys for
23 that.  I'm sure it's an attorney, it's a firm, but
24 I'm not sure who would be setting those up.  It may
25 have been -- I don't -- I don't -- I don't remember

**Page 46**

1  the name.  I don't -- I don't know which firm we
2  used to do that stuff.
3      Q    Okay.  There's a lawyer.  His name is John
4  Mantas.
5      A    Okay.
6      Q    Is it possible that he helped you set
7  those up?
8      A    Sure.  Sure.  It could have been.
9      Q    Has John Mantas done any legal work for
10 you personally?
11     A    No.  I don't -- I don't remember.  Maybe.
12 Gini, maybe.
13     Q    Okay.
14     A    I don't -- I don't remember.  This is the
15 not fun stuff of my days during my career.  And I
16 just participate to get something done, but I don't
17 put any -- I don't occupy much of my memory with it.
18     Q    There's another entity called, maybe,
19 Pro -- Poros, P-o-r-o-s?
20     A    Okay.
21     Q    Are you familiar with that entity?
22     A    Sure.
23     Q    Tell me the correct name for that entity.
24     A    It was P-o-r-o-s.
25     Q    Okay.  And did P-o-r-o-s -- is it

**Page 47**

1  pronounced Poros?
2      A    Yes.  Exactly.
3      Q    Did you have any ownership interest in
4  that entity?
5      A    I'm pretty sure.  Most of those we were --
6  they were set up and they were 50-50.
7      Q    Right.  Does that entity still exist?
8      A    No.
9      Q    All right.  And where was that entity
10 based?
11     A    Chicago.
12     Q    Chicago.
13     A    I'm pretty sure.
14     Q    Did it have a bank account?
15     A    Yes.
16     Q    And did you have signatory authority over
17 that bank account?
18     A    I used to have signatory authority for all
19 accounts.
20     Q    Okay.
21     A    I see any -- no reason why I would not
22 have for that one.
23     Q    What was the purpose of Triton Marine,
24 LLC, or Triton Marine Holdings, LLC?
25     A    To -- was the company that owned a vessel

**Page 48**

1  that we purchased in Greece.
2      Q    Okay.  Was that the only purpose of the
3  entity?
4      A    Yes.
5      Q    Okay.
6      A    Yes, to operate that business.
7      Q    It was a business?
8      A    That was the intent.  That's why we got
9  that.
10     Q    Okay.
11     A    It was a business, and the plan was to
12 operate that business out of Athens --
13     Q    Okay.
14     A    -- and do day trips and three-day trips.
15 Relationships.
16     Q    So that entity was not in the construction
17 business, right?
18     A    It was not.
19     Q    There's another entity called Global
20 Logistics and Procurement Company, LLC.  Are you
21 familiar with that entity?
22     A    Isn't that Poros?  I think Poros was that
23 d/b/a.
24     Q    Okay.
25     A    I think -- I don't think Poros and Global

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 82 of
Case: 1:19-cv-06332 Document #: 761-1 262 filed: 07/13/25 Page 6 of 7 PageID #:33111

AB Litigation Services

Page 49

1  Logistics was a different company.  It was the same
2  company.  One was d/b/a of the other, I believe.
3      Q    Okay.  Well, that makes sense to me now.
4           And so your answer on Global Logistics and
5  Procurement Company, LLC, is that you had -- if it
6  had a bank account, you would have had signatory
7  authority over it?
8      A    Yeah.
9      Q    Do you know where that entity banked?
10     A    At the time we were -- we were working
11 with Byline --
12     Q    Okay.
13     A    -- so I would assume that it would have
14 been Byline Bank.
15     Q    Okay.  There's another entity called --
16 and I'm not going to be able to pronounce it.  I'll
17 spell it for you.  H-e-p-h-a-e-s-t-u-s Chicago, LLC.
18     A    Hephaestus.  Okay.
19     Q    Could you pronounce that for me?
20     A    Hephaestus.  Hephaestus.  It's a
21 mythological --
22          MR. GAVRILOS:  He's the Greek God of wine
23 and partying, Gini.
24     A    And -- and fire.
25          MR. GAVRILOS:  And fire.

Page 50

1      Q    (By Ms. Marziani) Fire.  Fire.  There you
2  go.  Fire.
3           MR. GAVRILOS:  You can't properly do that
4  without a campfire, so they go hand in hand.
5      Q    (By Ms. Marziani) All right.  So you're
6  familiar with this entity, correct?
7      A    Yes.  Yes.  Yes.  Yes.  Yes.  I was just
8  reminded of it, but, yes.
9      Q    What -- what did this entity do?
10     A    This entity was created for a construction
11 project we did for a pizzeria that we built.  And
12 then we held part of our fee to have whatever --
13 participate in profits of the restaurant when the
14 restaurant would go, which is not all that uncommon
15 for small, little businesses and small restaurants
16 that need a lot of resources on the onset.
17          And then as a contractor you invest in the
18 people and you -- instead of taking money on your
19 fee when you build it, you leave a small percentage
20 of -- so you can gain that in profits if the
21 restaurant does well.
22          So that's kind of like an industry thing
23 that does exist, does happen.  And that is how that
24 company was meant to be.
25     Q    Did that company operate more than -- or

Page 51

1  was it involved in more than one restaurant?
2      A    It -- no.
3      Q    And where was the restaurant located?
4      A    It was on Randolph, I believe, down by the
5  lake, close to Navy Pier.
6      Q    Do you recall the name of the restaurant?
7      A    I'm trying to.
8      Q    Okay.
9      A    It was a pizza, little pizza place, but I
10 don't remember the name of it right now.  And I
11 can't believe I don't remember the name of it, but
12 I'm drawing a blank.
13     Q    And is that business still operating?
14     A    Hephaestus?
15     Q    Yes.
16     A    No.
17     Q    Do you know if the restaurant's still
18 operating?
19     A    I haven't heard that it is not.
20     Q    Okay.
21     A    I've not kept in touch with those people.
22 Great people.  But after I moved from Chicago, I
23 didn't.  I'm not around, so I don't know.  I don't
24 know if the restaurant in this moment still operates
25 or not.  Not sure.

Page 52

1      Q    Did you have anyone else as a partner or a
2  member of this LLC besides yourself?
3      A    Yeah.  It was Peter and I.
4      Q    Okay.  Was there any -- was there anyone
5  else?
6      A    I have --
7           THE COURT REPORTER:  I'm sorry.  Was the
8  question, Was there anyone else?
9           MS. MARZIANI:  Yes.
10     A    Peter.
11     Q    (By Ms. Marziani) Was Peter the only other
12 member?
13     A    Yes.  Yes.  I'm not aware of anyone else.
14     Q    There's another entity.  It's the initials
15 RPDC of Illinois, LLC.  Are you familiar with that
16 entity?
17     A    It does not ring a bell at all.  RPDC?
18     Q    Correct.
19     A    I have -- I did not -- it doesn't ring a
20 bell at all, at all, as to what that is.
21     Q    Okay.
22     A    RPDC.
23     Q    Do you have any operating agreements
24 related -- or stock certificates or any other
25 documents related to these entities that we just

Case No. 1:25-cv-02537     Document 1-9     filed 08/13/25     USDC Colorado     pg 83 of
Case: 1:19-cv-06332 Document #: 761-1 Filed: 07/30/25 Page 7 of 7 PageID #:33112
AB Litigation Services

---

**Page 237**

```
 1   articles that are under $500 value.
 2       Q   Okay.  And then, finally, you know, we
 3   just went through quite a few transactions, line
 4   item payments that were pulled from the bank
 5   statements.  Do any of those transactions reflect a
 6   loan agreement or an expectation that payment would
 7   be reimbursed to you?
 8       A   They do not.
 9       Q   Okay.  I have no other questions.
10           MS. MARZIANI:  All right.  We're reserving
11   our right to call you again, but as we said,
12   we'll -- we'll try to do it at a least inconvenient
13   time or manner.  Great.
14           MR. GAVRILOS:  Thank you.  Thank you for
15   your time, Spiro.
16           THE DEPONENT:  Thank you.
17           (The Citation Examination concluded at
18   3:10 p.m. on December 12, 2023.)
19
20
21
22
23
24
25
```

---

**Page 238**

```
 1           I, SPYRIDON TSAPARAS, do hereby certify
 2   that I have read the foregoing transcript and that
 3   the same and accompanying amendment sheets, if any,
 4   constitute a true and complete record of my
 5   testimony.
 6
 7
 8
 9           _____
   SRD              Signature of Deponent
10
11           (  ) No amendments
11           (  ) Amendments attached
12
13       Acknowledged before me this _____day
14   of _____, 20_____.
15
16       Notary Public: _____
17       My commission expires _____
18       Seal:
19
20
21
22
23
24
25
```

---

**Page 239**

```
 1   STATE OF COLORADO  )
                        ) SS. REPORTER'S CERTIFICATE
 2   COUNTY OF DENVER   )
 3           I, Sharon R. Dobson, do hereby certify
 4   that I am a Registered Professional Reporter within
 5   the State of Colorado; that previous to the
 6   commencement of the examination, the deponent was
 7   duly sworn to testify to the truth.
 8           I further certify that this deposition was
 9   taken in shorthand by me at the time and place
10   herein set forth, that it was thereafter reduced to
11   typewritten form, and that the foregoing constitutes
12   a true and correct transcript.
13           I further certify that I am not related
14   to, employed by, nor of counsel for any of the
15   parties or attorneys herein, nor otherwise
16   interested in the result of the within action.
17           In witness whereof, I have affixed my
18   signature on December 21, 2023.
19
20           Sharon R. Dobson
             _____
             Sharon R. Dobson, RPR
21           216 - 16th Street, Suite 600
             Denver, Colorado  80202
22
23
24
25
```

---

**Page 240**

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
 3   December 21, 2023
 4   Constantine Gavrilos, Esq.
     Amundsen Davis
 5   150 North Michigan Avenue, Suite 3300
     Chicago, IL  60601
 6
     Re:  Citation Examination of SPYRIDON TSAPARAS
 7        NHC, LLC vs. Centaur Construction
          Company Inc., et al.
 8        Case No. 1:19-cv-06332
 9   The aforementioned deposition is ready for reading
     and signing.  Please attend to this matter by
10   following BOTH of the items indicated below:
11   _____ Call 303-296-0017 and arrange with us to
            read and sign the deposition in our office
12
     _XXX_ Have the deponent read your copy and sign
13        the signature page and amendment sheets,
          if applicable; the signature page is
14        attached
15   _____ Read the enclosed copy of the deposition
          and sign the signature page and amendment
16        sheets, if applicable; the signature page
          is attached
17
     _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18
     _____ By _____ due to a trial
19        date of
20   Please be sure the original signature page and
     amendment sheets, if any, are SIGNED BEFORE A NOTARY
21   PUBLIC and returned to AB Litigation Services for
     filing with the original deposition.  A copy of
22   these changes should also be forwarded to counsel of
     record.  Thank you.
23
     AB LITIGATION SERVICES
24
     cc:  All Counsel
25
```

# EXHIBIT 14



Transcript of the Testimony of
# Peter Alexopoulos

December 15, 2023

NCH, LLC v. Centaur Construction Company, Inc., et al

Chimniak Court Reporting and Video, Inc.
312.781.9111
OfficeManager@ChimniakCourtReporting.com
www.ChimniakCourtReporting.com

NCH, LLC v. Centaur Construction Company, Inc., et al

Peter Alexopoulos                                                    12/15/2023

1

1              IN THE UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF ILLINOIS

2                    EASTERN DIVISION

3   NHC LLC, a Florida limited     )

    liability company,             )

4                                  )

            Plaintiff,             )

5                                  )

        vs.                        )   No. 1:19-cv-06332

6                                  )   Honorable Matthew F.

    CENTAUR CONSTRUCTION           )   Kennelly

7   COMPANY INC, an Illinois       )

    corporation, SPIRO             )

8   TSAPARAS, and PETER            )

    ALEXOPOULOS,                   )

9                                  )

            Defendants.            )

10

11          The Citation to Discover Assets

12   examination of PETER ALEXOPOULOS, taken pursuant

13   to the Federal Rules of Civil Procedure of the

14   United States District Courts pertaining to the

15   taking of Citation to Discover Assets, taken

16   before JANET L. ROBBINS, CSR No. 084-002207,

17   Certified Shorthand Reporter of the State of

18   Illinois, and ROBIN M. CHIMNIAK, CSR

19   No. 084-001999, Certified Shorthand Reporter of

20   the State of Illinois, on December 15, 2023, at

21   12:00 p.m.

22

23

24

**NCH, LLC v. Centaur Construction Company, Inc., et al**

Peter Alexopoulos                                                                                12/15/2023

| 46 |
|---|

```
 1        A.    I didn't say anything.
 2        Q.    Okay.  We've asked many times for a
 3   copy of that trust document and any amendments to
 4   it.
 5              Do you have a copy of that?
 6        A.    I do not.
 7        Q.    Do you have the ability to get that?
 8        A.    I don't know.  I could ask.  I don't
 9   have access to it.  I may be able to get access to
10   it.  I don't know.
11        Q.    Would you ask?
12              Mr. Alexopoulos, you're familiar with
13   the term "certificates of deposit"?
14        A.    Yes.
15        Q.    Do you have any certificates of
16   deposit?
17        A.    I do not.
18        Q.    Do you have any interest in any
19   certificates of deposit?
20        A.    Not that I'm aware of.
21        Q.    Mr. Alexopoulos, do you have any
22   brokerage accounts or stock accounts?
23        A.    No, ma'am.
24        Q.    Have you ever owned any stock?
```

| 47 |
|---|

```
 1        A.    My recollection serves that maybe when
 2   I was in college, I bought a couple of things that
 3   turned out to be poor decisions, for lack of a
 4   better term.  I have not had any stocks or
 5   securities or anything as far back as I can
 6   remember.
 7        Q.    Okay.  So that would be with publicly
 8   traded stocks, so like your Microsoft stock or
 9   your Amazon stock that you bought in college.
10              But what about other entities, like
11   private companies?  So --
12        A.    So --
13        Q.    -- stock -- go ahead.
14        A.    I'm sorry.  Go ahead and finish your
15   question so that I make sure I answer it
16   correctly.
17        Q.    Okay.  Do you have any stock or
18   interest in private companies?
19        A.    Is a membership interest the same as a
20   stock?
21        Q.    That's how I look at it.  You're --
22        A.    So --
23        Q.    Go ahead.
24        A.    So I believe I had one share of an
```

| 48 |
|---|

```
 1   entity called Robert's Pizza and Dough Company.
 2        Q.    Uh-huh.
 3        A.    And I also, I believe, had a membership
 4   interest -- I don't remember the name of the LLC.
 5   It's no longer in existence.  Those are the only
 6   two that come to mind.
 7        Q.    So how would you identify the one that
 8   is no longer in existence?
 9        A.    It was a management company.  I'm
10   trying to remember the name of the entity.  It's
11   been a while.
12              I didn't have -- there was no financial
13   component to it.  It was simply I was a member so
14   that I could act on behalf of the entity.
15        Q.    Do you recall who the other members
16   were?
17        A.    No.  I think one of them -- I think the
18   one that I'm thinking about may have had -- I
19   think my brother was the -- one of the other
20   members.  I don't remember.
21        Q.    So there's an entity called Broadsmore
22   Capital LLC.
23        A.    Yes, thank you.  Thank you.
24        Q.    I didn't mean to torture you so much.
```

| 49 |
|---|

```
 1        A.    No.
 2        Q.    So you had only -- you had some
 3   interest, you don't recall how much, in Broadsmore
 4   Capital LLC?
 5        A.    Yes.  So I was a member of the LLC.  I
 6   don't remember what my interest was.  It was --
 7   from what I remember, it was purely for the
 8   purpose of being able to act on behalf of the LLC,
 9   but I don't -- I don't remember the rest of the
10   components.
11        Q.    How would you act on behalf of
12   Broadsmore Capital LLC?
13        A.    I'm sorry.  Repeat the question.
14        Q.    Excuse me.  When you say you had an
15   interest in it only so that you could act on
16   behalf of Broadsmore, I'm wondering what you did
17   to act on behalf of Broadsmore.
18        A.    What was my role?
19        Q.    Okay.
20        A.    I -- I kind of oversaw and facilitated
21   the -- how do I summarize this? -- the activities
22   of the LLC as far as managing the assets that it
23   had or was involved in.  That was kind of my role,
24   is to help oversee the management of real estate
```

**NCH, LLC v. Centaur Construction Company, Inc., et al**

Peter Alexopoulos                                                    12/15/2023

14 (Pages 50 to 53)

---

50

```
 1    assets.
 2        Q.    So Broadsmore Capital was involved in
 3    real estate?
 4        A.    Broadsmore Capital had real estate --
 5    Broadsmore Capital was an entity that had
 6    ownership interest in entities that owned real
 7    estate, yes.
 8        Q.    Okay.  And your brother, Nicholas --
 9    Nicholas Alexos, was involved in Broadsmore?
10        A.    Yes, ma'am.
11        Q.    Does Broadsmore Capital LLC still
12    exist?
13        A.    No, ma'am.
14        Q.    Do you know when it stopped existing?
15        A.    I don't know when the entity was
16    closed.
17        Q.    When did you stop working for it?
18        A.    Four or five years ago.
19        Q.    Are you familiar with a company called
20    Triton Marine LLC?
21        A.    I am.
22        Q.    What was the business of Triton Marine
23    LLC?
24        A.    Triton Marine was an entity that was
```

---

51

```
 1    established to potentially capitalize on a project
 2    opportunity that was being developed overseas, and
 3    it revolved around the hospitality industry.
 4        Q.    Was Triton Marine LLC in the
 5    construction business?
 6        A.    No.  Triton Marine had nothing to do --
 7    Triton Marine at its time did not have anything to
 8    do with construction.
 9        Q.    So when you say "the hospitality
10    business," what business was it involved in then?
11        A.    So on the construction side, Centaur
12    would often do projects in the hospitality sector.
13    And the project that we were exploring to
14    undertake overseas was in the hospital sector.  So
15    that was an entity that was set up with the
16    expectation of if that project moved forward, we
17    would have a basis for growing that hospitality
18    side of the equation.
19        Q.    I'm still confused.  What business
20    would Triton Marine then do?
21        A.    So Triton Marine was, again, an entity
22    that was set up with the expectation of trying to
23    explore opportunities in the hospitality sector in
24    Greece.  I don't know a ton about Triton Marine.
```

---

52

```
 1    It didn't have much activity, and I also wasn't
 2    overly involved in that entity.
 3        Q.    There's another entity called Triton
 4    Marine Holdings LLC.
 5              Is that a company that you're familiar
 6    with?
 7        A.    What was the name of the first entity?
 8        Q.    Triton Marine LLC.  And the second one
 9    that I'm asking about now is Triton Marine
10    Holdings, with an "S," LLC.
11        A.    My recollection is not such that there
12    were two different entities.  I thought it was all
13    one.  If there were two separate distinct
14    entities, I don't remember them.
15        Q.    Okay.  Do you have access to the
16    operating agreement for Triton Marine LLC?
17        A.    I do not.
18        Q.    Were you a member of Triton Marine LLC?
19        A.    I was.
20        Q.    Who would have access to the operating
21    agreement then?
22        A.    That's a very good question.  The
23    server that a lot of this information was probably
24    held on, from what I understand, is not
```

---

53

```
 1    accessible.  So I don't know how to gain that
 2    information.
 3        Q.    Okay.  Is there an entity called Global
 4    Logistics & Procurement Company LLC?  Are you
 5    familiar with that entity?
 6        A.    I am.
 7        Q.    How are you familiar with that entity?
 8        A.    That entity was created for the purpose
 9    of the procurement of items for our projects as a
10    construction company.  When you are tasked with
11    procuring items for a construction project, we
12    thought that there would be a viable business in
13    developing a procurement company as opposed to
14    building that construction does.  The procurement
15    side buys things for the projects.
16              So Global Logistics & Procurement was
17    established for the purpose of setting up that
18    business model to become a procurement company.
19        Q.    Did Global Logistics & Procurement
20    Company LLC span more than one project, or was it
21    only for one project?
22        A.    I don't believe it ever worked on a
23    second project.  I think it was set up to be able
24    to accommodate multiple projects, but I don't
```

---

**NCH, LLC v. Centaur Construction Company, Inc., et al**

Peter Alexopoulos                                                    12/15/2023

15 (Pages 54 to 57)

| | |
|---|---|
| **54** | **56** |

**54**

1  think it ever did work for more than one project.
2      Q.    And you had a membership interest in
3  that LLC?
4      A.    I did.
5      Q.    And what was your percentage interest
6  in that LLC?
7      A.    50 percent.
8      Q.    Triton Marine, did you have an interest
9  in Triton Marine?
10      A.    I did.
11      Q.    What was your membership interest?
12      A.    50 percent.
13      Q.    There's an entity called -- I'm not
14  going to be able to pronounce it.  It's spelled
15  H-e-p-h-a-e-s-t-u-s, Chicago LLC.
16          Are you familiar with that entity?
17      A.    Hephaestus, yes.
18      Q.    Did you have a membership interest in
19  that entity?
20      A.    I did.
21      Q.    What was your percentage interest in
22  Hephaestus?
23      A.    50 percent.
24      Q.    Who had the other 50 percent?

**56**

1  about for Hephaestus, that RPDC, which stands for
2  Robert's Pizza and Dough Company, that is the
3  entity that gave Hephaestus the one share.
4      Q.    Okay.  So you didn't have a membership
5  interest in RPDC?
6      A.    No, ma'am.
7      Q.    Okay.  Do you know who had a membership
8  interest in RPDC of Illinois LLC?
9      A.    I do not know who the members were of
10  that entity.
11      Q.    Who did you deal with when you were
12  working, assume -- and maybe I shouldn't assume,
13  but who did you deal with at RPDC of Illinois LLC
14  when you worked on that project?
15      A.    So the one gentleman who's name I
16  remember was Jay.  I want to say his last name was
17  Sher or Sherer.
18          I'm drawing a blank on the other
19  gentleman's name.  Oh, Robert for Robert's Pizza
20  and Dough Company.  I just don't remember his last
21  name.
22      Q.    All right.  There's another entity,
23  Sportsman's Resource Training LLC.  You're
24  familiar with that entity?

| | |
|---|---|
| **55** | **57** |

**55**

1      A.    Spiro Tsaparas.
2      Q.    What was the purpose of Hephaestus?
3      A.    Hephaestus -- we had done work on a
4  project.  The owners of the project wanted to
5  provide Centaur in exchange for some outstanding
6  balances, goodwill, call it, I don't know the
7  exact rationale, wanted to give us one share of
8  the entity.  And we established Hephaestus LLC in
9  order to own the one share of that restaurant
10  project.  Because when we were building it, there
11  was an expectation that that entity would grow and
12  that might turn into something at some point.  So
13  that's why the entity was set up.
14      Q.    And do you have a copy of the operating
15  agreement?
16      A.    I do not, but I may be able to get
17  that.
18      Q.    Okay.  Would you please?
19          There's this other entity, RPDC of
20  Illinois LLC.
21      A.    Yes.
22      Q.    I think that you previously testified
23  that you had one share of that entity?
24      A.    So the items that we were just talking

**57**

1      A.    I am.
2      Q.    Are you the manager of that entity?
3      A.    The sole member and manager of the
4  entity, yes.
5      Q.    Do you have an operating agreement?
6      A.    I believe so.
7      Q.    Could you provide us with that
8  operating agreement and any transfers since --
9  let's say, since January of 2021?
10          MR. GAVRILOS:  Can I just ask you to
11      clarify?  When you say *transfers,* do you
12      mean like any sort of financial transaction
13      or like a conveyance of, say, a voting
14      interest or distribution interest from SRT to
15      another entity?  What do you mean by
16      *transfer*?
17  BY MS. MARZIANI:
18      Q.    So I'm looking for distributions that
19  are documented.  I'm looking for transfers of any
20  interests.  You've said you're the sole member and
21  the sole manager, but sometimes that changes.  So
22  any interest in the LLC transferred, I would like
23  that as well.
24      A.    Sure.  There haven't been any, but

**NCH, LLC v. Centaur Construction Company, Inc., et al**

Peter Alexopoulos                                                                    12/15/2023

50 (Pages 194 to 196)

---

194

```
 1            THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3    NHC LLC, a Florida limited  )
      liability company,          )
 4           Plaintiff,           )
                                  )
 5       vs.                      )   No. 1:19-cv-06332
                                  )   Honorable Matthew F.
 6    CENTAUR CONSTRUCTION         )      Kennelly
      COMPANY INC, an Illinois    )
 7    corporation, et al.,        )
             Defendants.          )
 8
 9         I, PETER ALEXOPOULOS, state that I have
10    read the foregoing transcript of the testimony
11    given by me at my deposition on December 15, 2023,
12    and that said transcript constitutes a true and
13    correct record of the testimony given by me at
14    said deposition except as I have so indicated on
15    the errata sheets provided herein.
16
17         _____
                   PETER ALEXOPOULOS
18    No corrections (Please initial)_____
      Number of errata sheets submitted_____
19
      SUBSCRIBED AND SWORN to
20    before me this _____ day
      of _____, 2024.
21
22    _____
          Notary Public
23
24
```

---

195

```
 1         CERTIFIED SHORTHAND REPORTERS
 2              REPORTER CERTIFICATE
 3         I, JANET ROBBINS, a Certified Shorthand
 4    Reporter for the State of Illinois, and ROBIN
 5    CHIMNIAK, a Certified Shorthand Reporter for the
 6    State of Illinois, do hereby certify that
 7    heretofore, to wit, on December 19, 2023, remotely
 8    appeared before us PETER ALEXOPOULOS, a witness in
 9    a certain cause now pending and undetermined in
10    the United States District Court, Northern
11    District of Illinois, Eastern Division, wherein
12    NHC LLC is the Plaintiff and Centaur Construction
13    Company Inc., et al., are the Defendants.
14         I further certify that the witness was by
15    JANET ROBBINS first duly sworn to testify the
16    truth, the whole truth and nothing but the truth
17    in the cause aforesaid; that the testimony then
18    given by the said witness was reported
19    stenographically by each reporter individually and
20    was thereafter transcribed individually by each
21    reporter, and the foregoing is a true and complete
22    transcript of the testimony so given by the said
23    witness as aforesaid.
24         The signature of the witness to the
```

---

196

