# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

---

NHC LLC,

        Plaintiff

        vs.

CENTAUR CONSTRUCTION COMPANY, INC., *et al.*,

        Defendant.

Case No. 1:25-cv-02537

Judge S. Kato Crews

Mag. Judge Timothy P. O'Hara

---

## RESPONSE IN OPPOSITION TO NON-PARTIES M SOURCING, LLC AND M DEVELOPMENT, LLC'S MOTION (1) TO QUASH THIRD PARTY CITATIONS TO DISCOVER ASSETS AND (2) FOR A PROTECTIVE ORDER

---

The crux of M Development, LLC and M Sourcing, LLC's (collectively, the "M Entities") argument in their Motion (1) to Quash Third Party Citations to Discover Assets and (2) for a Protective Order (the "Motion to Quash") is that they are disinterested non-parties in receipt of subpoena-like requests for discovery in an action pending in the United States District Court for the Northern District of Illinois.  The M Entities argument fails both legally and factually.

Numerous courts have directly rejected the M Entities argument that a citation to discover assets (an Illinois law specific post-judgment tool enabling judgment creditors to identify judgment debtors' assets) is governed by Federal Rule of Civil Procedure ("Rule") 45.  As that caselaw makes clear, a citation to discover assets is *not* akin to a subpoena.  Moreover, even if Rule 45 did apply to citations (it does not), the M Entities have sought relief in the improper forum and have waived any jurisdictional or procedural objections to the issuance of the citations.  Accordingly, this Court can and should deny the Motion to Quash on these procedural bases alone.

Moreover, the partial factual record does not support the M Entities' attempts to paint themselves as disinterested non-parties.  In an email to M Development employees on May 12, 2025, judgment debtor Spiro Tsaparas ("Tsaparas") said of Judgment Debtors'[1] entanglements with the M Entities, "[w]e always acknowledged that a day of reckoning regarding these arrangements would come, and I fully understand and accept that moment has arrived."[2]  (Ex. 1.)[3] These entanglements include (but are not limited to) a sham loan from M Development to a company called Triton Marine Holdings, LLC ("Triton"), which was nothing more than a vehicle

---

[1]  Collectively, Centaur Construction Company Inc. ("Centaur"), Tsaparas, and Peter Alexopoulos ("Alexopoulos") are referred to as "Judgment Debtors."
[2]  A true and correct copy of the May 12, 2024, email from Tsaparas to various M Development employees is attached hereto as **Exhibit 1**.
[3]  Notably, this document was not produced until *after* NHC had filed its motion to compel (which remains pending in the Northern District of Illinois) in the underlying litigation, after the M Entities had claimed all documents had been produced.  A copy of that pending motion, which predates the Motion to Quash filed by the M Entities, is attached hereto as **Exhibit 2**.

to funnel money to Judgment Debtors, and a sham employment agreement between Tsaparas and

M Sourcing, which was a company thrown together *after entry of the multimillion dollar judgment*

against Judgment Debtors to carry on the work of Centaur while trying to avoid the judgment

entered in *NHC LLC v. Centaur Construction Company Inc.*, *et al.*, Case No. 19-cv-06332 (N.D.

Ill.) (the "Underlying Litigation").  Indeed, Mark Hunt ("Hunt"), principal of the M Entities, knew

that by doing this, he would be subjecting himself and his companies to liability—that is why they

prepared an indemnification agreement in anticipation of this moment.[4]  (Ex. 3.)

In order to avoid their "day of reckoning" in the Underlying Litigation, the M Entities have

engaged in forum shopping so that they can attempt to rewrite the narrative of this tortured case.

The Northern District of Illinois is well acquainted with the facts and extensive procedural history

of the Underlying Litigation.  Indeed, the Northern District of Illinois *specifically granted NHC*

*leave* to issue the citations to the M Entities.  (Underlying Litigation, Dkt. No. 550.)  There is no

viable legal or factual basis to permit the M Entities to avail themselves of this forum and, as such,

the Motion to Quash should be denied.  *See, e.g.*, *Fansen v. Terps Ltd. Liability Co.*, 153 F.R.D.

655, 660 (D. Colo. 1994) (awarding Rule 11 sanctions for forum shopping).

## I.  Background

### A.  The Underlying Litigation

Tsaparas and Alexopoulos were/are the principals of Centaur.[5]  (Ex. 4 at 6:12-13.)  In late

2017, NHC LLC ("NHC") purchased the land on which the Nobu Hotel Chicago ("Nobu Hotel

Project") was being developed.  Centaur was ultimately retained as the general contractor.  After

NHC paid Centaur tens of millions of dollars to complete the Nobu Hotel Project, NHC learned

---

[4] A true and correct copy of the indemnification agreement is attached hereto as **Exhibit 3**.  In fact, it was Judgment Debtors' counsel that structured this arrangement with Hunt and the M Entities.

[5] Attached hereto as **Exhibit 4** is a true and correct copy of portions of the jury trial transcript from August 16, 2022 (Volume 3-B).

that Judgment Debtors were engaged in a Ponzi scheme in which funds provided by NHC for the Nobu Hotel Project were used for other purposes.

NHC filed suit against Judgment Debtors alleging claims for common law fraud and breach of contract. (Underlying Litigation, Dkt. No. 26.) After a jury trial, judgment was entered against Judgment Debtors jointly and severally in the total amount of $22,272,124.34 for fraud and breach of contract, plus punitive damages against Judgment Debtors individually and in particular Tsaparas in the amount of $1,500,000.00 (the "Judgment"). (*Id*., Dkt. No. 228.)