```
 1    foregoing deposition was not waived.
 2         We further certify that the taking of
 3    this deposition was pursuant to notice and that
 4    there were present at the taking of said
 5    deposition the appearances as heretofore noted.
 6         We further certify that we are not
 7    relatives or employees or attorneys or counsel,
 8    nor relatives or employees of such attorney or
 9    counsel for any of the parties hereto, nor
10    interested directly or indirectly in the outcome
11    of this action.
12         IN TESTIMONY WHEREOF, I have hereunto set
      my hand on this 12th day of January, 2024.
13
14
15         _____
           JANET L. ROBBINS, CSR, RPR
16         CSR License No. 084-002207
17
18         IN TESTIMONY WHEREOF, I have hereunto set
      my hand on this 12th day of January, 2024.
19
20         _____
           ROBIN M. CHIMNIAK, CSR, RPR, RMR
21         CSR License No. 084-001999
22
23
24
```

---

# EXHIBIT 15

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 001
DATE: 08/26/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 8/26/2022 | Construction Services (8/7/2022-8/20/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | |
|---|---|
| **SUBTOTAL** | **$19,230.77** |
| SALES TAX | |
| SHIPPING & HANDLING | |
| TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000044

# Triton

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 002
DATE: 09/09/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 8/26/2022 | Construction Services (8/21/2022-9/04/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | SALES TAX | |
| | | SHIPPING & HANDLING | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 003
DATE: 09/19/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 9/19/2022 | Construction Services (9/05/2022-9/18/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **SUBTOTAL** | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 004
DATE: 10/03/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 10/3/2022 | Construction Services (9/18/2022-10/2/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| | **SUBTOTAL** | **$19,230.77** |
| | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**                    MDEV-000047

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 005
DATE: 10/17/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 10/17/2022 | Construction Services (10/2/2022-10/16/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **SUBTOTAL** | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

MDEV-000048

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 006
DATE: 10/31/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 10/31/2022 | Construction Services (10/17/2022-10/30/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 007
DATE: 11/16/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 11/16/2022 | Construction Services (10/31/2022-11/13/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **SUBTOTAL** | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**  MDEV-000050

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 008
DATE: 11/28/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 11/28/2022 | Construction Services (11/14/2022-11/27/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| | **SUBTOTAL** | **$19,230.77** |
| | | |
| | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**                                   MDEV-000051

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 009
DATE: 12/12/2022

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 11/28/2022 | Construction Services (11/28/2022-12/11/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **SUBTOTAL** | $19,230.77 |
| | | | |
| | | **TOTAL DUE** | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000052

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 010
DATE: 12/22/2022

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 12/22/2022 | Construction Services (12/12/2022-12/25/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **SUBTOTAL** | $19,230.77 |
| | | | |
| | | **TOTAL DUE** | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**                                                        MDEV-000053

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 011
DATE: 1/10/2023

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 1/10/2023 | Construction Services (12/26/2022-1/08/2023) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **SUBTOTAL** | $19,230.77 |
| | | | |
| | | **TOTAL DUE** | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

# EXHIBIT 16

| Date | Amount |
|---|---|
| 12/16/20 | $ 36,000.00 |
| 01/28/21 | $ 92,515.67 |
| 01/28/21 | $ 7,500.00 |
| 03/26/21 | $ 100,000.00 |
| 04/30/21 | $ 120,000.00 |
| 05/18/21 | $ 30,000.00 |
| 05/28/21 | $ 80,000.00 |
| 06/22/21 | $ 110,000.00 |
| 07/16/21 | $ 120,000.00 |
| 03/03/22 | $ 15,000.00 |
| 03/31/22 | $ 53,000.00 |
| 04/06/22 | $ 25,000.00 |
| 04/20/22 | $ 50,000.00 |
| 04/27/22 | $ 9,500.00 |
| 05/13/22 | $ 30,000.00 |
| 05/17/22 | $ 8,500.00 |
| 06/01/22 | $ 538,149.97 |
| 06/29/22 | $ 25,000.00 |
| 07/12/22 | $ 100,000.00 |
| 08/12/22 | $ 11,344.67 |
| 08/26/22 | $ 19,230.77 |
| 09/09/22 | $ 19,230.77 |
| 09/22/22 | $ 32,000.00 |
| 09/23/22 | $ 19,230.77 |
| 10/07/22 | $ 19,230.77 |
| 10/20/22 | $ 19,230.77 |
| 11/04/22 | $ 19,230.77 |
| 11/18/22 | $ 19,230.77 |
| 11/28/22 | $ 19,230.77 |
| **TOTAL** | **$ 1,747,356.47** |

# EXHIBIT 17

**THIS AMENDED AND RESTATED PROMISSORY NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR ANY STATE SECURITIES LAW. THIS NOTE IS NON-NEGOTIABLE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED BY THE HOLDER HEREOF.**

## AMENDED AND RESTATED PROMISSORY NOTE

$4,164,759.90                                                        Chicago, Illinois
                                                        Effective December 30, 2021

FOR VALUE RECEIVED, the undersigned, Triton Marine Holdings, LLC, an Illinois limited liability company ("Maker"), agrees to pay to M Sourcing, LLC, a Colorado limited liability company, or its assignee or any subsequent assignee hereof (any of them, "Payee"), the sum of Four Million One Hundred Sixty Four Thousand Seven Hundred Fifty Nine and 90/100 Dollars ($4,164,759.90), plus interest at the Applicable Federal Rate of Zero and 19/100 percent (0.19%) per annum, compounded annually and computed on the basis of a 365-day year for the actual number of days elapsed from the date hereof until paid in accordance with the terms hereof (the "Total Note Amount"). This Note amends and restates in its entirety, and is a complete novation of, that certain Promissory Note dated effective as of December 28, 2021, made by Maker in favor of Mark Hunt (the "Initial Promissory Note"), and Maker is hereby released from all obligations set forth in the Initial Promissory Note.

1.   Payments: This Note will be payable by Maker to Payee in eight (8) equal annual installments of principal and interest in the aggregate annual amount of $524,602.74 ("Annual Payments"), in accordance with the amortization table attached hereto as **Exhibit A**, which is hereby incorporated in this Note. Payments shall be due on the first day of January each calendar year, commencing on January 1, 2022 (i.e., year 1).

2.   Maturity Date: Except as otherwise provided herein, all outstanding principal and all accrued and unpaid interest on this Note will be due and payable on January 1, 2029 (i.e., year 8) (the "Maturity Date").

3.   Advance Payment: Maker may, without penalty, prepay all or part of the principal and accrued interest due on this Note at any time and from time to time. Any prepayment of less than all the sums due under this Note will not excuse the payment of the remainder of the payments due hereunder, and will require recalculating the amortization table set forth in **Exhibit A** attached hereto with respect to the remaining payments under this Note.

4.   Acceleration: If Maker is terminated with cause or leaves the employ of Payee and the Company at any time prior to the Maturity Date, then the Total Note Amount shall be accelerated and immediately due and payable by Maker to Payee without notice. If Maker is terminated without cause at any time prior to the

**CONFIDENTIAL**                                                        **MDEV-000007**

Maturity Date, then the balance of any remaining unforgiven principal and interest shall be accelerated and immediately due and payable by Maker to Payee without notice. Any principal and interest accelerated under this section are not eligible to be forgiven under Section 2 of this Note.

5. Waivers: Presentment of payment, notice of dishonor, protest and notice of protest are hereby waived.

6. Default: Each of the following will constitute an event of default under this Note, after notice if required, time being of the essence (each, an "Event of Default"):

   (a) Maker fails to make any payment when due under this Note;

   (b) Any breach by Maker of any covenant contained in this Note;

   (c) Any breach by Payee of any covenant contained in this Note;

   (d) Maker quits or leaves the employ of Payee prior to the Maturity Date;

   (e) Maker becomes bankrupt or admits in writing an inability to pay Maker's debts as they become due, makes an assignment for the benefit of creditors, consents to the appointment of a trustee or receiver, or files for relief in bankruptcy, or other proceedings for relief in equity or under any acts of Congress or any laws of any state of the United States relating to the relief of debtors;

   (f) A trustee or receiver is appointed for Maker or for part of Maker's property without Maker's consent;

   (g) Bankruptcy or insolvency proceedings, or other proceedings for relief in equity or under any acts of Congress or any laws of any state of the United States relating to the relief of debtors are instituted against Maker or are consented to by Maker; or

   (h) If at any time Payee has a good faith, reasonable belief that Maker no longer has the desire, willingness, or ability to render services to Payee and the Company in a faithful, dutiful, and loyal manner.

   In the case of any such Event of Default, the entire unpaid principal balance of this Note, together with all accrued and unpaid interest thereon, shall forthwith be accelerated and become immediately due and payable without notice (the "Accelerated Payments" or "Acceleration").

7. Notice of Default: Maker will immediately and without notice be deemed in default under this Note (which shall constitute an Event of Default), if Maker fails to perform the terms, covenants, and conditions of this Note, other than the failure to make payments on the Note. If (a) Maker fails to make any payment due under this Note within five (5) business days after the due date for such payment, (b) Payee has

2

CONFIDENTIAL

given written notice to Maker of Maker's failure to make such payment in a timely manner, and (c) Maker has not made such payment within five (5) business days after Maker's receipt of such notice, then Maker will be deemed in default under this Note (which shall constitute an Event of Default).

8.  Payee's Rights: After an Event of Default, whether by Acceleration or otherwise, all past due principal and accrued and unpaid interest shall bear interest at a default rate equal to five percent (5%) per annum.

9.  Assignment: This Note may be assigned by Payee, any assignee of Payee, or any subsequent assignee, in each case without prior notice or consent of Maker. This Note shall transfer to the estate of Payee in the event of the death of Payee. This Note may not be assigned by Maker.

10. Confession of Judgment; Enforcement of Judgment: To further secure payment hereof, Maker hereby irrevocably authorizes any attorney of any court of record to appear for Maker, at any time from time to time after payment is due, whether by Acceleration or otherwise, and confesses judgment, without process, in favor of Payee against Maker for such amount that may be unpaid hereunder, together with statutory interest and costs of such proceeding, with any state court located in Cook County, Illinois or federal court located in Chicago, Illinois, at any time after any part of any principal and interest is past due under this Note. Maker hereby confesses judgment, without process, in favor of Payee and against Maker for such amount as may be unpaid hereunder, together with statutory interest, attorneys' fees, and the costs of such proceeding. Maker hereby waives and releases all errors which may intervene in any such proceeding and hereby consents to immediate execution upon said judgment, hereby ratifying and confirming all that said attorney, Payee, or any attorney acting for Payee may do by virtue hereof. Maker hereby waives and fully releases any attorney-in-fact obtained by Payee or Payee's counsel to confess judgment on Maker's behalf. Neither Maker, nor any attorney acting for Maker, shall seek to open said judgment or contest the enforcement of any such judgment sought to be enforced by Payee under this Section 10. Maker acknowledges that this Note is being executed in Illinois.

11. Indemnification Agreement. The parties hereby agree that the obligations of Maker set forth in this Note, including without limitation the obligations to pay principal and interest hereunder, are subject to the terms and conditions set forth in that certain Amended and Restated Indemnification Agreement between Spiro Tsaparas, Payee, M Development, LLC, and Mark Hunt dated December 30, 2022, including without limitation the offset provisions set forth therein.

12. Severability. If one or more provisions of this Note is (are) held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

3

**CONFIDENTIAL**

**MDEV-000009**

13. <u>Additional Costs and Expenses</u>. Maker shall pay all costs and expenses incurred by Payee in collecting the obligations hereunder, including, without limitation, reasonable attorneys' fees and court costs incurred by Payee in collection of this Note. These costs and expenses shall include, without limitation, any costs or expenses incurred by Payee in any bankruptcy, reorganization, insolvency or other similar proceedings of Maker. The rights and remedies of Payee stated herein are cumulative to and not exclusive of any rights or remedies otherwise available to Payee at law or in equity.

14. <u>Choice of Laws</u>: This Note will be governed by the internal laws, without regard to conflict of laws, of Illinois. Any suit or action on this Note shall be brought in any state or federal court having its situs in Cook County, Illinois, which shall be the exclusive jurisdiction for such suits, and each party hereby irrevocably submits to the jurisdiction of these courts.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

4

**CONFIDENTIAL**

IN WITNESS WHEREOF, Maker and Payee have executed this Note, and Mark Hunt, Maker, and Payee have each consented to the novation of the Initial Promissory Note effected by this Note, in each case effective as of the dates indicated below.

**Maker:**

Triton Marine Holdings, LLC

By: _____
Name: Spiro Tsaparas
Title: Manager
Date:    12-30-2022

**Payee:**

M Sourcing, LLC

By: _____
Name: Mark Hunt
Title: Manager
Date:    12.30.2022

**Consent to the novation of the Initial Promissory Note effected by this Note:**

_____
Mark Hunt, individually
Date:    12.30.2022

*[Signature Page to Amended and Restated Promissory Note]*

5

## EXHIBIT A

### Amortization Table

| | | |
|---|---|---|
| Year 1 | Due: January 1, 2022 | $524,602.74 |
| Year 2 | Due: January 1, 2023 | $524,602.74 |
| Year 3 | Due: January 1, 2024 | $524,602.74 |
| Year 4 | Due: January 1, 2025 | $524,602.74 |
| Year 5 | Due: January 1, 2026 | $524,602.74 |
| Year 6 | Due: January 1, 2027 | $524,602.74 |
| Year 7 | Due: January 1, 2028 | $524,602.74 |
| Year 8 | Due: January 1, 2029 | $524,602.74 |

32720641

CONFIDENTIAL                    MDEV-000012

# EXHIBIT 18



Colorado Secretary of State
ID#: 20228110736
Document 2: 20228110736
Filed on: 11/14/2022 09:09:09 AM
Paid: $1.00

# Articles of Organization for a Limited Liability Company

filed pursuant to § 7-90-301 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

**The domestic entity name of the limited liability company is**   M Sourcing, LLC

**The principal office street address is**   516 E Hyman Avenue
2nd Fl
Aspen CO 81611
US

**The principal office mailing address is**   516 E Hyman Avenue
2nd Fl
Aspen CO 81611
US

**The name of the registered agent is**   Linda Manning

**The registered agent's street address is**   516 E Hyman Avenue
2nd Fl
Aspen CO 81611
US

**The registered agent's mailing address is**   516 E Hyman Avenue
2nd Fl
Aspen CO 81611
US

The person above has agreed to be appointed as the registered agent for this entity.

**The management of the limited liability company is vested in**   Members

There is at least one member of the limited liability company.

**Person(s) forming the limited liability company**

Linda Manning
516 E Hyman Avenue
2nd Fl
Aspen CO 81611
US

**CONFIDENTIAL**                **MDEV-000321**

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., and, if applicable, the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

**Name(s) and address(es) of the individual(s) causing the document to be delivered for filing**

Linda Manning
516 E Hyman Avenue
2nd Fl
Aspen CO 81611
US

**CONFIDENTIAL**            **MDEV-000322**

# EXHIBIT 19

**From:**          Fogel, Eric <efogel@amundsendavislaw.com>
**Sent:**          Friday, December 30, 2022 11:45 AM
**To:**          Nancy Turken
**Cc:**          Mark Hunt
**Subject:**       RE: Mark-Spiro Documents/Confidential

Hi Nancy – please see responses below.

Happy New Year and Best Regards,

**Eric M. Fogel**
*Equity Partner*
Co-Chair, Corporate and Securities
Direct: 312-894-3225
Fax: 312-997-1791
150 North Michigan Avenue, Suite 3300 Chicago,
Illinois 60601
efogel@amundsendavislaw.com
www.amundsendavislaw.com



This message is intended only for the individual or entity to which it is addressed and
may contain information that is attorney work product, privileged, confidential
and/or exempt from disclosure under applicable law. If the reader of this message is
not the intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If you have
received this communication in error, please notify us immediately by telephone and
return the original message to us at the above address via email or the United States
Postal Service. Thank you.

---

**From:** Nancy Turken
**Sent:** Friday, December 30, 2022 12:24 PM
**To:** Fogel, Eric
**Cc:** Mark Hunt
**Subject:** FW: Mark-Spiro Documents/Confidential

**[EXTERNAL]**
Hi Eric
Mark forwarded these to me. Sorry, sidetracked travels have delayed mark's attention to this so he asked me to step in
and help here.
I have a few questions.
1. I have some advances (including today's legal fee wire $142,196) to add to the outstanding balance/note. We do
   want to raise the principal amount. Can I send you those amounts to update? Yes we can increase the principal
   balance by this amount and spread it ratably over the remaining life of the loan.
2. We formed M Sourcing LLC that spiro will be an employee of. Should the employment agreement be in that
   name? or are you proposing a different structure that M Sourcing would be under? M Sourcing LLC would be
   fine, we will adjust the documents.

**CONFIDENTIAL**          **MDEV-000511**

I'm available to discuss anytime, call or email me at your convenience. I understand we are looking to execute this all today. <mark>We will get you documents asap.</mark>

Thank you.

N

Nancy Turken

(312) 560-6705

---

**From:** Mark Hunt <mhunt@mdevco.com>
**Sent:** Friday, December 30, 2022 11:11 AM
**To:** Nancy Turken <nturken@mdevco.com>
**Subject:** Fwd: Mark-Spiro Documents/Confidential

Sent from my iPhone

Begin forwarded message:

> **From:** "Fogel, Eric" <efogel@amundsendavislaw.com>
> **Date:** December 28, 2022 at 7:24:43 PM MST
> **To:** Mark Hunt <mhunt@mdevco.com>
> **Cc:** "Peterson, Victor" <vpeterson@amundsendavislaw.com>
> **Subject: Mark-Spiro Documents/Confidential**

Hello Mark:

I thought I would send you the revised documents. Note that I changed M Development to MH Holding, LLC., as that name is available in Colorado (not formed yet, waiting your approval).

If you want to raise the principal amount of the note, please let me know.

We set everything up for signature on Friday, the 30th.

It would be good to get this done this year.

Is it ok to send these to Spiro?

Please call me.

I'm around all day tomorrow.

312-296-3436.

Best Regards,

**CONFIDENTIAL**                                                    **MDEV-000512**

**Eric M. Fogel**
*Equity Partner*
Co-Chair, Corporate and Securities
Direct: 312-894-3225
Fax: 312-997-1791
150 North Michigan Avenue, Suite 3300 Chicago,
Illinois 60601
efogel@amundsendavislaw.com

www.amundsendavislaw.com

This message is intended only for the individual or entity to which it is addressed and may contain information that is attorney work product, privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via email or the United States Postal Service. Thank you.

3

**CONFIDENTIAL**                    **MDEV-000513**

# EXHIBIT 20

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 120
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 2 of 43 PageID #:33149
This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts. Forms are free at ilcourts.info/forms.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NHC LLC, a Florida limited liability company,

     Plaintiff,

v.

                                                 Case No. 19-cv-06332

CENTAUR CONSTRUCTION COMPANY INC., an Illinois       Honorable Matthew F. Kennelly
corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS,

     Defendants.

## THIRD PARTY CITATION TO DISCOVER ASSETS TO M DEVELOPMENT, LLC

**TO:**   M Development, LLC

       c/o Mark Hunt, Registered Agent

       680 Nell Erickson

       Aspen, CO 81611

| | |
|---|---|
| In **1**, if the debtor is a person, enter the address for the debtor. If the debtor is a business, enter the name and address of the registered agent. The registered agent can be found on the Illinois Secretary of State's website. | **1.** This combined citation and notice is being sent to the above-referenced third-party (the "Respondent" or "You") and to the debtors referenced below (collectively, the "Debtors") because the above-referenced Plaintiff (the "Creditor") believes the Respondent has property belonging to one or more of the Debtors:

**Spiros Tsaparas a/k/a Spyridon Tsaparas**     **Peter Alexopoulos**
96 Mountain Laurel Ct., Unit A              8053 N. Ozark Ave.
Aspen, CO 81611                         Niles, IL 60714

**Centaur Construction Co., Inc., a dissolved Illinois Corporation**
Attn.: IL Secretary of State, as Reg. Agent
69 W. Washington St., 12th Floor
Chicago, IL 60602 |

**2. A representative from the Respondent must fill out the attached *Answer to Citation* and take the actions described in Section Four (4) below.**

| | |
|---|---|
| In **3**, you will need to find out if the appearance will be in person, or by phone or video. Contact the U.S. District Clerk by phone, or visit their website. Once you have this information, check **3a** or **3b**.

Fill out the appearance date and time, and then:

If you check **3a**, fill out the address of the building where the Debtor will attend in person.

If you check **3b**, fill out:
• the phone number for the U.S. Dist. Court Clerk's office.
• the instructions for how to appear by | **3. The next court date is**   02/19/2025   at  9:30  ☑ a.m.   ☐ p.m.
                                 *Date*               *Time*

   [X]a.  In person (unless otherwise agreed to or ordered)
            in Courtroom 2103 of the Everett McKinley Dirksen United States Courthouse

The address is:    219 South Dearborn Street, Courtroom 2103
                      *Street*
Chicago, IL 60604
*City*              *State*           *ZIP*
OR
☐  b.  By phone or video
     **Information and instructions for how you must attend by phone or video:**

**Attending by phone or video is also called a "Remote Appearance." For more information, call the U.S. Dist. Court for the Northern Dist. of Illinois (Eastern Division) Court Clerk at (312) 435 5670 or visit their website (www.ilnd.uscourts.gov).** |

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 121
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 3 of 43 PageID #:33150
Enter the Case Number given by the Clerk: 19-cv-06332

| **Notice to Debtors** | • You can attend court on the court date listed in section 3. You may be able to claim certain protections (exemptions) at that court date. For a list of exemptions see section 5 below. See *How to File an Emergency Motion to Claim Exemption* for information on how to file this *Motion*.<br>• If you need to go to court earlier than the court date listed in section 3, you can file an *Emergency Motion to Claim Exemption*.<br>• You do not have to attend court. However, if you do not attend, and you have money in this bank, the court may turn your money over to the creditor. |
|---|---|
| **Notice to Respondent** | • If you do not answer or attend court on the date listed in section 3, the judge may do one of two things:<br>    ○ Issue a rule to show cause; OR<br>    ○ Enter a conditional judgment.<br>• If there is a rule to show cause court date, you will have to explain why you did not attend court on the court date and why you should not be found in contempt of court. If you do attend the rule to show cause on the set court date, the judge may find you in contempt, and you might be arrested and jailed.<br>• If the court enters a conditional judgment, you will have 30 days to answer or appear. If you fail to do so, then the court may enter a final judgment against you. |

**The Respondent's duties and obligations**:

4.  The Respondent must file the *Answer* on page **4** telling the Court about all accounts or safety deposit boxes that the debtor may have an ownership interest in or appears as a signatory.  The Respondent must not transfer (sell, give away or get rid of) any property not exempt from the enforcement of a judgment. This prohibition shall remain in effect until further order of the court or termination of the proceeding. The Respondent is required to withhold double the unpaid amount listed below in paragraph **6**.  The Respondent is not required to withhold beyond double the unpaid amount listed below.

**THE RESPONDENT IS FURTHER COMMANDED** to produce the documents described in the attached Rider no less than fourteen (14) calendar days before the examination date to Zachary J. Watters, Vedder Price P.C., at 222 North LaSalle Street, Suite 2400, Chicago, Illinois 60601 (zwatters@vedderprice.com.    **THE RESPONDENT IS PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the Debtors or to which the Debtors may be entitled or which may be acquired by or become due to the Debtors and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the Debtors until further order of court or termination of the proceedings. The Respondent is not required to withhold the payment of any money beyond double the amount of the judgment.    If the responsive account(s) consists solely of funds that can be identified as exempt under federal or state law, the Respondent is PROHIBITED from withholding the funds, and the Respondent must respond that the funds are exempt. Deposited funds that are exempt under federal and state law include Social Security Disability Insurance (SSDI) and Social Security Retirement Insurance (SSRI), Supplemental Security Income (SSI), veteran's benefits, public assistance benefits, unemployment compensation benefits, child support and/or circuit breaker property tax relief benefits.

5.    Each of the Debtors have the right to claim certain protections ("exemptions"). If the Debtors claim an exemption, the income or property covered by that exemption cannot be taken to pay the judgment. Here are some exemptions one or more of the Debtors may be able to claim:

1.  Money or belongings up to $4,000 ( wildcard exemption );
2.  Social Security, Supplemental Security Income benefits, and disability;
3.  Public assistance benefits;
4.  Child support;
5.  Unemployment compensation benefits;
6.  Workers' compensation benefits;
7.  Veteran's benefits;
8.  Circuit breaker property tax relief benefits;
9.  The respective Debtor's equity interest, up to $2,400, in any one motor vehicle;
10.   The respective Debtor's equity interest, up to $1,500, in any professional books, or tools of their trade;
11.   Pension and retirement benefits and refunds; AND
12.   The respective Debtor's equity interest, up to $15,000, in the house they live in.

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 122
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 4 of 43 PageID #:33151
Enter the Case Number given by the Clerk: 19-cv-06332

**To debtor:** see *Emergency Motion to Claim Exemption* for further instruction on how to ask the court for these exemptions.

The Debtors have the right at the court date listed in section **3** to declare property or income as exempt. The Debtors also have the right to ask for these exemptions at an earlier date by notifying the clerk in writing at the office of the Circuit Clerk. A court date will be promptly set. Necessary forms must be prepared by the Debtors and sent to the Respondent and the Creditor or the Creditor's attorney.

6. **Certification by the Creditor:**

In **6a**, enter the name of the debtor and the date of the judgment. If the judgment has been renewed ("revived"), enter that date.

**A judgment was entered against the Debtors (jointly and severally) on March 15, 2023 in an aggregate original principal amount of no less than $22,272,124.34, plus post judgment interest at the statutory rate. A true and correct copy of the referenced judgment is enclosed herewith. The current amount that remains to be paid, including the Creditor's court costs and post judgment interest, minus any applicable payments which have been made, is no less than $21,000,000.00 as of the date of the issuance of this Third Party Citation to Discover Assets, plus court costs of this proceeding.**

In **6b**, enter the amount of the judgment.

In **6c**, enter how much is still owed to you. You are entitled to the judgment amount, court costs (e.g., filing fees, service fees, sheriff's fee, etc.), and post judgment interest of 9% per year. Subtract any payments made by the debtor.

You must mail this *Citation* by first-class regular mail to the debtor.

**I certify I will mail by regular first-class mail a copy of this *Third-Party Citation* to the Debtors at the addresses shown above within 3 business days after service on the Respondent s registered agent.**

Under the Code of Civil Procedure, [735 ILCS 5/1-109](), making a statement on this form that you know to be false is perjury, a Class 3 Felony.

**I certify that everything in this *Third Party Citation to Discover Assets* is true and correct. I understand that making a false  statement on this form is perjury and has penalties provided by law under [735 ILCS 5/1-109]().**

If you are completing this form on a computer, sign your name by typing it.  If you are completing it by hand, sign and print your name.

*/s/* Zachary J. Watters
*Your Signature*

222 North LaSalle Street, Suite 2400
*Street Address*

Zachary J. Watters (Vedder Price P.C.)
*Print Your Name*

Chicago, Illinois 60601
*City, State, ZIP*

Enter your complete address, telephone number, and email address, if you have one.

zwatters@vedderprice.com
*Email*

(312) 609-7594
*Telephone*

ARDC No. 6310675
*Attorney # (if any)*

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

THOMAS ☐. ☐RUTO☐, CLER☐

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐        ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐

(☐y) ☐EPUT☐ CLER☐                          ☐ATE

THOMAS G. BRUTON, CLERK



(By) DEPUTY CLERK

January 14, 2025

DATE

Enter the Case Number given by the Clerk:          19-cv-06932

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NHC LLC, a Florida limited liability company,

      Plaintiff,

v.                                                          Case No. 19-cv-06332

CENTAUR CONSTRUCTION COMPANY INC., an Illinois          Honorable Matthew F. Kennelly
corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS,

      Defendants.

### ANSWER TO THIRD PARTY CITATION TO DISCOVER ASSETS

**1. Information about the Respondent and the Debtors:**

   a. Respondent's name: _M Development, LLC_

   b. Respondent's address: _680 Nell Erickson_

| | | |
|---|---|---|
| Aspen | CO | 81611 |
| *City* | *State* | *ZIP* |

**To creditor:** fill out section 1. In **1a**, enter the bank's name.

In **1b**, enter the bank's current address.

In **1c**, enter the debtor's name.

In **1d**, enter the last 4 digits of the debtor's Social Security Number.

In **1e**, list the amount of the judgment.

   c. Debtors' names: (1) Spiros Tsaparas a/k/a Spyridon Tsaparas

                  (2) Peter Alexopoulos

                  (3) Centaur Construction Co., Inc., a dissolved Illinois Corporation

A judgment was entered against the Debtors (jointly and severally) on March 15, 2023 in an aggregate original principal amount of no less than $22,272,124.34, plus post-judgment interest at the statutory rate. A true and correct copy of the referenced judgment is enclosed herewith. The current amount that remains to be paid, including the Creditor's court costs and post judgment interest, minus any applicable payments which have been made, is no less than $21,000,000.00 as of the date of the Third Party Citation to Discover Assets issued with this Answer form, plus court costs of this proceeding.

      **NOTICE TO RESPONDENT:** This is a *Citation.* You might need to freeze up to double the on the source of the deposits. See question 2.

**2. Interrogatories:**

   a. On the date of service of the *Citation*, do you have any personal property or money belonging to any of the debtors?

      ☐Yes   ☐No  ***If no, do not fill out the rest of the form. Sign below.***

**To creditor:** leave the rest of the form blank.

**To Respondent:** fill out the remaining parts of this form and sign it. Then file this *Answer* with the court and send a copy to the creditor. Contact the Clerk for instructions on how to file this *Answer* with the court.

   b. Is any of the money deposited into an IRA?

      ☐Yes. If yes, do not freeze the IRA accounts.   ☐No

   c. Have all of the deposits made during the past 90 days been electronically deposited and identified as Social Security, Unemployment Compensation, Public Assistance, Veteran's Benefits, Pension, or Retirement?

      ☐Yes. If yes, do not freeze the account.   ☐No

   d. Is the account's current balance equal to or less than the total of the exempt deposits? ☐Yes.

      If yes, do not freeze the account.   ☐No

      If you checked **No** in **b**, **c**, and **d**, then freeze up to double the amount of the judgment.

Enter the Case Number given by the Clerk: _____19-cv-06332_____

**3. Property:**

a. ☐ Account

| | Account Type | Account Balance | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |
| 3. | | $ | $ |
| 4. | | $ | $ |
| 5. | | $ | $ |
| 6. | | $ | $ |

b. ☐ Safety Deposit   ☐ Yes   ☐ No

c. ☐ Other property *(rents, mortgages, etc.)*

| | Describe Property | Value of Property | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |

d. ☐ Less Right of Offset for Loans  $_____

e.                                    **Total Amount Frozen:**  $_____

**4. List all electronic monthly deposits:**

| | Account Number | Source of Deposit | Monthly Amount |
|---|---|---|---|
| 1. | | | $ |
| 2. | | | $ |
| 3. | | | $ |

**5. List all joint account holders or anyone who has a claim on the property:**

> If all of the property belongs to another person who is not the debtor, do not freeze the property.

a. _____

*First*                    *Middle*                    *Last Name*

_____

*Street*

_____

*City*                         *State*                         *ZIP*

Account Information:  Type:  ☐ Checking   ☐ CD   ☐ Savings
Account Number: _____

b. _____

*First*                    *Middle*                    *Last Name*

_____

*Street*

_____

*City*                         *State*                         *ZIP*

Account Information:  Type:  ☐ Checking   ☐ CD   ☐ Savings
Account Number: _____

Enter the Case Number given by the Clerk: _____ 19-cv-06332

c.

| First | Middle | Last Name |

_____

Street

_____

| City | State | ZIP |

Account Information:    Type:    ☐ Checking    ☐ CD    ☐ Savings

Account Number: _____

| Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony. | **I certify that everything in the *Answer to Citation Proceeding* is true and correct. I understand that making a false statement on this form is perjury and has penalties by law under 735 ILCS 5/1-109.** |

| If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name. | _____ *Your Signature* | _____ *Street Address* |
| Enter your complete address, telephone number, and email address, if you have one. | _____ *Print Your Name* | _____ *City, State, ZIP* |
| Mail or hand-deliver a copy of this completed *Answer* to the Clerk, plaintiff, and debtor. | _____ *Email* | _____ *Telephone* |
| | _____ *Attorney # (if any)* | |

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

NHC LLC,

Plaintiff(s),

v.

Centaur Construction Company Inc. et al,

Defendant(s).

Case No.  19 C 6332
Judge Matthew F. Kennelly

## <u>AMENDED JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

☐     in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

☒     other: On Count 1 (breach of contract) – In favor of plaintiff NHC LLC and against defendants Centaur Construction Co. and Spiros Tsaparas jointly and
severally. On Count 2 (fraud) - In favor of plaintiff NHC LLC and against defendants Centaur Construction Co.; Spiros Tsaparas; and Peter Alexopoulos jointly and severally. Compensatory damages are awarded in favor plaintiff NHC LLC and against defendants Centaur Construction Co.; Spiros Tsaparas; and Peter Alexopoulos jointly and severally in the total amount of $22,272,124.34. This entire amount is attributable to Count 2 (fraud). Of this same total $22,122,124.34 is attributable to Count 1 (breach of contract) for which defendants Centaur Construction Co. and Spiros Tsaparas are jointly and severally liable. Punitive damages are awarded on Count 2 (fraud) in favor of plaintiff NHC LLC and against defendant Centaur Construction Co. in the amount of $630,666.00; against defendant Spiros Tsaparas in the amount of $1,500,000.00; and against defendant Peter Alexopoulos in the amount of $400,000.00.

This action was *(check one)*:

☐ tried by a jury with Judge          presiding, and the jury has rendered a verdict.

ILND 450 (Rev. 10/13) Judgment in a Civil Action

☐ tried by Judge        without a jury and the above decision was reached.

☒ decided by Judge Matthew F. Kennelly on a motion


Date:   3/15/2023                              Thomas G. Bruton, Clerk of Court

                                               Melissa Astell , Deputy Clerk

## RIDER TO THIRD PARTY CITATION TO DISCOVER ASSETS
## TO M DEVELOPMENT, LLC

### DEFINITIONS

1. The term "Communication" as used herein shall mean any written, electronic or verbal transmission of words or thoughts between or among two or more Persons, including, without limitation, any letter, electronic mail ("e-mail"), instant or text message, blog, web posting, interview, conference, meeting, spoken words, conversation, understanding, agreement, discussion, talks, and reports, whether transmitted in orally, in writing or by any electronic device.

2. The term "Document" and "Documents" as used herein shall mean the original and each non-identical copy (whether different from the original because of marginal notes, or other material inserted therein, or attached thereto or otherwise) of any written or graphic matter, however produced or reproduced, whether sent or received or neither, including drafts and both sides thereof, and including but not limited to: papers, books, letters, correspondence, telegrams, cables, telex messages, e-mails, text messages, memoranda, typed or handwritten notes, notations, work papers, transcripts, minutes, reports and recordings of telephone or other conversations, or of interviews or of conferences or other meetings, maps, charts, plans, specifications, diagrams, photographs, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, ledgers, journals, Financial Statements, statistical records, desk calendars, appointment books, diaries, expense account records, lists, tabulations, sound recordings, computer printouts, data processing input and output, microfilms, all other records kept by electronic, photographic or mechanical means, and items similar to any of the foregoing.

3. The term "Evidencing" as used herein shall mean proving, indicating, or probative of the existence or nature of the matter discussed.

4. The term "Financial Statement" as used herein shall mean any Document prepared by You or at Your request reflecting Your financial condition, including, without limitation, audited and unaudited financial statements, balance sheets, profit and loss statements, cash flow statements, and any written representation by You to any creditor, Person, firm or entity from which You were or are seeking credit.

5. The term "Judgment Debtors" as used herein shall mean Centaur Construction Company Inc., Spiro Tsaparas, and Peter Alexopoulos, who are judgment debtors in this matter, and their partners, agents, employees, accountants, counsel, trustees, predecessors/successors and/or affiliated business affiliates, including but not limited to Triton Marine Holdings, LLC, and any other Person (including, without limitation, any entities) under their control or direction, and any other Persons (including, without limitation, any entities) under the control or direction of any of the foregoing or acting on behalf of any of them, regardless of affiliation or employment.

6. The terms "Own" and "Ownership Interest" include direct and/or indirect (i.e., through a related Person (including, without limitation, any entity)) ownership, complete and/or fractional ownership, contingent ownership, and/or present and/or future ownership.

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 130
of 262
Case: 1:19-cv-06332 Document #: 761-20    Filed: 07/30/25 Page 12 of 43 PageID #:33159

7.      The term "Person" as used herein shall mean any natural Person, corporate entity, partnership, association (including professional association), sole proprietorship, or other entity.

8.      The term "Project" as used herein shall mean any collaborative business enterprise or planned undertaking by two or more Persons, contractual or implied, for profit or otherwise, for any purpose.

9.      The term "Relating To" as used herein shall mean consisting of, referring to, reflecting, supporting, prepared in connection with, used in preparation for or being in any way legally, logically or factually connected with the matter discussed.

10.      The term "Real Estate" or "Real Property" means any real property, and includes any interest in real property, including, without limitation, fractional interests, indirect interests, contingent interests, joint interests, guaranties, present and/or future interests, and/or any interest in real property through any limited and/or general partnerships.

11.      The term "Relevant Period" as used herein shall mean the period from January 1, 2019 to the present.

12.      The term "Triton Loan" as used herein shall mean the promissory note between Triton Marine Holdings, LLC and M Sourcing, LLC effective December 30, 2021 for the amount of $4,164,759.90, attached as **Exhibit 1** to this Rider, as well as the associated indemnification agreement entered into by M Development, LLC attached as **Exhibit 2** to this Rider.

13.      The term "Trust" includes any trust created by You and/or any Person (including, without limitation, any entity) in which You have any interest, whether present, future, vested and/or contingent, including, but not limited to, any trust created by You or any Person (including, without limitation, any entity) by written or verbal agreement with any Person (including, without limitation, any entity), whether such Person is identified as "trustee," "agent," "custodian," "nominee" or in any other fashion.

14.      "You" and/or "Your" as used herein shall mean M Development, LLC and each and every one of Your partners, members, directors, managers, officers, agents, employees, accountants, counsel, trustees, subsidiaries, parent organizations, predecessor(s) in interest, successor(s) in interest, and any other person (including, without limitation, any entities) under the control or direction of any of the foregoing or purporting to act on behalf of any of them, regardless of affiliation or employment.

## CONSTRUCTIONS

15.      The terms "and" as well as "or" as used herein shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this Citation Rider any information which might otherwise be construed to be outside its scope.

16.      The use of the singular form of any word includes the plural and vice versa, as necessary to bring within the scope of Citation Rider any information which might otherwise be construed to be outside its scope.

17.     Wherever a masculine pronoun or possessive adjective appears, reference is made to male, female, nonbinary, and nongendered Persons.

18.     For purposes of limitation, each Rider request should be construed independently and not by reference to any other request.

## INSTRUCTIONS

1.     All Documents which are not produced because of a claim of privilege, because of a claim that such Documents form a part of the attorney's work product, or because of a claim that the Documents were prepared in anticipation of litigation, shall be identified in sufficient detail to permit a request for in camera inspection of each Document in the event any claim of privilege is disputed. In the event that any request is not answered or Document is not produced by reason of a claim of privilege, You are required to provide a log setting forth the following:

(a)     the author or originator;

(b)     each addressee or recipient of the Document or any copy thereof;

(c)     the date the Document bears or, if it bears no date, the date on which it was made;

(d)     the title or subject matter of the Document and a general description of its contents;

(e)     the nature of the Document (e.g., memorandum, telegram, chart, etc.); and

(f)     the basis or bases for the claim of privilege.

2.     To the extent that no single Document exists or is in Your possession, custody or control which contains all of the information sought in any particular request, You are to provide such other Documents in Your possession, custody or control which are sufficient to show, compute, compile or explain all of the information sought in the request or as much information as is available.

3.     The Documents produced pursuant to the subject Third Party Citation to Discover Assets and this Citation Rider are to be segregated and identified by the number of the request used in the DOCUMENT REQUESTS section of this Citation Rider to which the Documents are responsive.

4.     For each responsive Document or other requested information that You assert is privileged or is not discoverable, identify that Document or other requested information. State the specific grounds for the claim of privilege or other grounds for exclusion. Also, for each Document You claim is not discoverable, state the date of the Document; the name, job title and address of the Person (including, without limitation, any entity) who prepared it; the name, job title and address of the Person (including, without limitation, any entity) to whom it was addressed, to whom it was circulated or who saw it; the name, job title and address of the Person (including, without limitation, any entity) now in possession of the Document; the description of the subject matter of the Document; and the present location and custodian of the Document.

5.     For a responsive Document that no longer exists or that cannot be located, identify the Document, state how and when it passed out of existence or when it could no longer be located, and the reason(s) for the disappearance.  Also, identify each Person (including, without limitation, any entity) having knowledge about the disposition or loss of the Document, and identify any other Document Evidencing the lost Document's existence or any facts about the lost Document.

6.     The accompanying Third Party Citation to Discover Assets to M Development shall be deemed continuing so as to require You to supplement Your response with respect to any Request below if You obtain information or Documents on the basis of which You know that the response was misleading and/or incorrect and/or the response was not complete.

7.     With respect to any Document requested that was, but no longer is, in Your possession or subject to Your control, state whether said Document:

(a)     is missing or lost;
(b)     has been destroyed;
(c)     has been transferred, voluntarily or involuntarily, to any other Person or entity; or
(d)     has been otherwise disposed of.

## DOCUMENT REQUESTS

1.     All Documents and Communications Evidencing and/or Relating To payments of money by any Person to any of the Judgment Debtors.

2.     All Documents and Communications Evidencing and/or Relating To income and/or assets of any of the Judgment Debtors.

3.     All Documents and Communications Evidencing and/or Relating To any amounts owed by You to any of the Judgment Debtors, and the schedule under which payments will be made.

4.     All Documents and Communications Evidencing and/or Relating To any amounts owed by any of the Judgment Debtors to You, and the schedule under which payments will be made.

5.     All Documents and Communications Evidencing and/or Relating To the Triton Loan of December 30, 2021 and the associated indemnification agreement.