Following entry of the Judgment, NHC has made repeated efforts to collect the monies it is owed. Those efforts have been stymied by repeated misconduct from Judgment Debtors and various third-parties affiliated with Judgment Debtors. In particular, Tsaparas has consistently frustrated efforts to satisfy the Judgment, largely by engaging in what the Northern District of Illinois has observed is a deliberate strategy to "[s]tall, delay, [and] do nothing" in an effort to avoid complying with the court's orders and paying his obligation to NHC.[6] (Ex. 5 at 23:13-15.)[7]

**B.    M Development's Role in the Nobu Hotel Project**

M Development has been operating since approximately 1997 and is a developer of both residential and commercial properties.[8] (Ex. 6 at 7:1-17.) In 2016, M Development become the owner of the Nobu Hotel Project in Chicago. (*Id*. at 7:21-24.) M Development retained Centaur as the general contractor of the Nobu Hotel project in order to construct the hotel.[9] (Ex. 7 at 8:1-14.) During that time, Centaur was responsible for demolishing the existing building and

---

[6] A true and correct copy of portions of the transcript of the August 7, 2024, hearing in the Underlying Litigation is attached hereto as **Exhibit 5**.
[7] Since entry of Judgment against them, Judgment Debtors have been sanctioned and/or held in contempt *at least* six time for their efforts to conceal assets. (*See, e.g.,* Underlying Litigation, Dkt. Nos. 295, 337, 459, 461, 482, and 505.)
[8] A true and correct copy of portions of the deposition transcript of Hunt is attached hereto as **Exhibit 6**.
[9] A true and correct copy of portions of the trial transcript, Volume 3-A, is attached hereto as **Exhibit 7**.

performing certain subgrade work.[10]  (Ex. 8 at 19:8-16.)  Thereafter, the work stopped due to M

Development's inability to obtain financing.[11]  (Ex. 9 at 36:14-23.)  In December 2017, M

Development sold the Nobu Hotel Project to NHC and recommended that Centaur remain as the

general contractor.  (*Id*. at 35:10-24; Ex. 3 at 18:17-21.)

The Nobu Hotel Project was not the first time M Development and Centaur worked

together.  The relationship between M Development and Centaur was "longstanding" and the two

entities had collaborated on more than a dozen projects, in addition to the Nobu Hotel Project.

(Ex. 6 at 18:21-24; Ex. 7 at 9:5-7.)  The relationship between M Development and Centaur extends

to their respective principals, Hunt and Tsaparas.  Hunt and Tsaparas describe themselves as "dear

friends" and call each other "brothers."[12]  (Ex. 10 at 70:20-24.)  Hunt previously testified that he

has "gotten into kind of the bad habit of making a bunch of loans to [Tsaparas] over the years[.]"[13]

(Ex. 11 at 13:10-25; 14:1-25; 15:1-16.)  Hunt testified that the cumulative values of those loans

was approximately $4.1 million.  (*Id*. at 13:18-25; 14:1-10.)

## C.    M Development's Continued Relationship With Judgment Debtors

Contrary to information provided by M Development, NHC now knows that M

Development's relationship with Judgment Debtors, specifically Centaur, continued after the sale

of the Nobu Hotel Project.  At trial, Hunt, the owner of M Development, testified that although he

and his company were currently working with Tsaparas on "upwards of 20 projects," he and his

---

[10] A true and correct copy of portions of the deposition transcript of Alexopoulos is attached hereto as **Exhibit 8**.
[11] A true and correct copy of portions of the deposition transcript of Rodrigo Chapur Duarte is attached hereto as **Exhibit 9**.
[12] A true and correct copy of portions of the January 8, 2025, evidentiary hearing transcript is attached hereto as **Exhibit 10**.
[13] A true and correct copy of portions of the citation examination transcript of Hunt is attached hereto as **Exhibit 11**.

company were *not* currently working on any projects with Centaur.[14]  (Ex. 12 at 25:6-24.)  NHC now knows this testimony was false.

For example, in early October 2022 (approximately two months after Hunt's trial testimony), Tsaparas, in his role as CEO of Centaur, communicated with the City of Aspen and multiple M Development employees regarding a joint project referred to as the "201 E Main Street" project.[15]  (Ex. 13.)  Based on information currently available, NHC believes that Centaur was involved in multiple similar projects in the greater Aspen area with M Development, including, but not limited to, projects referred to as "312 Hyman," "434 Cooper," and "834 Hallam."[16]  (Ex. 14 (referring to the "Centaur team" working on various projects).)  Eventually, Centaur's name was removed from these projects, including the "201 E Main Street" project, and replaced with another entity.[17]  (Group Ex. 15 at p. 6 (Van Senus: "The proposal for 201 is directed to centaur.  Should I cross that out and put 201 Main LLC?"  Tsaparas: "Yes").)  With the exception of the name change, however, there is no indication of any other changes.  Put simply, the personnel, tasks, and all other aspects of the projects remained the same; a new corporate name was inserted as part of an overnight transition from Centaur to other entities.  (Group Ex. 15 at p. 10 (Tsaparas:  "Please tell Martha OK field Greg Woods not to use my Centaur Construction email anymore and only use the M source and you'll see.  Thanks."  Tsaparas:  "Please make sure mail forwarding g [sic] is still active and change the address on as many accounts as possible.").)

---

[14] A true and correct copy of portions of the trial transcript, Volume 4-A, is attached hereto as **Exhibit 12**.
[15] A true and correct copy of an email exchange between Tsaparas, the City of Aspen, and M Development employees regarding the 201 E Main Street project is attached hereto as **Exhibit 13**.
[16] A true and correct copy of a July 29, 2021 email from Linda Manning of M Development regarding the projects referred to as "312 Hyman," "434 Cooper," and "834 Hallam" is attached hereto as **Exhibit 14**.
[17] A true and correct copy of excerpts of text message communications between Tsaparas and Deanna Van Senus ("Van Senus"), Tsaparas' assistant, is attached hereto as **Group Exhibit 15**.

**D.**    **Judgment Debtors' Use of Triton To Further Partner with M Development**

NHC's investigation has revealed that Judgment Debtors utilized Triton in, *inter alia*, an attempt to obfuscate their continued relationship with M Development.  Tsaparas and Alexopoulos have each confirmed that they were or are the sole owners of Triton.[18]  (Ex. 16 at 43:7-45:2; Ex. 17 at 50:19-53:2.)  NHC, however, has never gotten a straight answer as to Triton's purpose.