6.     All Documents and Communications Evidencing and/or Relating To amounts paid by You to Triton Marine Holdings, LLC for "Construction Services" during the Relevant Period as reflected in the invoices attached as **Exhibit 3**, as well as the work performed by Triton in consideration for these amounts.

7.     All Documents and Communications Evidencing and/or Relating To any employment or retainer agreements between You and any Judgment Debtor.

8.     All Communications (that pertain to the payment of any money, and/or any contract and/or services) between You and any of the Judgment Debtors during the Relevant Period.

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 133
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 15 of 43 PageID #:33162
of 262

9.    All Documents and Communications Evidencing and/or Relating To payments made from You to any of the Judgment Debtors during the Relevant Period.

10.    All Documents and Communications Evidencing and/or Relating To payments made from any of the Judgment Debtors to You during the Relevant Period.

11.    All Documents and Communications Relating To any anticipated and/or future payments from You to any of the Judgment Debtors.

12.    All Documents and Communications Relating To any anticipated and/or future payments from any of the Judgment Debtors to You.

13.    All Documents reflecting Communications between You and any third party, from the Relevant Period to the present, Evidencing or Relating To any and all assets and/or transfers of assets to and/or from either and/or both of the Judgment Debtors (and/or any purported assignee and/or successor in interest).

14.    All Documents reflecting Communications between You and any third party from the Relevant Period to the present, Evidencing or Relating To any expected income, assets and/or funds to be received by either and/or both of the Judgment Debtors (and/or any purported assignee and/or successor in interest).

15.    All Documents and Communications Evidencing and/or Relating To the transfer of assets or liabilities by You to the Judgment Debtor.

16.    All Documents and Communications Evidencing and/or Relating To the transfer of assets or liabilities to You by the Judgment Debtor.

17.    All contracts between You and any of the Judgment Debtors from January 1, 2015 through the present date.

18.    All Documents that pertain to monies exchanged between You and any of the Judgment Debtors, whether in Trust or in title.

19.    A copy of Your Articles of Incorporation and/or Articles of Organization and any amendments thereto.

20.    A copy of Your By-Laws and any amendments thereto.

21.    A copy of the Certificate of Incorporation (and/or Organization) from a Secretary of State Evidencing Your existence as a formal business entity.

22.    A copy of Your Notice of Incorporation (and/or Organization) as it appeared when first published.

23.    Copies of the minutes of all Your meetings of shareholders and/or Owners/directors/officers in which the Judgment Debtors were discussed.

24.     Copies of the minutes of all meetings of Your Board of Directors in which the Judgment Debtors were discussed.

25.     All Documents Evidencing and/or Relating To loans (and/or a transfer of money and/or property) by You to any corporation and/or business entity in which any of the Judgment Debtors has an interest (directly or indirectly).

26.     All Documents Evidencing and/or Relating To loans (and/or a transfer of money and/or property) to You from any corporation and/or business entity in which any of the Judgment Debtors has an interest (directly or indirectly) and/or any party to this litigation.

27.     Copies of corporate/business records or ledgers Evidencing the identity and address of each person or entity who has Owned stock and has/had Ownership Interest in You during the past five (5) years, the consideration paid or promised for the stock and/or Ownership Interest, and the date(s) on which the consideration was paid or promised.

28.     Copies of corporate/business records or ledgers Evidencing the payment of dividends and/or draws to any shareholder and/or Owner since Your incorporation and/or organization, to whom the dividends/draws were paid, the amounts paid, and the date(s) of such payments.

29.     For each bank account maintained in Your name, a copy of the monthly statement(s) for the Relevant Period, ending with the date of Your response to these requests.

30.     All Documents related to wages, income and/or other monies to any of the Judgment Debtors for the Relevant Period, ending with the date of Your response to these requests.

31.     Copies of any and all Documents to/from any governmental entity that relate to assets of the Judgment Debtors.

32.     All Documents and/or Communications Evidencing or Relating To Your payment of Judgment Debtors' legal fees, expenses, and/or costs (including, without limitation, any retainer payments) during the Relevant Period.

33.     All Documents and/or Communications between You and any of the Judgment Debtors Relating To tax withholdings to any local, state, federal, or international taxing authority.

34.     All Documents and/or Communications between You and any taxing authority Relating To Judgment Debtors' tax withholdings and/or monies owed to any taxing authorities.

35.     All Documents and Communications Evidencing and/or Relating To any and all employees that were once employed or continue to be employed by You who once were or currently are employed by any of the Judgment Debtors, or any employees shared in any way between You and any of the Judgment Debtors.

36.     All Documents and Communications Evidencing and/or Relating To mergers, de factor mergers, joint ventures, partnerships, affiliations, sales, purchases, acquisitions, pledges,

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 135
of 262
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 17 of 43 PageID #:33164

transfers, assignments, conveyances, and/or other transactions regarding any of the Judgement Debtors' assets and/or debts, including the assets and/or debts of any and all of their affiliates.

37.     All Documents and Communications Relating To Judgment Debtors and/or their partners, members, directors, managers, officers, agents, employees, accountants, counsel, subsidiaries, parent organizations, predecessor(s) in interest, successor(s) in interest, and any other person or entities under the control or direction of any of the foregoing or purporting to act on behalf of any of them.

38.     All Documents and Communications Evidencing and/or Relating To the relationship between You and any of the Judgment Debtors.

39.     All Documents and Communications Evidencing and/or Relating To the relationship between You and M Sourcing, LLC.

40.     All Documents and Communications Evidencing and/or Relating To any transactions, deposits, or withdrawals for any checking account, savings account, certificate of deposit, money market account, cryptocurrency wallets, company credit card accounts, and/or any other such account with any financial institution, whether foreign, domestic or other, whether registered in Your name alone but which any Judgment Debtor has or had access to, in the name of You or Judgment Debtors or others (including, but not limited to entities), in Your name or the names of Judgment Debtors as trustee for another or others, in the name of another or others as trustee for You or Judgment Debtors, any partnership, Trust and/or other entity in which You or Judgment Debtors have and/or had an interest or have or had authority to represent in connection therewith (including cancelled checks, wire transfer confirmations, check stubs, bank or other statements, ledgers, passbooks and/or correspondence).

41.     All Documents and Communications Evidencing and/or Relating To expenses incurred by any of the Judgment Debtors through any accounts affiliated with You, including company credit cards, business travel, personal services, corporate memberships, or any other such accounts.

42.     All Documents and Communications Evidencing and/or Relating To any K-1, W-2, 1099, tax return, or extension for tax returns not yet filed, including, without limitation, any income, intangible, property or gift tax return, filed by You with any local, state, federal, or foreign government during the Relevant Period, including all exhibits, forms, and schedules attached to the tax returns.

43.     All Documents and/or Communications from the Relevant Period to the present Relating To (i) any cash withdrawals by the Judgment Debtors, (ii) the spending of cash on any property, goods or services by the Judgment Debtors, and/or (iii) the storage of and/or saving of cash outside of financial institutions by the Judgment Debtors (e.g., in a safe, etc.).

44.     All Documents and Communications Evidencing and/or Relating To all donations, charitable gifts, or endowments by You or Judgment Debtors to any Persons or entities, including, without limitation, charitable funds, religious organizations, educational institutions, municipalities, non-profit organizations, hospitals, business leagues, recreation clubs, lodges,

fraternities, societies, labor organizations, cooperatives, social welfare organizations, veterans organizations, medical charities, charitable risk pools, and child care organizations.

45.     All Documents and Communications Evidencing and/or Relating To any interest whatsoever that Judgment Debtors have and/or had in any domestic Real Estate located within the United States, including, without limitation, its territories, dependencies, tribal sovereignties, occupation zones, or other administrated areas, incorporated or unincorporated, including, without limitation, along with any and all written opinions or appraisals that You or Judgment Debtors have received or contracted for, reflecting values on any domestic Real Property that You or Judgment Debtors presently Own, either legally or beneficially, and/or property which You or Judgment Debtors have owned during the Relevant Period.

46.     All Documents and Communications between or among You, including Mark Hunt, and/or Judgment Debtors Relating To the payment of any expenses, including personal, legal, business, or otherwise by You, Mark Hunt, and/or M Sourcing, LLC on behalf of any of the Judgment Debtors.

47.     Any and all Documents and/or Communications not specifically requested herein that relate to any assets of any of the Judgment Debtors.

Case No. 1:25-cv-02537     Document 1-9     filed 08/13/25     USDC Colorado     pg 137
of 262
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 19 of 43 PageID #:33166

# EXHIBIT 1

**THIS AMENDED AND RESTATED PROMISSORY NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR ANY STATE SECURITIES LAW. THIS NOTE IS NON-NEGOTIABLE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED BY THE HOLDER HEREOF.**

## AMENDED AND RESTATED PROMISSORY NOTE

$4,164,759.90                                           Chicago, Illinois
                                              Effective December 30, 2021

FOR VALUE RECEIVED, the undersigned, Triton Marine Holdings, LLC, an Illinois limited liability company ("Maker"), agrees to pay to M Sourcing, LLC, a Colorado limited liability company, or its assignee or any subsequent assignee hereof (any of them, "Payee"), the sum of Four Million One Hundred Sixty Four Thousand Seven Hundred Fifty Nine and 90/100 Dollars ($4,164,759.90), plus interest at the Applicable Federal Rate of Zero and 19/100 percent (0.19%) per annum, compounded annually and computed on the basis of a 365-day year for the actual number of days elapsed from the date hereof until paid in accordance with the terms hereof (the "Total Note Amount"). This Note amends and restates in its entirety, and is a complete novation of, that certain Promissory Note dated effective as of December 28, 2021, made by Maker in favor of Mark Hunt (the "Initial Promissory Note"), and Maker is hereby released from all obligations set forth in the Initial Promissory Note.

1.   Payments: This Note will be payable by Maker to Payee in eight (8) equal annual installments of principal and interest in the aggregate annual amount of $524,602.74 ("Annual Payments"), in accordance with the amortization table attached hereto as **Exhibit A**, which is hereby incorporated in this Note. Payments shall be due on the first day of January each calendar year, commencing on January 1, 2022 (i.e., year 1).

2.   Maturity Date: Except as otherwise provided herein, all outstanding principal and all accrued and unpaid interest on this Note will be due and payable on January 1, 2029 (i.e., year 8) (the "Maturity Date").

3.   Advance Payment: Maker may, without penalty, prepay all or part of the principal and accrued interest due on this Note at any time and from time to time. Any prepayment of less than all the sums due under this Note will not excuse the payment of the remainder of the payments due hereunder, and will require recalculating the amortization table set forth in **Exhibit A** attached hereto with respect to the remaining payments under this Note.

4.   Acceleration: If Maker is terminated with cause or leaves the employ of Payee and the Company at any time prior to the Maturity Date, then the Total Note Amount shall be accelerated and immediately due and payable by Maker to Payee without notice. If Maker is terminated without cause at any time prior to the

Maturity Date, then the balance of any remaining unforgiven principal and interest shall be accelerated and immediately due and payable by Maker to Payee without notice. Any principal and interest accelerated under this section are not eligible to be forgiven under Section 2 of this Note.

5.  Waivers: Presentment of payment, notice of dishonor, protest and notice of protest are hereby waived.

6.  Default: Each of the following will constitute an event of default under this Note, after notice if required, time being of the essence (each, an "Event of Default"):

    (a)  Maker fails to make any payment when due under this Note;

    (b)  Any breach by Maker of any covenant contained in this Note;

    (c)  Any breach by Payee of any covenant contained in this Note;

    (d)  Maker quits or leaves the employ of Payee prior to the Maturity Date;

    (e)  Maker becomes bankrupt or admits in writing an inability to pay Maker's debts as they become due, makes an assignment for the benefit of creditors, consents to the appointment of a trustee or receiver, or files for relief in bankruptcy, or other proceedings for relief in equity or under any acts of Congress or any laws of any state of the United States relating to the relief of debtors;

    (f)  A trustee or receiver is appointed for Maker or for part of Maker's property without Maker's consent;

    (g)  Bankruptcy or insolvency proceedings, or other proceedings for relief in equity or under any acts of Congress or any laws of any state of the United States relating to the relief of debtors are instituted against Maker or are consented to by Maker; or

    (h)  If at any time Payee has a good faith, reasonable belief that Maker no longer has the desire, willingness, or ability to render services to Payee and the Company in a faithful, dutiful, and loyal manner.

    In the case of any such Event of Default, the entire unpaid principal balance of this Note, together with all accrued and unpaid interest thereon, shall forthwith be accelerated and become immediately due and payable without notice (the "Accelerated Payments" or "Acceleration").

7.  Notice of Default: Maker will immediately and without notice be deemed in default under this Note (which shall constitute an Event of Default), if Maker fails to perform the terms, covenants, and conditions of this Note, other than the failure to make payments on the Note. If (a) Maker fails to make any payment due under this Note within five (5) business days after the due date for such payment, (b) Payee has

CONFIDENTIAL                                    MDEV-000008

given written notice to Maker of Maker's failure to make such payment in a timely manner, and (c) Maker has not made such payment within five (5) business days after Maker's receipt of such notice, then Maker will be deemed in default under this Note (which shall constitute an Event of Default).

8.    Payee's Rights: After an Event of Default, whether by Acceleration or otherwise, all past due principal and accrued and unpaid interest shall bear interest at a default rate equal to five percent (5%) per annum.

9.    Assignment: This Note may be assigned by Payee, any assignee of Payee, or any subsequent assignee, in each case without prior notice or consent of Maker. This Note shall transfer to the estate of Payee in the event of the death of Payee. This Note may not be assigned by Maker.

10.    Confession of Judgment: Enforcement of Judgment: To further secure payment hereof, Maker hereby irrevocably authorizes any attorney of any court of record to appear for Maker, at any time from time to time after payment is due, whether by Acceleration or otherwise, and confesses judgment, without process, in favor of Payee against Maker for such amount that may be unpaid hereunder, together with statutory interest and costs of such proceeding, with any state court located in Cook County, Illinois or federal court located in Chicago, Illinois, at any time after any part of any principal and interest is past due under this Note. Maker hereby confesses judgment, without process, in favor of Payee and against Maker for such amount as may be unpaid hereunder, together with statutory interest, attorneys' fees, and the costs of such proceeding. Maker hereby waives and releases all errors which may intervene in any such proceeding and hereby consents to immediate execution upon said judgment, hereby ratifying and confirming all that said attorney, Payee, or any attorney acting for Payee may do by virtue hereof. Maker hereby waives and fully releases any attorney-in-fact obtained by Payee or Payee's counsel to confess judgment on Maker's behalf. Neither Maker, nor any attorney acting for Maker, shall seek to open said judgment or contest the enforcement of any such judgment sought to be enforced by Payee under this Section 10. Maker acknowledges that this Note is being executed in Illinois.

11.    Indemnification Agreement. The parties hereby agree that the obligations of Maker set forth in this Note, including without limitation the obligations to pay principal and interest hereunder, are subject to the terms and conditions set forth in that certain Amended and Restated Indemnification Agreement between Spiro Tsaparas, Payee, M Development, LLC, and Mark Hunt dated December 30, 2022, including without limitation the offset provisions set forth therein.

12.    Severability. If one or more provisions of this Note is (are) held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

3

13.  Additional Costs and Expenses. Maker shall pay all costs and expenses incurred by Payee in collecting the obligations hereunder, including, without limitation, reasonable attorneys' fees and court costs incurred by Payee in collection of this Note. These costs and expenses shall include, without limitation, any costs or expenses incurred by Payee in any bankruptcy, reorganization, insolvency or other similar proceedings of Maker. The rights and remedies of Payee stated herein are cumulative to and not exclusive of any rights or remedies otherwise available to Payee at law or in equity.

14.  Choice of Laws: This Note will be governed by the internal laws, without regard to conflict of laws, of Illinois. Any suit or action on this Note shall be brought in any state or federal court having its situs in Cook County, Illinois, which shall be the exclusive jurisdiction for such suits, and each party hereby irrevocably submits to the jurisdiction of these courts.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

4

CONFIDENTIAL

MDEV-000010

IN WITNESS WHEREOF, Maker and Payee have executed this Note, and Mark Hunt, Maker, and Payee have each consented to the novation of the Initial Promissory Note effected by this Note, in each case effective as of the dates indicated below.

**Maker:**

Triton Marine Holdings, LLC

By:
Name: Spiro Tsaparas
Title: Manager
Date: 12-30-2022

**Payee:**

M Sourcing, LLC

By:
Name: Mark Hunt
Title: Manager
Date: 12-30-2022

**Consent to the novation of the Initial Promissory Note effected by this Note:**

Mark Hunt, individually
Date: 12-30-2022

*[Signature Page to Amended and Restated Promissory Note]*

5

CONFIDENTIAL

MDEV-000011

## EXHIBIT A

## Amortization Table

| | | |
|---|---|---|
| Year 1 | Due: January 1, 2022 | $524,602.74 |
| Year 2 | Due: January 1, 2023 | $524,602.74 |
| Year 3 | Due: January 1, 2024 | $524,602.74 |
| Year 4 | Due: January 1, 2025 | $524,602.74 |
| Year 5 | Due: January 1, 2026 | $524,602.74 |
| Year 6 | Due: January 1, 2027 | $524,602.74 |
| Year 7 | Due: January 1, 2028 | $524,602.74 |
| Year 8 | Due: January 1, 2029 | $524,602.74 |

32720641

CONFIDENTIAL

MDEV-000012

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 144
of 262
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 26 of 43 PageID #:33173

# EXHIBIT 2

## AMENDED AND RESTATED INDEMNIFICATION AGREEMENT

This AMENDED AND RESTATED INDEMNIFICATION AGREEMENT (this "Agreement") is made and entered into as of December 30, 2022, by and among Spiro Tsaparas ("Indemnitor"), on the one hand, and Mark Hunt ("Hunt"), M Development, LLC, an Illinois limited liability company ("M Development"), and M Sourcing, LLC, a Colorado limited liability company (the "Company" and, collectively with Hunt, M Development, and each of their respective affiliates, successors, and assigns, "Indemnitees"; and, each of the Indemnitees, an "Indemnitee"), on the other hand. Indemnitor and Indemnitees are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

RECITALS

WHEREAS, the Company has loaned $4,164,759.90 to Triton Marine Holdings, LLC, an Illinois limited liability company ("Triton"), which is an affiliate of Indemnitor, pursuant to that certain Amended and Restated Promissory Note issued by Triton in favor of the Company on the date hereof (the "Note");

WHEREAS, the Company intends to employ Indemnitor pursuant to that certain Employment Agreement entered into by the Company and Indemnitor on the date hereof (the "Employment Agreement"); and

WHEREAS, in connection with the Note and the Employment Agreement, the Parties desire for Indemnitor to indemnify Indemnitees on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, which are hereby incorporated in this Agreement, and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Indemnification by Indemnitor.  Indemnitor hereby agrees to indemnify each Indemnitee and to hold each Indemnitee harmless against, and to promptly reimburse each Indemnitee for, from and against each and every demand, claim, loss (which shall include any diminution in value), liability, judgment, damage, cost and expense (including, without limitation, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (collectively, "Losses") imposed on or incurred by such Indemnitee, in each case directly or indirectly relating to, resulting from, or arising out of or in connection with any one or more of the Note, the Employment Agreement, or any claim, demand, litigation, or regulatory action by any third party against or relating to Indemnitor or any one or more of his business companies or business dealings or business affairs, including but not limited to claims by any one or more of the creditors or judgment creditors of Indemnitor.

2.    Notice and Defense of Third-Party Claims.  If any action, claim or proceeding is brought or asserted under this Agreement against any one or more of Indemnitees in respect of which indemnity may be sought under this Agreement from Indemnitor, such Indemnitee(s) shall

MDEV-000002

give prompt written notice of such action or claim to Indemnitor, who shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such Indemnitee(s) and the payment of all expenses; except that any delay or failure to so notify Indemnitor shall relieve Indemnitor of his obligations hereunder only to the extent, if at all, that he is prejudiced by reason of such delay or failure. Indemnitees shall have the right to employ separate counsel in any of the foregoing actions, claims or proceedings and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of Indemnitees unless both Indemnitees and Indemnitor are named as parties and Indemnitees shall in good faith determine that representation by the same counsel is inappropriate. In the event that Indemnitor, within ten (10) days after notice of any such action or claim, fails to assume the defense thereof, Indemnitees shall have the right to undertake the defense, compromise or settlement of such claim, action or proceeding for the account of Indemnitor, subject to the right of Indemnitor to assume the defense of such action, claim or proceeding with counsel reasonably satisfactory to Indemnitees at any time prior to the settlement, compromise or final determination thereof. Anything in this Agreement to the contrary notwithstanding, Indemnitor shall not, without Indemnitee's prior written consent (which consent shall not be unreasonably withheld, conditioned, or delayed), settle or compromise any action or claim or proceeding or consent to entry of any judgment with respect to any such action or claim unless it (i) does not involve any finding or admission of any violation of law or any violation of the rights of any person and would not have any adverse effect on any other claims that may be made against Indemnitee, (ii) does not involve any relief other than monetary damages that are paid in full by Indemnitor, and (iii) completely, finally and unconditionally releases Indemnitees in connection with such action or claim and would not otherwise adversely affect Indemnitees.

3.      Procedures for Payment of Indemnification Obligation; Offset. Once a Loss is agreed to by Indemnitor or finally adjudicated to be payable pursuant to this Agreement, any and all such indemnifiable Losses shall be satisfied by Indemnitor, within fifteen (15) business days of such Losses being agreed to in writing or such final, non-appealable adjudication, by wire transfer of immediately available funds.  Notwithstanding anything to the contrary set forth in this Agreement, Indemnitees may seek to satisfy all such indemnifiable Losses from Indemnitor personally and may offset such indemnifiable Losses against any amount(s) otherwise payable by either or both Indemnitees to Indemnitor, including such amount(s) pursuant to the Note and/or the Employment Agreement, including provisions in the Employment Agreement relating to base salary, bonus, reimbursement of expenses, and any forgiveness of amounts due under the Note.

4.      Limitations on Indemnification Obligation.

a.      Except in the case of fraud, the maximum liability of Indemnitor for indemnification obligations hereunder shall not exceed the aggregate amount of outstanding principal and accrued but unpaid interest under the Note.

b.      For the purposes of calculating Losses under this Agreement, (i) such Losses shall be reduced by the amount of any proceeds that the applicable Indemnitee actually recovers (reduced by deductibles paid and the portion of any increase in deductibles, increase in premiums, costs of collection and/or retro-premiums resulting

2

MDEV-000003

from such matter) pursuant to the terms of any insurance policies; provided, however, that such Indemnitee shall promptly reimburse Indemnitor for any subsequent recoveries from such sources, if previously indemnified hereunder, so as to avoid a double recovery; and (ii) such Losses shall be reduced by the amount of any actual Tax benefit received by an Indemnitee as a result of such Losses.

   c. Each Indemnitee shall take, and cause his or its affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise to any Loss.

  5. <u>Survival</u>.  All covenants and agreements made by any Party hereunder shall survive in accordance with their terms or, if no term is stated, for six (6) years. Any claim for indemnification for which notice has been given within the prescribed survival period may be prosecuted to conclusion notwithstanding the subsequent expiration of such period.

  6. <u>Miscellaneous Provisions</u>.

   a. Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested, by electronic mail, or delivered by overnight courier to Indemnitor or Indemnitees at the following addresses (or to such other addresses as any such Party may from time to time specify in writing pursuant to this Section 6(a):

If to Indemnitees:  M Development, LLC and M Sourcing, LLC
      516 E. Hyman Ave., 2nd Floor
      Aspen, CO 81611
      Attn: Mark Hunt
      Email: mhunt@mdevco.com

Any such notice or communication that is addressed as provided in this Section 6(a) will be deemed given (a) upon delivery, if delivered personally; (b) on the third business day after deposit in the United States mails, if delivered by certified or registered mail; (c) if delivered by electronic mail (with delivery receipt requested), on the date of transmission if on a business day before 5:00 p.m. local time of the recipient party (otherwise on the next succeeding business day); and (d) on the first business day of the receiving Party after the delivery to the courier, if delivered by overnight courier.

   b. This Agreement contains the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements or understandings, whether written or oral, with respect thereto.

   c. This Agreement may be amended, modified, superseded, cancelled, renewed, or extended, and the terms and conditions hereof may be waived, only by a written instrument which specifically references this Agreement and which is signed by all of the Parties or, in the case of a waiver, signed by the Party waiving compliance. No delay on the part of any Party in exercising any right, power or privilege hereunder shall

CONFIDENTIAL         MDEV-000004

operate as a waiver thereof, nor shall any waiver on the part of any Party of any right, power or privilege hereunder, or any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. Except as otherwise provided herein, the rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any Party may otherwise have at law or in equity.

d.       This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to the choice of law principles thereof. Venue for the adjudication or resolution of any disputes or claims arising under this Agreement shall be in a court of competent jurisdiction situated in Cook County, Illinois.

e.       This Agreement shall not be assigned by operation of law or otherwise; provided, however, that without any consent required, Indemnitees may, by providing written notice to Indemnitor, assign this Agreement and Indemnitees' rights and obligations hereunder in whole or in part (i) to an affiliate of Indemnitees and (ii) to any person who acquires the Company or all or a substantial portion of the assets of the Company (by merger, recapitalization, sale of stock or otherwise).  Notwithstanding the foregoing, either or both of the Indemnitees may, without any consent required, assign his or its rights, but not his or its obligations, under this Agreement to any of its financing sources.

f.       All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

g.       This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

h.       The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.  Each and every provision of this Agreement shall be treated as separate and distinct and, in the event of any provision hereof being declared invalid, such invalid provision shall be deemed amended to the extent required to make it valid and enforceable, and such amended provision and the remaining provisions of this Agreement shall remain in full force and effect if such does not defeat the intent of this Agreement. The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and the agreements ancillary hereto.

*[Signature Page Follows]*

4

CONFIDENTIAL                                        MDEV-000005

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the Parties or by duly authorized representatives of such Parties, on the date first above written.

Indemnitor:

SPIRO TSAPARAS, individually

Indemnitees:

MARK HUNT, individually

M DEVELOPMENT, LLC

By:
Name: Mark Hunt
Title: Manager

M SOURCING, LLC

By:
Name: Mark Hunt
Title: Manager

*[Signature Page to Indemnification Agreement]*

31297141

5

**CONFIDENTIAL**

**MDEV-000006**

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 150
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 32 of 43 PageID #:33179
of 262

# EXHIBIT 3

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 001
DATE: 08/26/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | TOTAL |
|------|-------------|-------|
| 8/26/2022 | Construction Services (8/7/2022-8/20/2022) | $19,230.77 |

| | |
|------|------|
| **SUBTOTAL** | **$19,230.77** |
| SALES TAX | |
| SHIPPING & HANDLING | |
| TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 002
DATE: 09/09/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | TOTAL |
|------|-------------|-------|
| 8/26/2022 | Construction Services (8/21/2022-9/04/2022) | $19,230.77 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **SUBTOTAL** | **$19,230.77** |
| | SALES TAX | |
| | SHIPPING & HANDLING | |
| | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

**MDEV-000045**

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 003
DATE: 09/19/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 9/19/2022 | Construction Services (9/05/2022-9/18/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000046

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 154
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 36 of 43 PageID #:33183
of 262

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 004
DATE: 10/03/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 10/3/2022 | Construction Services (9/18/2022-10/2/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **SUBTOTAL** | $19,230.77 |
| | | | |
| | | **TOTAL DUE** | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

MDEV-000047

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 005
DATE: 10/17/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 10/17/2022 | Construction Services (10/2/2022-10/16/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

CONFIDENTIAL

MDEV-000048

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 006
DATE: 10/31/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 10/31/2022 | Construction Services (10/17/2022-10/30/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 007
DATE: 11/16/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 11/16/2022 | Construction Services (10/31/2022-11/13/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

MDEV-000050

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 158
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 40 of 43 PageID #:33187
of 262

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 008
DATE: 11/28/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 11/28/2022 | Construction Services (11/14/2022-11/27/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000051

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 009
DATE: 12/12/2022

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 11/28/2022 | Construction Services (11/28/2022-12/11/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000052

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 010
DATE: 12/22/2022

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 12/22/2022 | Construction Services (12/12/2022-12/25/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 161
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 43 of 43 PageID #:33190
OF 262

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 011
DATE: 1/10/2023

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 1/10/2023 | Construction Services (12/26/2022-1/08/2023) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000054

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 162
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 1 of 43 PageID #:33191
of 262

# EXHIBIT 21

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 163
Case: 1:19-cv-06332 Document #: 761-2 Filed: 07/30/25 Page 2 of 43 PageID #:33192
This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts. Forms are free at ilcourts.info/forms.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NHC LLC, a Florida limited liability company,

     Plaintiff,

v.                                      Case No. 19-cv-06332

CENTAUR CONSTRUCTION COMPANY INC., an Illinois     Honorable Matthew F. Kennelly
corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS,

     Defendants.

### THIRD PARTY CITATION TO DISCOVER ASSETS TO M SOURCING, LLC

**TO:**   M Sourcing, LLC

      c/o Linda Manning, Registered Agent

      100 S Spring Street

      Aspen, CO 81611

> In **1**, if the debtor is a person, enter the address for the debtor. If the debtor is a business, enter the name and address of the registered agent.
>
> The registered agent can be found on the Illinois Secretary of State's website.

**1.** This combined citation and notice is being sent to the above-referenced third-party (the "Respondent" or "You") and to the debtors referenced below (collectivley, the "Debtors") because the above-referenced Plaintiff (the "Creditor") believes the Respondent has property belonging to one or more of the Debtors:

**Spiros Tsaparas a/k/a Spyridon Tsaparas**     **Peter Alexopoulos**
96 Mountain Laurel Ct., Unit A          8053 N. Ozark Ave.
Aspen, CO 81611                  Niles, IL 60714

**Centaur Construction Co., Inc., a dissolved Illinois Corporation**
Attn.: IL Secretary of State, as Reg. Agent
69 W. Washington St., 12th Floor
Chicago, IL 60602

> In **3**, you will need to find out if the appearance will be in person, or by phone or video. Contact the U.S. District Clerk by phone, or visit their website. Once you have this information, check **3a** or **3b**.
>
> Fill out the appearance date and time, and then:
>
> If you check **3a**, fill out the address of the building where the Debtor will attend in person.
>
> If you check **3b**, fill out the phone number for the U.S. Dist. Court Clerk's office.
>
> • the instructions for how to appear by

**2.** A representative from the Respondent must fill out the attached *Answer to Citation* and take the actions described in Section Four (4) below.

**3.** The next court date is   02/19/2025   at  9:30  ☑ a.m. ☐ p.m.
                              *Date*          *Time*

     [X]a.  In person (unless otherwise agreed to or ordered)

               in Courtroom 2103 of the Everett McKinley Dirksen United States Courthouse

     The address is:     219 South Dearborn Street, Courtroom 2103
                                   *Street*
     Chicago, IL 60604
     *City*              *State*            *ZIP*
     OR

     ☐  b.  By phone or video

               **Information and instructions for how you must attend by phone or video:**

             **Attending by phone or video is also called a "Remote Appearance." For more information, call the U.S. Dist. Court for the Northern Dist. of Illinois (Eastern Division) Court Clerk at (312) 435 5670 or visit their website (www.ilnd.uscourts.gov).**

| | |
|---|---|
| **Notice to Debtors** | • You can attend court on the court date listed in section 3. You may be able to claim certain protections (exemptions) at that court date. For a list of exemptions see section 5 below. See *How to File an Emergency Motion to Claim Exemption* for information on how to file this *Motion*.<br>• If you need to go to court earlier than the court date listed in section 3, you can file an *Emergency Motion to Claim Exemption*.<br>• You do not have to attend court. However, if you do not attend, and you have money in this bank, the court may turn your money over to the creditor. |
| **Notice to Respondent** | • If you do not answer or attend court on the date listed in section 3, the judge may do one of two things:<br> ○ Issue a rule to show cause; OR<br> ○ Enter a conditional judgment.<br>• If there is a rule to show cause court date, you will have to explain why you did not attend court on the court date and why you should not be found in contempt of court. If you do attend the rule to show cause on the set court date, the judge may find you in contempt, and you might be arrested and jailed.<br>• If the court enters a conditional judgment, you will have 30 days to answer or appear. If you fail to do so, then the court may enter a final judgment against you. |

**The Respondent's duties and obligations**:

4.    The Respondent must file the *Answer* on page **4** telling the Court about all accounts or safety deposit boxes that the debtor may have an ownership interest in or appears as a signatory. The Respondent must not transfer (sell, give away or get rid of) any property not exempt from the enforcement of a judgment. This prohibition shall remain in effect until further order of the court or termination of the proceeding. The Respondent is required to withhold double the unpaid amount listed below in paragraph **6**. The Respondent is not required to withhold beyond double the unpaid amount listed below.

**THE RESPONDENT IS FURTHER COMMANDED** to produce the documents described in the attached Rider no less than fourteen (14) calendar days before the examination date to Zachary J. Watters, Vedder Price P.C., at 222 North LaSalle Street, Suite 2400, Chicago, Illinois 60601 (zwatters@vedderprice.com. **THE RESPONDENT IS PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the Debtors or to which the Debtors may be entitled or which may be acquired by or become due to the Debtors and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the Debtors until further order of court or termination of the proceedings. The Respondent is not required to withhold the payment of any money beyond double the amount of the judgment. If the responsive account(s) consists solely of funds that can be identified as exempt under federal or state law, the Respondent is PROHIBITED from withholding the funds, and the Respondent must respond that the funds are exempt. Deposited funds that are exempt under federal and state law include Social Security Disability Insurance (SSDI) and Social Security Retirement Insurance (SSRI), Supplemental Security Income (SSI), veteran's benefits, public assistance benefits, unemployment compensation benefits, child support and/or circuit breaker property tax relief benefits.

   5.    Each of the Debtors have the right to claim certain protections ("exemptions"). If the Debtors claim an exemption, the income or property covered by that exemption cannot be taken to pay the judgment. Here are some exemptions one or more of the Debtors may be able to claim:

1.  Money or belongings up to $4,000 ( wildcard exemption );
2.  Social Security, Supplemental Security Income benefits, and disability;
3.  Public assistance benefits;
4.  Child support;
5.  Unemployment compensation benefits;
6.  Workers' compensation benefits;
7.  Veteran's benefits;
8.  Circuit breaker property tax relief benefits;
9.  The respective Debtor's equity interest, up to $2,400, in any one motor vehicle;
10.   The respective Debtor's equity interest, up to $1,500, in any professional books, or tools of their trade;
11.   Pension and retirement benefits and refunds; AND
12.   The respective Debtor's equity interest, up to $15,000, in the house they live in.

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 165
Case: 1:19-cv-06332 Document #: 761-2 Filed: 07/30/25 Page 4 of 43 PageID #:33194
of 262
Enter the Case Number given by the Clerk: 19-cv-06332

**To debtor:** see *Emergency Motion to Claim Exemption* for further instruction on how to ask the court for these exemptions.

The Debtors have the right at the court date listed in section **3** to declare property or income as exempt. The Debtors also have the right to ask for these exemptions at an earlier date by notifying the clerk in writing at the office of the Circuit Clerk. A court date will be promptly set. Necessary forms must be prepared by the Debtors and sent to the Respondent and the Creditor or the Creditor's attorney.

In **6a**, enter the name of the debtor and the date of the judgment. If the judgment has been renewed ("revived"), enter that date.

6. **Certification by the Creditor:**

**A judgment was entered against the Debtors (jointly and severally) on March 15, 2023 in an aggregate original principal amount of no less than $22,272,124.34, plus post judgment interest at the statutory rate. A true and correct copy of the referenced judgment is enclosed herewith. The current amount that remains to be paid, including the Creditor's court costs and post judgment interest, minus any applicable payments which have been made, is no less than $21,000,000.00 as of the date of the issuance of this Third Party Citation to Discover Assets, plus court costs of this proceeding.**

In **6b**, enter the amount of the judgment.

In **6c**, enter how much is still owed to you. You are entitled to the judgment amount, court costs (e.g., filing fees, service fees, sheriff's fee, etc.), and post judgment interest of 9% per year. Subtract any payments made by the debtor.

You must mail this *Citation* by first-class regular mail to the debtor.

**I certify I will mail by regular first-class mail a copy of this *Third-Party Citation* to the Debtors at the addresses shown above within 3 business days after service on the Respondent s registered agent.**

Under the Code of Civil Procedure, [735 ILCS 5/1-109](#), making a statement on this form that you know to be false is perjury, a Class 3 Felony.

**I certify that everything in this *Third Party Citation to Discover Assets* is true and correct. I understand that making a false statement on this form is perjury and has penalties provided by law under [735 ILCS 5/1-109](#).**

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

*/s/* Zachary J. Watters
*Your Signature*

222 North LaSalle Street, Suite 2400
*Street Address*

Zachary J. Watters (Vedder Price P.C.)
*Print Your Name*

Chicago, Illinois 60601
*City, State, ZIP*

Enter your complete address, telephone number, and email address, if you have one.

zwatters@vedderprice.com
*Email*

(312) 609-7594
*Telephone*

ARDC No. 6310675
*Attorney # (if any)*

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

THOMAS ▢. ▢RUTO▢, CLER▢

▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢                    ▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢▢

(▢y) ▢EPUT▢ CLER▢                        ▢ATE

THOMAS G. BRUTON, CLERK



(By) DEPUTY CLERK

January 14, 2025

DATE

Enter the Case Number given by the Clerk:          19-cv-06332

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NHC LLC, a Florida limited liability company,

      Plaintiff,

v.                                                    Case No. 19-cv-06332

CENTAUR CONSTRUCTION COMPANY INC., an Illinois    Honorable Matthew F. Kennelly
corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS,

      Defendants.

## ANSWER TO THIRD PARTY CITATION TO DISCOVER ASSETS

**1.  Information about the Respondent and the Debtors:**

    a.  Respondent's name: _M Sourcing, LLC_

    b.  Respondent's address: _100 S Spring Street_

                    *Street Address*

    c.  Aspen                    CO                    81611
        *City*                    *State*                    *ZIP*

    c.  Debtors' names: (1) Spiros Tsaparas a/k/a Spyridon Tsaparas

                (2) Peter Alexopoulos

                (3) Centaur Construction Co., Inc., a dissolved Illinois Corporation

> **To creditor:** fill out section 1. In **1a**, enter the bank's name.
>
> In **1b**, enter the bank's current address.
>
> In **1c**, enter the debtor's name.
>
> In **1d**, enter the last 4 digits of the debtor's Social Security Number.
>
> In **1e**, list the amount of the judgment.

A judgment was entered against the Debtors (jointly and severally) on March 15, 2023 in an aggregate original principal amount of no less than $22,272,124.34, plus post-judgment interest at the statutory rate. A true and correct copy of the referenced judgment is enclosed herewith. The current amount that remains to be paid, including the Creditor's court costs and post judgment interest, minus any applicable payments which have been made, is no less than $21,000,000.00 as of the date of the Third Party Citation to Discover Assets issued with this Answer form, plus court costs of this proceeding.

    **NOTICE TO RESPONDENT:** This is a *Citation.* You might need to freeze up to double the on the source of the deposits. See question 2.

> **To creditor:** leave the rest of the form blank.
>
> **To Respondent:** fill out the remaining parts of this form and sign it. Then file this *Answer* with the court and send a copy to the creditor. Contact the Clerk for instructions on how to file this *Answer* with the court.

**2.  Interrogatories:**

    a.  On the date of service of the *Citation*, do you have any personal property or money belonging to any of the debtors?

        ☐Yes    ☐No  ***If no, do not fill out the rest of the form. Sign below.***

    b.  Is any of the money deposited into an IRA?

        ☐Yes.  If yes, do not freeze the IRA accounts.    ☐No

    c.  Have all of the deposits made during the past 90 days been electronically deposited and identified as Social Security, Unemployment Compensation, Public Assistance, Veteran's Benefits, Pension, or Retirement?

        ☐Yes. If yes, do not freeze the account.    ☐No

    d.  Is the account's current balance equal to or less than the total of the exempt deposits? ☐Yes.

        If yes, do not freeze the account.    ☐No

        If you checked **No** in **b**, **c**, and **d**, then freeze up to double the amount of the judgment.

Enter the Case Number given by the Clerk: _____ 19-cv-06332

**3.   Property:**

a.   ☐   Account

| | Account Type | Account Balance | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |
| 3. | | $ | $ |
| 4. | | $ | $ |
| 5. | | $ | $ |
| 6. | | $ | $ |

b.   ☐   Safety Deposit   ☐ Yes   ☐ No

c.   ☐   Other property *(rents, mortgages, etc.)*