During his citation examination, Hunt testified that Triton was an entity owned by Tsaparas and through which Tsaparas allegedly provided consulting services to M Development or M Sourcing, prior to Tsaparas executing his employment agreement with M Sourcing in December 2022.  (Ex. 11 at 12:17-13:9.)  Hunt testified that in connection with those consulting services Triton issued 11 invoices[19] (Group Ex. 18) to M Development and M Sourcing for a cumulative total of $211,538.47.  (Ex. 11 at 19:17-20:1.)  Curiously, all of these invoices were issued *after* the jury's verdict.  However, NHC's analysis of bank records indicates that between December 2020 and November 2022, M Development paid Triton a total of $1,747,356.47.[20]  (Ex. 19.)

However, following Hunt's citation examination, Tsaparas gave drastically different testimony regarding the alleged purpose of Triton during his citation examination.  According to Tsaparas, the "only purpose" of Triton was to own "a vessel that [Tsaparas and Alexopoulos] purchased in Greece."   (Ex. 16 at 47:23-48:4.)  Tsaparas clarified that Triton "was not in the construction business."  (*Id*. at 48:16-18.)  In addition to the divergent stories regarding the role of Triton, M Development and Judgment Debtors have never explained why Triton, whether involved

---

[18] A true and correct copy of portions of Tsaparas' citation examination transcript is attached hereto as **Exhibit 16**.  A true and correct copy of portions of Alexopoulos' citation examination transcript is attached hereto as **Exhibit 17**.

[19] True and correct copies of invoices issued by Triton to M Development or M Sourcing are attached hereto as **Group Exhibit 18**.

[20] A summary of bank records indicating payments from M Development to Triton is attached hereto as **Exhibit 19**.

in the construction industry or not, was purportedly provided a more than $4.1 million dollar loan from M Sourcing.[21]  (Ex. 20.)

### E.    The Formation of M Sourcing

M Sourcing was formed in November 2022, shortly *after* the Judgment was originally entered in this case.[22]  (Ex. 21.)  NHC now knows that Amundsen Davis, former counsel for Judgment Debtors and the M Entities, coordinated both the creation of M Sourcing and the documentation of the purported loan between Triton and M Sourcing.[23]  (Ex. 22.)

### F.    Prior Efforts to Obtain Information and documents from the M Entities

There is ample evidence that M Development and Hunt worked closely with Judgment Debtors to assist Judgment Debtors' efforts to avoid their payment obligations and circumvent NHC's efforts to satisfy the Judgment.  In fact, as discussed further below, all outward signs point to the fact that M Sourcing is just Centaur with different corporate branding, as M Sourcing proceeded with the same projects, used the same personnel, and even used the same server to store data.  Yet the M Entities remarkably claim to have only minimal connections to this case.

NHC first served third-party citations on the M Entities in August 2023—more than *two years ago*—in response to which the M Entities responded with a minimal production and Hunt sat for a citation examination.  Notably, the M Entities did not (because they could not) raise any jurisdictional challenge or move to quash the citations issued by the Northern District of Illinois.

---

[21] A true and correct copy of an Amended and Restated Promissory Note between Triton and M Sourcing is attached hereto as **Exhibit 20**.
[22] A true and correct copy of publicly available records of the Colorado Secretary of State is attached hereto as **Exhibit 21**.
[23] A true and correct copy of an email between M Development personnel and Amundsen Davis is attached hereto as **Exhibit 22**.

When NHC discovered new information in late 2024, it filed an *ex parte* motion seeking the court's permission to issue new citations to the M Entities.[24] (Ex. 23.)  In that motion, NHC demonstrated that: (i) Centaur's operations, and possibly its assets, have been transferred to the M Entities, (ii) M Development had been paying the Judgment Debtors' legal bills, and (iii) there were discrepancies regarding multi-million dollar financial transactions involving the M Entities, Judgment Debtors, and Triton.  *Id.*  On December 17, 2024, the court *granted* that motion, finding that the citations to the M Entities were appropriate.  (Underlying Litigation, Dkt. No. 550.)  In short, the Northern District of Illinois has already specifically approved the citations at issue here.

Following that order, NHC's counsel conferred with counsel for the M Entities and served citations on both M Sourcing and M Development in January 2025 (the "Citations").[25] (Exs. 24-25.)  Again, the M Entities did not respond with a motion to quash.  Instead, the M Entities engaged in a lengthy meet and confer process and produced documents on April 8, 2025.  After it became clear that the M Entities were unwilling to fully produce documents required by the Citations, NHC filed its pending Motion to Compel in the Underlying Litigation on July 30, 2025. (Underlying Litigation, Dkt. No. 761.)  It was not until NHC filed its Motion to Compel that the M Entities suggested, for the first time after **years** of addressing this matter in the Northern District of Illinois, that the Citations were subject to a Motion to Quash in Colorado.  Then, a day later, the M Entities filed a response in the Underlying Litigation, incorporating the same frivolous arguments from the Motion to Quash and arguing that the issue is properly addressed by this Court. (*See* Underlying Litigation, Dkt. No. 779 (the "Response").)  Far from showing that they are "willing to cooperate and produce documents" (Motion to Quash, p. 4), this pattern of behavior shows a long and carefully planned pattern of delay and obstruction.

---

[24] A true and correct copy of the *Ex Parte* Motion is attached hereto as **Exhibit 23**.
[25] True and correct copies of the Citations are attached hereto as **Exhibits 24 and 25**.