| | Describe Property | Value of Property | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |

d.   ☐   Less Right of Offset for Loans  $_____

e.                              **Total Amount Frozen:**  $_____

**4.   List all electronic monthly deposits:**

| | Account Number | Source of Deposit | Monthly Amount |
|---|---|---|---|
| 1. | | | $ |
| 2. | | | $ |
| 3. | | | $ |

**5.   List all joint account holders or anyone who has a claim on the property:**

If all of the property belongs to another person who is not the debtor, do not freeze the property.

a.   _____

*First*                 *Middle*                         *Last Name*

_____

*Street*

_____

*City*                               *State*                          *ZIP*

Account Information:   Type:   ☐ Checking   ☐ CD   ☐ Savings
Account Number: _____

b.   _____

*First*                 *Middle*                         *Last Name*

_____

*Street*

_____

*City*                               *State*                          *ZIP*

Account Information:   Type:   ☐ Checking   ☐ CD   ☐ Savings
Account Number: _____

Enter the Case Number given by the Clerk: _____ 19-cv-06332

c.

| | | |
|---|---|---|
| First | Middle | Last Name |

Street

| | | |
|---|---|---|
| City | State | ZIP |

Account Information:   Type:   ☐ Checking   ☐ CD   ☐ Savings

Account Number: _____

| Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony. | **I certify that everything in the *Answer to Citation Proceeding* is true and correct. I understand that making a false statement on this form is perjury and has penalties by law under 735 ILCS 5/1-109.** |
|---|---|

_____          _____
Your Signature                                      Street Address

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

_____          _____
Print Your Name                                    City, State, ZIP

Enter your complete address, telephone number, and email address, if you have one.

_____          _____
Email                                                    Telephone

Mail or hand-deliver a copy of this completed *Answer* to the Clerk, plaintiff, and debtor.

_____
Attorney # (if any)

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

NHC LLC,

Plaintiff(s),

v.

Centaur Construction Company Inc. et al,

Defendant(s).

Case No.  19 C 6332
Judge Matthew F. Kennelly

## AMENDED JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $      ,

      which ☐ includes      pre–judgment interest.
            ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

───────────────────────────────────────────────────────────

☐     in favor of defendant(s)
and against plaintiff(s)

.    Defendant(s) shall recover costs from plaintiff(s).

───────────────────────────────────────────────────────────

☒     other: On Count 1 (breach of contract) – In favor of plaintiff NHC LLC and against defendants Centaur Construction Co. and Spiros Tsaparas jointly and severally. On Count 2 (fraud) - In favor of plaintiff NHC LLC and against defendants Centaur Construction Co.; Spiros Tsaparas; and Peter Alexopoulos jointly and severally. Compensatory damages are awarded in favor plaintiff NHC LLC and against defendants Centaur Construction Co.; Spiros Tsaparas; and Peter Alexopoulos jointly and severally in the total amount of $22,272,124.34. This entire amount is attributable to Count 2 (fraud). Of this same total $22,122,124.34 is attributable to Count 1 (breach of contract) for which defendants Centaur Construction Co. and Spiros Tsaparas are jointly and severally liable. Punitive damages are awarded on Count 2 (fraud) in favor of plaintiff NHC LLC and against defendant Centaur Construction Co. in the amount of $630,666.00; against defendant Spiros Tsaparas in the amount of $1,500,000.00; and against defendant Peter Alexopoulos in the amount of $400,000.00.

───────────────────────────────────────────────────────────

This action was *(check one)*:

☐ tried by a jury with Judge      presiding, and the jury has rendered a verdict.

ILND 450 (Rev. 10/13) Judgment in a Civil Action

☐ tried by Judge _____ without a jury and the above decision was reached.

☒ decided by Judge Matthew F. Kennelly on a motion

Date:   3/15/2023                              Thomas G. Bruton, Clerk of Court

                                               Melissa Astell , Deputy Clerk

## RIDER TO THIRD PARTY CITATION TO DISCOVER ASSETS TO M SOURCING

### DEFINITIONS

1.      The term "Communication" as used herein shall mean any written, electronic or verbal transmission of words or thoughts between or among two or more Persons, including, without limitation, any letter, electronic mail ("e-mail"), instant or text message, blog, web posting, interview, conference, meeting, spoken words, conversation, understanding, agreement, discussion, talks, and reports, whether transmitted in orally, in writing or by any electronic device.

2.      The term "Document" and "Documents" as used herein shall mean the original and each non-identical copy (whether different from the original because of marginal notes, or other material inserted therein, or attached thereto or otherwise) of any written or graphic matter, however produced or reproduced, whether sent or received or neither, including drafts and both sides thereof, and including but not limited to: papers, books, letters, correspondence, telegrams, cables, telex messages, e-mails, text messages, memoranda, typed or handwritten notes, notations, work papers, transcripts, minutes, reports and recordings of telephone or other conversations, or of interviews or of conferences or other meetings, maps, charts, plans, specifications, diagrams, photographs, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, ledgers, journals, Financial Statements, statistical records, desk calendars, appointment books, diaries, expense account records, lists, tabulations, sound recordings, computer printouts, data processing input and output, microfilms, all other records kept by electronic, photographic or mechanical means, and items similar to any of the foregoing.

3.      The term "Evidencing" as used herein shall mean proving, indicating, or probative of the existence or nature of the matter discussed.

4.      The term "Financial Statement" as used herein shall mean any Document prepared by You or at Your request reflecting Your financial condition, including, without limitation, audited and unaudited financial statements, balance sheets, profit and loss statements, cash flow statements, and any written representation by You to any creditor, Person, firm or entity from which You were or are seeking credit.

5.      The term "Judgment Debtors" as used herein shall mean Centaur Construction Company Inc., Spiro Tsaparas, and Peter Alexopoulos, who are judgment debtors in this matter, and their partners, agents, employees, accountants, counsel, trustees, predecessors/successors and/or affiliated business affiliates, including but not limited to Triton Marine Holdings, LLC, and any other Person (including, without limitation, any entities) under their control or direction, and any other Persons (including, without limitation, any entities) under the control or direction of any of the foregoing or acting on behalf of any of them, regardless of affiliation or employment.

6.      The terms "Own" and "Ownership Interest" include direct and/or indirect (i.e., through a related Person (including, without limitation, any entity)) ownership, complete and/or fractional ownership, contingent ownership, and/or present and/or future ownership.

7.      The term "Person" as used herein shall mean any natural Person, corporate entity, partnership, association (including professional association), sole proprietorship, or other entity.

8.      The term "Project" as used herein shall mean any collaborative business enterprise or planned undertaking by two or more Persons, contractual or implied, for profit or otherwise, for any purpose.

9.      The term "Relating To" as used herein shall mean consisting of, referring to, reflecting, supporting, prepared in connection with, used in preparation for or being in any way legally, logically or factually connected with the matter discussed.

10.     The term "Real Estate" or "Real Property" means any real property, and includes any interest in real property, including, without limitation, fractional interests, indirect interests, contingent interests, joint interests, guaranties, present and/or future interests, and/or any interest in real property through any limited and/or general partnerships.

11.     The term "Relevant Period" as used herein shall mean the period from January 1, 2019 to the present.

12.     The term "Triton Loan" as used herein shall mean the promissory note between Triton Marine Holdings, LLC and M Sourcing, LLC effective December 30, 2021 for the amount of $4,164,759.90, attached as **Exhibit 1** to this Rider, as well as the associated indemnification agreement entered into by M Development, LLC attached as **Exhibit 2** to this Rider.

13.     The term "Trust" includes any trust created by You and/or any Person (including, without limitation, any entity) in which You have any interest, whether present, future, vested and/or contingent, including, but not limited to, any trust created by You or any Person (including, without limitation, any entity) by written or verbal agreement with any Person (including, without limitation, any entity), whether such Person is identified as "trustee," "agent," "custodian," "nominee" or in any other fashion.

14.     "You" and/or "Your" as used herein shall mean M Sourcing, LLC and each and every one of Your partners, members, directors, managers, officers, agents, employees, accountants, counsel, trustees, subsidiaries, parent organizations, predecessor(s) in interest, successor(s) in interest, and any other person (including, without limitation, any entities) under the control or direction of any of the foregoing or purporting to act on behalf of any of them, regardless of affiliation or employment.

## CONSTRUCTIONS

15.     The terms "and" as well as "or" as used herein shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this Citation Rider any information which might otherwise be construed to be outside its scope.

16.     The use of the singular form of any word includes the plural and vice versa, as necessary to bring within the scope of Citation Rider any information which might otherwise be construed to be outside its scope.

17.     Wherever a masculine pronoun or possessive adjective appears, reference is made to male, female, nonbinary, and nongendered Persons.

18.     For purposes of limitation, each Rider request should be construed independently and not by reference to any other request.

## INSTRUCTIONS

1.     All Documents which are not produced because of a claim of privilege, because of a claim that such Documents form a part of the attorney's work product, or because of a claim that the Documents were prepared in anticipation of litigation, shall be identified in sufficient detail to permit a request for in camera inspection of each Document in the event any claim of privilege is disputed. In the event that any request is not answered or Document is not produced by reason of a claim of privilege, You are required to provide a log setting forth the following:

(a)     the author or originator;

(b)     each addressee or recipient of the Document or any copy thereof;

(c)     the date the Document bears or, if it bears no date, the date on which it was made;

(d)     the title or subject matter of the Document and a general description of its contents;

(e)     the nature of the Document (e.g., memorandum, telegram, chart, etc.); and

(f)     the basis or bases for the claim of privilege.

2.     To the extent that no single Document exists or is in Your possession, custody or control which contains all of the information sought in any particular request, You are to provide such other Documents in Your possession, custody or control which are sufficient to show, compute, compile or explain all of the information sought in the request or as much information as is available.

3.     The Documents produced pursuant to the subject Third Party Citation to Discover Assets and this Citation Rider are to be segregated and identified by the number of the request used in the DOCUMENT REQUESTS section of this Citation Rider to which the Documents are responsive.

4.     For each responsive Document or other requested information that You assert is privileged or is not discoverable, identify that Document or other requested information. State the specific grounds for the claim of privilege or other grounds for exclusion. Also, for each Document You claim is not discoverable, state the date of the Document; the name, job title and address of the Person (including, without limitation, any entity) who prepared it; the name, job title and address of the Person (including, without limitation, any entity) to whom it was addressed, to whom it was circulated or who saw it; the name, job title and address of the Person (including, without limitation, any entity) now in possession of the Document; the description of the subject matter of the Document; and the present location and custodian of the Document.

5.      For a responsive Document that no longer exists or that cannot be located, identify the Document, state how and when it passed out of existence or when it could no longer be located, and the reason(s) for the disappearance.  Also, identify each Person (including, without limitation, any entity) having knowledge about the disposition or loss of the Document, and identify any other Document Evidencing the lost Document's existence or any facts about the lost Document.

6.      The accompanying Third Party Citation to Discover Assets to M Sourcing shall be deemed continuing so as to require You to supplement Your response with respect to any Request below if You obtain information or Documents on the basis of which You know that the response was misleading and/or incorrect and/or the response was not complete.

7.      With respect to any Document requested that was, but no longer is, in Your possession or subject to Your control, state whether said Document:

(a)      is missing or lost;
(b)      has been destroyed;
(c)      has been transferred, voluntarily or involuntarily, to any other Person or entity; or
(d)      has been otherwise disposed of.

## DOCUMENT REQUESTS

1.      All Documents and Communications Evidencing and/or Relating To payments of money by any Person to any of the Judgment Debtors.

2.      All Documents and Communications Evidencing and/or Relating To income and/or assets of any of the Judgment Debtors.

3.      All Documents and Communications Evidencing and/or Relating To any amounts owed by You to any of the Judgment Debtors, and the schedule under which payments will be made.

4.      All Documents and Communications Evidencing and/or Relating To any amounts owed by any of the Judgment Debtors to You, and the schedule under which payments will be made.

5.      All Documents and Communications Evidencing and/or Relating To the Triton Loan of December 30, 2021 and the associated indemnification agreement.

6.      All Documents and Communications Evidencing and/or Relating To any employment or retainer agreements between You and any Judgment Debtor.

7.      All Documents and Communications Evidencing and/or Relating To amounts paid by You to Triton Marine Holdings, LLC for "Construction Services" during the Relevant Period as reflected in the invoices attached as **Exhibit 3**, as well as the work performed by Triton in consideration for these amounts.

8.    All Documents and Communications Evidencing and/or Relating To any work performed for You, whether for financial consideration or otherwise, by any of the Judgment Debtors.

9.    All Communications (that pertain to the payment of any money, and/or any contract and/or services) between You and any of the Judgment Debtors during the Relevant Period.

10.    All Documents and Communications Evidencing and/or Relating To payments made from You to any of the Judgment Debtors during the Relevant Period.

11.    All Documents and Communications Evidencing and/or Relating To payments made from any of the Judgment Debtors to You during the Relevant Period.

12.    All Documents and Communications Relating To any anticipated and/or future payments from You to any of the Judgment Debtors.

13.    All Documents and Communications Relating To any anticipated and/or future payments from any of the Judgment Debtors to You.

14.    All Documents reflecting Communications between You and any third party, from the Relevant Period to the present, Evidencing or Relating To any and all assets and/or transfers of assets to and/or from either and/or both of the Judgment Debtors (and/or any purported assignee and/or successor in interest).

15.    All Documents reflecting Communications between You and any third party from the Relevant Period to the present, Evidencing or Relating To any expected income, assets and/or funds to be received by either and/or both of the Judgment Debtors (and/or any purported assignee and/or successor in interest).

16.    All Documents and Communications Evidencing and/or Relating To the transfer of assets or liabilities by You to the Judgment Debtor.

17.    All Documents and Communications Evidencing and/or Relating To the transfer of assets or liabilities to You by the Judgment Debtor.

18.    All contracts between You and any of the Judgment Debtors from January 1, 2015 through the present date.

19.    All Documents that pertain to monies exchanged between You and any of the Judgment Debtors, whether in Trust or in title.

20.    A copy of Your Articles of Incorporation and/or Articles of Organization and any amendments thereto.

21.    A copy of Your By-Laws and any amendments thereto.

22.    A copy of the Certificate of Incorporation (and/or Organization) from a Secretary of State Evidencing Your existence as a formal business entity.

23.    A copy of Your Notice of Incorporation (and/or Organization) as it appeared when first published.

24.    Copies of the minutes of all Your meetings of shareholders and/or Owners/directors/officers in which the Judgment Debtors were discussed.

25.    Copies of the minutes of all meetings of Your Board of Directors in which the Judgment Debtors were discussed.

26.    All Documents Evidencing and/or Relating To loans (and/or a transfer of money and/or property) by You to any corporation and/or business entity in which any of the Judgment Debtors has an interest (directly or indirectly).

27.    All Documents Evidencing and/or Relating To loans (and/or a transfer of money and/or property) to You from any corporation and/or business entity in which any of the Judgment Debtors has an interest (directly or indirectly) and/or any party to this litigation.

28.    Copies of corporate/business records or ledgers Evidencing the identity and address of each person or entity who has Owned stock and has/had Ownership Interest in You during the past five (5) years, the consideration paid or promised for the stock and/or Ownership Interest, and the date(s) on which the consideration was paid or promised.

29.    Copies of corporate/business records or ledgers Evidencing the payment of dividends and/or draws to any shareholder and/or Owner since Your incorporation and/or organization, to whom the dividends/draws were paid, the amounts paid, and the date(s) of such payments.

30.    For each bank account maintained in Your name, a copy of the monthly statement(s) for the Relevant Period, ending with the date of Your response to these requests.

31.    All Documents related to wages, income and/or other monies to any of the Judgment Debtors for the Relevant Period, ending with the date of Your response to these requests.

32.    Copies of any and all Documents to/from any governmental entity that relate to assets of the Judgment Debtors.

33.    All Documents and/or Communications Evidencing or Relating To Your payment of Judgment Debtors' legal fees, expenses, and/or costs (including, without limitation, any retainer payments) during the Relevant Period.

34.    All Documents and/or Communications between You and any of the Judgment Debtors Relating To tax withholdings to any local, state, federal, or international taxing authority.

35.    All Documents and/or Communications Evidencing or Relating To employment agreements and/or bonuses between You and any of the Judgment Debtors.

36.    All Documents and Communications Evidencing and/or Relating To any and all employees that were once employed or continue to be employed by You who once were or

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 178
of 262
Case: 1:19-cv-06332 Document #: 761-21 Filed: 07/30/25 Page 17 of 43 PageID #:33207

currently are employed by any of the Judgment Debtors, or any employees shared in any way between You and any of the Judgment Debtors.

37.    All Documents and Communications Evidencing and/or Relating To mergers, de factor mergers, joint ventures, partnerships, affiliations, sales, purchases, acquisitions, pledges, transfers, assignments, conveyances, and/or other transactions regarding any of the Judgement Debtors' assets and/or debts, including the assets and/or debts of any and all of their affiliates.

38.    All Documents and Communications Relating To Judgment Debtors and/or their partners, members, directors, managers, officers, agents, employees, accountants, counsel, subsidiaries, parent organizations, predecessor(s) in interest, successor(s) in interest, and any other person or entities under the control or direction of any of the foregoing or purporting to act on behalf of any of them.

39.    All Documents and Communications Evidencing and/or Relating To the relationship between You and any of the Judgment Debtors.

40.    All Documents and Communications Evidencing and/or Relating To the relationship between You and M Development, LLC.

41.    All Documents and Communications Evidencing and/or Relating To any transactions, deposits, or withdrawals for any checking account, savings account, certificate of deposit, money market account, cryptocurrency wallets, company credit card accounts, and/or any other such account with any financial institution, whether foreign, domestic or other, whether registered in Your name alone but which any Judgment Debtor has or had access to, in the name of You or Judgment Debtors or others (including, but not limited to entities), in Your name or the names of Judgment Debtors as trustee for another or others, in the name of another or others as trustee for You or Judgment Debtors, any partnership, Trust and/or other entity in which You or Judgment Debtors have and/or had an interest or have or had authority to represent in connection therewith (including cancelled checks, wire transfer confirmations, check stubs, bank or other statements, ledgers, passbooks and/or correspondence).

42.    All Documents and Communications Evidencing and/or Relating To expenses incurred by any of the Judgment Debtors through any accounts affiliated with You, including company credit cards, business travel, personal services, corporate memberships, or any other such accounts.

43.    All Documents and Communications Evidencing and/or Relating To any K-1, W-2, 1099, tax return, or extension for tax returns not yet filed, including, without limitation, any income, intangible, property or gift tax return, filed by You with any local, state, federal, or foreign government during the Relevant Period, including all exhibits, forms, and schedules attached to the tax returns.

44.    All Documents and/or Communications from the Relevant Period to the present Relating To (i) any cash withdrawals by the Judgment Debtors, (ii) the spending of cash on any property, goods or services by the Judgment Debtors, and/or (iii) the storage of and/or saving of cash outside of financial institutions by the Judgment Debtors (e.g., in a safe, etc.).

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 179
of 262
Case: 1:19-cv-06332 Document #: 761-21 Filed: 07/30/25 Page 18 of 43 PageID #:33208

45.     All Documents and Communications Evidencing and/or Relating To all donations, charitable gifts, or endowments by You or Judgment Debtors to any Persons or entities, including, without limitation, charitable funds, religious organizations, educational institutions, municipalities, non-profit organizations, hospitals, business leagues, recreation clubs, lodges, fraternities, societies, labor organizations, cooperatives, social welfare organizations, veterans organizations, medical charities, charitable risk pools, and child care organizations.

46.     All Documents and Communications Evidencing and/or Relating To any interest whatsoever that Judgment Debtors have and/or had in any domestic Real Estate located within the United States, including, without limitation, its territories, dependencies, tribal sovereignties, occupation zones, or other administrated areas, incorporated or unincorporated, including, without limitation, along with any and all written opinions or appraisals that You or Judgment Debtors have received or contracted for, reflecting values on any domestic Real Property that You or Judgment Debtors presently Own, either legally or beneficially, and/or property which You or Judgment Debtors have owned during the Relevant Period.

47.     All Documents and Communications between or among You, including Mark Hunt, and/or Judgment Debtors Relating To the payment of any expenses, including personal, legal, business, or otherwise by You, Mark Hunt, and/or M Development, LLC on behalf of any of the Judgment Debtors.

48.     Any and all Documents and/or Communications not specifically requested herein that relate to any assets of any of the Judgment Debtors.

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 180
of 262
Case: 1:19-cv-06332 Document #: 761-21 Filed: 07/30/25 Page 19 of 43 PageID #:33209

# EXHIBIT 1

THIS AMENDED AND RESTATED PROMISSORY NOTE (THIS "<u>NOTE</u>") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>") OR ANY STATE SECURITIES LAW. THIS NOTE IS NON-NEGOTIABLE AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED BY THE HOLDER HEREOF.

## AMENDED AND RESTATED PROMISSORY NOTE

$4,164,759.90

Chicago, Illinois
Effective December 30, 2021

FOR VALUE RECEIVED, the undersigned, Triton Marine Holdings, LLC, an Illinois limited liability company ("<u>Maker</u>"), agrees to pay to M Sourcing, LLC, a Colorado limited liability company, or its assignee or any subsequent assignee hereof (any of them, "<u>Payee</u>"), the sum of Four Million One Hundred Sixty Four Thousand Seven Hundred Fifty Nine and 90/100 Dollars ($4,164,759.90), plus interest at the Applicable Federal Rate of Zero and 19/100 percent (0.19%) per annum, compounded annually and computed on the basis of a 365-day year for the actual number of days elapsed from the date hereof until paid in accordance with the terms hereof (the "<u>Total Note Amount</u>"). This Note amends and restates in its entirety, and is a complete novation of, that certain Promissory Note dated effective as of December 28, 2021, made by Maker in favor of Mark Hunt (the "<u>Initial Promissory Note</u>"), and Maker is hereby released from all obligations set forth in the Initial Promissory Note.

1.  <u>Payments</u>: This Note will be payable by Maker to Payee in eight (8) equal annual installments of principal and interest in the aggregate annual amount of $524,602.74 ("<u>Annual Payments</u>"), in accordance with the amortization table attached hereto as **Exhibit A**, which is hereby incorporated in this Note. Payments shall be due on the first day of January each calendar year, commencing on January 1, 2022 (i.e., year 1).

2.  <u>Maturity Date</u>: Except as otherwise provided herein, all outstanding principal and all accrued and unpaid interest on this Note will be due and payable on January 1, 2029 (i.e., year 8) (the "<u>Maturity Date</u>").

3.  <u>Advance Payment</u>: Maker may, without penalty, prepay all or part of the principal and accrued interest due on this Note at any time and from time to time. Any prepayment of less than all the sums due under this Note will not excuse the payment of the remainder of the payments due hereunder, and will require recalculating the amortization table set forth in **Exhibit A** attached hereto with respect to the remaining payments under this Note.

4.  <u>Acceleration</u>: If Maker is terminated with cause or leaves the employ of Payee and the Company at any time prior to the Maturity Date, then the Total Note Amount shall be accelerated and immediately due and payable by Maker to Payee without notice. If Maker is terminated without cause at any time prior to the

Maturity Date, then the balance of any remaining unforgiven principal and interest shall be accelerated and immediately due and payable by Maker to Payee without notice. Any principal and interest accelerated under this section are not eligible to be forgiven under Section 2 of this Note.

5.  Waivers: Presentment of payment, notice of dishonor, protest and notice of protest are hereby waived.

6.  Default: Each of the following will constitute an event of default under this Note, after notice if required, time being of the essence (each, an "Event of Default"):

    (a)  Maker fails to make any payment when due under this Note;

    (b)  Any breach by Maker of any covenant contained in this Note;

    (c)  Any breach by Payee of any covenant contained in this Note;

    (d)  Maker quits or leaves the employ of Payee prior to the Maturity Date;

    (e)  Maker becomes bankrupt or admits in writing an inability to pay Maker's debts as they become due, makes an assignment for the benefit of creditors, consents to the appointment of a trustee or receiver, or files for relief in bankruptcy, or other proceedings for relief in equity or under any acts of Congress or any laws of any state of the United States relating to the relief of debtors;

    (f)  A trustee or receiver is appointed for Maker or for part of Maker's property without Maker's consent;

    (g)  Bankruptcy or insolvency proceedings, or other proceedings for relief in equity or under any acts of Congress or any laws of any state of the United States relating to the relief of debtors are instituted against Maker or are consented to by Maker; or

    (h)  If at any time Payee has a good faith, reasonable belief that Maker no longer has the desire, willingness, or ability to render services to Payee and the Company in a faithful, dutiful, and loyal manner.

In the case of any such Event of Default, the entire unpaid principal balance of this Note, together with all accrued and unpaid interest thereon, shall forthwith be accelerated and become immediately due and payable without notice (the "Accelerated Payments" or "Acceleration").

7.  Notice of Default: Maker will immediately and without notice be deemed in default under this Note (which shall constitute an Event of Default), if Maker fails to perform the terms, covenants, and conditions of this Note, other than the failure to make payments on the Note. If (a) Maker fails to make any payment due under this Note within five (5) business days after the due date for such payment, (b) Payee has

2

    MDEV-000008

given written notice to Maker of Maker's failure to make such payment in a timely manner, and (c) Maker has not made such payment within five (5) business days after Maker's receipt of such notice, then Maker will be deemed in default under this Note (which shall constitute an Event of Default).

8.  Payee's Rights: After an Event of Default, whether by Acceleration or otherwise, all past due principal and accrued and unpaid interest shall bear interest at a default rate equal to five percent (5%) per annum.

9.  Assignment: This Note may be assigned by Payee, any assignee of Payee, or any subsequent assignee, in each case without prior notice or consent of Maker. This Note shall transfer to the estate of Payee in the event of the death of Payee. This Note may not be assigned by Maker.

10. Confession of Judgment; Enforcement of Judgment: To further secure payment hereof, Maker hereby irrevocably authorizes any attorney of any court of record to appear for Maker, at any time from time to time after payment is due, whether by Acceleration or otherwise, and confesses judgment, without process, in favor of Payee against Maker for such amount that may be unpaid hereunder, together with statutory interest and costs of such proceeding, with any state court located in Cook County, Illinois or federal court located in Chicago, Illinois, at any time after any part of any principal and interest is past due under this Note. Maker hereby confesses judgment, without process, in favor of Payee and against Maker for such amount as may be unpaid hereunder, together with statutory interest, attorneys' fees, and the costs of such proceeding. Maker hereby waives and releases all errors which may intervene in any such proceeding and hereby consents to immediate execution upon said judgment, hereby ratifying and confirming all that said attorney, Payee, or any attorney acting for Payee may do by virtue hereof. Maker hereby waives and fully releases any attorney-in-fact obtained by Payee or Payee's counsel to confess judgment on Maker's behalf. Neither Maker, nor any attorney acting for Maker, shall seek to open said judgment or contest the enforcement of any such judgment sought to be enforced by Payee under this Section 10. Maker acknowledges that this Note is being executed in Illinois.

11. Indemnification Agreement. The parties hereby agree that the obligations of Maker set forth in this Note, including without limitation the obligations to pay principal and interest hereunder, are subject to the terms and conditions set forth in that certain Amended and Restated Indemnification Agreement between Spiro Tsaparas, Payee, M Development, LLC, and Mark Hunt dated December 30, 2022, including without limitation the offset provisions set forth therein.

12. Severability. If one or more provisions of this Note is (are) held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

3

CONFIDENTIAL

13.    <u>Additional Costs and Expenses</u>. Maker shall pay all costs and expenses incurred by Payee in collecting the obligations hereunder, including, without limitation, reasonable attorneys' fees and court costs incurred by Payee in collection of this Note. These costs and expenses shall include, without limitation, any costs or expenses incurred by Payee in any bankruptcy, reorganization, insolvency or other similar proceedings of Maker. The rights and remedies of Payee stated herein are cumulative to and not exclusive of any rights or remedies otherwise available to Payee at law or in equity.

14.    <u>Choice of Laws</u>: This Note will be governed by the internal laws, without regard to conflict of laws, of Illinois. Any suit or action on this Note shall be brought in any state or federal court having its situs in Cook County, Illinois, which shall be the exclusive jurisdiction for such suits, and each party hereby irrevocably submits to the jurisdiction of these courts.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

4

**CONFIDENTIAL**

MDEV-000010

IN WITNESS WHEREOF, Maker and Payee have executed this Note, and Mark Hunt, Maker, and Payee have each consented to the novation of the Initial Promissory Note effected by this Note, in each case effective as of the dates indicated below.

**Maker:**

Triton Marine Holdings, LLC

By: _____
Name: Spiro Tsaparas
Title: Manager
Date: 12-30-2022

**Payee:**

M Sourcing, LLC

By: _____
Name: Mark Hunt
Title: Manager
Date: 12-30-2022

**Consent to the novation of the Initial
Promissory Note effected by this Note:**

_____
Mark Hunt, individually
Date: 12-30-2022

*[Signature Page to Amended and Restated Promissory Note]*

5

**CONFIDENTIAL**

MDEV-000011

## EXHIBIT A

### Amortization Table

| Year 1 | Due: January 1, 2022 | $524,602.74 |
|--------|----------------------|-------------|
| Year 2 | Due: January 1, 2023 | $524,602.74 |
| Year 3 | Due: January 1, 2024 | $524,602.74 |
| Year 4 | Due: January 1, 2025 | $524,602.74 |
| Year 5 | Due: January 1, 2026 | $524,602.74 |
| Year 6 | Due: January 1, 2027 | $524,602.74 |
| Year 7 | Due: January 1, 2028 | $524,602.74 |
| Year 8 | Due: January 1, 2029 | $524,602.74 |

32720641

CONFIDENTIAL

MDEV-000012

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 187
Case: 1:19-cv-06332 Document #: 761-21 Filed: 07/30/25 Page 26 of 43 PageID #:33216
of 262

# EXHIBIT 2

**AMENDED AND RESTATED INDEMNIFICATION AGREEMENT**

This AMENDED AND RESTATED INDEMNIFICATION AGREEMENT (this "Agreement") is made and entered into as of December 30, 2022, by and among Spiro Tsaparas ("Indemnitor"), on the one hand, and Mark Hunt ("Hunt"), M Development, LLC, an Illinois limited liability company ("M Development"), and M Sourcing, LLC, a Colorado limited liability company (the "Company" and, collectively with Hunt, M Development, and each of their respective affiliates, successors, and assigns, "Indemnitees"; and, each of the Indemnitees, an "Indemnitee"), on the other hand. Indemnitor and Indemnitees are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

RECITALS

WHEREAS, the Company has loaned $4,164,759.90 to Triton Marine Holdings, LLC, an Illinois limited liability company ("Triton"), which is an affiliate of Indemnitor, pursuant to that certain Amended and Restated Promissory Note issued by Triton in favor of the Company on the date hereof (the "Note");

WHEREAS, the Company intends to employ Indemnitor pursuant to that certain Employment Agreement entered into by the Company and Indemnitor on the date hereof (the "Employment Agreement"); and

WHEREAS, in connection with the Note and the Employment Agreement, the Parties desire for Indemnitor to indemnify Indemnitees on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, which are hereby incorporated in this Agreement, and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     _Indemnification by Indemnitor_. Indemnitor hereby agrees to indemnify each Indemnitee and to hold each Indemnitee harmless against, and to promptly reimburse each Indemnitee for, from and against each and every demand, claim, loss (which shall include any diminution in value), liability, judgment, damage, cost and expense (including, without limitation, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (collectively, "Losses") imposed on or incurred by such Indemnitee, in each case directly or indirectly relating to, resulting from, or arising out of or in connection with any one or more of the Note, the Employment Agreement, or any claim, demand, litigation, or regulatory action by any third party against or relating to Indemnitor or any one or more of his business companies or business dealings or business affairs, including but not limited to claims by any one or more of the creditors or judgment creditors of Indemnitor.

2.     _Notice and Defense of Third-Party Claims_. If any action, claim or proceeding is brought or asserted under this Agreement against any one or more of Indemnitees in respect of which indemnity may be sought under this Agreement from Indemnitor, such Indemnitee(s) shall

 MDEV-000002

give prompt written notice of such action or claim to Indemnitor, who shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such Indemnitee(s) and the payment of all expenses; except that any delay or failure to so notify Indemnitor shall relieve Indemnitor of his obligations hereunder only to the extent, if at all, that he is prejudiced by reason of such delay or failure. Indemnitees shall have the right to employ separate counsel in any of the foregoing actions, claims or proceedings and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of Indemnitees unless both Indemnitees and Indemnitor are named as parties and Indemnitees shall in good faith determine that representation by the same counsel is inappropriate. In the event that Indemnitor, within ten (10) days after notice of any such action or claim, fails to assume the defense thereof, Indemnitees shall have the right to undertake the defense, compromise or settlement of such claim, action or proceeding for the account of Indemnitor, subject to the right of Indemnitor to assume the defense of such action, claim or proceeding with counsel reasonably satisfactory to Indemnitees at any time prior to the settlement, compromise or final determination thereof. Anything in this Agreement to the contrary notwithstanding, Indemnitor shall not, without Indemnitee's prior written consent (which consent shall not be unreasonably withheld, conditioned, or delayed), settle or compromise any action or claim or proceeding or consent to entry of any judgment with respect to any such action or claim unless it (i) does not involve any finding or admission of any violation of law or any violation of the rights of any person and would not have any adverse effect on any other claims that may be made against Indemnitee, (ii) does not involve any relief other than monetary damages that are paid in full by Indemnitor, and (iii) completely, finally and unconditionally releases Indemnitees in connection with such action or claim and would not otherwise adversely affect Indemnitees.

3.      Procedures for Payment of Indemnification Obligation: Offset. Once a Loss is agreed to by Indemnitor or finally adjudicated to be payable pursuant to this Agreement, any and all such indemnifiable Losses shall be satisfied by Indemnitor, within fifteen (15) business days of such Losses being agreed to in writing or such final, non-appealable adjudication, by wire transfer of immediately available funds. Notwithstanding anything to the contrary set forth in this Agreement, Indemnitees may seek to satisfy all such indemnifiable Losses from Indemnitor personally and may offset such indemnifiable Losses against any amount(s) otherwise payable by either or both Indemnitees to Indemnitor, including such amount(s) pursuant to the Note and/or the Employment Agreement, including provisions in the Employment Agreement relating to base salary, bonus, reimbursement of expenses, and any forgiveness of amounts due under the Note.

4.      Limitations on Indemnification Obligation.

a.      Except in the case of fraud, the maximum liability of Indemnitor for indemnification obligations hereunder shall not exceed the aggregate amount of outstanding principal and accrued but unpaid interest under the Note.

b.      For the purposes of calculating Losses under this Agreement, (i) such Losses shall be reduced by the amount of any proceeds that the applicable Indemnitee actually recovers (reduced by deductibles paid and the portion of any increase in deductibles, increase in premiums, costs of collection and/or retro-premiums resulting

2

from such matter) pursuant to the terms of any insurance policies; provided, however, that such Indemnitee shall promptly reimburse Indemnitor for any subsequent recoveries from such sources, if previously indemnified hereunder, so as to avoid a double recovery; and (ii) such Losses shall be reduced by the amount of any actual Tax benefit received by an Indemnitee as a result of such Losses.

        c.     Each Indemnitee shall take, and cause his or its affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise to any Loss.

      5.    <u>Survival</u>.  All covenants and agreements made by any Party hereunder shall survive in accordance with their terms or, if no term is stated, for six (6) years. Any claim for indemnification for which notice has been given within the prescribed survival period may be prosecuted to conclusion notwithstanding the subsequent expiration of such period.

      6.    <u>Miscellaneous Provisions</u>.

        a.     Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested, by electronic mail, or delivered by overnight courier to Indemnitor or Indemnitees at the following addresses (or to such other addresses as any such Party may from time to time specify in writing pursuant to this Section 6(a):

If to Indemnitees:       M Development, LLC and M Sourcing, LLC
                       516 E. Hyman Ave., 2nd Floor
                       Aspen, CO 81611
                       Attn:     Mark Hunt
                       Email:    mhunt@mdevco.com

Any such notice or communication that is addressed as provided in this Section 6(a) will be deemed given (a) upon delivery, if delivered personally; (b) on the third business day after deposit in the United States mails, if delivered by certified or registered mail; (c) if delivered by electronic mail (with delivery receipt requested), on the date of transmission if on a business day before 5:00 p.m. local time of the recipient party (otherwise on the next succeeding business day); and (d) on the first business day of the receiving Party after the delivery to the courier, if delivered by overnight courier.

        b.     This Agreement contains the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements or understandings, whether written or oral, with respect thereto.

        c.     This Agreement may be amended, modified, superseded, cancelled, renewed, or extended, and the terms and conditions hereof may be waived, only by a written instrument which specifically references this Agreement and which is signed by all of the Parties or, in the case of a waiver, signed by the Party waiving compliance. No delay on the part of any Party in exercising any right, power or privilege hereunder shall

<div align="center">3</div>

**MDEV-000004**

operate as a waiver thereof, nor shall any waiver on the part of any Party of any right, power or privilege hereunder, or any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. Except as otherwise provided herein, the rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any Party may otherwise have at law or in equity.

d.     This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to the choice of law principles thereof. Venue for the adjudication or resolution of any disputes or claims arising under this Agreement shall be in a court of competent jurisdiction situated in Cook County, Illinois.

e.     This Agreement shall not be assigned by operation of law or otherwise; provided, however, that without any consent required, Indemnitees may, by providing written notice to Indemnitor, assign this Agreement and Indemnitees' rights and obligations hereunder in whole or in part (i) to an affiliate of Indemnitees and (ii) to any person who acquires the Company or all or a substantial portion of the assets of the Company (by merger, recapitalization, sale of stock or otherwise). Notwithstanding the foregoing, either or both of the Indemnitees may, without any consent required, assign his or its rights, but not his or its obligations, under this Agreement to any of its financing sources.

f.     All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

g.     This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

h.     The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. Each and every provision of this Agreement shall be treated as separate and distinct and, in the event of any provision hereof being declared invalid, such invalid provision shall be deemed amended to the extent required to make it valid and enforceable, and such amended provision and the remaining provisions of this Agreement shall remain in full force and effect if such does not defeat the intent of this Agreement. The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and the agreements ancillary hereto.

*[Signature Page Follows]*

CONFIDENTIAL                                        MDEV-000005

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the Parties or by duly authorized representatives of such Parties, on the date first above written.

Indemnitor:

_____
SPIRO TSAPARAS, individually

Indemnitees:

_____
MARK HUNT, individually

M DEVELOPMENT, LLC

By: _____
Name: Mark Hunt
Title:  Manager

M SOURCING, LLC

By: _____
Name: Mark Hunt
Title:  Manager

*[Signature Page to Indemnification Agreement]*

31297141

CONFIDENTIAL

MDEV-000006

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 193
Case: 1:19-cv-06332 Document #: 761-21 Filed: 07/30/25 Page 32 of 43 PageID #:33222
of 262

# EXHIBIT 3

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 001
DATE: 08/26/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|--|-------|
| 8/26/2022 | Construction Services (8/7/2022-8/20/2022) | | $19,230.77 |
| | | SUBTOTAL | $19,230.77 |
| | | SALES TAX | |
| | | SHIPPING & HANDLING | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**                    MDEV-000044

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 002
DATE: 09/09/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|--|-------|
| 8/26/2022 | Construction Services (8/21/2022-9/04/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | **$19,230.77** |
| | | SALES TAX | |
| | | SHIPPING & HANDLING | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**                                                    MDEV-000045

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 003
DATE: 09/19/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | TOTAL |
|------|-------------|-------|
| 9/19/2022 | Construction Services (9/05/2022-9/18/2022) | $19,230.77 |
| | | |
| | | |
| | | |
| | | |
| | **SUBTOTAL** | $19,230.77 |
| | | |
| | **TOTAL DUE** | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

MDEV-000046

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 004
DATE: 10/03/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 10/3/2022 | Construction Services (9/18/2022-10/2/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

MDEV-000047

**Triton**

**INVOICE**

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 005
DATE: 10/17/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|--|-------|
| 10/17/2022 | Construction Services (10/2/2022-10/16/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000048

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 006
DATE: 10/31/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | TOTAL |
|------|-------------|-------|
| 10/31/2022 | Construction Services (10/17/2022-10/30/2022) | $19,230.77 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **SUBTOTAL** | $19,230.77 |