On August 15, 2025, NHC's counsel sent a letter to the M Entities' counsel, explaining why the M Entities' arguments were without merit and demanding that the Motion to Quash and Response be withdrawn within three days.[26]  (Ex. 26.)  The Motion to Quash and Response were not withdrawn.  On August 20, 2025, the court in the Underlying Litigation held an in-person hearing where it addressed, among other things, the Motion to Compel.  (Underlying Litigation, Dkt. No. 786).  The court gave the M Entities until August 27, 2025 to file a supplemental brief addressing the issues raised in NHC's letter, and granted NHC leave to file a reply brief by September 8, 2025.  (*Id.*).  The M Entities filed their supplemental brief on August 27, 2025. (Underlying Litigation, Dkt. No. 791, the "Supplemental Brief").)

## II.    Legal standard

Rule 69 incorporates into federal law state post-judgment enforcement procedures.  The incorporated state procedures in the U.S. Northern District of Illinois are Section 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402) and Illinois Supreme Court Rule 277, the state statutes and rules governing supplementary procedures.  Thus, included within Rule 69 is the Court's authority to compel the production of documents in these citation proceedings to discover assets to apply to the judgment.  *See GE Betz, Inc. v. Zee Co*., 718 F.3d 615, 628 (7th Cir. 2013). The scope of permissible discovery by the judgment creditor is extremely broad: "more than one appellate court has held that extensive searching for assets — even described as 'a "fishing expedition"' — is permissible." *See, e.g.*, *Id.*

As discussed in greater detail below, Rule 45 has no applicability here.  Rule 45 relates to subpoenas issued to non-parties in federal court.  *Id.*

---

[26] A true and correct copy of the August 15, 2025, letter to the M Entities' counsel is attached hereto as **Exhibit 26**.  Assuming the Motion to Quash and Response are not withdrawn, NHC intends to serve a motion for Rule 11 sanctions, to be filed after the expiration of the 21-day safe harbor.

III.    **Argument**

    A.    **Rule 45 Does Not Apply to Citations to Discover Assets and Thus the Motion
to Quash is Procedurally Improper and Should be Denied.**

The Motion to Quash strings together various statutory provisions and general case law
assertions to argue that Rule 69(a) preempts the Illinois statute regarding citations to discover
assets and the standards of Rule 45 should apply to this case. In crafting this argument, the M
Entities completely ignore numerous cases, including circuit-level authority, holding that Rule 45
has *no application* in the context of a citation to discover assets.

In *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 851 (7th Cir. 1981), the Seventh Circuit
held that a citation to discover assets under Illinois law should not be treated as tantamount to a
subpoena under Rule 45. In so holding, the Seventh Circuit observed that "FRCP Rule 69(a)
subordinates state supplementary procedure only when there is a federal statute fulfilling a
comparable function." *Id.* (citations omitted). Here, there is no comparable function since a
citation to discover assets under Illinois law "contemplates more than merely the discovery of the
assets of the judgment debtor. The statute also provides that the judgment creditor is 'entitled to .
. . compel the application of non-exempt assets or income discovered toward the payment of the
amount due under the judgment or decree.'" *Id.* (citations omitted). Since the purpose of a citation
to discover assets exceeds that of a subpoena, the Seventh Circuit held that Rule 69 does not
preempt Illinois state law with respect to the issuance of a citation to discover assets. *Id.* ("This
additional remedial aspect distinguishes the citation procedure from a general discovery
proceeding" and distinguishes a citation from a subpoena.)

Having found that a citation to discover assets is not the equivalent of a subpoena issued
under Rule 45, the Seventh Circuit went on to hold that a citation to discover assets is more akin

to a summons, compelling the recipient to appear before the issuing court and participate in the collection action.  Specifically, the Seventh Circuit stated:

> a citation to discover assets is more appropriately considered a document in the nature of a summons. Service of the citation commences the supplementary proceeding in the same manner that service of a summons commences an ordinary civil action. The citation, like a summons, commands the party served to appear before the court in regard to the specified cause.

*Id*.  In so holding, the Seventh Circuit also noted that, similar to a summons, "Illinois law does not restrict the issuance of a citation to discover assets to Illinois residents." *Id.* at 851-52.  As a result, the Seventh Circuit found that Rule 45 "in inapplicable to the service of a citation summons and does not displace Illinois law[.]"  *Id*. at 851.  Critically, the *Textile Banking*[27] case is not an aberration.[28]

Additional Seventh Circuit precedent directly contradicts another fundamental premise of the Motion to Quash, the Response, and the Supplemental Brief — that the M Entities are "non-parties."  To be clear, third-party citation respondents are **parties** to the Underlying Litigation.  *See GE Betz*, 718 F.3d at 629-630 ("[A] third-party citation respondent in an Illinois citation action is a defendant."); *Laborers' Pension Fund v. KMC Masonry*, LLC, 710 F. Supp.2d 741, 744 (N.D. Ill. 2010) ("Illinois clearly allows a judgment creditor to obtain a restraining order by means of a

---

[27] Because the Underlying Litigation is pending in the Northern District of Illinois, the Seventh Circuit decision in *Textile Banking* is dispositive.  Yet, both the Motion to Quash and the Response filed in the Underlying Litigation fail to distinguish (or even mention) the *Textile Banking* case.

[28] Other cases throughout the country (including multiple circuit-level decisions) confirm that Rule 69(a) does not preempt state laws on the execution of judgments.  *See, e.g., Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 414 (6th Cir. 1999) (rejecting argument that Rule 69(a) preempts California's law on execution of judgments); *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996) (same); *Lobster 207, LLC v. Pettegrow*, 2023 WL 5604458, at *10 (D. Me. Aug. 30, 2023) (stating that *Textile Banking* was persuasive); *Meyer v. ERJ, Inc*., 2000 WL 521481, at *1 (N.D. Ill. Apr. 5, 2000) ("The familiar rules of deposition discovery do not apply here, for a citation to discover assets is more akin to a summons than a deposition subpoena."); *Broaddus v. Shields*, 2012 WL 1144664, at *5 (N.D. Ill. Apr. 5, 2012) (rejecting application of the Federal Rules of Civil Procedure to a citation's demand for document production); *Golden v. Nadler Pritikin & Mirabelli, LLC*, 2009 WL 10867885, n. 1 (N.D. Ill. March 30, 2009) ("Rule 45 is not controlling over citations to discover assets.").

citation proceeding against a third party who is a defendant in a separate action brought by the judgment debtor.").  Indeed, the Seventh Circuit has clearly established that "a third-party citation respondent in Illinois has all of the qualities traditionally associated with a defendant. A third-party citation respondent is initially served with notice of the action against it; it is in direct opposition to the party bringing the action (the judgment creditor); it has the opportunity to vindicate its rights at trial; and it has the right to appeal any adverse judgment against it."  *GE Betz*, 718 F.3d at 629-30.  Thus, no matter how many times the M Entities assert that they are "non-parties," binding Seventh Circuit precedent holds otherwise.