| | **TOTAL DUE** | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

MDEV-000049

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 007
DATE: 11/16/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 11/16/2022 | Construction Services (10/31/2022-11/13/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**MDEV-000050**

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 008
DATE: 11/28/2022

**TO:**
M Development
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|---|-------|
| 11/28/2022 | Construction Services (11/14/2022-11/27/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000051

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 202
Case: 1:19-cv-06332 Document #: 761-21 Filed: 07/30/25 Page 41 of 43 PageID #:33231
of 262

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 009
DATE: 12/12/2022

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|--|-------|
| 11/28/2022 | Construction Services (11/28/2022-12/11/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

MDEV-000052

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 203
of 262
Case: 1:19-cv-06332 Document #: 761-21 Filed: 07/30/25 Page 42 of 43 PageID #:33232

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 010
DATE: 12/22/2022

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|------|-------------|--|-------|
| 12/22/2022 | Construction Services (12/12/2022-12/25/2022) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000053

**Triton**

# INVOICE

96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

INVOICE # 011
DATE: 1/10/2023

**TO:**
M Sourcing LLC
516 East Hyman Avenue
2nd Floor
Aspen, CO 81611
Phone: 970.230.5434

**SHIP TO:**
Triton
96 Mountain Laurel Court
Aspen, CO 81611
Phone: 312.735.4960

**COMMENTS OR SPECIAL INSTRUCTIONS:**

| DATE | DESCRIPTION | | TOTAL |
|---|---|---|---|
| 1/10/2023 | Construction Services (12/26/2022-1/08/2023) | | $19,230.77 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | SUBTOTAL | $19,230.77 |
| | | | |
| | | TOTAL DUE | $19,230.77 |

Bank Information:
Triton (US Bank) Acct. No. 125401763011
Routing No. 102000021

**CONFIDENTIAL**

MDEV-000054

# EXHIBIT 22



1144 15TH STREET   SUITE 3600   DENVER, CO 80202
T 303.301.1490   F 303.301.1491   www.Venable.com

April 8, 2025

**t** 303.301.1494
**f** 303.301.1491
JArett@Venable.com

*JArett@Venable.com*

Zachary J. Watters
222 North LaSalle Street, Suite 2400
Chicago, IL 60601
zwatters@vedderprices.com

Re:    *NHC LLC v. Centaur Construction Co. Inc. et al.*, Case No. 19-cv-06332
        Citations to M Sourcing, LLC and M. Development, LLC

Dear Mr. Watters,

        As you know, this firm represents M Sourcing, LLC and M Development, LLC in connection with the Third-Party Citations to Discovery Assets ("Citations") served by you on behalf of the plaintiffs in the above-referenced Underlying Action.  Enclosed herewith please find non-parties M Sourcing, LLC and M Development, LLC's (collectively, the "M Entities") responses and objections to your Citations.

        As you further know, you served the Citations on the M Entities on January 14, 2025. Following discussions between the parties and by mutual agreement, you gave the M Entities an extension of time, to April 8, 2025, to respond to the Citations.  I appreciate the courtesy in granting the M Entities this extension.

<u>Objections</u>

1.  The M Entities object to the Citations because they require compliance outside the geographical limits specified in Fed. R. Civ. P. 45(c). Pursuant to Rule 45(c), the M Entities cannot be compelled to comply with the Citations outside of the state of Colorado.  By providing these responses, the M Entities do not waive their objection to this deficiency and reserve all rights to contest the Citations with the court for the district where compliance is properly required, which is the U.S. District Court for the District of Colorado.

2.  The M Entities object to the Citations to the extent that they seek to impose burdens and obligations on the M Entities that are broader than those imposed on non-parties by F.R.C.P. 45 and 69, or any other applicable law.

3.  The M Entities object to the Citations to the extent they seek documents that in the first instance should be sought and obtained from the debtors in the Underlying Action.

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 207
Case: 1:19-cv-06332 Document #: 761-20 Filed: 07/30/25 Page 3 of 12 PageID #:33236
of 262



4.  The M Entities object to the Citations to the extent they seek documents or communications subject to attorney-client, work product, or other privileges.

5.  The M Entities object to the Citations because they are overly broad, unduly burdensome, vague, and ambiguous.  The Citations each contain forty-eight requests, many of which are overly broad in their scope and, if responded to fully, would essentially require the M Entities, non-parties to the case, to hand over the entirety of their corporate records.  As such, the Citations seek documents and records which go beyond what is reasonably necessary to inquire into the matter at issue in the Underlying Action.

6.  The M Entities object to the Citations because they request records which are proprietary in nature, and which contain trade secrets and other confidential commercial information which the M Entities object to producing.  This includes, but is not limited to, the M Entities' bank account statements and other corporate ledgers, as well as tax returns filed by the M Entities.

7.  The M Entities object to the Citations to the extent that they seek records that are obtainable from some other source that is more convenient, less burdensome, or less expensive, including but not limited to from the other parties to the Underlying Action.  The M Entities also object to the Citations to the extent they seek electronically stored information from a source that is not reasonably accessible.

8.  The M Entities object to the Citations to the extent that the burden or expense of responding to the Citations outweighs any benefit of the records requested in the Citations.

9.  The M Entities object to the Citations because they seek records which may not be relevant to the subject matter in the above- referenced action or reasonably calculated to lead to the discovery of admissible evidence.

During our discussions, we have reached certain agreements in order to resolve some of the objections outline above.  The requests for which we have reached a mutual agreement are outlined below.  The referenced request number corresponds to the M Sourcing citation, though the agreement applies to the corresponding request in the M Development citation.  By producing documents in response to the modified requests, the M Entities do not waive the objections described above and reserve all rights to contest the requests.

Requests 7-9, 39: After the M Entities objected to these requests as overly broad and unduly burdensome, it is the M Entities' understanding that you agreed to allow the M Entities to provide you with a list of projects that Mr. Tsaparas and former employees of Centaur Construction Company Inc. have worked on during the Relevant Period in lieu of producing documents in



response to the full request.  Based on this understanding, the M Entities will produce documents responsive to this modified request.

<u>Requests 20-23, 28-29</u>: After the M Entities objected to these requests as overly broad and unduly burdensome, it is the M Entities' understanding that you agreed to allow the M Entities to provide you with a declaration related to the ownership of M Sourcing and M Development in lieu of producing documents responsive to this request.  A draft of that declaration is attached to this letter for your approval.

<u>Request No. 30</u>: After the M Entities objected to this request as overly broad, unduly burdensome, and requesting irrelevant confidential business information, it is the M Entities' understanding that you agreed to withdraw this request for at least the time being, pending a review of the other documents produced.  Based on this understanding, the M Entities are not producing documents responsive to this request.

<u>Request No. 38</u>: After the M Entities objected to this request as overly broad, unduly burdensome, and requesting irrelevant confidential business information, it is the M Entities' understanding that you agreed to withdraw this request.  Based on this understanding, the M Entities are not producing documents responsive to this withdrawn request.

<u>Request 40</u>: After the M Entities objected to this request as overly broad, unduly burdensome, and requesting irrelevant confidential business information, it is the M Entities' understanding that you agreed to limit this request a limited set of documents sufficient to show the relationship between M Sourcing, LLC and M Development, LLC.  Based on this understanding, the M Entities will produce documents responsive to this modified request.

<u>Request 43</u>: After the M Entities objected to this request as overly broad and requesting irrelevant confidential business information, it is the M Entities' understanding that you agreed to limit this request to tax documents related to the Judgment Debtors.  Based on this understanding, the M Entities will produce documents responsive to this modified request.

<u>Request No. 45</u>: After the M Entities objected to this request as overly broad, unduly burdensome, and requesting irrelevant confidential business information, it is the M Entities' understanding that you agreed to limit this request to documents related to donations, charitable gifts, or endowments made by the Judgment Debtors or donations, charitable gifts, or endowments made by the M Entities using assets provided by the Judgment Debtors.  Based on this understanding, the M Entities do not have any documents responsive to this modified request.

<u>Document Production</u>

Subject to and without waiving these objections, the M Entities are producing documents Bates numbers MDEV-000307 through MDEV-000626 in response to the requests and modified



requests in the Citations.  These documents are in addition to the documents that have previously been produced in response to other requests, Bates numbers MDEV-000001 through MDEV-000306, some of which are responsive to the requests and modified requests in the Citations. The documents have been stamped 'Confidential." For the avoidance of any doubt, the M Entities claim the full confidential protections available in the Underlying Action.

I have also enclosed the answers to the Citations, which were also submitted to the court via U.S. mail.

Please feel free to contact me at 303-301-1494 with any questions.



Sincerely,


*/s/ Jessica J. Arett*
Jessica J. Arett



cc:    Emily Keimig

**[PROPOSED] DECLARATION OF MARK HUNT**

I, Mark Hunt, declare as follows:

1. I am over eighteen (18) years old and am competent to testify as to the facts in this Declaration based on my personal knowledge.

2. I am personally familiar with each and every owner of M Development, LLC and M Sourcing, LLC.

3. Without making any representations as to the number or legal structure of the owners of M Development, LLC or M Sourcing, LLC, to the extent that M Development, LLC and M Sourcing, LLC is owned by a corporate entity, I have full knowledge of all direct and indirect owners of any such entity.

4. Based on the above knowledge, I can certify that the following entities or individuals do not have a direct or indirect ownership interest in M Sourcing, LLC or M Development, LLC and do not have a direct or indirect ownership interest in any entity which owns any portion of M Sourcing, LLC or M Development, LLC: Centaur Construction Company Inc., Spiro Tsaparas, or Peter Alexopoulos.

5. I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of April, 2025

_____
Mark Hunt

Enter the Case Number given by the Clerk:      19-cv-06932

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NHC LLC, a Florida limited liability company,

      Plaintiff,

v.                                                              Case No. 19-cv-06332

CENTAUR CONSTRUCTION COMPANY INC., an Illinois        Honorable Matthew F. Kennelly
corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS,

      Defendants.

### ANSWER TO THIRD PARTY CITATION TO DISCOVER ASSETS

**1. Information about the Respondent and the Debtors:**

    a.  Respondent's name: _M Development, LLC_

| | |
|---|---|
| **To creditor:** fill out section 1. In **1a**, enter the bank's name. | b.  Respondent's address: _680 Nell Erickson_ <br>                _Street Address_ |

c.    Aspen          CO                  81611
       _City_             _State_                  _ZIP_

In **1b**, enter the bank's current address.

In **1c**, enter the debtor's name.

In **1d**, enter the last 4 digits of the debtor's Social Security Number.

In **1e**, list the amount of the judgment.

    c.  Debtors' names: (1) Spiros Tsaparas a/k/a Spyridon Tsaparas

                           (2) Peter Alexopoulos

                           (3) Centaur Construction Co., Inc., a dissolved Illinois Corporation

A judgment was entered against the Debtors (jointly and severally) on March 15, 2023 in an aggregate original principal amount of no less than $22,272,124.34, plus post-judgment interest at the statutory rate. A true and correct copy of the referenced judgment is enclosed herewith. The current amount that remains to be paid, including the Creditor's court costs and post judgment interest, minus any applicable payments which have been made, is no less than $21,000,000.00 as of the date of the Third Party Citation to Discover Assets issued with this Answer form, plus court costs of this proceeding.

      **NOTICE TO RESPONDENT:** This is a *Citation.* You might need to freeze up to double the on the source of the deposits. See question 2.

| | |
|---|---|
| **To creditor:** leave the rest of the form blank. <br><br> **To Respondent**: fill out the remaining parts of this form and sign it. Then file this *Answer* with the court and send a copy to the creditor. Contact the Clerk for instructions on how to file this *Answer* with the court. | **2. Interrogatories:** <br><br>   a.  On the date of service of the *Citation*, do you have any personal property or money belonging to any of the debtors? <br>     ☐Yes  ☒No  ***If no, do not fill out the rest of the form. Sign below.*** <br><br>   b.  Is any of the money deposited into an IRA? <br>     ☐Yes.  If yes, do not freeze the IRA accounts.    ☐No <br><br>   c.  Have all of the deposits made during the past 90 days been electronically deposited and identified as Social Security, Unemployment Compensation, Public Assistance, Veteran's Benefits, Pension, or Retirement? <br>     ☐Yes. If yes, do not freeze the account.  ☐No <br><br>   d.  Is the account's current balance equal to or less than the total of the exempt deposits? ☐Yes. <br>     If yes, do not freeze the account.  ☐No <br><br>     If you checked **No** in **b**, **c**, and **d**, then freeze up to double the amount of the judgment. |

Enter the Case Number given by the Clerk: _____ 19-cv-06332

**3.   Property:**

a.  ☐  Account

| | Account Type | Account Balance | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |
| 3. | | $ | $ |
| 4. | | $ | $ |
| 5. | | $ | $ |
| 6. | | $ | $ |

b.  ☐  Safety Deposit   ☐ Yes   ☐ No

c.  ☐  Other property *(rents, mortgages, etc.)*

| | Describe Property | Value of Property | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |

d.  ☐  Less Right of Offset for Loans  $ _____

e.                                    **Total Amount Frozen:**  $ _____

**4.   List all electronic monthly deposits:**

| | Account Number | Source of Deposit | Monthly Amount |
|---|---|---|---|
| 1. | | | $ |
| 2. | | | $ |
| 3. | | | $ |

**5.   List all joint account holders or anyone who has a claim on the property:**

> If all of the property belongs to another person who is not the debtor, do not freeze the property.

a.  _____

*First*              *Middle*                    *Last Name*

_____

*Street*

_____

*City*                        *State*                        *ZIP*

Account Information:  Type:  ☐ Checking  ☐ CD  ☐ Savings

Account Number: _____

b.  _____

*First*              *Middle*                    *Last Name*

_____

*Street*

_____

*City*                        *State*                        *ZIP*

Account Information:  Type:  ☐ Checking  ☐ CD  ☐ Savings

Account Number: _____

Enter the Case Number given by the Clerk: _____ 19-cv-06332

c.

| | | |
|---|---|---|
| *First* | *Middle* | *Last Name* |

*Street*

| | | |
|---|---|---|
| *City* | *State* | *ZIP* |

Account Information:  Type:  ☐ Checking  ☐ CD  ☐ Savings

Account Number: _____

---

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

**I certify that everything in the *Answer to Citation Proceeding* is true and correct. I understand that making a false statement on this form is perjury and has penalties by law under 735 ILCS 5/1-109.**

Mark Hunt
---
*Your Signature*

c/o Jessica Arett, Venable LLP, 1144 15th Street, Suite 3600
---
*Street Address*

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

Mark Hunt
---
*Print Your Name*

Denver, CO 80202
---
*City, State, ZIP*

Enter your complete address, telephone number, and email address, if you have one.

jarett@venable.com
---
*Email*

303-301-1494
---
*Telephone*

Mail or hand-deliver a copy of this completed *Answer* to the Clerk, plaintiff, and debtor.

_____
*Attorney # (if any)*

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

Enter the Case Number given by the Clerk:    19-cv-06332

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NHC LLC, a Florida limited liability company,

      Plaintiff,

v.                                   Case No. 19-cv-06332

CENTAUR CONSTRUCTION COMPANY INC., an Illinois     Honorable Matthew F. Kennelly
corporation, SPIRO TSAPARAS, and PETER ALEXOPOULOS,

      Defendants.

## ANSWER TO THIRD PARTY CITATION TO DISCOVER ASSETS

**1.** **Information about the Respondent and the Debtors:**

    a.  Respondent's name: _M Sourcing, LLC_

    b.  Respondent's address: _100 S Spring Street_

| | | |
|---|---|---|
| | *Street Address* | |

    c.    Aspen               CO                         81611

            *City*                   *State*                         *ZIP*

    c.   Debtors' names: (1) Spiros Tsaparas a/k/a Spyridon Tsaparas

                        (2) Peter Alexopoulos

                        (3) Centaur Construction Co., Inc., a dissolved Illinois Corporation

A judgment was entered against the Debtors (jointly and severally) on March 15, 2023 in an aggregate original principal amount of no less than $22,272,124.34, plus post-judgment interest at the statutory rate. A true and correct copy of the referenced judgment is enclosed herewith. The current amount that remains to be paid, including the Creditor's court costs and post judgment interest, minus any applicable payments which have been made, is no less than $21,000,000.00 as of the date of the Third Party Citation to Discover Assets issued with this Answer form, plus court costs of this proceeding.

        **NOTICE TO RESPONDENT:** This is a *Citation.* You might need to freeze up to double the on the source of the deposits. See question 2.

**2.** **Interrogatories:**

    a.  On the date of service of the *Citation*, do you have any personal property or money belonging to any of the debtors?

        ☐Yes  ☒No  ***If no, do not fill out the rest of the form. Sign below.***

    b.  Is any of the money deposited into an IRA?

        ☐Yes.  If yes, do not freeze the IRA accounts.    ☐No

    c.  Have all of the deposits made during the past 90 days been electronically deposited and identified as Social Security, Unemployment Compensation, Public Assistance, Veteran's Benefits, Pension, or Retirement?

        ☐Yes. If yes, do not freeze the account.    ☐No

    d.  Is the account's current balance equal to or less than the total of the exempt deposits? ☐Yes.

    If yes, do not freeze the account.    ☐No

    If you checked **No** in **b**, **c**, and **d**, then freeze up to double the amount of the judgment.

---

**To creditor:** fill out section 1. In **1a**, enter the bank's name.

In **1b**, enter the bank's current address.

In **1c**, enter the debtor's name.

In **1d**, enter the last 4 digits of the debtor's Social Security Number.

In **1e**, list the amount of the judgment.

---

**To creditor:** leave the rest of the form blank.

**To Respondent**: fill out the remaining parts of this form and sign it. Then file this *Answer* with the court and send a copy to the creditor. Contact the Clerk for instructions on how to file this *Answer* with the court.

---

Enter the Case Number given by the Clerk: _____ 19-cv-06332 _____

3. **Property:**

a. ☐ Account

| | Account Type | Account Balance | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |
| 3. | | $ | $ |
| 4. | | $ | $ |
| 5. | | $ | $ |
| 6. | | $ | $ |

b. ☐ Safety Deposit    ☐ Yes    ☐ No

c. ☐ Other property *(rents, mortgages, etc.)*

| | Describe Property | Value of Property | Amount Withheld |
|---|---|---|---|
| 1. | | $ | $ |
| 2. | | $ | $ |

d. ☐ Less Right of Offset for Loans  $ _____

e.                                        **Total Amount Frozen:**  $ _____

4. **List all electronic monthly deposits:**

| | Account Number | Source of Deposit | Monthly Amount |
|---|---|---|---|
| 1. | | | $ |
| 2. | | | $ |
| 3. | | | $ |

5. **List all joint account holders or anyone who has a claim on the property:**

> If all of the property belongs to another person who is not the debtor, do not freeze the property.

a. _____

*First*              *Middle*                    *Last Name*

_____

*Street*

_____

*City*                        *State*                        *ZIP*

Type text here

Account Information:  Type:  ☐ Checking   ☐ CD   ☐ Savings

Account Number: _____

b. _____

*First*              *Middle*                    *Last Name*

_____

*Street*

_____

*City*                        *State*                        *ZIP*

Account Information:  Type:  ☐ Checking   ☐ CD   ☐ Savings

Account Number: _____

Enter the Case Number given by the Clerk: _____ 19-cv-06332

c. _____

| First | Middle | Last Name |

_____

*Street*

_____

| City | State | ZIP |

Account Information:   Type:   ☐ Checking   ☐ CD   ☐ Savings

Account Number: _____

| | |
|---|---|
| Under the Code of Civil Procedure, <u>735 ILCS 5/1-109</u>, making a statement on this form that you know to be false is perjury, a Class 3 Felony. | **I certify that everything in the *Answer to Citation Proceeding* is true and correct. I understand that making a false statement on this form is perjury and has penalties by law under <u>735 ILCS 5/1-109</u>.** |

| | |
|---|---|
| | Mark Hunt _____ | c/o Jessica Arett, Venable LLP, 1144 15th Street, Suite 3600 |

*Your Signature*  ·  *Street Address*

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

Mark Hunt _____    Denver, CO 80202

*Print Your Name*  ·  *City, State, ZIP*

Enter your complete address, telephone number, and email address, if you have one.

jarett@venable.com _____    303-301-1494

*Email*  ·  *Telephone*

Mail or hand-deliver a copy of this completed *Answer* to the Clerk, plaintiff, and debtor.

_____

*Attorney # (if any)*

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 217
of 262
Case: 1:19-cv-06332 Document #: 761-28 Filed: 07/30/25 Page 1 of 6 PageID #:33246

# EXHIBIT 23

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 218
of 262
Case: 1:19-cv-06332 Document #: 761-28 Filed: 07/30/25 Page 2 of 6 PageID #:33247

| | |
|---|---|
| **From:** | Arett, Jessica J. |
| **To:** | Watters, Zachary J.; Jackson, Daniel P. |
| **Cc:** | Keimig, Emily F.; Stahl, Holly A. |
| **Subject:** | FW: [EXT] RE: NHC v. Centaur Construction - M Development and M Sourcing Third-Party Citation Document Production |
| **Date:** | Wednesday, July 30, 2025 10:02:04 AM |
| **Attachments:** | 2025-04-08 JJA Letter to Z. Watters(66498934.1).pdf |

Af708937-a88e-42bf-ba2a-5cff5e30518f

Af708937-a88e-42bf-ba2a-5cff5e30518f

Zach and Dan,

Thank you again for your time during our call last week. I write to respond to your recent email and to address and clarify some of the inaccuracies contained therein.


**Document Production Overview**

First, the M Entities categorically reject the suggestion that they have failed to provide fulsome and complete productions in response to the two citations served in January. As you know, those citations encompassed nearly 50 document requests—many of which were extraordinarily broad in scope, unduly burdensome, and sought irrelevant and confidential business and financial records. Responding fully would have required the M Entities—non-parties to the underlying action—to turn over nearly all of their corporate records. These demands exceed the reasonable bounds of discovery permitted under the rules and go far beyond what is necessary for the underlying matter.


Throughout our discussions, we have made substantial efforts to reach reasonable compromises to resolve our objections by narrowing the scope of the requests to target documents that actually assist NHC in its collection efforts against the judgment debtors. As detailed in my April 8, 2025 letter—which I've reattached—we have produced all documents required under the modified requests per our agreement. Any assertion that the M Entities now need to produce additional documents – documents that have no relation to any assets or property of the debtor – is further a violation of Illinois Supreme Court Rule 277, which provides that a citation can only be issued against a party when there is reason to believe the party has property or income the judgment debtor is entitled to reach or is indebted to the judgment debtor. As evidenced by the documents produced so far, you do not have grounds to assert a basis for believing either.


During our call, you did not identify any specific categories of documents that you believe remain outstanding under the modified requests, nor have you suggested additional documents that were not covered by the modified requests but you believe NHC would be entitled to. As such, we are left with the original, overbroad requests, which you now appear unwilling to narrow. As I said on the call, if you believe certain narrower categories of documents have not been produced and are relevant to a reasonable belief that the M Entities are holding property or income of the judgment debtors, please identify them and I will confer with my clients. Absent any such narrowing, my clients are not prepared to produce documents beyond those described in our April 8 letter.


**Clarifications on Specific Requests**

Regarding the specific requests raised in your email, we confirm your understanding of the parties' positions described in your email, <u>except</u> as noted below:


**Requests 7–9**

These seek all documents relating to work performed by Triton, Mr. Tsaparas, and Centaur. As we discussed, the judgment debtors and Triton were involved in numerous projects for the M Entities. Fully responding would require producing voluminous business records. To resolve this burden, you agreed the M Entities could instead provide a list of projects involving Mr. Tsaparas, Centaur, and its former employees. That list has been provided. If you are now seeking broader categories of documents, you have not explained why NHC requires more than what has been provided. As a result, without further narrowing or explanation, the M Entities will not produce additional documents responsive to this request.  We remain open to considering a narrowed request.


**Request 30**

This seeks monthly statements for all M Entities' bank accounts. As previously explained, the M Entities objected due to the request's breadth, burden, and confidential nature. Nonetheless, we produced all bank records reflecting transactions with the judgment debtors. You subsequently agreed to withdraw this request. If you are now renewing it, please explain why the existing

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 219
of 262
Case: 1:19-cv-06332 Document #: 761-28 Filed: 07/30/25 Page 3 of 6 PageID #:33248

production is inadequate and what possible relevance bank statements for the M Entities that have no relation to the judgment debtors can have for your collection efforts. Otherwise, the M Entities stand on their objection.

**Request 36**
This seeks all documents and communications regarding M Entities' employees who also worked for the judgment debtors. The request, as drafted, would require production of entire employment files and all emails with and about the relevant employees, as well as all business work product related to said employees. To address this, and per your agreement, we produced a list of relevant projects and identified the employees involved. If additional documents are now being requested, we ask that you articulate why the existing production is insufficient and further narrow the request, which we will consider.

**Request 38**
This seeks all documents and communications relating to the judgment debtors and their affiliates. Fully responding would require the same voluminous production as above. We have already produced documents responsive to this and other related requests, including agreements, payments, and communications with the debtors. You agreed to withdraw this request. If you are now renewing it, please explain the need for further production and provide a narrowed version for us to consider.

**Request 39**
This seeks all documents relating to the relationship between the judgment debtors and the M Entities. As discussed, this request is functionally duplicative of Request 36. We resolved the objection by producing a list of relevant projects, as agreed. If you believe further documents are needed, please clarify the insufficiency and propose a narrowed scope for our consideration. Otherwise, the M Entities will stand on the documents already produced and the previously stated objection.

**Request 43**
This seeks all tax returns and related communications and documents for the M Entities. As you are aware, the judgment debtors hold no ownership interest in the M Entities. We previously offered—and you accepted—a stipulation confirming this fact. The M Entities produced tax documents relating to the judgment debtors. If you are seeking broader categories of documents, please explain why they are necessary and propose a narrowed version for consideration. **Otherwise, the M Entities maintain their objection.**

**Jurisdiction for Enforcement**
Finally, with respect to your assertion that enforcement proceedings may be brought in Illinois, such assertion is contradicted by the rules and Illinois law. Illinois law provides that a court lacks jurisdiction to enforce a citation if the court does not have personal jurisdiction over the party cited. *See Woolford v. Woolford*, 2009 WL 315043 (N.D. Ill. 2009) (concluding that a citation cannot be enforced if a court does not have personal jurisdiction). Here, neither entity has any connections to Illinois, and you have not alleged that any property of the debtor was transferred from Illinois to the M Entities in Colorado. As stated in my letter, the M Entities reserve the right to contest any assertion that the Illinois court can exercise jurisdiction over them. Moreover, to the extent you assert that you can assert jurisdiction under Rule 45, Fed. R. Civ. P. 45(c) and 45(d)(2)(B)(i) make clear that any motion to compel must be filed in the district where compliance is required—here, Colorado. Despite repeated requests, you have not provided any legal basis for proceeding in Illinois, where the M Entities have no connection.

We remain open to a productive dialogue and will consider any narrowed, reasonable proposals you wish to make.

Best regards,
Jessica

Jessica J. Arett | Partner | Venable LLP
t 303.301.1494 | f 303.301.1491

JArett@Venable.com | www.Venable.com

_____

**From:** Watters, Zachary J. <zwatters@vedderprice.com>
**Sent:** Monday, July 21, 2025 8:33 AM
**To:** Arett, Jessica J. <JArett@Venable.com>
**Cc:** Jackson, Daniel P. <djackson@vedderprice.com>; Keimig, Emily F. <EFKeimig@Venable.com>

**Subject:** RE: [EXT] RE: NHC v. Centaur Construction - M Development and M Sourcing Third-Party Citation Document Production

**Caution: External Email**

Jessica,

We have availability at 2:00 p.m. (CST) today.  Does that work on your end?  If so, we'll circulate an invite.

Zach

**Zachary J. Watters,** Shareholder

VedderPrice

222 North LaSalle Street, Chicago, Illinois 60601
T +1 312 609 7594
web | email | offices | biography

**From:** Arett, Jessica J. <JArett@Venable.com>
**Sent:** Friday, July 18, 2025 5:54 PM
**To:** Watters, Zachary J. <zwatters@vedderprice.com>
**Cc:** Jackson, Daniel P. <djackson@vedderprice.com>; Keimig, Emily F. <EFKeimig@Venable.com>
**Subject:** [EXT] RE: NHC v. Centaur Construction - M Development and M Sourcing Third-Party Citation Document Production [VED-VP.FID535382]

Hi Zach,

Are you around on Monday to discuss this?  I'm available between 12-5 MT.

Thanks,
Jessica

Jessica J. Arett | Partner | Venable LLP
t 303.301.1494 | f 303.301.1491

JArett@Venable.com | www.Venable.com

**From:** Watters, Zachary J. <zwatters@vedderprice.com>
**Sent:** Wednesday, July 16, 2025 4:07 PM
**To:** Arett, Jessica J. <JArett@Venable.com>
**Cc:** Jackson, Daniel P. <djackson@vedderprice.com>; Keimig, Emily F. <EFKeimig@Venable.com>
**Subject:** NHC v. Centaur Construction - M Development and M Sourcing Third-Party Citation Document Production [VED-VP.FID535382]

**Caution: External Email**

Jessica,

We are writing with respect to the Third-Party Citations to Discover Assets served on M Sourcing, LLC ("M Sourcing") and M Development, LLC ("M Dev." and collectively, the "M Entities").  We have attached copies of both Third-Party Citations for your reference.

Since we last met and conferred regarding the document production associated with the Third-Party Citations served on the M Entities, NHC LLC ("NHC") has: (i) reviewed the supplemental document production provided by the M Entities (bates labeled MDEV-307 – 626); (ii) spent significant time and resources attempting to obtain documents from Centaur Construction Inc., Spiro Tsaparas, and Peter Alexopoulos (collectively, the "Judgment Debtors"); and (iii) spent significant time and resources obtaining documents from various third-parties.  Based on our review of the documents provided by the M Entities, the Judgment Debtors, and various third-parties, NHC is not satisfied that the M Entities have made a fulsome and complete document production.

NHC understands and acknowledges that during our last meet-and-confer discussion, we attempted to reach a compromise with

respect to certain requests in an effort to avoid motion practice. However, based on the documents produced by the M Entities and additional information NHC has obtained, the limited documents produced in response to the compromise requests are not sufficient and do provide NHC with the documents and information it is entitled to. Given the passage of time since our last meet-and-confer discussion, we are writing to confirm our understanding as to the positions of the M Entities with respect to certain requests. The request numbers identified below correspond to the request numbers in the Third-Party Citation issued to M Sourcing, although this correspondence applies to the nearly substantively identical requests issued to M Dev. Please provide confirmation as to the accuracy of the positions outlined below within five days.

<u>Request Nos. 1-5, 10-17, 19, 26-27, 30-35, 41-42, 44, and 47:</u> These requests relate to monies provided to, owed to, accepted from, or related to the Judgment Debtors and it is our understanding that the M Entities' position is that they have produced all documents responsive to these requests.

<u>Request Nos. 6 and 18:</u> These requests relate to agreements between the M Entities and the Judgment Debtors and it is our understanding that the M Entities' position is that they have produced all documents responsive to these requests.

<u>Request Nos. 24-25:</u> These requests relate to meeting minutes concerning the Judgment Debtors and it is our understanding that the M Entities' position is that no such documents exist.

<u>Request No. 37:</u> This request relates to mergers, joint ventures, partnerships, and affiliations involving the Judgment Debtors and it is our understanding that the M Entities' position is that no such documents exist.

<u>Request No. 46:</u> This request relates to any interest the Judgment Debtors possess in real estate and it is our understanding that the M Entities' position is that no such documents exist.

<u>Request Nos. 7-9, 36, and 39:</u> It is our understanding that with the exception of the list of projects previously provided by the M Entities, the M Entities are not willing to produce any documents responsive to these requests.

<u>Request No. 30:</u> It is our understanding that the M Entities are not willing to produce documents responsive to this request.

<u>Request No. 38:</u> It is our understanding that the M Entities are not willing to produce documents responsive to this request.

<u>Request No. 43:</u> It is our understanding that the M Entities are not willing to produce documents responsive to this request.


Thank you.

Zach


**Zachary J. Watters**, Shareholder

**Vedder**Price

222 North LaSalle Street, Chicago, Illinois 60601

T +1 312 609 7594

<u>web</u> | <u>email</u> | <u>offices</u> | <u>biography</u>

---

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, Vedder Price (FL) LLP, which operates in Florida, and Vedder Price Pte. Ltd., which operates in Singapore.


CONFIDENTIALITY NOTE: This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 609-5038 and also indicate the sender's name. Thank you.

d250106us

*********************************************************************************
This electronic mail transmission may contain confidential or privileged information. If
you believe you have received this message in error, please notify the sender by reply
transmission and delete the message without copying or disclosing it.
*********************************************************************************

Case No. 1:25-cv-02537   Document 1-9   filed 08/13/25   USDC Colorado   pg 223
of 262
Case: 1:19-cv-06332 Document #: 761-24 Filed: 07/30/25 Page 1 of 2 PageID #:33252

# EXHIBIT 24



McFadden 000218

Case No. 1:25-cv-02537     Document 1-9     filed 08/13/25     USDC Colorado     pg 225
of 262
Case: 1:19-cv-06332 Document #: 761-25 Filed: 07/30/25 Page 1 of 3 PageID #:33254

# EXHIBIT 25

 Gmail

**Dee Van Senus <dvansenus@gmail.com>**

---

## Re: working together

1 message

---

**Dee Van Senus** <dvansenus@gmail.com>                    Tue, Sep 7, 2021 at 9:05 AM
To: Spiro Tsaparas <spiro@centaurco.com>

3/12/25, 11:41 AM                          Gmail - Re: working together

Case No. 1:25-cv-02537      Document 1-9      filed 08/13/25      USDC Colorado      pg 227
Case: 1:19-cv-06332 Document #: 761-25 Filed: 07/30/25 Page 3 of 3 PageID #:33256

Hi Spiro,

I hope you had a nice holiday weekend. I meant to get my questions to you earlier but I took the long weekend to unplug and decompress.

I appreciate your offer but I have a couple questions before I can fully commit.

1. What do you mean by "integrator"?
2. If we decide that we are still a good fit to work together, what happens after the 90 days?
3. Are the 90 days calendar days or business days?

I'd be happy to jump on a call at any point if you'd like to discuss over the phone.

Sincerely,
DeAnna

On Wed, Sep 1, 2021 at 7:48 AM Spiro Tsaparas <spiro@centaurco.com> wrote:

> DeAnna,
>
> If you determine that your current employment is not a good fit for you and you are willing to give me an opportunity to work together I suggest the following.
>
> We engage on a 90 day trial period during which you will be exposed to my new world. Payment will be $30,000 paid up front the week before you start on a consulting basis. At the 60 day mark we will have a meeting to discuss specifics and determine if it is a fit. We will start in Aspen for 5 days so you get to see the operations. You will not communicate on my behalf, answer emails etc. but simply support me. while my expectation is for you to assist me, the position is to act as the integrator of the entire new company. We can discuss further.
>
> Take your time to respond.
>
> Spiro Tsaparas | Chief Executive Officer
>
> **CENTAUR**
> 121 South Galena St, Aspen, Colorado, 81611
> **P** 312 644 4470 **C** 312 735 4960
> Centaurco.com
>
>   
>
> Notice: The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centaur. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to info@centaurco.com and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT 28

**Subject:** Re: Email communication
**From:** Bronwyn Bateman <████████████████████████>
**Date:** 12/30/2021, 8:11 PM
**To:** Spiro Tsaparas <spiro@centaurco.com>

Spiro,

Congratulations on your deal. Is this for RH, Crystal Palace, both or something else? Nonetheless, I am sure you worked hard to do the deal and it will keep you very busy! Always good to be busy.

As for COVID in Aspen, how unfortunate - amazing transmission. Goldie is strong and now has good antibodies.

I am sorry about the roofer - I hope he gets well. Hopefully, he will be back to normal the first week of January. Ant suggested removing the ceiling in the dining room (unit B) to look for the source. That might be the next step.

A happy new year to you, Corri, ████████████. I am convinced that ███ has engineering potential!

Bronwyn

On Wed, Dec 29, 2021 at 3:27 PM Spiro Tsaparas <spiro@centaurco.com> wrote:

> Dear Bronwyn,
>
> The roofer has not come yet as he got COVID and had to cancel.
>
> He will be at the house on Monday.
>
> In the interim, I will sweep the roof tomorrow and send you a photo of the membrane.
>
> I hope you are well and staying safe. The transmission rate here advanced to 32% today which is unheard of.

JBB003467

12/29/2024, 11:17 AM

The museum closed due to no available employees along with several other businesses and restaurants. I hope it passes swiftly.

On a personal note, I finalized my deal and executed the documents. Excited to begin a new chapter while I continue to do what I love.

Spiro Tsaparas | Chief Executive Officer

**CENTAUR**

121 South Galena St, Aspen, Colorado, 81611
**P** 312 644 4470 **C** 312 735 4960
Centaurco.com

 

Notice: The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centaur. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to info@centaurco.com and destroy this communication and all copies thereof, including all attachments.

**From:** Bronwyn Bateman ██████████████████████
**Sent:** Monday, December 27, 2021 11:34 AM
**To:** Spiro Tsaparas <spiro@centaurco.com>
**Subject:** Re: Email communication

Thank you.

I hope you and your family are over the COVID infections - and that you had a wonderful Christmas.

Bronwyn

On Mon, Dec 27, 2021 at 10:29 AM Spiro Tsaparas <spiro@centaurco.com> wrote:

JBB003468

Bronwyn,

I am at my desk catching up with emails.

I will be responding on emails you sent me today.

Spiro Tsaparas | Chief Executive Officer

**CENTAUR**

121 South Galena St, Aspen, Colorado, 81611

**P** 312 644 4470 **C** 312 735 4960

Centaurco.com



Notice: The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centaur. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to info@centaurco.com and destroy this communication and all copies thereof, including all attachments.

This email has been generated from outside your organization.

JBB003469

12/29/2024, 11:17 AM

# EXHIBIT 27

**Subject:** Fwd: Pump in boiler room
**From:** Bronwyn Bateman <████████████████>
**Date:** 5/4/2021, 6:29 PM
**To:** Spiro Tsaparas <spiro@centaurco.com>

First, congratulations on the merger/acquisition by RH. Quite a feather in your cap.

And, thank you for the phone call. The check for the electricians is in the mail.

There were a couple of issues that we did not resolve.

1. Cost of the timers. I'll reimburse you.
2. Condenser motor. I'll reimburse you.
3. 60" round table. I am fine with either tempered glass or laminated glass, if it fits?
I don't recall where I purchased the table. In the past, I have used Epic Custom Glass 970.947.9456 and Elmer Glass   (970) 945-5037. Do you have a preference?
4. Thank you for contacting Partners Builders. I would like to get the cricket installed and eliminate the problem of ice build-up. I would be happy to call them if you would prefer.

Are there any other costs that I have not reimbursed?

Again, I thank you for your expertise.

Bronwyn


---------- Forwarded message ---------
**From:** **Spiro Tsaparas** <spiro@centaurco.com>
**Date:** Tue, May 4, 2021 at 11:59 AM
**Subject:** RE: Pump in boiler room
**To:** Bronwyn Bateman ████████████████
**Cc:** Anthony Ant Meikle <██████████████>


Bronwyn,

I am sorry it has taken me so long to respond.


**Heat Tape**

- The heat tape work has been completed. Two breaker boxes were installed with two separate  timers for each unit. The heat tapes have been separated for each unit and both units have autonomous controls, however, the system is designed to operate on a  timer during sunshine in the day  time, therefore we don't run the risk of someone forge tting to turn those on and have ice damning.
- The work was performed by a licensed electrician that works for RA Electric and does all my "side jobs", with the proper equipment and it is fully paid.

**Roof Cricket**

- While the installation of the cricket will add the belts and suspenders to the roof membrane, with this new system and the installa  tion of the pads next year, I find the expense frivolous and over the top. I recommend against the cricket at this  time, especially while I am the tenant of unit A as I am always checking things and performing repairs...

**Subzero condenser**

- The condenser fan motor went out in our subzero and I replaced it ( video below -

Download Attachment

Available until Jun 3, 2021

- It has been about 3 – 4 months and the fridge is performing really well.

**60" round patio table**

- A piece of ice fell on the table and broke the glass. I have to replace the glass. Do you remember by any chance who you bought the table/pa  tio furniture from? If not I will order a custom laminated pec of glass so it is more durable...


Spiro Tsaparas | Chief Executive Officer

**CENTAUR**
121 South Galena St, Aspen, Colorado, 8161?
**P** 312 644 4470 **C** 312 735 4960
Centaurco.com



Notice: The information contained in this communication is confidential, may be attorney-client privileged, ma
constitute inside information, and is intended only for the use of the intended addressee. It is the property of Centa
Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may b
unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail ti
info@centaurco.com and destroy this communication and all copies thereof, including all attachment

**From:** Bronwyn Bateman ████████████████
**Sent:** Wednesday, April 14, 2021 8:01 AM
**To:** Spiro Tsaparas <spiro@centaurco.com>

<center>

# JBB002872

</center>

12/29/2024, 11:23 AM

**Subject:** Fwd: July 16
**From:** Bronwyn Bateman ███████████████
**Date:** 6/6/2022, 6:58 PM
**To:** Aspen Rental Lisa Turchiarelli ████████████

I told Spiro that I would keep you in the loop.

He is closing down his company but working for another newly-formed
company that is RH and another investor. He will be flying around the world
building - and then turning the building over to someone else. They will
eventually do a REIT. I hope it is successful.

---------- Forwarded message ---------
**From: Bronwyn Bateman** <███████████████
Date: Mon, Jun 6, 2022 at 6:21 PM
Subject: Re: July 16
To: Douglas Hershey <██████████████
Cc: Lisa Turchiarelli <█████████████████

I told Spiro that I would work things out with him.

On Mon, Jun 6, 2022 at 6:17 PM Douglas Hershey ████████████████ wrote:
Hi Lisa
As you know, last month Bronwyn and I had a brief stop in our Mountain Valley homesite to pick up two
bicycles to take back to Sacramento. Spiro was there, but I neglected to ask him what rooms in his home,
Unit A. would be available in that third week of July when Bronwyn and I will be there with guests.
As you know, the facilities are available for someone to spend time in the room and adjacent shower on the
upper level above the garage - but rarely used. And, of course, in addition to the two nice rooms on the
ground level, there are the two rooms at the lower level plus the small room next to what was next to
elevator entry.
Which, if any, of these rooms are:
(1) not available for two people?
(2) not available at all?
For either of (1) or (2), what is the reason?
I appreciate the time you have taken to bring to us good people to spend their year(s) in my home of a
week.

Doug Hershey

On Monday, June 6, 2022, 04:38:34 PM PDT, Lisa Turchiarelli ███████████████ wrote:

# JBB003917

12/29/2024. 11:13 AM

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 235
of 262
Case: 1:19-cv-06332 Document #: 761-28 Filed: 07/30/25 Page 1 of 7 PageID #:33264

EXHIBIT 28

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                     EASTERN DIVISION
 4                       ---oOo---
 5
 6
    NHC LLC, a Florida limited      )
 7  liability company,,            )
                                   )
 8              Plaintiff,         )
                                   ) No. 19-cv-06332
 9                                 )
       vs.                         )
10                                 )
    CENTAUR CONSTRUCTION COMPANY    )
11  INC., an Illinois corporation, )
    SPIRO TSAPARAS, and PETER       )
12  ALEXOPOULOS,                   )
                                   )
13              Defendants.        )
    _____  )
14
15     EXAMINATION OF JANE BRONWYN BATEMAN HERSHEY, MD
16              Tuesday, March 25, 2025
17                   At 9:04 AM
18
19  Taken at:
20   Boutin Jones Inc.
     555 Capitol Mall
21   Sacramento, CA 95814
22
                        ---oOo---
23
24  Reported By:  Deirdre M. Dawson
                  CSR #11737
25
```