The only case law cited in the Motion to Quash that addresses a somewhat comparable situation is a non-binding easily-distinguishable Maryland district court decision, *Sabol v. Brooks*, 469 F. Supp. 2d 324, 327 (D. Md. 2006).  The *Sabol* ruling, however, is of no significance since the judgment creditor in that case specifically asked the court to *issue a subpoena*, as opposed to a device comparable to a citation to discover assets under Maryland law.  *Id.*

In the Supplemental Brief, the M Entities addressed this precedent for the first time, presumably previewing what their reply arguments will be before this Court.  The M Entities likely will argue that the above-referenced cases are distinguishable because they address the summons device intended to initiate the citation procedures, rather than the related discovery procedures. (Supplemental Brief, p. 1).  According to the M Entities, the Illinois rules for enforcing judgments provide no mechanism for document production and thus, Rule 45 must apply in the vacuum.  This argument fails for at least *two* reasons.

*First*, the M Entities are incorrect that Illinois law does not include discovery procedures. Pursuant to Illinois Supreme Court Rule 277(c)(4) a citation "may require, upon reasonable specification thereof, the production at the examination of any books, documents, or records in his

or its possession or control which have or may contain information concerning the property or income of the debtor."  Ill. S. Ct. R. 277(c)(4); *see also JPMorgan Chase Bank v. PT Indah Kiat Pulp and Paper*, 2012 WL 2254193, at *1-2 (N.D. Ill. June 14, 2012) (applying Rule 69(a)(1) to a Section 1402 citation to discover assets and its request for the "production of . . . any book, papers, or records" which may contain information concerning income or property of the debtor and finding that all but one of the creditor's requests were not overbroad).  The case law makes abundantly clear that a judgment debtor can avail itself of either state or federal rules of discovery. *See, e.g., Evans v. Chicago Football Franchise Ltd. Partnership*, 127 F.R.D. 492, 493 (N.D. Ill. 1989) ("This language clearly contemplates that plaintiff has a choice between using the federal discovery rules and using the practice of the state.").[29]  NHC had the choice to, *inter alia*, issue a subpoena pursuant to Rule 45, or avail itself to the expansive Illinois procedure for enforcement of judgments.  As is its right, NHC choose the Illinois procedure for citations to discover assets. Accordingly, the M Entities cannot re-characterize this choice to suit their own needs and desire to have a different judge in this case.  *See Chevron Corp. v. Donziger*, 2020 WL 635556, at *5 (S.D.N.Y. Feb. 11, 2020) ("to the extent that the subpoenas command discovery in aid of the Money Judgments or execution thereof, they are enforceable under Rule 69(a)(2) and the CPLR without regard to Rule 45" where the creditor elected to proceed under New York law).

*Second*, the M Entities' approach makes no sense.  Under the M Entities' interpretation of the rules, a court would be within its rights to summon a **person** into its courtroom for a citation to discover assets, and any challenge to jurisdiction of that person would need to be resolved in the court where the citation is to take place.  But a court does not have the right to compel the production of *documents*, which is clearly a lesser burden.  Indeed, if the M Entities' interpretation

---

[29] *See also FTC v. Trudeau*, 2013 WL 842599, at *9 (N.D. Ill. March 6, 2013) (same); *Signature Fin. LLC v. Shtayner*, 2020 WL 6870817, at *9 (N.D. Ill. Nov. 23, 2020) (same).

were correct, it would mean that the recipient of a citation that sought both an appearance and the production of documents (like the Citations here) would have to object to that citation in two separate jurisdictions. That is nonsensical—which presumably is why the M Entities do not cite a single case where this has ever happened.

### B.    The M Entities Waived any Right to Challenge the Procedural Propriety of the Citations.

Even if the Motion to Quash had some basis in the law (it does not) and Rule 45 was applicable (it is not), the Motion to Quash is procedurally improper in at least *three* respects.

*First*, this Court is not the proper forum to adjudicate the motion to quash. It is black-letter law that since the substantive changes to Rule 45, effective December 1, 2013, "subpoena-related motions and applications are to be made to the court where compliance is required[.]" Fed. R. Civ. P. 45 (Advisory Committee Notes to 2013 Amendment); *Clem v. Schultz*, 2022 WL 814200, at *2 (D. Colo. Mar. 17, 2022) (holding that "the district where compliance [with the subpoena] is required is the District of Nebraska, and only that court can compel [subpoena recipient's] attendance at his deposition.")

Here, the place of compliance required by the Citations is Illinois. Specifically, both Citations compel the attendance of a representative of the M Entities before the Court in the Underlying Litigation and compel the production of documents in Chicago, Illinois. (Exs. 25-26.) For over a decade, numerous federal courts throughout the country have systematically denied motions to quash subpoenas which compel compliance in other locations. *See, e.g.*, *Semex All, v. Elite Dair Genomics, LLC*, 2014 WL 1576917 (S.D. Ohio Apr. 18, 2014) (finding the court "lack[ed] the power" to quash the subpoenas, which required compliance in the Northern District

of Illinois).[30]  As a result, even if the M Entities were correct and Rule 45 applied to the Motion

to Quash (again, it does not), this Motion it still pending in the incorrect court and should be denied

on that basis.