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 237
of 262
Case: 1:19-cv-06332 Document #: 761-28 Filed: 07/30/25 Page 3 of 7 PageID #:33266

Page 2

```
 1        A P P E A R A N C E S
 2
      For the       DANIEL P. JACKSON
 3    Plaintiffs:     Vedder Price
                  222 North LaSalle Street
 4                Chicago, Illinois 60601
                  (312) 609-7836
 5
 6    For the Witness:   GEORGE D. SAX
                  Scharf Banks Marmor
 7                30 W Hubbard Street, Ste 500
                  Chicago, Illinois 60654
 8                (312) 726-6000
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
                          4
 1            INDEX OF EXHIBITS
 2            Mark  Admit
 3  EXHIBIT 1   Citation Notice       12
 4  EXHIBIT 2   Photographs          26
 5  EXHIBIT 2A  Photographs          28
 6  EXHIBIT 3   Long Term Lease       31
 7  EXHIBIT 4   Long-Term Lease Agreement Amend/Extend 37
 8  EXHIBIT 5   Long-Term Lease Agreement     48
 9            Amendment/Extend II
10  EXHIBIT 6   Bookkeeper Accounting      48
11  EXHIBIT 7   E-mails              59
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

Deirdre Dawson, CSR #11737

Page 3

```
                   3
 1    INDEX OF WITNESSES       PAGE
 2
 3  JANE BRONWYN BATEMAN HERSHEY, MD
 4  Direct Examination By Mr. Jackson    5
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