*Second*, the M Entities' objections and Motion to Quash are untimely.  Rule 45(d)(2)(B)

states that objections "must be served before the earlier of the time specified for compliance or 14

days after the subpoena is served."  *See also Ott v. City of Milwaukee*, 682 F.3d 552, 558 (7th Cir.

2012) ("Rule 45 require[s] the recipient of a subpoena to raise all objections at once, rather than

in staggered batches, so that discovery does not become a 'game.'") (citation omitted); *Trudeau*,

2013 WL 842599 at *8 ("Objections must be raised before the earlier of the time specified for

compliance or 14 days after the subpoena is served.").  The deadline applicable to the Citations

passed on January 28, 2025 (14 days after service of the Citations).  Under Rule 45(d)(3), the Court

may only quash a subpoena on a "timely motion."  The Motion to Quash is not timely, having been

filed approximately eight months *after* the Citations were served.  *See, e.g., Flagstar Bank, FSB v.

Freestar Bank, N.A.*, 2009 WL 2706965, *3 (N.D. Ill. Aug. 25, 2009) ("[C]ourts have held that 'a

motion to quash must be made at or before the time of compliance.'") (citation omitted).

Accordingly, the M Entities have waived their objections.

*Finally*, when a party answers a citation, it waives jurisdictional or venue-related

objections.  *See, e.g., Bank of Hickory Hills v. Hammann*, 439 N.E.2d 1048, 1051 (Ill. App. Ct.

1982) (stating that "[a]ny questions of improper venue must be raised promptly" and noting that

conduct appearing to acquiesce to venue bars the respond from challenging that venue).  Moreover,

jurisdictional defenses are waived when a respondent gives the "reasonable expectation that it will

---

[30] *See also Fidelis Group Holdings, LLC v. Chalmers Automotive, LLC*, 2016 WL 4547994 (E.D. La. Sept.
1, 2016) (finding motion to quash was "improvidently filed" in Louisiana since subpoena required
production of documents in Delaware); *Tomelleri v. Zazzle, Inc.*, 2015 WL 400904 (D. Kan. Jan. 28, 2015)
(denied motion to quash two subpoenas requiring compliance in California and New York);

defend the suit on the merits." *Gates v. Syrian Arab Republic*, 2013 WL 1337214, *3 (N.D. Ill. Mar. 29, 2013). In a situation (like this one) where there are multiple citations to the same party, "the second citation issued against respondent was merely an extension of the first citation." *CE Design Ltd. v. Homegrown Advertising, Inc.*, 2011 WL 10303450 (Ill. App. Ct. May 17, 2011) (holding that party that responded in writing to a citation waived jurisdictional objections).

Here, the M Entities' waiver is beyond dispute. For two years the M Entities have participated in the citation proceedings by meeting and conferring regarding the Citations, producing documents, and sitting for a citation examination. After years of participating in these proceedings (and obfuscating their involvement with the Judgment Debtors by releasing small sets of documents and continually trying to negotiate production under the Citations), the M Entities last-minute Motion to Quash is a transparent attempt to avoid revealing all required information regarding their involvement with Judgment Debtors and Judgment Debtors' assets. Moreover, the M Entities filed their answers to the Citations on April 10, 2025. (Underling Litigation, Dkt. Nos. 632-33.) There is no question that M Entities have waived the right to make any jurisdictional or venue based challenges.[31]

### D.    The Motion to Quash fails on the Merits.

#### 1.    The Citations Seek Documents That May Lead to the Discovery of Admissible Evidence.

For the reasons discussed above, this Court need not address the merits of the Motion to Quash. But even if the Court did so, the Motion to Quash should be denied. The Motion to Quash

---

[31] Even if the Court concludes that Rule 45 applies and is inclined to do anything other than deny the Motion to Quash outright, it should transfer the Motion to Quash to the Northern District of Illinois for disposition pursuant to Rule 45(f). *See, e.g.*, *In re Motion for Protective Order*, 2016 WL 4415008, at *2 (S.D. Ind. Aug. 18, 2016) (finding "exceptional circumstances" under Rule 45(f) and transferring motion for protective order to issuing court); *In re Pork Antitrust Litig.*, 2022 WL 1156726, at *3 (S.D. Ind. Apr. 19, 2022) (finding "exceptional circumstances" under Rule 45(f) based on "long-running, complex" underlying litigation).

asks the Court to "quash all aspects of the Citations that exceed the documents already produced

and issue a protective order against further requests by Plaintiff." (Motion to Quash, p. 19.) Thus,

the M Entities are not trying to limit the scope of the Citations—they are trying to avoid *any* further

production. But the Citations are appropriate and seek documents that may lead to the discovery

of admissible evidence. The M Entities have intentionally intertwined their business operations

with those of Judgment Debtors and cannot now complain about requests seeking to evaluate those

relationships. Successor liability is an appropriate line of inquiry for post-judgment citations. *See,*

*e.g.*, Underlying Litigation, Dkt. No. 674 (permitting "NHC to seek documents relating to its

successor liability theory."); *Sullivan v. Alpine Irrigation Co*., 2011 WL 1575617, at *5 (N.D. Ill.

Apr. 25, 2011) ("[N]ot only has the Seventh Circuit allowed judgment creditors to pursue

successor liability claims in supplemental proceedings, but other Illinois courts have as well.").

At this stage, NHC is under no obligation to demonstrate successor liability. Instead, the

only pertinent question is whether the information and documents NHC is requesting *could* relate

to its theory of successor liability.[32] The only viable answer to this question is yes. Accordingly,

there is no basis to quash the Citations.