Deirdre Dawson, CSR #11737

Page 5

```
 1          Tuesday, March 25, 2025
 2          JANE BRONWYN BATEMAN HERSHEY, MD ,
 3    the Witness herein, having been duly and regularly sworn
 4    by the Certified Shorthand Reporter, deposed and
 5    testified as follows:
 6              ---oOo---
 7          MR. JACKSON:  And I believe before we commence,
 8    Mr. Sax had a statement he wanted to make.
 9          MR. SAX:  Yes.  I represent the witness,
10    Dr. Bateman.  We're appearing here today in response to
11    a notice to show up in a courtroom in Chicago.  We
12    objected to doing that on personal jurisdiction grounds,
13    and as a compromise we produced her here in Sacramento
14    County where she lives.  So this is subject to and
15    without waiving that objection to the personal
16    jurisdiction of Illinois.
17          MR. JACKSON:  And I'll also just note, for the
18    record, I do appreciate Mr. Sax and his -- his
19    coordination and efforts to get this thing done by an
20    agreement and I appreciate Dr. Bateman being here today
21    as well.
22          DIRECT EXAMINATION
23    BY MR. JACKSON:
24    Q.  So let's just start this off.  Again, I know
25    you stated your name to me a couple times before.  Could
```

Page 94

1    A.  Yes.
2    Q.  -- and he talks about a company that he works
3  with called "Marquez Maintenance", M-A-R-Q-U-E-Z, for
4  the record.  Do you see that?
5    A.  Yes.
6    Q.  And he says:  "He gives them, Marquez
7  Maintenance, a really high volume", do you see that?
8    A.  Yes.
9    Q.  Do you know -- tell me what this related to.
10  Why were you having these conversations regarding
11  Marquez Maintenance?
12    A.  I have used -- Nakagawa to -- to get rid of --
13  snowplow -- and they've been a little flaky.  The owner
14  died, and then I couldn't get through, I could only
15  leave messages, and this happened very recently as well.
16  But in between these times they've been pretty
17  responsible and I think there may have been problems
18  with snowplowing.
19    Q.  Okay.  Jumping ahead to 03 -- JBB 003916.  Let
20  me know when you're there.  You there?
21    A.  Yes.
22    Q.  And it's an e-mail from you to Spiro at his
23  Centaur e-mail address --
24    A.  Yes.
25    Q.  -- again, so strike that.

Page 95

1        June 6th, 2022, and it says:  "Spiro,
2  congratulations on your transition.  Sounds like a less
3  stressful situation."
4        What did you mean by that?  What prompted this
5  e-mail?
6    A.  Restoration Hardware and him having told me
7  that he is global service with United Airlines, which is
8  a very big deal on United Airlines.
9    Q.  So the "congratulations on the transition"; was
10  the transition from his old company into whatever this
11  new merger or acquirement was with RH, that's the
12  transition you're talking about?
13    A.  I don't know what I was saying, what I was
14  e-mailing about at the time.
15    Q.  I think the next page might shed some light for
16  us.
17        JBB 003917, and it's an e-mail from you to
18  Lisa T. at Coldwell, correct?
19    A.  Yes.
20    Q.  Okay.  And it says here:  "I told Spiro that I
21  would keep you in the loop."
22        So did you and Spiro have another telephone or
23  in-person conversation around this date, seems to me?
24    A.  I think it's likely.
25    Q.  Okay.  And what did he tell you on that

Page 96

1  conversation?
2    A.  That he was working, looking at, I believe he
3  said he was working on Restoration Hardware locations
4  around Europe or the world.
5    Q.  So your e-mail says, from you to Lisa, that:
6  "He is closing down his company but working for another
7  newly formed company, that is RH and another investor."
8  It says that, right?
9    A.  Yes.
10    Q.  And that's something you would have learned
11  from your conversation with Spiro, correct?
12    A.  In all likelihood.
13    Q.  Okay.  Now he mentions this newly formed
14  company, this RH and another investor.  Did he tell you
15  who the other investor was?
16    A.  I don't recall.
17    Q.  Did he elaborate any further on this closing
18  down of his company and this new company?
19    A.  No, but not that I recall.
20    Q.  But did he indicate that this was a company
21  that he was a principle or had some ownership interest
22  in?
23    A.  I don't recall.  Aside -- I don't recall aside
24  from what I wrote in the e-mail.
25    Q.  Okay.  And he also mentions that he will be

Page 97

1  building -- flying around the world building and then
2  turning the building over, selling it to someone else --
3    A.  Yeah.
4    Q.  -- and they will eventually do a REIT, a real
5  estate investment trust, right?
6    A.  I do recall that.
7    Q.  What did he tell you about that?
8    A.  Well, I don't recall, but I have done a lot of
9  investing and I know what REITs are.
10    Q.  And based on your personal experience with
11  REITs, reasonable to assume or to know here that if he's
12  forming a REIT based on projects that connotes some sort
13  of ownership interest in the project itself?
14    A.  It implies that.
15    Q.  Okay.  Next, let's flip forward to JBB 004283,
16  and this is an e-mail from you July 29th, 2022 --
17    A.  Yes.
18    Q.  -- again, to Lisa, and fair to say that this
19  e-mail was prompted by an alert that you received from
20  RH?
21    A.  Oh, I must -- I probably sent that because I
22  was buying our son -- oh no, because I read the
23  newspapers so much.  And I get -- and I don't pay for it
24  but I get Bloomberg, I look at Bloomberg.com.
25    Q.  And then you forwarded, it looks like, this RH

25 (Pages 94 - 97)

Page 98

1  article to Spiro at Centaur.com, or his Centaur e-mail
2  address, right?
3    A.  Yes.
4    Q.  And then you separately e-mailed Lisa stating,
5  again:  "Worrisome.  I am sorry that Spiro lost the
6  contract to renovate the Crystal Palace."
7    A.  I must have learned that.
8    Q.  How did you learn that?  Because the article
9  below doesn't mention that.
10   A.  It would have been -- can I answer?
11      It would have been from Lisa.
12   Q.  Okay.  What else did Lisa tell you?  Any other
13  details you can provide me?
14   A.  No.
15   Q.  Would it surprise you to learn that Spiro may
16  still be working on the Crystal Palace project in some
17  capacity?
18   A.  You know, I have no idea what he's doing.  I
19  haven't -- he did try to call me the other day and
20  fortunately I was on the phone and didn't answer.
21   Q.  Did he leave you a voicemail?
22   A.  Oh, I don't know.  I never -- because of my
23  hearing problem I don't pay attention to voicemails.
24   Q.  Jumping ahead, JBB 00446.
25   A.  4406?

Page 99

1    Q.  JBB 004466?
2    A.  Oh, 66.
3    Q.  If I said it wrong, I apologize.
4    A.  Okay.
5    Q.  Here's where we start to get into some e-mails
6  regarding some late payments or some problems with the
7  payment of the expenses or utilities, correct?
8    A.  I believe they have paid their rent pretty much
9  on time, but the utilities were a big problem.
10   Q.  Can you elaborate?
11   A.  My bookkeeper -- well, I pay everything and
12  then I scan the invoice and send it to my bookkeeper and
13  then she puts together an invoice.  And there was a
14  period of time when they were not paying the utilities.
15   Q.  Did you ever have any conversations with them
16  on why?
17   A.  No.
18   Q.  Okay.  Jumping down to JBB 004776, that is an
19  e-mail from Spiro at his Centaur e-mail address where he
20  lists himself as the CEO of Centaur to you --
21   A.  Yes.
22   Q.  -- saying:  "Thank you for sending me articles.
23  I always read with a smile."
24      Do you know what article he was referring to?
25   A.  No, but I routinely cut -- tear things out of

Page 100

1  the newspaper for friends and I am -- oh, I have some
2  vague recollection of it.  It was about the CEO of
3  Restoration Hardware, I believe.
4    Q.  Tell me more.
5    A.  Well it was either the Wall Street Journal or
6  the New York Times, so.
7    Q.  Was it about allegations of financial
8  improprieties?
9    A.  I don't recall.  But I do remember now they had
10  a picture of him, you know, and it was in the -- either
11  the New York Times or the Wall Street Journal because
12  those two papers I read pretty consistently.
13   Q.  Okay.  Scanning ahead now, we're into 2023.
14  That's good, we're making progress.
15      JBB 005023, e-mails to and from you and Spiro,
16  correct?
17   A.  Yes.
18   Q.  And again, so we're now in 2023, and you're
19  still communicating with Spiro at his Centaur e-mail
20  address, right?
21   A.  Yes.
22   Q.  And he still is indicating he's the chief
23  executive officer of Centaur, correct?
24   A.  Yes.
25   Q.  Okay.  Now the first page here, at top, he

Page 101

1  says:  "I'm staying at The Bless."  Do you know what
2  "The Bless" is?
3    A.  No.
4    Q.  Me neither.  But the next line is what I would
5  like to chat a little bit more about.  He says:  "We
6  purchased the last Palace on Villa Nueva and meeting
7  with architects."
8      Do you know what "the last Palace on Villa
9  Nueva" is?
10   A.  No.
11   Q.  Is that -- I know you say no, but maybe if I
12  give you a little more information that may refresh your
13  recollection.
14      Is the Villa Nueva Palace, is that a project in
15  Aspen, if you know?
16   A.  I do not believe that it is in Aspen.
17   Q.  Okay.  Now again, it says -- says:  "We
18  purchased," you know, thus implying that he was one of
19  the purchasers of that project, correct?
20   A.  He or his company, or Restoration Hardware.
21   Q.  Okay.  Well, he doesn't say Restoration
22  Hardware there or another company.  "We" connotes
23  multiple parties, correct?
24   A.  More than one.
25   Q.  Okay.  More than one inclusive of one's self,

26 (Pages 98 - 101)

Page 102

1 too, correct?
2    A.  Yes.
3    Q.  Now you responded -- or down below here, you
4 indicated: "Wonderful for RH and your career," but I
5 think that relates to an e-mail beneath here.
6       So let's go to JBB -- the next page, 005024,
7 down at the bottom, again, it's a lengthy e-mail from
8 Spiro, at his Centaur account, January 31st, 2023, to
9 you --
10    A.  Yes.
11    Q.  -- at the bottom: "We also purchased the
12 Aman Hotel in Jackson Hole, Wyoming, that we are
13 preparing for a major rehabilitation."
14       Do you see that?
15    A.  Yes.
16    Q.  Again, same as with the other "we" purchase,
17 indicating there that him, inclusive of some group or
18 entity, purchased that hotel in Jackson Hole, Wyoming,
19 correct?
20    A.  Yes.
21    Q.  Thereby implying some sort of ownership
22 interest as one of the purchasers, correct?
23    A.  Yes.
24    Q.  And then you respond then, that the previous
25 page, 5023: "Wonderful for RH and your career", right?

Page 103

1    A.  Yes.
2    Q.  So do you believe this had something to do with
3 his joint venture with RH if you responded in that
4 fashion?
5    A.  Yes, I did think that.
6    Q.  And he didn't correct you, right?
7    A.  I would have to go back and look at the
8 e-mails.  Okay.  Okay, that was an e-mail after this.
9    Q.  Yeah, the next e-mail he just tells about
10 another purchase "we" made.
11    A.  Yes, you're right.
12    Q.  All right.  Next, JBB 005024, oh wait, sorry.
13 I already asked you about some of the questions on there
14 but I have a couple more.
15       Was there any other projects, other than the
16 ones we've just talked about, that Spiro ever mentioned
17 to you that him and or and/or his company owned or had
18 purchased?
19    A.  He did say he was doing something in England.
20    Q.  And did he say that was, again, something that
21 "he and his company"?
22    A.  I don't recall.
23    Q.  Okay.  Skipping ahead several pages,
24 JBB 005127, this is e-mails, again, e-mails from his
25 Centaur e-mail address?

Page 104

1    A.  Oh.
2    Q.  This is e-mails about the racing, right?
3    A.  Yes, it is.
4    Q.  And so based on -- to just kind of jog your
5 recollection, did he still have some affiliation with
6 that Aspen racetrack in 2023?
7    A.  Yes.
8    Q.  Can you elaborate on that?
9    A.  I believe he said he was president of the
10 racetrack and they were investigating -- what, in
11 fact, I'm quite sure he said he was president of the
12 racetrack and they were investigating the Crown death.
13    Q.  Now in connection with Spiro's love of
14 automobiles, his racing of automobiles, and/or his
15 affiliation with this racetrack, you never saw him
16 driving any automobiles?
17    A.  No.
18    Q.  You ever see him drive a Porsche around?
19    A.  No.
20    Q.  On the occasions where you were with Spiro in
21 person, whether it be at dinner or wherever else in your
22 meetings, did you ever notice a nice watch?
23    A.  No.
24    Q.  Okay.  Next, let's go, skipping a couple,
25 JBB 005444, e-mail, April 17th, 2023, from Lisa to you,

Page 105

1 forwarding a message below from Spiro, where he sent you
2 a cashier's check for utilities.
3       Oh, you're not there.
4    A.  I know.  Well, we're not there.
5    Q.  Sorry.
6    A.  I am here, upstairs, but --
7       MR. SAX:  I think he meant we can't find the
8 page here yet.  I'm looking for it.  We'll let you know
9 when we find it.
10       MR. JACKSON:  It was several pages ahead.  I
11 skipped several.  I was going to ask questions.
12       MR. SAX:  Okay.  Here it is.
13       MR. JACKSON:  Great.
14       THE WITNESS:  And do you want me to do the ones
15 from Spiro?
16       BY MR. JACKSON:
17    Q.  So yeah, there's an e-mail from Spiro to Lisa
18 that just indicates the cashier's check attached will be
19 mailed to Bronwyn tomorrow and then Lisa forwarded that
20 e-mail to you and the e-mail above, right?
21    A.  Yes.
22    Q.  And then the next page, on 005445, is a copy of
23 that cashier's check from U.S. Bank, right?
24    A.  Yes.
25    Q.  So around that time, April of '23, Spiro was

27 (Pages 102 - 105)

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 241
of 262
Case: 1:19-cv-06332 Document #: 761-28 Filed: 07/30/25 Page 7 of 7 PageID #:33270



Page 130

1    A.   One time Spiro told me she made $10,000, I
2  think it was, in one day with her show.  And I believe
3  Corri has a partner.  I don't know how I know that.
4    Q.   Did Spiro ever tell you that Centaur
5  Construction lent Ms. McFadden over $700,000 over the
6  past couple of years in, you know, not the past couple,
7  but over the course of one of her companies?
8    A.   He did not tell me that.
9    Q.   Okay.  But he told you she made $10,000 one day
10  at a -- some sort of sale?
11    A.   She has a TV program and I think she might even
12  have a following.  I never buy anything on TV so I don't
13  know what kind of situation that might be.
14    Q.   Do you know if Spiro, himself, personally does
15  any work with or for Ms. McFadden's company?
16    A.   I have no idea.
17    Q.   Okay.  I think that's all I have.
18       MR. SAX:  And I certainly don't have anything.
19  So is this -- are we concluded?
20       MR. JACKSON:  Yeah.
21       MR. SAX:  Okay.
22       THE WITNESS:  Thank you very much.
23       MR. SAX:  Thank you.
24       (Whereupon, the examination of JANE BRONWYN
25  BATEMAN HERSHEY, MD, adjourned at 12:39 PM)

Page 131

1  STATE OF CALIFORNIA        )
                              )   ss.
2  COUNTY OF SAN JOAQUIN      )
3
4       I, Deirdre Dawson, do hereby certify that I am
5  a licensed Certified Shorthand Reporter, duly qualified
6  and certified as such by the State of California;
7       That prior to being examined, the witness named
8  in the foregoing examination was by me duly sworn to
9  testify to tell the truth, the whole truth, and nothing
10  but the truth;
11       That the said examination was by me recorded
12  stenographically at the time and place herein mentioned;
13  and the foregoing pages constitute a full, true,
14  complete and correct record of the testimony given by
15  the said witness;
16       That I am a disinterested person, not being in
17  any way interested in the outcome of said action, or
18  connected with, nor related to any of the parties in
19  said action, or to their respective counsel, in any
20  manner whatsoever.
21
       Dated:  March 30th, 2025
22
23
24       Deirdre M. Dawson, CSR
       Certificate No. 11737
25

Page 132

1            Veritext Legal Solutions
                1100 Superior Ave
2                   Suite 1820
               Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
   March 31, 2025
5
   To: Mr. Sax
6
   Case Name: Nhc Llc v. Centaur Construction Company Inc., Etc.
7
   Veritext Reference Number: 7275861
8
   Witness:  Jane Bateman Hershey , MD      Deposition Date:  3/25/2025
9
10  Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 133

1            DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 7275861
3   CASE NAME: Nhc Llc v. Centaur Construction Company Inc., Etc.
   DATE OF DEPOSITION: 3/25/2025
4   WITNESS' NAME: Jane Bateman Hershey , MD
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
     I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date            Jane Bateman Hershey , MD
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
13    They have read the transcript;
      They signed the foregoing Sworn
         Statement; and
14    Their execution of this Statement is of
         their free act and deed.
15
     I have affixed my name and official seal
16
   this _____ day of_____, 20_____.
17
18    _____
     Notary Public
19    _____
     Commission Expiration Date
20
21
22
23
24
25

Veritext Legal Solutions

www.veritext.com                                     888-391-3376

# EXHIBIT 29

CTRL000022141 - Messages - Spiro Tsaparas-1.xlsx

| Chat Session | Message Date | Type | Sender Name | Text | Attachment |
|---|---|---|---|---|---|
| Spiro Tsaparas | 2022-03-18 15:04:36 | Outgoing | | Spiro, we need to jump. | |
| Spiro Tsaparas | 2022-03-18 15:04:50 | Outgoing | | Mass timber call is next. I told Oz we'd be a few min late | |
| Spiro Tsaparas | 2022-03-18 15:36:16 | Outgoing | | I'm jumping on a zoom with Christina now to go over the M logo if you have any interest is joining. | |
| Spiro Tsaparas | 2022-03-18 17:33:52 | Incoming | Spiro Tsaparas | Please send a zoom call invite to kim, Peter and I for Monday 11:00am | |
| Spiro Tsaparas | 2022-03-18 17:36:59 | Outgoing | | Ok, did you provide her an update on the $65k for aerolek. I would assume that wire didn't go out this week | |
| Spiro Tsaparas | 2022-03-18 17:37:24 | Incoming | Spiro Tsaparas | I did not | |
| Spiro Tsaparas | 2022-03-18 17:37:39 | Outgoing | | I will send on Monday | |
| Spiro Tsaparas | 2022-03-18 17:59:51 | Incoming | Spiro Tsaparas | Ok | |
| Spiro Tsaparas | 2022-03-18 18:05:19 | Outgoing | | 11 CT | |
| Spiro Tsaparas | 2022-03-18 19:19:57 | Incoming | Spiro Tsaparas | 👍 | |
| Spiro Tsaparas | 2022-03-18 19:36:38 | Incoming | Spiro Tsaparas | Can you send me a pdf of the accountability chart for M/Rh global expansion? | |
| Spiro Tsaparas | 2022-03-18 19:37:40 | Outgoing | | I looked everywhere | |
| Spiro Tsaparas | 2022-03-18 19:37:47 | Outgoing | | Just sent | |
| Spiro Tsaparas | 2022-03-18 19:38:22 | Incoming | Spiro Tsaparas | Let me know if correct | |
| Spiro Tsaparas | 2022-03-18 19:39:39 | Outgoing | | Perfect | |
| Spiro Tsaparas | | | | 👍 let me know if you need anything else | |
| Spiro Tsaparas | | | | I love it | |
| Spiro Tsaparas | | | | All set | |
| Spiro Tsaparas | 2022-03-18 19:50:20 | Incoming | Spiro Tsaparas | You rock DeAnna! Thank you!!! | |
| Spiro Tsaparas | | | | You are good, very good! | |
| Spiro Tsaparas | | | | Liked "I love it | |
| Spiro Tsaparas | | | | All set | |
| Spiro Tsaparas | | | | You rock DeAnna! Thank you!!! | |
| Spiro Tsaparas | 2022-03-18 19:53:20 | Outgoing | | You are good, very good!" | |
| Spiro Tsaparas | 2022-03-21 11:02:07 | Incoming | Spiro Tsaparas | Waiting for host to start meeting | |
| Spiro Tsaparas | 2022-03-21 11:02:13 | Incoming | Spiro Tsaparas | I think it is you | |
| Spiro Tsaparas | 2022-03-21 11:02:23 | Outgoing | | One sec | |
| Spiro Tsaparas | 2022-03-21 11:03:28 | Incoming | Spiro Tsaparas | What are my credentials for zoom | |
| Spiro Tsaparas | 2022-03-21 11:03:51 | Outgoing | | I'll transfer the call to you once everyone is in. There are two zoom accounts. Centaur and then your person one | |

CTRL000022141 - Messages - Spiro Tsaparas-1.xlsx

| Chat Session | Message Date | Type | Sender Name | Text | Attachment |
|---|---|---|---|---|---|
| Spiro Tsaparas | 2024-05-14 12:37:26 | Incoming | Spiro Tsaparas | From me... as me | |
| Spiro Tsaparas | 2024-05-14 12:37:29 | Outgoing | | Ok | |
| | | | | DeAnna,<br>Please send the SA team,<br>Giulia, Dimitri, Taliaferri, drew, Jason, Brad, Brennan, DJA, Modif, Dave Larouch, the list of samples and let them know that this is being shipped to Aspen next week and would like to arrange an onsite kickoff with the whole team followed by dinner and review of all samples. | |
| Spiro Tsaparas | 2024-05-14 12:55:00 | Incoming | Spiro Tsaparas | I would like to see that done last week in May, first week in June. | |
| Spiro Tsaparas | 2024-05-14 13:05:41 | Outgoing | | Liked "DeAnna,<br>Please send the SA team,<br>Giulia, Dimitri,T...." | |
| | | | | Nancy's response:<br><br>I'll set it up. It's already past wire cutoff. As an FYI, you are asking mark to put in $ for this and for payroll. Again, RH not paying not only makes us look bad but puts a huge burden on M. It's a vicious cycle and while you are working hard you are also making it hard. Your #'s don't count payroll. I wish I could use your math. | |
| Spiro Tsaparas | 2024-05-14 13:37:10 | Outgoing | | Follow up email:<br><br>The wire to WPS is in process. I'll have confirmations in the morning. Your pressure to pay should be directed to RH and not to me. | |
| Spiro Tsaparas | 2024-05-14 13:40:10 | Outgoing | | | |

Case No. 1:25-cv-02537    Document 1-9    filed 08/13/25    USDC Colorado    pg 245
of 262
Case: 1:19-cv-06332 Document #: 761-30 Filed: 07/30/25 Page 1 of 18 PageID #:33274

# EXHIBIT 30

<center>**EMPLOYMENT AGREEMENT**</center>

This **EMPLOYMENT AGREEMENT** (the "*Agreement*") is made as of December 30, 2022, by and between M Sourcing, LLC, a Colorado limited liability company (or, for purposes of this Agreement only, any of its current and/or subsequent Affiliates (as defined below), who may be or become the employing entity related to this Agreement in accordance with the terms hereof) (referred to herein as the "*Company*"), and Spiro Tsaparas ("*Executive*").

<center>**RECITALS**</center>

The Company desires to employ Executive, and Executive desires to be so employed by the Company, subject to the terms, conditions and covenants set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive agree and intend to be legally bound as follows:

<center>**ARTICLE I**
**EMPLOYMENT SERVICES**</center>

**1.1** **Term of Employment**. Executive's employment is on an at-will basis under this Agreement, which shall commence on the date hereof (the "*Commencement Date*") and the initial term of which shall continue (a) until December 31, 2029 (*"Initial Term"*), and shall automatically renew for additional terms of one (1) year unless either party delivers to the other party a written notice of nonrenewal at least ninety (90) days before the end of the Initial Term or any renewal term, or (b) until terminated pursuant to **Article III** below (such period, the "*Employment Term*").