---

[32] Various courts have permitted discovery into broad topics, including "indicia of continuity" between the debtor and the successor entity, *Roofers' Pension Fund v. Robinson Roofing, Inc.*, 2010 WL 4962820, at *4 (N.D. Ill. Dec. 1, 2020), or whether there is continuity of business operations, use of the same facilities, the same jobs under the same conditions, the same workforce, the same supervisors, the same machinery, equipment, and methods of production, and the same offered services, *Trustees of Chicago Painters and Decorators Pension Fund v. NGM Services, Inc.*, 2014 WL 7330939, at *3 (N.D. Ill. Dec. 22, 2014). Moreover, courts outside the supplemental proceeding context have also permitted broad discovery into successor liability issues. *See*, *Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1, Pension Trust Fund*, 2019 WL 454324, at *3 (N.D. Ill. Feb. 5, 2019) (permitting discovery for successor liability claims into "customers, vendors, and projects" and "the management, administration, employment, financial records, property and assets, business locations, and communications regarding [the plaintiff]); *Moriarty v. LSC Ill. Corp.*, 1999 WL 1270711, at *3 (N.D. Ill. Dec. 29, 1999) (finding Rule 26(b) permits a broad range of discovery and that plaintiff was entitled to discovery on remittance reports, payroll records, tax returns, ownership interests, and employee information).

Indeed, a mountain of evidence *already* exists that M Sourcing is the successor of Centaur and that Tsaparas has an ownership interest in one or more of the M Entities. Despite the efforts of Judgment Debtors and the M Entities to conceal this information, NHC has obtained emails, text messages, declarations, testimonial transcripts, and other documents showing that there may be successor liability. By way of non-exhaustive examples only, NHC sets forth the following:

- Van Senus was being paid directly by Tsaparas until sometime in 2024, at which point the M Entities began paying her directly *and adding it on to Tsaparas' compensation*. This reflects a clear collusive effort to avoid paying the Judgment while continuing with "business as usual" under the cover of M Sourcing.

- All e-mails that NHC has seen during the purported "transitional" period between Centaur and M Sourcing are exclusively from Centaur's email account. Even after M Sourcing allegedly began operations, Tsaparas and Centaur continued to use Centaur's email account, addresses, and server and Tsaparas continued to hold himself out as the CEO of Centaur.[33] (Ex. 13; Group Ex. 27; Ex. 28.)

- After the Judgment, Centaur continued to operate but eventually shifted to one or more new entities (including M Sourcing) to avoid payment on the Judgment. The personnel, tasks, and all other aspects of the projects remained the same; a new corporate name was inserted as part of the transition from Centaur to other entities. (Group Ex. 15.) The text messages demonstrate, among other things, that: (i) Centaur was continuing to operate long after the Judgment, (ii) Tsaparas set up forwarding from his Centaur email account, (iii) Tsaparas was instructing his assistant to simply replace "Centaur" in contracts with other entities, (iv) Tsaparas was telling people who previously contacted him at Centaur to use his new M Sourcing email address (on the same projects), (v) Tsaparas instructed his assistant to shut down the Centaur website shortly after post-Judgment proceedings began in the Lawsuit, (vi) Tsaparas told his assistant that her employment would begin with "JV/M" (presumably meaning "joint venture/M Sourcing") once "Centaur is cleaned up," (vii) Tsaparas instructed his assistant to create the M Sourcing logo using the Centaur logo as a baseline and put the logo on Centaur booklets, (viii) M Sourcing was using Centaur's old server, and (ix) payments were being made to M Sourcing on projects that were initiated by Centaur.

- In January 2023, Tsaparas (still using his Centaur email address that listed him as the CEO) bragged to his landlord about new projects, stating that "We purchased the Aman Hotel in Jackson Hole WY that we are preparing for a major rehabilitation" and "We purchased the

---

[33] A true and correct copy of multiple emails are attached hereto as **Group Exhibit 27**. A true and correct copy of an email exchange between an employee of M Development and Amundsen Davis is attached hereto as **Exhibit 28**.

last palace on Villanueva and meeting with architects. It will be a magnificent project."[34] (Ex. 29.)  From the email alone it is unclear exactly who Tsaparas means by "we," but news articles provide additional context and reflect that the Aman Hotel was actually purchased by M Development.  *See* "M Development marches to its own beat," Hotels Magazine, available at https://hotelsmag.com/news/m-development-marches-to-its-own-beat/ (last visited August 28, 2025).

• M Development, Tsaparas, and Sachse Construction (a general contractor that works with Tsaparas and the M Entities on dozens of projects) have publicly held out Tsaparas  as a "principal" of M Development.  *See* https://www.sachseretailsummit.com/spiro-tsaparas (last visited August 28, 2025).

• In a sworn declaration, disinterested third party Brett Hall, who had done business with Tsaparas and Centaur since 2020, attested that Tsaparas told him he was taking an ownership interest in various projects related to the M Entities, but the deal was being structured in such a way as to avoid payment obligations associated with the Underlying Litigation.[35]  (Ex. 30.)

• The court in Underlying Litigation has acknowledged that "I completely agree that pretty much everything that has happened on the defendants -- I don't say the defense side because that includes the lawyers -- on the defendants' side of the case stinks, smells, you know, looks like the fish are starting to rot or whatever. It wouldn't surprise me at all if there were some tacit understanding between M Development and Mr. Tsaparas that everything that's gotten added on, everything that's gotten advanced after the note gets added on in some way so it's still owed."[36]  (Ex. 31 at 11:11-19.)

This is just a sampling of the evidence that gives NHC a reasonable belief that successor liability may apply here, and NHC is entitled to the requested information related thereto and to enforce its Judgment accordingly.

As for the self-serving Declaration of Hunt, the Court should give it no credence whatsoever because it is flatly contradicted by the evidence above.  It also makes no sense.  Hunt claims that "[t]he M Entities have not worked with Centaur since 2022"  (Hunt Decl., ¶ 8), but the reality (as set forth above) is that M Sourcing was closely linked to Centaur *long* after 2022,

---

[34] A true and correct copy of an email exchange between Tsaparas and his landlord are attached hereto as **Exhibit 29**.