**1.2** **Title and Positions**. During the Employment Term, Executive shall hold the position of, of the Company and any of its subsidiaries, and shall report directly to the CEO/President of the Company (the "*Board*"). Executive's responsibilities shall include such duties as are commensurate with Executive's positions and as may be assigned from time to time to Executive in good faith by the Board. Executive represents and warrants that Executive is free to accept employment with the Company, and that Executive has no existing commitments or obligations of any kind (including any restrictive covenant(s) for the benefit of any prior employer) that would hinder or interfere with Executive's obligations hereunder. In the event of the death or permanent disability of the CEO/President, the Company and any interim or replacement CEO/President shall be and remain bound by the terms of this Agreement.

**1.3** **Activities and Duties During Employment**.

(a) Executive shall conduct himself, both professionally and personally, with due regard to applicable legal requirements, and in a manner that will not have a material adverse effect on the reputation of the Company or Executive. Executive shall devote Executive's full and complete business time, attention, skill and energy to the business and affairs of the Company and its subsidiaries, and shall use Executive's reasonable best efforts to faithfully perform Executive's responsibilities in a diligent, trustworthy, efficient and businesslike manner so as to advance the legitimate interests of the Company. In this regard, Executive shall not own, operate, or participate in, in any conceivable way, without

<center>1</center>

 **MDEV-000026**

first receiving the Company's informed written consent, any non-Company: development company or projects; building projects; construction, building, demolition, or remodeling of any sort, for any individual or entity, including himself and his family; land development projects; or any other business of any type, directly or indirectly. Notwithstanding anything to the contrary contained in this Agreement, Executive may participate in the following specifically enumerated activities, so long as they do not detract in any way from Executive's full time employment with the Company or Executive's loyalty to the Company, and provided that such activities do not compete in any way with any current or prospective business interests of the Company:

       (i)     Executive may perform renovation work at his primary residence that he lives at with his family;

       (ii)    Executive may assist his wife with limited and intermittent activities in connection with her prospective retail business provided it is not competitive with the Company;

       (iii)   Executive may continue serving on the board of a local motorsports park in Colorado; and

       (iv)   Executive may continue his work with the local county sheriff's department to teach a safe driving curriculum for youth drivers in the state of Colorado.

       (b)    Executive shall comply in all material respects with all applicable laws, and all written policies, rules and regulations of the Company, including without limitation codes of conduct and any charter of the Board or any compensation committee of the Board (the "***Committee***"), as applicable, in each case subject to the terms of this Agreement.

       (c)    Executive's roles and responsibilities are set forth in Exhibit A and shall include such other responsibilities as the Company's CEO or the Board may reasonably assign from time to time. Executive will be required to do all lawful activities of the Company.

## ARTICLE II
## COMPENSATION

   **2.1**    **Base Salary**. The Company shall pay Executive an annual base salary of $500,000.00 ("***Base Salary***"), less applicable withholdings, payable in accordance with the general payroll practices of the Company. The Committee may review Executive's Base Salary annually.

   **2.2**    **Promissory Note Forgiveness**. Provided Executive faithfully performs his duties to the Company for the full duration of the Initial Term, all principal and interest due under that certain Amended and Restated Promissory Note, dated as of the date hereof, made by Triton Marine Holdings, LLC, an Illinois limited liability company, which is an affiliate of Executive, in favor of the Company (the "***Promissory Note***"), will be forgiven under the following terms.

2

**CONFIDENTIAL**                 **MDEV-000027**

(a)     If Executive dies or becomes permanently Disabled or Incapacitated (as defined below) during the Initial Term of this Agreement, the full outstanding amount of the Promissory Note will be forgiven.

(b)     If Executive remains employed by the Company for the full Initial Term of this Agreement, the full outstanding amount of the Promissory Note will be forgiven if Tsaparas has been faithful, dutiful, and loyal in providing services to Payee and the Company during the course of the full Initial Term. Tsaparas shall devote full time to the Company and shall have no other development company, building projects, land development projects, real estate projects, construction projects, or any other business of any type, whether directly or indirectly, without the written consent of the Company; provided, however, that Tsaparas may participate in the limited activities enumerated in Section 1.3(a) of this Agreement.

(c)     If Executive is terminated without Cause (as defined below) prior to the completion of the Initial Term of this Agreement, Executive shall be excused from repaying an amount equal to one-eighth of the Promissory Notes' principal and interest multiplied by the number of Executive's completed years of employment with the Company. The remaining balance of principal and interest on the Promissory Note as of the date of termination shall immediately become due on that date.

(d)     If Executive voluntarily resigns his employment with the Company or is terminated with Cause (as defined below) prior to the completion of the Initial Term of this Agreement, there will be no forgiveness or excuse from repayment of the Promissory Note, and the full balance of principal and interest on the Promissory Note shall immediately become due on the termination date.

**2.3     Bonus**. The decision to pay a bonus to Executive, and the amount of that bonus, if any, rests with the Board of Managers in its sole discretion. Executive has no guarantee or automatic entitlement to any bonus payment.

**2.4     Reimbursement of Expenses**. The Company shall reimburse Executive for all reasonable expenses incurred by Executive while performing Executive's duties under this Agreement, subject to the Company's policies in effect from time to time and corroborating documentation reasonably satisfactory to the Company.

**2.5     Health Care and Benefit Plans**. During the Employment Term, Executive shall be eligible to receive all fringe benefits and perquisites and to participate in all health care and other benefit programs normally available to other senior-level employees of the Company (subject to all applicable eligibility and contribution policies and rules), as may be in effect from time to time, including without limitation such insurance programs as may be implemented by the Company.

**2.6     Vacation**. Executive shall receive a to-be-determined number of days of PTO, which includes vacation and sick days, for his use at his discretion, subject to the reasonable business needs of the Company.

3

## ARTICLE III
## TERMINATION OF EMPLOYMENT

**3.1** **Employment At Will**. Executive's employment by the Company is at-will, and either Executive or the Company may terminate Executive's employment with the Company (the effective date of separation being the "***Termination Date***"), subject to the following:

(a) **Termination**.

(i) The Company may terminate Executive's employment at any time and for any reason, by giving two (2) weeks' prior written notice of such termination to Executive designating an immediate or future termination date. The Company may immediately terminate Executive's employment for Cause.

(ii) Executive may terminate Executive's employment for any reason, by giving the Company two (2) weeks' prior written notice of termination.

(iii) Executive's employment will terminate immediately without any notice upon Executive's death or following Executive's receipt of written notice from the Company stating that the Company has made a good faith determination that Executive has become permanently Disabled or Incapacitated (as defined below).

(b) **Accrued but Unpaid Obligations**.

(i) If Executive separates from employment with the Company, the Company shall have no further obligation hereunder or otherwise with respect to Executive except payment of: (1) Executive's Base Salary under **Section 2.1;** and (2) benefits under **Sections 2.4, 2.5, and 2.6**, that have accrued (but have not been paid) as of the Termination Date.

(ii) All amounts payable pursuant to this **Section 3.1(b)** shall be paid in accordance with the Company's general payroll practices and benefits plans and policies in place as of the Termination Date.

(c) For purposes of this Agreement:

(i) the term "***Affiliate***" means, with respect to the Company: (1) any other entity or person owning 10% or more of the voting or beneficial interests of the Company; (2) any other entity or person directly or indirectly controlling, controlled by or under common control with the Company; or (3) any other entity in which more than 10% of the voting or beneficial interests are owned by one or more persons or entities who have a relationship with the Company described in clause (1) or (2); provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any person or entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the

4

**CONFIDENTIAL**

**MDEV-000029**

management and policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

(ii)     The term "*Cause*" means that Executive has: (1) engaged in any act of insubordination, failure to follow Company policies or comply with this Agreement, material dishonesty, willful malfeasance, gross negligence, or breach of fiduciary duty related to employment; (2) committed an act of fraud, embezzlement, moral turpitude or constituting a felony, or otherwise engaged in conduct that materially diminishes Executive's credibility or reputation; (3) refused to perform specific reasonable directives from the Board or any other officer to whom Executive reports that are reasonably consistent with the scope and nature of Executive's responsibilities; (4) used or been under the influence of illegal drugs at the workplace or while performing Company business, or refused to submit for a drug test upon the Company's request; (5) breached any provision of **Article IV**; or (6) failed to obtain the Board's informed written consent prior to engaging in any non-Company Business. The decision to terminate Executive's employment for Cause, to take other action or to take no action in response to any occurrence shall be in the sole and exclusive discretion of the Board. Executive's employment by the Company also shall be deemed terminated for Cause if Executive resigns from the Company and the Board determines in good faith that one or more of the events described above existed as of the time of such resignation.

(iii)     The term "*Disabled or Incapacitated*" means Executive's permanent inability or failure, due to a physical or mental impairment, to substantially perform the essential functions of Executive's job, with or without a reasonable accommodation, of a permanent nature, as determined by a physician designated by the Board of Managers. Upon request, Executive shall provide the Board with documentation from Executive's health care provider sufficient for the Board to determine the nature and extent of any physical or mental impairment that may interfere with Executive's performance of Executive's job duties, as well as any accommodations that could be made.

## ARTICLE IV
## RESTRICTIVE COVENANTS

**4.1**     For purposes of this **Article IV**:

(a)     the term "*Business*" means the business of the Company as conducted on the Commencement Date, including, without limitation, providing construction and maintenance services operating in the sewer and water and telecom/communications sectors;

(b)     the term "*Confidential Information*" shall mean any non-public information, in whatever form or medium, concerning the operations or affairs of the Business, including, but not limited to, (A) sales, sales volume, sales methods, sales proposals, business plans, advertising and marketing plans, strategic and long-range plans, and any information related to any of the foregoing, (B) customers, customer lists, prospective customers and customer

5

records, (C) investors, investor lists, prospective investors and investor records, (D) general price lists and prices charged to specific customers, (E) trade secrets, (F) financial statements, budgets and projections, (G) software owned or developed (or being developed) for use in or relating to the conduct of the Business, (H) the names, addresses and other contact information of all vendors and suppliers and prospective vendors and suppliers of the Business, (I) partners, partner lists, prospective partners, and partner records, (J) tenants, tenant lists, prospective tenants, and tenant records, and (K) all other confidential or proprietary information belonging to the Company or relating to the Business; provided, however, that Confidential Information shall not include (1) knowledge, data and information that is generally known or becomes known in the trade or industry of the Company (other than as a result of a breach of this Agreement or other agreement or instrument to which Executive is bound), and (2) knowledge, data and information gained without a breach of this Agreement on a non-confidential basis from a person who is not legally prohibited from transmitting the information to Executive;

(c)     the term "*Confidentiality Period*" means, (A) with respect to Confidential Information (other than trade secrets), Employment Term with the Company and for a period of five (5) years after the termination of Executive's employment for any reason, (B) with respect to trade secrets, during the Employment Term with the Company and for such period after the termination of Executive's employment as the information in question falls within the definition of trade secrets under prevailing law, and (C) with respect to any proprietary technology and pricing information, during the Employment Term with the Company and for all periods thereafter;

(d)     the term "*Company*" shall be deemed to include the Company and all of its Affiliates;

(e)     the term "*Non-Compete Restricted Period*" shall mean the period commencing on the Commencement Date and terminating twenty-four (24) months following the termination of the Employment Term;

(f)     the term "*Non-Solicit Restricted Period*" shall mean the period commencing on the Commencement Date and terminating twenty-four (24) months following the termination of the Employment Term;

(g)     the term "*Prior Inventions*" shall mean all inventions, original works of authorship, developments and improvements which were made by Executive, alone or jointly with others, prior to Executive's employment, association or other engagement with the Company or any affiliate thereof. To preclude any possibility of uncertainty, Executive has set forth on Exhibit B attached hereto a complete list of all Prior Inventions which Executive considers to be Executive's property or the property of third parties and which Executive wishes to have excluded from the scope of this Agreement. If disclosure of any such Prior Invention on Exhibit B would cause Executive to violate any prior confidentiality agreement, Executive understands that Executive is not to list such Prior Invention in Exhibit B but is to inform the Company that all Prior Inventions have not been listed for that reason; and

6

(h)     the term "***Territory***" shall mean any geographical area in or for which Executive performed services for the Company, including but not limited to North America and Europe.

**4.2**     Executive agrees and acknowledges that, to ensure that the Company retains its value and goodwill, Executive must not use any Confidential Information, special knowledge of the Business, or the Company's relationships with its customers, investors, partners, tenants, and employees, all of which Executive will gain access to through Executive's employment with the Company, other than in furtherance of Executive's legitimate job duties. Executive further acknowledges that:

(a)     the Company is currently engaged in the Business;

(b)     the Business is highly competitive and the services to be performed by Executive for the Company are unique and national in nature;

(c)     Executive will occupy a position of trust and confidence with the Company and will acquire an intimate knowledge of Confidential Information and the Company's relationships with its customers and employees; the agreements and covenants contained in this **Article IV** are essential to protect the Company, the Confidential Information and the goodwill of the Business and are being entered into in consideration for the various rights being granted to Executive under this Agreement the Company would be irreparably damaged if Executive were to disclose the Confidential Information or provide services to any person or entity in violation of the provisions of this Agreement;

(d)     the scope and duration of the covenants set forth in this **Article IV** are reasonably designed to protect a protectable interest of the Company and are not excessive in light of the circumstances; and

(e)     Executive has the means to support himself and Executive's dependents other than by engaging in activities prohibited by this **Article IV**.

**4.3**     **Confidential Information**.

(a)     Executive acknowledges that Executive will be entrusted with Confidential Information.

(b)     During the Confidentiality Period, Executive: (A) shall hold the Confidential Information in strictest confidence, take all reasonable precautions to prevent the inadvertent disclosure of the Confidential Information to any unauthorized person, and follow all the Company's policies protecting the Confidential Information; (B) shall not use, copy, divulge or otherwise disseminate or disclose any Confidential Information, or any portion thereof, to any unauthorized person; (C) shall not make, or permit or cause to be made, copies of the Confidential Information, except as necessary to carry out Executive's authorized duties as an employee of the Company; and (D) shall promptly and fully advise the Company of all facts known to Executive concerning any actual or threatened unauthorized use or disclosure of which Executive becomes aware.

7

**CONFIDENTIAL**                          **MDEV-000032**

(c)    Executive hereby assigns to the Company any rights Executive may have or acquire in the Confidential Information, and recognizes that the Company shall be the sole owner of all copyrights, trade secret rights, and all other rights throughout the world (collectively, "***Proprietary Rights***") in connection with such rights.

(d)    If Executive receives any subpoena or becomes subject to any legal obligation that might require Executive to disclose Confidential Information, Executive will provide prompt written notice of that fact to the Company, enclosing a copy of the subpoena and any other documents describing the legal obligation. In the event that the Company objects to the disclosure of Confidential Information, by way of a motion to quash or otherwise, Executive agrees to not disclose any Confidential Information while any such objection is pending.

(e)    Executive understands that the Company and its Affiliates have and will receive from third parties confidential or proprietary information ("***Third Party Information***") under a duty to maintain the confidentiality of such Third Party Information and to use it only for limited purposes. During the term of Executive's association with the Company and at all times after the termination of such association for any reason, Executive will hold Third Party Information in strict confidence and will not disclose or use any Third Party Information unless expressly authorized by the Company in advance or as may be strictly necessary to perform Executive's obligations with the Company, subject to any agreements binding on the Company with respect to such Third Party Information.

(f)    Executive will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or of any other person to whom Executive has an obligation of confidentiality, and Executive will not bring onto the Company's premises any unpublished documents or any property belonging to any former employer or of any other person to whom Executive has an obligation of confidentiality.

*Notice Regarding Whistleblower Immunity*

*Pursuant to 18 USC § 1833(b), an individual may not be held criminally or civilly liable under any federal or state trade secret law for disclosure of a trade secret made: (i) in confidence to a government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; and/or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.*

*Confidentiality Notice*

*Executive understands and acknowledges that Executive's duty of confidentiality and non-disclosure pursuant to this Agreement does not limit or restrict Executive's ability to communicate directly with the U.S. Securities and Exchange Commission about a possible securities law violation, nor limit nor restrict Employee's Section 7 rights under the National Labor Relations*

8

*Act, nor limit nor restrict Employee's right to communicate with the Equal Opportunity Employment Commission or any other federal, state, or local government agency, office, or official.*

### 4.4    Ownership of Inventions.

(a)    Executive hereby agrees that any and all inventions (whether or not an application for protection has been filed under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protected under copyright laws), real estate projects, designs, construction methodologies or techniques, technologies, real estate development or financing plans, Moral Rights, mask works, trademarks, trade names, trade dress, goodwill associated with trademarks, tradename, and trade dress, trade secrets, publicity rights, know-how, ideas (whether or not protected under trade secret laws), and all other subject matter protected under patent, copyright, Moral Right (defined as any right to claim authorship of a work, any right to object to any distortion or other modification of work, and any similar right, existing under the law of any country, or under any treaty), mask work, trademark, trade secret, or other laws, that have been or are developed, generated or produced by Executive, solely or jointly with others, at any time during the Employment Term, shall be the exclusive property of the Company, subject to the obligations of this **Article IV** with respect to Confidential Information, and Executive hereby forever waives and agrees never to assert against the Company, its successors or licensees any and all ownership, interest, Moral Rights or similar rights with respect thereto. Executive hereby assigns to the Company all right, title and interest to the foregoing inventions, concepts, ideas and materials, together with the right to sue and recover for any past, present, and future infringement of such inventions, concepts, ideas and materials. This **Section 4.4** does not apply to any invention of Executive for which no equipment, supplies, facility or Confidential Information of the Company was used and that was developed entirely on Executive's own time, unless the invention (A) relates to (x) the Business or (y) the Company's actual or demonstrably anticipated research or development, or (B) results from any work performed by Executive for or on behalf of the Company. Executive shall keep and maintain adequate and current written records of all inventions, concepts, ideas and materials made by Executive (jointly or with others) during the term of Executive's association or employment with the Company. Such records shall remain the property of the Company at all times. Executive shall promptly and fully disclose to the Company the nature and particulars of any Inventions or research project undertaken on the Company's behalf.

Unless the parties otherwise agree in writing, Executive is under no obligation to incorporate any Prior Inventions in any of Company's products or processes or other Company Invention. If, in the course of Executive's performance, Executive chooses to incorporate into any such Company product or process or other Company Invention any Prior Invention owned by Executive or in which Executive otherwise has an interest, Executive grants the Company a nonexclusive, royalty free, irrevocable, perpetual, world-wide license to copy, reproduce, make and have made, modify and create derivative works of, use, sell and license such Prior Inventions and derivative works as part of or in connection with any such Company product or process or other Company Invention.

9

**CONFIDENTIAL**                                                   MDEV-000034

(b)     During or subsequent to the Employment Term, Executive shall execute all papers, and otherwise provide assistance, at the Company's request and expense, to enable the Company or its nominees to obtain and enforce all proprietary rights with respect to the Company Inventions (as defined below) in any and all countries. To that end, Executive will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, defending, evidencing and enforcing any such proprietary rights, and the assignment of any or all of such proprietary rights. In addition, Executive will execute, verify and deliver assignments of such rights to the Company or its designee. Executive's obligation to assist the Company with respect to such rights shall continue beyond the termination of Executive's association with the Company.

(c)     Executive waives and quitclaims to the Company all claims of any nature whatsoever which Executive now has or may in the future obtain for infringement of any Proprietary Rights assigned under this Agreement or otherwise to the Company.

(d)     Executive acknowledges that all original works of authorship which are made by Executive (solely or jointly with others) during the course of the association with or performance of services for the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act and any successor statutes. Inventions assigned to the Company or as directed by the Company under this Agreement or otherwise are referred to as "***Company Inventions***."

(e)     Upon termination of Executive's employment or engagement by the Company for any reason, or upon receipt of written request from the Company, Executive shall immediately deliver to the Company all tangible and intangible property (including without limitation computers, computing devices, cell phones, memory devices and any other tangible item), drawings, notes, memoranda, specification, devices, notebooks, formulas and documents, together with all copies of any of the foregoing, and any other material containing, summarizing, referencing, or incorporating in any way or otherwise disclosing any Company Inventions, Third Party Information or Confidential Information of the Company or any of its Affiliates.

**4.5     Non-Solicitation**.

(a)     During the Non-Solicit Restricted Period, Executive shall not (other than in furtherance of Executive's legitimate job duties on behalf of Company), directly or indirectly, on Executive's own behalf or for any other person or entity:

(i)     solicit for employment or hire, or attempt to solicit for employment or hire, any person who is or was employed by the Company or any of its Affiliates at any time within six (6) months prior to the solicitation or hire (the "***Restricted Personnel***"); or

(ii)     otherwise interfere with the relationship between any Restricted Personnel and the Company or the relationship between any investor and the Company.

10

**CONFIDENTIAL**                    **MDEV-000035**

(b)     During the Non-Solicit Restricted Period, Executive shall not (other than in furtherance of Executive's legitimate job duties on behalf of Company), directly or indirectly, on Executive's own behalf or for any other person or entity:

(i)     solicit any customer of or investor in the Company with whom Executive interacted during the last two (2) years of Executive's employment in an effort to further a business relationship with the Company; or

(ii)    otherwise interfere with the relationship between the Company and any such customer or investor.

Notwithstanding the foregoing, Executive shall not be prohibited, following the termination of his employment with the Company, from soliciting any person or entity for the purpose of selling such person or entity products or services wholly unrelated to the Business so long as such Executive complies in all respects with **Sections 4.3** and **4.5(a)(i)** of this Agreement.

**4.6     Non-Competition**. During the Non-Compete Restrictive Period, Executive shall not, directly or indirectly, alone or in combination with any other individual or entity, own (other than through the passive ownership of less than one percent (1%) of the publicly traded shares of any entity), operate, manage, control, or participate in an executive, managerial, strategic, or sales role, in any individual or entity (other than the Company) that engages in or proposes to engage in the Business in the Territory.

**4.7**     If any court of competent jurisdiction shall deem any provision in this **Article IV** too restrictive, the other provisions shall stand, and the court shall modify the unduly restrictive provision to the point of greatest restriction permissible by law.

**4.8**     If this Agreement is terminated for any reason, Executive acknowledges and agrees that the restrictive covenants set forth in this Article IV or in any other agreement between the Company or any subsidiary or Affiliate thereof and Executive containing restrictive covenants against Executive in favor of the Company or any subsidiary or Affiliate thereof (the "*Restrictive Covenants*") shall survive the termination of this Agreement and Executive shall continue to be bound by the terms of this **Article IV** as if this Agreement was still in effect.

**4.9**     The Company and Executive agree that the damages will accrue to the Company by reason of Executive's failure to observe any of the Restrictive Covenants. Therefore, if the Company shall institute any action or proceeding to enforce such provisions, Executive waives the claim or defense that there is an adequate remedy at law and agrees in any such action or proceeding not to (i) interpose the claim or defense that such remedy exists at law, or (ii) require the Company to show that monetary damages cannot be measured. Without limiting any other remedies that may be available to the Company, Executive hereby specifically affirms the appropriateness of injunctive or other equitable relief in any such action. Executive also acknowledges that the remedies afforded the Company pursuant to this **Section 4.9** are not exclusive, nor shall they preclude the Company from seeking or receiving any other relief, including without limitation, any form of monetary or other equitable relief.

11

**CONFIDENTIAL**                                                                                    **MDEV-000036**

## ARTICLE V
## POST-TERMINATION OBLIGATIONS

**5.1**    **Return of Company Materials**. No later than three (3) business days following the termination of Executive's employment for any reason, Executive shall return to the Company, and shall not retain in any form or media of expression, all Company and Affiliate property that is then in Executive's possession, custody or control, including, without limitation, all keys, access cards, credit cards, computer hardware and software, documents, records, policies, marketing information, design information, specifications and plans, data base information and lists, and any other property or information that Executive has or had relating to the Company or any Affiliate (whether those materials are in paper or computer-stored form), and including but not limited to any documents containing, summarizing, or describing any Confidential Information. Upon the Company's request, Executive will sign a sworn certification, in a form acceptable to the Company, verifying that Executive has returned all Company property, including any Confidential Information and copies thereof.

**5.2**    **Executive Assistance**. During the Employment Term and thereafter, Executive shall, upon reasonable notice, furnish the Company with such information as may be in Executive's possession or control, and cooperate with the Company in connection with any litigation, claim, or other dispute in which the Company or any of its Affiliates is or may become a party. The Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by Executive in fulfilling Executive's obligations under this **Section 5.2**. In addition, if the Company requests such assistance after termination of Executive's employment and such assistance requires that Executive provide assistance other than limited, periodic telephone assistance, the Company will compensate Executive on an hourly basis at the hourly rate Executive received at the date of termination of his employment.

## ARTICLE VI
## MISCELLANEOUS

**6.1**    **Notices**. Any notices, consents or other communications required or permitted to be sent or given hereunder shall be in writing and shall be deemed properly served if (i) delivered personally, in which case the date of such notice shall be the date of delivery; (ii) delivered to a nationally recognized overnight courier service, in which case the date of delivery shall be the next business day; or (iii) sent by facsimile transmission (with a copy sent by first-class mail), in which case the date of delivery shall be the date of transmission, or if after 5:00 P.M., the next business day. If not personally delivered, notice shall be sent addressed as follows: (x) if to Executive, to the address listed on the signature page hereof, and (y) if to the Company, at 516 E. Hyman Ave., 2nd Floor, Aspen, CO 81611, or in either case at such other address as may hereafter be specified by notice given by either party to the other party. Executive shall promptly notify the Company of any change in his address set forth on the signature page.

**6.2**    **Successors and Assigns**. This Agreement shall be binding upon, and inure to the benefit of, and be enforceable by, the parties hereto and the Company's successors and permitted assigns. In the case of the Company, the successors and permitted assigns hereunder shall include without limitation any Affiliate as well as the successors in interest to the Company or any such Affiliate (whether by merger, liquidation (including successive mergers or liquidations) or otherwise).

12

**CONFIDENTIAL**

This Agreement or any right or interest hereunder is one of personal service and may not be assigned by Executive under any circumstance. Nothing in this Agreement, whether expressed or implied, is intended or shall be construed to confer upon any person other than the parties and successors and assigns permitted by this **Section 6.2** any right, remedy or claim under or by reason of this Agreement.

**6.3** **Entire Agreement; Amendments**. This Agreement and the Recitals contain the entire understanding of the parties hereto with regard to the terms of Executive's employment, and supersede all prior agreements, understandings or letters of intent with regard to the terms of the employment relationship addressed herein; provided, however, that nothing contained herein shall supersede any provisions set forth in the Promissory Note. To the extent any restrictions or obligations in Promissory Note are more restrictive to Executive or more burdensome to Executive, than the restrictions and obligations in this Agreement, the Promissory Note shall control. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by each of the parties hereto.

**6.4** **Interpretation**. Article titles and section headings contained herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**6.5** **Expenses**. Each party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement, including the fees, expenses and disbursements of its counsel and accountants.

**6.6** **Waivers**. No provision of this Agreement may be waived except in a writing executed and delivered by the party against whom waiver is sought. Any such written waiver shall be effective only with respect to the event or circumstance described therein and not with respect to any other event or circumstance, unless such waiver expressly provides to the contrary.

**6.7** **Partial Invalidity**. Wherever possible, each term and provision of this Agreement shall be interpreted so as to be effective and valid under applicable law. If any term or provision shall be held invalid or unenforceable, the remaining terms and provisions hereof not be affected thereby, unless such a construction would be unreasonable. Executive's obligations in **Articles IV** and **V** shall survive and continue in full force notwithstanding the termination of this Agreement or Executive's employment for any reason.

**6.8** **Tax Matters**. Executive acknowledges that no representative or agent of the Company has provided Executive with any tax advice of any nature, and Executive has had the opportunity to consult with his own legal, tax and financial advisor(s) as to tax and related matters concerning the compensation to be received under this Agreement.

**6.9** **Indemnification Agreement**. The parties hereby agree that the obligations of the Company set forth in this Agreement, including without limitation the obligations to pay Base Salary and to forgive amounts due under the Promissory Note, are subject to the terms and conditions set forth in that certain Indemnification Agreement between Mark Hunt, M Development, LLC, M Sourcing, LLC, and Spiro Tsaparas, dated December 30, 2022, including without limitation the offset provisions set forth therein.

13

**CONFIDENTIAL**

**MDEV-000038**

**6.10** **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement.

**6.11** **Required Delay for Deferred Compensation Under 409A**. Notwithstanding any other provision of this Agreement, if at the time of separation from service Executive is determined by the Company to be a "specified employee" (as defined in Section 409A of the Code (together, with any state law of similar effect, "*Section 409A*") and Section 1.409A-1(i) of the Treasury Regulations), and the Company determines that delayed commencement of any portion of the termination payments and benefits payable to Executive pursuant to this Agreement is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code, then such portion of Executive's termination payments and benefits shall not be provided to Executive prior to the earliest of (1) the date that is six months and one day after Executive's separation from service, (2) the date of Executive's death or (3) such earlier date as is permitted under Section 409A (any such delayed commencement, a *"Payment Delay"*). Upon the expiration of such Payment Delay, all payments deferred pursuant to a Payment Delay shall be paid in a lump sum to Executive on the first day following the expiration of the Payment Delay, and any remaining payments due under the Agreement shall be paid on the original schedule provided herein.

This Agreement is intended to meet the requirements of Section 409A, and shall be interpreted and construed consistent with that intent. References to termination of employment, retirement, separation from service and similar or correlative terms in this Agreement shall mean a "separation from service" (as defined at Section 1.409A-1(h) of the Treasury Regulations) from the Company and from all other corporations and trades or businesses, if any, that would be treated as a single "service recipient" with the Company under Section 1.409A-1(h)(3) of the Treasury Regulations. Each installment of the payments and benefits provided for in this Agreement shall be treated as a separate "payment" for purposes of Treasury Regulation Section 1.409A-2(b)(2)(i)

**6.12** **Governing Law; Consent to Jurisdiction; Waiver of Jury**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, without regard to its conflict of law principles. For the purposes of any suit, action, or other proceeding arising out of this Agreement or with respect to Executive's employment hereunder, the Parties hereto: (i) agree to submit to the exclusive jurisdiction of the federal or state courts located in Cook County, Illinois, (ii) agree to unconditionally waive any objection to venue in such jurisdiction, and agree not to plead or claim forum non conveniens, and (iii) to waive their respective rights to a jury trial of any and such claims and causes of action.

**6.13** **Construction**. The language used in this Agreement will be deemed to be the language chosen by Executive and the Company to express their mutual intent, and no rule of strict construction will be applied against Executive or the Company.

[*Remainder of Page Left Intentionally Blank; Signature Page Follows*]

14

**CONFIDENTIAL**                        MDEV-000039

IN WITNESS WHEREOF, the Company has caused this Employment Agreement to be duly executed by an officer thereunto duly authorized, and Executive has hereunto set his hand, all as of the day and year first above written.

**COMPANY:**

M SOURCING, LLC

By: _____

Name: Mark Hunt

Title: Manager

**EXECUTIVE:**

SPIRO TSAPARAS

*[Signature Page to Employment Agreement]*

32718936

15

*Exhibit A*

### Roles and Responsibilities

- The role and responsibilities described herein are expected to represent a full-time job.

- Roles and responsibilities:

16

**CONFIDENTIAL**

**MDEV-000041**

## *Exhibit B*

## *Prior Inventions*

None.

**MDEV-000042**