[35] A true and correct copy of the Declaration of Brett Hall is attached hereto as **Exhibit 30**.

[36] A true and correct copy of portions of the June 10, 2025, hearing transcript is attached hereto as **Exhibit 31**.

including (but not limited to) sharing: (i) email accounts, (ii) servers, (iii) personnel, and (iv) the same projects.[37]  Moreover, it is telling that NHC has never seen an M Sourcing email address associated with Hunt—in fact, the only two people with M Sourcing email addresses in the documents that have been produced to NHC are Tsaparas and Van Senus, both of whom previously worked for Centaur.  Additionally, it notable that, based on certain records received to date, M Sourcing appears to operate primarily out of Greece, where Tsaparas is from.  At most, Hunt is an owner on paper only.  Based on the existing evidence, NHC is more than justified in seeking documents to assess the veracity of the claims made by Hunt in his declaration.

Moreover, the Hunt Declaration refers to specific documents that Hunt allegedly searched for in response to the Citation, but conspicuously neglects to mention any searches for email or text messages.  With respect to email communications, the M Entities have produced a *de minimis* amount of email communications to date.  Those email communications have consisted largely of correspondence regarding the increasing debt Tsaparas and/or Triton owe to M Development, the documentation of that same debt, and ministerial payroll communications.  To date, the M Entities have not produced any substantive amount of email communications: (i) between Hunt and Judgment Debtors, (ii) regarding the specific projects worked on by Centaur (under the purported direction of the M Entities), Triton, M Sourcing, Tsaparas, or any other former Centaur employees, or (iii) regarding the ownership interest of the M Entities or any affiliates of the M Entities, inclusive of whether or not Judgment Debtors possess an ownership interest.

---

[37] Unfortunately, and as noted above, Hunt has given false testimony on this subject before.  Hunt's attempts to explain away that false testimony fall flat—he address Tsaparas' failure to update his signature block (still referring to him as the CEO of Centaur in October 2022)—yet curiously ignores the more significant evidence that Tsaparas is using Centaur's email  address and server while allegedly working as a consultant through Triton and/or as an employee of M Sourcing.  NHC has requested all emails to and from Tsaparas in connection with the Triton invoices and other projects and tasks undertaken by Tsaparas to further establish this point.

With respect to text message communications, to say that Tsaparas is a prolific communicator via text message is an understatement. By way of example, Van Senus produced more than *300 pages* of text message communications between her and Tsaparas. The fact that Hunt has not identified, and the M Entities have not produced, a single text message is a strong indicator that the production is not complete.   And as reflected above, text message communications are some of the most critical in this case.

### 2.    The M Entities' objections are without merit.

To the extent the M Entities make objections, they are without merit.  It is notable that despite moving to quash the Citations, the M Entities also claim that they have complied with it. (Motion to Quash, p. 5.)  But the M Entities also acknowledge (in a footnote) that the Motion to Compel identified two groups of documents that they had not previously produced.  (*Id.* at n. 3.) Those two groups of documents are just the tip of the iceberg, and the M Entities' approach shows exactly why the Motion to Quash should be denied.  The M Entities are obligated to produce *all* responsive documents, and they clearly have not so.  NHC should not bear the burden of using discovery from other entities to identify gaps in the M Entities' production and repeatedly contacting the M Entities to demand a fulsome production.  Such staggered productions are precisely the sort of "game" that the Seventh Circuit warned against.  *See Ott*, 682 F.3d at 558.

The M Entities assert broad objections which do not address the responsive documents that the M Entities have refused to produce.  By way of example only, the M Entities have not produced:

- Any text messages with the Judgment Debtors, which are critical to show the nature of the relationships between the parties, particularly given Tsaparas' tendency to communicate by email.  Absent text messages, any suggestion in the Motion to Quash that the M Entities have produced "all communications" (Motion to Quash, p. 13) is inaccurate.

- All documents related to financial payments to the Judgment Debtors, which are critical to show the flow of money between the M Entities and the Judgment Debtors.

- Any emails with Tsaparas or anyone else employed by Centaur during the operative period, which are critical to understanding the transition from Centaur to Triton to M Sourcing. *This is particularly relevant given that NHC knows from other third parties that Centaur email accounts were still being used during the relevant period and even after M Sourcing was formed.*

- Any documents from the server that originally belonged to Centaur and was transitioned to use by M Sourcing.

- Any documents related to projects that Centaur was working on that were transitioned to M Sourcing, and how that transition occurred.

- Any documents related to the alleged consulting work that Triton did for M Development.

All of these documents are highly likely to lead to the discovery of admissible evidence and other than broad general objections, the M Entities have not explained how production of these documents would be unduly burdensome or not proportionate to the needs of the case, particularly in light of the successor liability issues. In many instances, the M Entities fall back on the oft-repeated assertion that Hunt is the sole owner of the M Entities as the basis for withholding documents. (*See, e.g.,* Motion to Quash, pp. 15, 17, 18.) But as set forth in detail above, NHC has a significant basis to doubt the accuracy of that assertion and is entitled to assess its veracity through document discovery.

Finally, to the extent the M Entities have genuine concerns about the confidentiality of the documents requested, the proper course is to invoke the protective order in this case, not quash the Citations.

## IV.    Conclusion

For the foregoing reasons, the Motion to Quash should be denied, or, *in the alternative*, transferred to the United States District Court for the Northern District of Illinois.

Dated:    September 3, 2025           /s/ Bryan K. Clark
                                      Vedder Price P.C.

                                      Daniel P. Jackson
                                      Bryan K. Clark
                                      Zachary J. Watters
                                      djackson@vedderprice.com
                                      bclark@vedderprice.com
                                      zwatters@vedderprice.com
                                      222 North LaSalle Street
                                      Chicago, IL 60601
                                      T:  (312) 609-7500
                                      F:  (312) 609-5005

                                      *Attorneys for NHC LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Bryan K. Clark*

Attorney for NHC LLC